# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| OCEAN STATE TACTICAL, LLC, d/b/a BIG BEAR HUNTING AND FISHING SUPPLY; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER | : : : : : | |
| *Plaintiffs*, | : : | |
| v. | : : | C.A. NO. 1:22-cv-00246-JJM-PAS |
| PETER F. NERONHA (official capacity), DARNELL S. WEAVER (official capacity) | : : : : | |
| *Defendant.* | : | |

## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

PETER F. NERONHA
ATTORNEY GENERAL
Sarah W. Rice, Bar No. 10465
Keith Hoffmann, Bar No. 9874
Special Assistants Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Extension 2054 / 1882
Fax: (401) 222-3016
SRice@riag.ri.gov
KHoffmann@riag.ri.gov

*Attorneys for Defendants Peter F. Neronha and Darnell S. Weaver, in their official capacities*

## TABLE OF CONTENTS

Page No.

INTRODUCTION ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND................................................ 6

A. Rhode Island Statutory and Regulatory Background...................................... 6

B. Historic Regulation of Firearms in Reaction to Societal and Technological Change............. 9

    Colonial Period................................................................................................ 9

    Revolutionary and Early America ................................................................ 12

    Antebellum and Civil War Era ..................................................................... 13

    Civil War and Reconstruction ...................................................................... 14

    Evolving Weapons Regulation from Reconstruction to the Present Day ............... 20

C. Large Capacity Magazines ............................................................................ 21

D. Plaintiffs' Claims .......................................................................................... 24

STANDARD OF REVIEW ................................................................................... 26

ARGUMENT ......................................................................................................... 27

I.     PLAINTIFFS CANNOT ESTABLISH A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS. ... 27

     A.     A Restriction on Large Capacity Magazines Is Consistent With the Second Amendment.................... 27

          1.     Restrictions on Large Capacity Magazines Do Not Burden the Right Articulated In the Second Amendment's Plain Text................ 29

          2.     Large Capacity Magazines are "dangerous and unusual."........................ 32

          3.     Any Burden Imposed by the Restriction on the Right to Keep and Carry Arms is Analogous to Burdens Imposed Throughout History................ 44

     B.     Rhode Island's Large Capacity Magazine Restriction Does Not Take Private Property for Which Compensation Is Due............. 49

          1.     The State May Protect the Public from Dangerous Items Without Implicating the Fifth Amendment's Takings Clause. .............................. 49

          2.     The Large Capacity Magazine Restriction Has Not Deprived Ocean State Tactical of All Economically Beneficial Use of Property. .............. 51

i

  C.  Rhode Island's Large Capacity Magazine Restriction Is Consistent with Due Process, Whatever the Theory. ............................................................................ 53

II. PLAINTIFFS HAVE ALSO FAILED TO DEMONSTRATE THE REMAINING THREE FACTORS NECESSARY TO OBTAIN A PRELIMINARY INJUNCTION ....................................................... 57

  A.  Ocean State Tactical Has Not Demonstrated Irreparable Harm. .......................... 57

  B.  The Public Interest and Balance of the Hardships Weigh in Favor of the State... 59

CONCLUSION....................................................................................................................... 61

## TABLE OF EXHIBITS

Exhibit No.

Declaration of Randolph Roth ........................................................................... Exhibit A

Declaration of Michael Vorenberg ..................................................................... Exhibit B

Declaration of Edward Troiano .......................................................................... Exhibit C

Collection of Aftermarket Compliant Magazines............................................... Exhibit D

Collection of Commercially Available Modification Kits................................... Exhibit E

Office of the State's Attorney for the Judicial District of Danbury, Report on the Shootings at Sandy Hook Elementary School and 39 Yogananda Street, Newtown, Connecticut on December 14, 2012 (2013) ..................................................... Exhibit F

Declaration of Dennis Baron ............................................................................. Exhibit G

Department of the Treasury, Bureau of Alcohol, Tobacco, Firearms & Explosives, Report and Recommendation on the Importability of Certain Semiautomatic Rifles (Jul. 6, 1989) ........................................................................................................... Exhibit H

Department of the Treasury, Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles (April 1998)..................................................... Exhibit I

Declaration of Megan L. Ranney....................................................................... Exhibit J

Christopher S. Koper, Daniel J. Woods and Jeffrey A. Roth, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* 18-19, Report to the National Institute of Justice, United States Department of Justice (June 2004)........................................................................................... Exhibit K

## INTRODUCTION

Rhode Island's legislature has enacted restrictions on the ownership and use of large capacity magazines in response to a growing public health and safety crisis of gun violence, worsened by technological changes making it cheap and easy for civilians to access dangerous and unusual weapons suited best for military use.  R.I. Gen. Laws § 11-47.1-1 to -3.[1]  At the time Rhode Island enacted the statute in June 2022, seven circuits had upheld similar magazine capacity restrictions against challenges that they impeded the individual right to armed self-defense. *Duncan v. Bonta*, 19 F.4th 1087, 1099 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.* ("*ANJRPC*"), 910 F.3d 106, 113 (3d Cir. 2018), *cert. granted, judgment vacated sub nom.*,  *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Bruck,* 142 S. Ct. 2894 (2022); *Kolbe v. Hogan*, 849 F.3d 114, 120 (4th Cir. 2017), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); 849 F.3d 114; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("*NYSRPA*"), 804 F.3d 242 (2d Cir. 2015) *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

*New York State Rifle & Pistol Association v. Bruen*, decided three days after Rhode Island's large capacity magazine restriction was enacted and the day the original complaint in this matter was filed, upended a decade of Second Amendment jurisprudence, clarifying that means-end

---

[1] All further statutory citations will be to R.I. General Laws, unless otherwise specified.

scrutiny is not a proper jurisprudential lens through which to view regulations touching on the individual right to armed self-defense. 142 S. Ct. 2111, 2127 (2022). *Bruen* set forth a new test, under which the first inquiry is whether "the Second Amendment's plain text covers" the regulated conduct. *Id.* at 2126. If it does, the government may nevertheless demonstrate that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* "To be sure, '[h]istorical analysis can be difficult; it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" *Id.* at 2130 (quoting *McDonald v. City of Chicago*, 561 U.S. 561, 803-04 (2010) (Scalia, J., concurring)). Practically, the test articulated by *Bruen* requires the court to apply "'various evidentiary principles and default rules' to resolve uncertainties" based on the "party presentation" of the relevant historical evidence. *Id.* at 2130 n.6. No court has had the opportunity to apply this test on a full evidentiary record to large capacity magazine restrictions. *But see Rocky Mountain Gun Owners v. The Town of Superior, et al.*, No. 22-01685 (D. Colo. Jul. 22, 2022) (granting temporary restraining order to broader ordinance including assault weapons ban without evidentiary submissions). Given the state of the law at the time, prior litigation did not focus on developing a record to support a robust text and history analysis, but certain factual findings related to the nature of large capacity magazines by the circuit courts are instructive in their unity in identifying these weapons as having dangerous and unusual characteristics. *See, e.g.*, *Duncan*, 19 F.4th at 1104–06; *Worman*, 922 F.3d at 37; *ANJRPC*, 910 F.3d at 121 n.25; *Kolbe*, 849 F.3d at 145; *Heller II*, 670 F.3d at 1262 (each finding large capacity magazines not necessary or appropriate for armed self-defense).

Restrictions on large capacity magazines, like Rhode Island's, pass constitutional muster under the new *Bruen* test as well as the old. These restrictions do not implicate individuals' Second

Amendment rights to own and carry firearms for personal self-defense because they do not relate to arms at all, but only accessories long understood to be ancillary to arms.  Individuals remain free to own and carry whatever lawful firearms they wish for self-defense, and lawful ammunition in whatever quantities they might desire, subject only to the restriction that magazines must be replaced or reloaded every ten rounds.  *Bruen* did not stand for the proposition that any regulation even incidentally related to firearms is impermissible; restrictions, like those on large capacity magazines, that only curtail use of firearms or firearms accessories in a manner compatible with the armed right to self-defense, have long been part of our historic tradition.[2]

Plaintiffs (hereinafter collectively "Ocean State Tactical") here seek an unqualified right to possess and use weapons of their choice, adorned with accessories developed for warfare. Ocean State Tactical asserts this right despite mounting and graphic evidence that these accessory-equipped weapons yield an unfair advantage against citizens who possess common weapons, such as semiautomatic handguns, for self-defense.  Ocean State Tactical claims this entitlement no matter how dangerous or unsuitable for common life such widespread possession would be, and with no basis on which to claim these accessories are used for, or amenable to, self-defense.  Such unfettered access to dangerous and unusual weapons, or the accessories that make otherwise common and lawful weapons dangerous and unusual, has never been part of the sweep of the Second Amendment.  An examination of the historical record reveals strong evidence of regulation of such weapons and accessories, especially where they create an unfair advantage for those willing to break social convention to use them to provoke violent conflict.

---

[2] To the extent that some circuit courts bypassed these textual and historic inquiries, or decided them summarily, those decisions should be revisited in light of full evidentiary records setting forth historic records and analyses.  *Bruen* recognized that even the historic record can be more fully illuminated through our system of "party presentation." 142 S. Ct. at 2030 n.6.

History is replete with regulations of firearms and firearms accessories, in Rhode Island and throughout the nation.  These regulations have varied considerably across both space and time, depending on the "general societal problem[s]," *Bruen*, 142 S. Ct. at 2131, confronting government.  Periods of relative social peace and low homicide, like the North during most of the Colonial Era, saw few regulations, but regulation soon followed after sharp increases in homicide rates and the use of concealed weapons in homicides—a phenomenon that appeared in different areas of the country at different times but which ultimately led to all states but Vermont enacting a concealed-carry restriction.  Capacity restrictions, whether through statute, cased law, or enforcement, have been part of United States history since weapons permitting one person to shoot more than ten rounds without reloading hit the scene in the mid-1800s.  As the record discussed herein, and supported by the declarations of expert historians, demonstrates, this history is not always discernible without significant contextual information.  However, appropriate context demonstrates that restrictions on capacity of firearms are part of a history and tradition of curtailing specific types of weapons or weapons accessories that pose more than the inherent danger of a right of armed self-defense and that work a fundamental unfairness in the average person's ability to exercise that right.  This memorandum therefore sets out the historical context of these regulations at some length.

Turning to the legal test for issuance of preliminary injunction, plaintiffs cannot meet their burden of demonstrating likelihood of success on the merits.  Under *Bruen*, large capacity magazine restrictions do not even reach the need for historic analysis. Because the large capacity feeding device restriction is aimed at firearms accessories, it does not fall within the Second Amendment's plain text, which is applicable only to "arms."  The capacity restriction does not regulate arms at all, and it does not prevent individuals from keeping or carrying operable firearms.

But even if this Court disagrees, the restriction is nevertheless within the history and tradition of firearms regulation in this country.  Large capacity magazines are accessories that make otherwise lawful semiautomatic weapons "dangerous and unusual" because they pose an enhanced danger and create an unfair advantage for criminals.  Lastly, restrictions on the manner of use of firearms are common in our historical tradition, and restrictions on magazine capacity fall within this rubric. For each of these reasons, plaintiffs cannot establish likelihood of success on the merits of their Second Amendment claim.

Plaintiffs' takings claims similarly provide no likelihood of success because when the government bans dangerous items, like adding a substance to the controlled substances act schedules, there is no taking.  Moreover, Rhode Island is not physically taking the magazines and plaintiffs retain economic value in their magazines—they may sell or modify the magazines, or move them to a jurisdiction where they remain legal.  The Takings Clause is not implicated by these normal exercises of the police power.

Lastly, plaintiffs also cannot establish irreparable harm or that the public interest or balance of equities land in their favor.  At most, plaintiffs have articulated only monetary harm.  Their leisurely pace in filing this motion belies any inherent, immediate irreparable harm to their Second Amendment rights, and any harm suffered by the requirement to modify, sell, or dispose of large capacity magazines would be remediable by economic damages.  Moreover, the legislature's judgment that the large capacity magazine restriction is in the public's interest is entitled to a presumption that the public will suffer harm if its duly enacted statute is enjoined.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   Rhode Island Statutory and Regulatory Background

Rhode Island has regulated firearms and firearms accessories since its earliest days as a colony. A brief history of Rhode Island-specific regulation is useful to understand the context of the large capacity magazine restriction at issue in this case.

Rhode Island, like most colonies, regulated firearms and firearms accessories from early days in order to provide for the need for collective self-defense on what was then a frontier. Rather than prohibiting certain firearms, Rhode Island and other colonies instead *mandated* that certain citizens be provided muzzle-loading black powder firearms and accessories in order to promote the defense of the colony. In 1638, Portsmouth Rhode Island's General Meeting adopted an Order that "every Inhabitant of this Island shall be always provided of one muskett, one pound of powder, twenty bulletts and two fademe of match, with Sword and rest and Bandeliers, all completely furnished." Minutes of a General Meeting (March 13, 1638) *in* 1 RECORDS OF RHODE ISLAND 54 (John Russell Bartlett, ed. 1856), available at Hathi Trust.[3] Later, similar laws were adopted in 1647 for the Colonie and Province of Providence and readopted in 1657. *Id.* at 147, 154.

But these early firearms and accessories regulations went beyond mandates. Colonial governments also regulated the safe storage of munitions. Rhode Island municipalities limited the amount of gunpowder an individual could store—in 1762 in Newport, for example, no one was

---

[3] Digital scans of copies of this work that reside at university libraries are available online for viewing by the public through the Hathi Trust Digital Library, https://www.hathitrust.org/. Viewing and limited download capabilities for selected works are available even without institutional affiliation. Throughout this memorandum, citations to works so available shall be denoted as "available at Hathi Trust." Given the practical problems posed by applying the *Bruen* text and history analysis, directions such as this one to locate sources shall be given where available in an attempt to increase the accessibility of these necessary arguments to the public. *See Bruen*, 142 S. Ct. at 2177 (J. Breyer, dissenting) ("Do lower courts have the research resources necessary to conduct exhaustive historical analyses in every Second Amendment case?").

allowed to possess more than 25 pounds of gunpowder and had to bring excess to the municipal storage facility outside of town, while in 1798 in Providence, no one was allowed to possess more than 28 pounds of gunpowder outside of officially designated storage and any gunpowder was required to be properly contained in a tin vessel.

Rhode Island enacted other restrictions limiting access to and use of weapons in the 19th Century.  In 1893, Rhode Island prohibited the carrying of concealed weapons, including "any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description." 1893 R.I. Pub. Laws 231.

The Rhode Island General Assembly has banned possession of certain firearms and accessories associated with criminal activity for nearly one hundred years.  In 1927, Rhode Island outlawed the possession of machine guns, which it defined at the time as any semiautomatic firearm that was capable of shooting more than 12 rounds without reloading.[4] 1927 R.I. Pub. Laws 256.  Machine guns are still banned in almost all circumstances and violation of the ban on manufacture, sale, purchase or possession of a machine gun is punishable by a sentence of imprisonment of up to ten years.  § 11-47-8(a).  At the same time, silencers were banned; a ban that has persisted to this day.  § 11-47-20.

There are myriad other weapons that Rhode Islanders may not possess: sawed-off shotguns, sawed-off rifles, ghost guns, undetectable firearms, any firearm produced by a 3D printing process, bombs, and bombshells.  § 11-47-8(b), (e); § 11-47-21 (with an enumerated exception for blasting

---

[4] In 1959 the law was amended to exempt firearms capable of shooting between 12 and 14 rounds. 1959 R.I. Pub. Laws 260.  Later, in the 1970s, the modern definition, which defines machine guns by their ability to fire more than once with one pull of the trigger, was enacted. 1975 R.I. Pub. Laws 738.

in commercial use).  In addition to a categorical ban on certain weapons, Rhode Island also bans manufacture, sale, purchase or possession of certain weapons accessories.  Rhode Island has banned silencers since 1927, which are broadly defined as a "device for deadening or muffling the sound of a firearm when discharged." § 11-47-20.  The categorical, possessory ban on silencers is punishable by imprisonment of not less than one year and one day. *Id.*  Similarly, Rhode Island bans "any bullets which have steel inner cores or cores of equivalent hardness and truncated cones," which are designed as "armor-piercing or metal-piercing bullets." § 11-47-20.1. Possession (or any prohibited act with respect to armor-piercing bullets) is punishable by up to three years imprisonment. *Id.*  Moreover, it is illegal for a Rhode Islander to "possess a bump-fire device, binary trigger, trigger crank, or any other device that when attached to a semiautomatic weapon allows full-automatic fire." § 11-47-8(d). When the statute prohibiting these accessories was enacted in 2018, it provided for a ninety-day window for those currently in possession to "sell, destroy, or otherwise remove" the prohibited accessories from Rhode Island.  *Id.*  After that date, possession of such accessories that impermissibly modify the fire rate of semiautomatic firearms became a felony punishable by a term of imprisonment not less than one or more than 10 years. *Id.*

In June 2022, the Rhode Island General Assembly added large capacity feeding devices to the list of accessories that are prohibited.  § 11-47.1-3.  A large capacity feeding device, also referred to as a large capacity magazine, is "a magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device which is capable of holding, or can readily be extended to hold, more than ten (10) rounds of ammunition to be fed continuously and directly therefrom into a semiautomatic firearm" but does not include a firearm's "attached tubular device which is capable of holding only .22 caliber rimfire ammunition." § 11-47.1-2(2).

Like some of the other prohibitions of weapons and accessories, the ban on large capacity magazines has exceptions.  Not only does it exempt certain tubular magazines, but it also contains exceptions for active-duty police and military otherwise authorized to possess such accessories, along with qualified retired police officers. § 11-47.1-2(2); § 11-47.1-3(2), (3). And, as is evident from the above definition, ammunition feeding devices for weapons like bolt-action rifles and shotguns, which are not semiautomatic because they require manual intervention before they are ready to fire again, are not subject to the restriction. § 11-47.1-2(2).  Rhode Islanders who currently possess a large capacity feeding device may transfer, sell, relocate, or permanently modify the device such that it can hold no more than ten rounds of ammunition and remain in compliance with the law.  § 11-47.1-3(b).  Nothing in the June 2022 law sets limits on the amount of ammunition or number of compliant magazines a person can possess (although Rhode Island does have laws regulating storage, carry, and sale to minors related to ammunition).  That is, both before and after the law, a person with the appropriate permit may concealed-carry a semiautomatic handgun with the ability to fire many dozens of rounds of ammunition.  The only practical difference is that to use more than ten rounds of ammunition, a shooter will need to switch magazines or re-load.

## B.    Historic Regulation of Firearms in Reaction to Societal and Technological Change

Key to *Bruen*'s new analysis is an evaluation of relevant firearms regulation in the context of United States history.  In support of the State defendants' opposition, two historians have provided declarations on this topic.  What follows is a summary of their findings, along with other relevant information from the historical record.

### Colonial Period

While European colonists restricted firearms ownership of Native Americans and Black Americans, these restrictions rarely extended to colonists of European ancestry themselves. Declaration of Randolph Roth, Exhibit 2 (hereinafter "Roth Decl.") ¶ 7, attached as Exhibit A.

Between England's Glorious Revolution and through the French and Indian War (which ended in 1763), the European colonists enjoyed a period of political stability and trust in government. *Id.* Homicide rates on the eve of the Revolution were low, and firearms only featured in about 10-15% of domestic and nondomestic homicides. *Id.* ¶ 8.

The firearms of the era were muzzle-loading; capable of lethality and accuracy at short range, but liable to misfire and, with the exception of rare double-barreled pistols, incapable of firing multiple shots without reloading. *Id.* ¶ 9. Reloading was time-consuming, requiring quite a bit of skill and experience—so too initial loading; a muzzle-loader, to be fired, requires a clean barrel, and ready access to powder, wadding, and shot or ball. *Id.* If all those materials were accessible, the would-be shooter would need to pour powder down the barrel, shove wadding down the barrel to hold the powder in place, and drop or ram the shot or ball down the barrel onto the charge. *Id.* The firing mechanism too required readying and needed to be replaced with fresh flint. This was a delicate process easily interrupted by vagaries like the weather, because black powder retains moisture, causing any number of problems. *Id.* For this reason, both familial homicides, which were relatively rare, and murders of servants, enslaved people, and slavers, which were not, were much more often committed with weapons close at hand like whips, sticks, hoes, shovels, axes, knives, feet, or fists. *Id.* ¶ 10.

In the situations where colonists were armed in anticipation of conflict—when anticipating hostile encounters with Native Americans, in periods of political instability, and when perpetrating violence against escaping enslaved people—murders were indeed committed with firearms. *Id.* ¶ 11. These represented encounters where the colonists intended to seek confrontation, and in many encounters with Native Americans and in all encounters with escaping enslaved people, by their very nature, were offensive uses of firearms. *See id.*

10

Although homicide from firearms in daily life remained a relatively rare societal problem during this period, European colonists nevertheless had reason to regulate firearms and firearms accessories.  For one thing, gunpowder was highly regulated.  In Boston, for example, a statute requiring gunpowder to be kept in a communal magazine outside of town walls was enacted in 1706.  1706 Mass. Acts 588, https://archive.org/details/actsresolvespass9214mass/page/588/mode/2up.  As explained above, Rhode Island also regulated the storage of gunpowder in the early Colonial period and limited the amount individuals could keep outside of the communal storage facilities.

A second type of regulation was common in this period and through the Revolution. Colonies and states through the early 1800s regulated militias, including a bevy of laws related to the type of working firearm each able-bodied white man was required to own and when those arms could be used (not for hunting in 1799 Maryland) and when and where they were permitted to be loaded.  Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 J. L. & CONTEMP. PROBS. 75-76 (2017), https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=4825&context=lcp.  Requirements for individuals to provide equipment for militias and later for the army raised by the Continental Congress included accessories like "[a] cloak," "[a] saddle; saddlecloth, breastplate, crupper, saddlestraps and pad," "saddlebags connected by two broad straps, in the common fashion, and not a portmanteau," and "[a] cartridge-box to buckle round the waist, with twelve tin pipes for the cartridges."  Congress Undertakes to Raise a Cavalry Corps., *in* 2 PUBLIC PAPERS OF GEORGE CLINTON, FIRST GOVERNOR OF NEW YORK 827, 828 (Wynkoop Hallenbeck Crawford Co. ed., 1900), available at Hathi Trust.

11

**Revolutionary and Early America**

During the Revolutionary period, more civilians went about armed and there were conflicts among roving bands of Tories and Patriots. Roth Decl. ¶ 13. But immediately after the Revolution, homicide rates once again declined as political peace prevailed in the North. *Id.* Weapons restrictions were largely absent during this time in the Northern states, apart from restrictions on dueling enacted in the wake of Alexander Hamilton's death, which served as an example of a high-profile threat that the practice posed to the nation's nascent public life, and was therefore regulated. *Id.* ¶ 15.

By contrast, in a number of states with legalized slavery, laws restricting weapons use did appear during this period. *Id.* ¶ 16. Homicide rates soared in these states after the Revolution, which increased social tensions in the region. *Id.* Abolitionist ideals surfaced in the Revolution led to dashed aspirations for Black Americans and fear from white slavers, and there was an attendant increase in deadly disputes and interracial killings. *Id.* Accordingly, the proportion of homicide by firearm also increased, as individuals armed themselves in anticipation of conflict. *Id.*

Technology also advanced during this period. Percussion-lock mechanism pistols used a sealed primer and reduced the risks of corrosion if kept loaded, a disadvantage of earlier black powder weapons. *Id.* ¶ 18. New types of knives like dirks and Bowie knives had longer blades designed expressly for fighting, rather than hunting or utility, and came with features like crossguards meant to protect combatants' hands and clip points which are more well-suited to cutting or stabbing. *Id.*

Concealable weapons like pistols, dirk knives, Bowie knives, swing-blade knives and switchblades surfaced as the weapon of choice in this period in the South. *Id.* ¶ 17. A criminal indictment in Georgia at the time described the practice of "the young the middle aged and the

aged" arming themselves with concealed weapons for alleged purposes of self-defense, "when in fact being so armed they frequently insult others with impunity . . . hence we so often hear of the stabbing shooting & murdering so many of our citizens." *Id.* The Louisiana Supreme Court similarly described the problem of concealed weapons being used to gain "secret advantages" over others. *Id.*

Virginia, Kentucky, Louisiana, Indiana, Arkansas, and Georgia therefore acted to restrict the carry of concealed weapons, including, depending on the state, fighting knives, pistols, or both, between 1813 and 1838. *Id.* ¶ 19. These new laws differed from earlier restrictions on possession or carrying because they applied to *everyone*, not just Black Americans or Native Americans. *Id.* Georgia also prohibited the sale and keeping of such weapons, with the exception of larger horseman's pistols which could not be concealed. *Id.* Virginia, Kentucky, Louisiana, Indiana, and Arkansas' laws were also strict: there were no circumstances where concealed carry was permitted under these laws.[5] *Id.*

### Antebellum and Civil War Era

In the late 1840s and 1850s, homicide rates exploded in all areas of the United States, including in the North. *Id.* ¶ 21. During this period, the United States became the most murderous affluent society in the world, as it remains today. *Id.* Like previous periods of instability, the proportion of homicides committed with firearms also increased. *Id.* ¶ 23. In the early years of the crisis of the mid-nineteenth century, new weapons technologies were not widely owned and concealable fighting knives and percussion-cap pistols remained the primary murder weapons. *Id.*

---

[5] Of course, concealed carry laws proliferated past this period and by the early twentieth century; all states except Vermont prohibited concealed firearms or severely restricted their possession. Roth Decl. ¶ 27. As explained above, Rhode Island enacted a similar restriction in the 1890s.

Samuel Colt's cap and ball revolver was a multi-shot weapon invented in 1836, which enabled the shooter to fire five or six shots in rapid succession and to reload with the second cylinder.  *Id.* ¶ 24.  Loading in the first place remained a fairly onerous task, however, because it still required the user to pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod.  *Id.*  These cap and ball revolvers, like muzzle-loaders, could not be safely stored loaded for long periods of time.  *Id.*  By contrast, Smith and Wesson's seven-shot .22 caliber rimfire revolver, invented in 1857, could be, because of its innovation in using rimfire ammunition, which sealed the corrosive powder and included the primer.  *Id.* ¶ 25.  But these weapons did not have eleven-or-greater capacities.  *Id.* ¶¶ 24, 25.

### Civil War and Reconstruction

Throughout the Civil War and Reconstruction, although high-capacity weapons became available, due to their dangerous and unusual nature their use remained almost entirely confined to military and state police forces and the government sought to prevent civilian use (which remained exceedingly rare).  Declaration of Michael Vorenberg, Exhibit 2 (hereinafter "Vorenburg Decl.") ¶¶ 2-6, attached as Exhibit B.  During the Civil War, sidearms like the six- and seven-shot revolvers described above, were available, but none held more than ten rounds.  *Id.* ¶ 15.  Similarly, the United States Army and Confederate army approved the adoption of two types of repeating rifles, the Spencer Rifle and the Sharps Rifle.  *Id.*  The Spencer was capable of firing 4 rounds without reloading and the Sharps was capable of firing 7 rounds without reloading.  *Id.*  These weapons were known as Spencers, Sharps, or "repeaters" or "repeating rifles."  *Id.*  On the cusp of the war, in 1860, a new, higher-capacity rifle was invented called the Henry Rifle.  *Id.* ¶ 14.  The Henry Rifle was closely followed by a model made by Winchester Repeating Rifle, sometimes called the Winchester 66 (after its release in 1866), which was followed by an update in 1873, the Winchester 73.  *Id.*  All three of these rifles "held fifteen rounds in a chamber fixed within a stock

14

just below the rifle barrel; . . . used a lever below the trigger to eject spent shells and load new rounds;[6] and . . . were easily reloaded." *Id.* "[I]n a class of their own, due to their high capacity, they were generally known only as Henrys or as Winchesters," not as repeaters or repeating rifles. *Id.* ¶ 15.

In the United States, Henry-Winchesters were first marketed primarily to pro-Union military units and state militias up until 1866. *Id.* ¶ 17. They were never officially adopted by the U.S. War Department; instead, certain units bought them for their soldiers or they were purchased by soldiers themselves. *Id.* The Confederate War Department also did not adopt Henry-Winchesters, leading a Confederate soldier to express his regret at not having access to "that damned Yankee rifle that can be loaded on Sunday and fired all week." *Id.* ¶ 18. After the war, civilian ownership of Henry-Winchesters was uncommon in the United States. *Id.* ¶ 20. According to a U.S. army report, only 808 Henrys were purchased by exiting soldiers as opposed to 8,289 Spencer Carbines. *Id.* Ultimately, perhaps 10,000 Henrys, primarily in the possession of retired military personnel, remained in circulation in a nation of 35 million people immediately after the war. *Id.* ¶ 21.

In 1866, the United States Congress passed the Fourteenth Amendment. *Id.* ¶ 7. The aftermath of the Civil War left large social divisions in the country and the federal government was left with the major project of "getting 'the seceded States, so called,' which were 'out of their proper practical relation with the Union,' back into their 'proper practical relation' with the Union." *Id.* ¶ 22. Between 1866 and 1871, these states were each admitted back into the Union,

---

[6] Winchesters and other repeating rifles of the time were not semiautomatic—they required a manual step (here lever-action) between firing to reload. They are therefore not included in the definition of large capacity feeding device and are not subject to the large capacity magazine restriction. § 11-47.1-2(2).

and when readmitted each state had a Governor loyal to the Union.  *Id.*   ¶ 25.  The Ku Klux Clan Acts of 1870 and 1871 were enacted to prevent mass murder by assassination, lynching, and mass shootings, and these Acts were effective for that purpose when enforced by the United States Army. Roth Decl. ¶ 25.  During this time period, state militias played a changing role—in some areas, they were loyal to the federal government and United States Army and in others, they were insurrectionist forces and regarded as unlawful by the federal government.  Vorenberg Decl. ¶¶ 26-33.  The United States Army often acted to supplement or supplant local police forces to protect civilians from insurrectionists, and the Army would often effectuate arrests and turn over arrestees to state law enforcement.  *Id.*   ¶ 40.  The southern and border state militias that were officially sanctioned during this time allowed Black American men to join, although some still maintained segregated companies.  *Id.* ¶ 32.

This background is necessary to understand the nature of regulation of high-capacity weapons during this time period, which was achieved through government enforcement rather than enactment of laws and regulations that can be easily referred to 150 years later.[7]  *Id.* ¶ 4.  During this time period, the United States Army and loyal state militias sought to prevent arms from reaching unlawful insurgent groups, using intelligence gathering to intercept arms shipments.  *Id.* ¶ 40.  As a result, in the southern and border states, a civilian receiving shipments of Henrys or Winchesters was likely to face seizure of the weapons before they even arrived or arrest and confiscation of the weapons.  *Id.* ¶ 41.

Moreover, accounts of civilian possession of these weapons in the Western states and frontier territories were often fictional.  *Id.* ¶ 46.  Two of the handful of factual accounts actually support that these weapons were not in ordinary civilian hands—one is a story of two former U.S.

---

[7] The details of this history are more thoroughly explicated in Exhibit B.

soldiers in conflict with members of the Blackfeet Nation, and the other is of a private armed guard accompanying a Wells Fargo cash shipment to the West.  *Id.*  These uses are akin to exemptions to modern weapons restrictions, which often exempt former armed forces and law enforcement as well as armed guards from restrictions on high-capacity or even automatic weapons.  Other civilian uses of these weapons included murders arising out of the Horrell-Higgins feud in New Mexico Territory near the Texas border.  Hunters in the West did not adopt the weapons.  *Id.*

The Native Peoples of the American Great Plains sometimes did have Winchesters, including at the Battle of Little Big Horn in 1876.  *Id.* ¶ 54.  These weapons were perceived as increasing their efficacy as soldiers.  *Id.* ¶ 53.  Immediately following Custer's defeat at Little Big Horn, the army banned trading any guns to any Native Americans and U.S. officers sought to arrest any traders that had been selling Winchesters in violation of the policy.  *Id.* ¶ 55.

In the North, almost no one owned Henrys or Winchesters.  *Id.* ¶ 58.  In the "Great Strike" of 1877, a weeks-long period of mob violence in cities from Philadelphia to Chicago, there are only two recorded incidents involving Henrys or Winchesters.  *Id.*  One was a discharge by a United States soldier, who had formerly been stationed in the West, firing into a crowd of civilians, and the other occurred in Kansas, where managers armed forty employees with Winchester rifles. Even in the midst of significant mass violence, there was no evidence of civilian self-defense use of these high-capacity weapons.  *Id.*  New National Guard units in the late 1870s in the North did appear to adopt the weapons for National Guard purposes, however.  *Id.* ¶ 60.

One example of how these weapons were treated as unusual comes from South Carolina. After Black American units of the integrated state militia demonstrated South Carolina could use Winchesters to keep the peace effectively, *id.* ¶ 65-66, the Ku Klux Klan sought Winchesters of their own, arranging for shipments under false labels. *Id.* ¶ 68.  Some shipments were intercepted,

but some reached the Klan and other white supremacist groups. *Id.* In 1870, the governor sought the help of the United States Army, and attempted to confiscate as many Winchesters as possible, eventually ordering militiamen to return the weapons to the state armory. *Id.* ¶ 69. The state militia was disbanded, and when it attempted to re-form in 1874, the 627 Winchester rifles were not re-distributed. *Id.* ¶ 70. In 1876, the "Red Shirts," an insurrectionary force, stole Winchesters and other weapons from the state armory and South Carolina was thrown into political chaos. *Id.* ¶ 71.

In Louisiana, the Winchester was at first only given to the New Orleans police force, the fearsome Metropolitans, who were the best-trained unit incorporated into the state militia (the state militia did not at first issue Winchesters to other companies). *Id.* ¶ 72. The Winchesters held by the Metropolitans in the New Orleans armory were highly restricted—they were not permitted to be used in parades or drills in public without specific individual orders to do so and were not permitted to be disassembled or removed from the armory unless authorized. *Id.* ¶ 96. These specific restrictions were not applicable to other weapons. *Id.* Further evidence of the unusual nature of Winchesters, as opposed to lower-capacity repeating rifles, is the importance of the Metropolitans to keeping the peace in the areas surrounding New Orleans during this time. When conflict was brewing in Colfax between the legitimate militia and insurrectionary forces, William Ward, the Black American leader of the legitimate militia (which did not have Winchesters), headed to New Orleans to seek the assistance of the Metropolitans. *Id.* ¶ 75-77. He was too late to secure their assistance to prevent the massacre of over 100 men at Colfax. *Id.* However, the Metropolitans were thereafter sent to Colfax to restore the peace, which they were able to do because of their access to high-capacity Winchesters. *Id.* ¶ 77. In 1874, the governor of Louisiana disbanded the state militia after the defeat of the Metropolitans by a much larger force of white insurrectionists. *Id.* ¶ 78.

Prior to 1874 in the southern states, Winchesters were possessed and regulated by pro-Reconstruction Republicans, who used them as a collective and state-sanctioned defense against pro-Redemption and white supremacist forces. *Id.* ¶ 85. While pro-Redemption forces managed to secure Winchesters in furtherance of their insurrectionary activity, these forces justified their possession through their position that it was *they* that were the legitimate state militia of the time. *Id.* ¶ 87. Non-militia law enforcement also used the weapons—in one notable instance, a Black American sheriff in Mississippi retained his Henry rifle after white insurrectionaries had ordered Black Americans in his region to forfeit their guns and stated that he "was justified in having that, because I was sheriff." *Id.* ¶ 89. Civilian use of these weapons was exceedingly rare (less than five instances in the historical record) and criminal—one example being the firing of "thirteen or fourteen shots in rapid succession" into a barbecue attended by Black American men, women, and children, killing and wounding many in the party. *Id.* ¶ 88.

These high-capacity weapons of the period were confined primarily to use by a select few, almost all of whom were U.S. soldiers or law enforcement officers sworn to the United States federal government. *E.g., id.* ¶ 93. State militiamen at the time might use Henrys or Winchesters in their service, but the weapons did not belong to them and were stored in state armories under special restriction when not in use. *Id.* ¶ 98. Indeed, Henry-Winchesters could be subject to seizure or confiscation when used for non-state sanctioned purposes. *Id.* ¶ 41. In other words, Henrys and Winchesters were consistently regarded as uniquely dangerous weapons because of their high capacity, suited for military purposes. Accounts of their use in other aspects of civilian life from this period are incredibly rare, and usually related to criminal activity or prevention of criminal activity by former soldiers and armed guards.

**Evolving Weapons Regulation from Reconstruction to the Present Day**

During this period of turmoil, from Reconstruction to the early 20th Century, use of concealed weapons for murder also proliferated, causing many additional states to experiment with concealed carry laws. Roth Decl. ¶ 21.  Texas originally enacted such statutes in 1868, and they were uniformly enforced through Reconstruction, until, as described above, white supremacist forces succeeded in displacing the Reconstruction-era governments in the 1890s.  *Id.* ¶ 28. California enacted a concealed carry ban in 1863, repealed it, and later re-enacted a similar restriction in 1917. *Id.* ¶¶ 29-30. In Rhode Island, the concealed carry restriction was enacted in 1893.  1893 R.I. Pub. Laws 231.  By the 1920s, the proportion of homicides committed by firearms reached today's levels and every state except Vermont, the state with the lowest homicide rate, restricted the carry of concealable weapons.  *Id.* ¶ 27.

Around the turn of the 20th century, additional weapons appeared, capable of great destruction that allowed small groups of people the ability to easily kill large groups in a small amount of time.  *Id.* ¶ 36.  Two were widely used by criminals and terrorists: dynamite, invented by Alfred Nobel in 1866 and the submachine gun, invented by General John T. Thompson in 1918. *Id.*  These were inexpensive weapons that could be wielded by one person and that were relatively stable compared to prior technologies.  *Id.* ¶ 37.  Submachine guns were used in gang slayings in the Prohibition Era.  *Id.* Dynamite was used in anarchist bombings between 1919-1920, including the murder of thirty-eight people and the wounding of 143 in an attack on Wall Street.  *Id.*

The increasingly devastating social toll of these advances led to restrictions.  Thirteen states restricted the capacity of semiautomatic and automatic firearms between 1927 and 1934 and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons).  *Id.* ¶ 39.  Regulations that began in 1917 with the passage of the Federal Explosives Act were built upon in the Organized

Crime Control act of 1970 to restrict ownership of a wide range of explosives. *Id.* These efforts to regulate weapons that can cause mass destruction has continued, including through the Secure Handling of Ammonium Nitrate Act of 2007, restricting large quantities of fertilizer in the wake of the 1995 Oklahoma City bombings. *Id.* ¶ 40.

Between 1994 and 2004, large capacity ammunition feeding devices holding more than ten rounds *and* manufactured after 1994 were banned federally as part of Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994.  After the sunset of these restrictions, local and state governments around the country have continued to enact capacity restrictions.  *Id.* ¶ 49.  And after the mass shooting in Las Vegas in 2017, the Trump administration federally banned possession of bump stocks, devices that convert semiautomatic weapons to be capably of fully automatic fire. *Id.* ¶ 40.

## C. Large Capacity Magazines

The technology of magazines has continued to evolve with firearms.  While ammunition feeding devices have been around since the first "automatic" (what we would now term semiautomatic) guns were invented in the 1800s, modern large capacity magazines are not the same as those ammunition feeding devices, which often involved a rotating mechanism or an ammunition clip feeding an internal magazine rather than today's more familiar detachable box magazine.  Guns & Ammo TV, *Rifle Revolution: Magazine Evolution*, GUNS & AMMO (June 2, 2015), https://www.gunsandammo.com/editorial/rifle-revolution-magazine-evolution/248768. While, as discussed above, weapons with large capacity feeding devices of one type or another have been an issue inviting government regulation and restriction since their incorporation into the Henry and Winchester rifles in the 1860s, large capacity magazines today, whether metal or polymer, are, "so much more reliable than they used to be."  *Id.*

Almost all common firearms today are equipped with detachable magazines, rather than magazines that are integrated into the gun.  Declaration of Edward Troiano (hereinafter Troiano Decl.) ¶ 5, attached as Exhibit C.  Many integrated magazines in modern weapons are in bolt-action rifles or in shotguns, which would not fall under the large capacity magazine restriction because they are not semiautomatic.  *Id.*  Therefore, most modern semiautomatic weapons use detachable magazines.  *Id.*  Magazine components can degrade over time, depending on the manufacturer, design, and material of the magazine.  *Id.* ¶ 7.  Therefore, firearms owners generally own more magazines than firearms and do not always use factory magazines, as "many brands of aftermarket magazines are really good."  Jeremy Stafford, *Are Aftermarket Magazines Worth It?*, GUNS & AMMO (Sept. 12, 2019), https://www.gunsandammo.com/editorial/are-aftermarket-magazines-worth-it/367705; *see also* ECF 12, ¶ 28; Troiano Decl. ¶ 8.  Sometimes, these aftermarket magazines can come in incredibly high round capacities, like a drum-round, fifty-round magazine from Magpul that can be used in a semiautomatic pistol handgun configuration. Magpul, *Magpul – 3 Drums*, YOUTUBE (Apr. 5, 2022), https://www.youtube.com/watch?v=vmcCBuIg0g8.  As the advertising demonstration video demonstrates, it can be difficult or impossible to distinguish between a modern semiautomatic pistol equipped with a high-capacity magazine and a machine gun.

Ocean State Tactical points to the Glock 19 and Kel-Tec PMR-30 as examples of semiautomatic handguns that do not come standard with fifteen and thirty round magazines.  ECF 8, 13.  But Magpul, for example, manufactures aftermarket magazines that can substitute for a Glock 19 magazine and these magazines come in 10 round configurations.  *PMAG D-50 GL9 – PCC,* MAGPUL, https://magpul.com/pmag-d-50-gl9-pcc.html?mp_global_color=118.  Even if a particular firearm does not come standard with the magazine capacity of your choice, there are

other options.  One is to select another weapon; other semiautomatic handgun choices come with ten round magazines as an option.  The Ruger LCP, which was the number one best-selling handgun in 2017 according to Ocean State Tactical's source, has a six plus one capacity.  *The Ruger LCP Is the Perfect Choice Lightweight, Compact and Powerful*, RUGER, https://ruger.com/products/lcp/models.html.  Moreover, as the website of any firearms accessory merchant can demonstrate, there are many options for magazines and a plethora of aftermarket magazines designed to be compatible with a wide range of firearms that come in ten round and less configurations. Exhibit D (collecting websites).  More recently, methods to modify existing magazines permanently through use of parts and epoxy have also been offered for commercial sale. Exhibit E (collecting websites).

Criminals have access to these large capacity magazines and use them to ill effect.  Chief Hugh Clements, Chief of the Providence Police Department, when testifying in support of this legislation, described an incident that occurred on in Providence, where, "[i]n the matter of two minutes [criminals] fired over 53 rounds."  He further expressed his view that the police are "severely outgunned" in situations like the one he described, where criminals are using high capacity feeding devices to spray fire in residential neighborhoods.  *Hearing on Various Bills Related to Weapons Before the S. Comm. on the Judiciary*, 2022 Leg. Sess. at 1:15 (R.I. 2022) (statement of Col. Hugh T. Clements Jr., Chief of the Providence Police Dep't), available at https://ritv.devosvideo.com/show?video=6baa7385691a&apg=234d9d19.

Reporting of how some individuals survived mass shootings in the 21st century illustrate that introducing more frequent magazine changes has the opportunity to save lives.  In the 2017 Las Vegas mass shooting, victims describe running for cover in the few pauses where the shooter reloaded.  Natalie Bruzda, *Veteran's Quick Reactions Saved Lives During Las Vegas Shooting*,

LAS VEGAS REV. J. (Nov. 10, 2017), https://www.reviewjournal.com/crime/shootings/veterans-quick-reactions-saved-lives-during-las-vegas-shooting/.  In Newtown, Connecticut, nine children were able to escape while the gunman paused to change out a thirty-round magazine.  OFF. OF THE STATE'S ATT'Y FOR THE JUDICIAL DIST. OF DANBURY, REPORT ON THE SHOOTINGS AT SANDY HOOK ELEMENTARY SCHOOL AND 39 YOGANANDA STREET, NEWTOWN, CONNECTICUT ON DECEMBER 14, 2012, at 10 (2013), attached as Exhibit F.  In Tuscon, Arizona, the gunman was tackled by bystanders in an opportunity afforded when he stopped to change extended magazines. Jessica Hopper, Kevin Dolak & Lauren Sher, *Heroes of Tucson Shooting: 'Something Had to Be Done.'* ABCNEWS (Jan. 10, 2011), https://abcnews.go.com/US/heroes-rep-gabrielle-giffords-shooting-tucson-arizona-subdued/story?id=12580345.  As the *en banc* panel of the Fourth Circuit in *Kolbe v. Hogan* observed, use of ten-round magazines as opposed to larger capacity magazines, "would for every 100 rounds fired afford 'six to nine more chances'" for bystander intervention, police intervention, magazine malfunction, and opportunities for victims to flee. *Kolbe*, 849 F.3d at 128.

## D.      Plaintiffs' Claims

Plaintiffs in this case include four individuals who allege that they each own "several" magazines that fall within Rhode Island's large capacity magazine restriction.  Compl. ¶¶ 5, 6, 7, 8.  Three of the individuals, Mary Brimer, James Robert Grundy, and Jeffrey Goyette allege that they "did not intend, desire, or plan to dispose of" those magazines before passage of the law, *id.* ¶¶ 6, 7, 8, but make no allegations about what they now intend to do with their large capacity magazines.  *Id.*  For example, Mr. Goyette is a Florida resident, but does not state whether he now plans simply to remove his large capacity magazines to Florida.  *Id.* at ¶ 8.  The fourth individual plaintiff, Jonathan Hirons, by contrast, avers that he will "forfeit" his large capacity magazines if the statute remains in effect, ECF 8-1, Exhibit B ¶ 9, but does not explain why he would not choose

to transfer his magazines to a federally licensed firearms dealer or modify his magazines, options he acknowledges are permissible under the law. *See id.* ¶ 4.

The fifth plaintiff is Ocean State Tactical, LLC, a federally licensed firearm dealer with a storefront location in Chepachet, Rhode Island. ECF 8-1, Exhibit C ¶ 2. As a federally licensed firearm dealer, Ocean State Tactical is exempt from the large capacity magazine restriction and is permitted to "manufacture, sell, offer to sell, transfer, purchase, possess, or" control restricted devices. R.I. Gen. Laws, § 11-47.1-3(a). Through its agent, Ocean State Tactical avers that it had annual revenue of about $50,000 from sales of all capacities of magazines through its Rhode Island storefront. ECF 8-1, Exhibit C ¶ 8. Ocean State Tactical further avers that it currently only makes about 5% of its revenues from sales other than at its storefront. *Id.*, Exhibit C ¶ 6. Ocean State Tactical has not provided any information about its overall profits, how many sales it makes to Rhode Island residents, what percent of its retail sales $50,000 represents, or any other detailed information that indicate Ocean State Tactical's ability to continue as a "store front location which engages in the sale of firearms and other hunting and fishing supplies" after the restriction takes effect for its customers. *See generally id.*

Ocean State Tactical filed its complaint on June 23, 2022. ECF 1. The initial complaint was not served until July 6, 2022, and Ocean State Tactical did not move for preliminary relief until August 9, 2022. In response to a motion to dismiss filed by the initial defendant State of Rhode Island, Ocean State Tactical amended its complaint to instead bring claims against named defendants Attorney General Peter F. Neronha and Superintendent Darnell S. Weaver in their official capacities. The Amended Complaint contains five counts alleging violation of (1) plaintiffs' Second Amendment rights (Count I); (2) the Takings Clause (Count II and III); and (3) substantive due process (on its face, on the theory that the law is retroactive, and on the theory that

25

the law is void for vagueness).  Count V seeks declaratory relief under 28 U.S.C. § 2201, and all counts seek injunctive and declaratory relief, along with attorneys' fees.  *See generally* ECF 12. In support of its motion for preliminary injunction, Ocean State Tactical provided only a copy of H 6614 Substitute A (Jan. Sess. 2022), Mr. Hiron's affidavit, and an affidavit of Mr. Andre Mendes, "Principal" of Ocean State Tactical.  ECF 8-1.

### STANDARD OF REVIEW

Ocean State Tactical seeks to preliminarily enjoin a duly enacted statute of Rhode Island, portions of which are already in effect and portions of which become effective December 18, 2022. Ocean State seeks this relief before discovery and supported by just two of the plaintiffs' affidavits. ECF 8-1. "[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24 (2008)).   A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  "A failure by the plaintiff to meet any one of the four requirements requires a denial of the motion." *Lopez v. Wall*, No. C.A. 09-578 S, 2010 WL 4118091, at *1 (D.R.I. Sept. 22, 2010), report and recommendation adopted, No. CA 09-578 S, 2010 WL 4118112 (D.R.I. Oct. 19, 2010) (citing *Figueroa v. Wall*, No. 05–415, 2006 WL 898166, *2 (D.R.I. Mar. 14, 2006)). However, "'[l]ikelihood of success is the main bearing wall' of this 'framework.'" *W Holding Co. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014) (quoting *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).  "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Esso Standard Oil Co. (Puerto Rico) v. Monroig–Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility'

26

of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012).  As set forth below, plaintiffs cannot meet their burden and their motion should be denied.

## ARGUMENT

**I.      Plaintiffs Cannot Establish A Strong Likelihood of Success on the Merits.**

### A.      A Restriction on Large Capacity Magazines Is Consistent With the Second Amendment.

Rhode Island's restriction on large capacity magazines "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111, 2127 (2022).   These specific accessories enable shooters to fire more than ten rounds of ammunition without pause, whatever the target, and have infamously become associated with mass murders, such as those Newton, Connecticut and Las Vegas, Nevada.  State legislatures are not compelled to sit by, idle, while society suffers violence inflicted by a fundamentally unfair imbalance in weaponry.  The government has instead, before and since the Founding, restricted weapons and weapons accessories when the use of those weapons  or weapons accessories in the civilian population create an unfairness to those armed only with weapons commonly used in self-defense.  This restriction has taken many forms— statute, application of the common law, regulation of the militia, and actual enforcement efforts. At times, the government has fallen short of the ideal of nondiscriminatory enforcement of these restrictions (like it has throughout our history in many other areas).  But in the aggregate, a history and tradition of restricting the most harmful weapons in society to military and police use is evident.

"Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Bruen* (Kavanaugh, J., Roberts, C.J., concurring), 142 S.C. at 2162 (quoting *Heller*, 554

U.S. at 636 and *McDonald*, 561 U.S. at 786 (plurality op.)).  As already recognized in *Bruen* and *Heller*, the Second Amendment extends only to an individual's right to keep and carry "arms" and does not protect a right to carry "dangerous and unusual weapons;" it only reaches those weapons "in 'common use' for self-defense today."  *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).  Large capacity magazines are not arms, are dangerous and unusual, and are not in common use for self-defense today.  Ocean State Tactical has not presented any evidence in support of its motion on any of these questions, relying on bare allegations that "[e]stimates" posit "millions" of large capacity magazines are owned, without any information at all about how those magazines are used.  ECF 12, ¶ 9.  It is the plaintiff's burden to demonstrate that the challenged regulation falls with the Second Amendment's scope.  *Bruen*, 142 S. Ct. at 2126.  Ocean State Tactical has failed to meet that burden.

Moreover, even if this Court were to go on to consider whether the government can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation," *id.*, Rhode Island is likely to meet that hurdle by demonstrating that the large capacity magazine restriction imposes a comparable burden on Second Amendment rights and has a comparable justification to other widespread restrictions present throughout history.  Rhode Island's restriction is a very slight burden on Second Amendment rights (to the extent it touches them at all) because it allows every Rhode Islander a choice among lawful semiautomatic firearms and the means to fire them as often as desired—the only restriction being that a shooter must pause to switch magazines after every ten rounds.  This restriction is justified by the same principle that has justified many disparate restrictions on the types and manner of firearms that can be used in particular activities—it eliminates a particularly unusual and dangerous modification to otherwise

lawful arms and it gives the target of the shooting "'six to nine more chances'" for every 100 rounds in which to act, *Kolbe*, 849 F.3d at 128; in other words, a fighting chance.

### 1.   Restrictions on Large Capacity Magazines Do Not Burden the Right Articulated In the Second Amendment's Plain Text.

As an initial matter, large capacity magazines do not fall within "the Second Amendment's plain text." *Id.* at 2129.  As *Heller* noted, the "object" of an individual's Second Amendment right is "Arms." *Heller*, 554 U.S. at 581.  But large capacity magazines are not "Arms," as the term "Arms" was understood at the Founding or at the ratification of the Second or Fourteenth Amendments.  *D.C. v. Heller*, 554 U.S. 570, 581 (2008) ("The 18th-century meaning is no different from the meaning today.").

*Heller* referred to definitions of Arms including "'[w]eapons of offence, or armour of defence'" and "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"  *Id.* (quoting Samuel Johnson, 1 Dictionary of the English Language 106 (4th ed. 1773) (reprinted 1978) and Timothy Cunningham, 1 A New and Complete Law Dictionary (1771), respectively).  Samuel Johnson's dictionary further defines "weapon" as an "instrument of offence; something with which one is armed to hurt another."  Samuel Johnson, 2 Dictionary of the English Language (4th ed. 1773), available at Hathi Trust.  *Bruen* further synthesized these sources and stated that Arms constitute "bearable" "instruments that facilitate armed self-defense," whether in existence at the founding or not.  *Bruen*, 142 S.Ct. at 2132.

The term "Arms" does not extend to objects that are associated with, but are not themselves, weapons.  *Cf. Worman*, 922 F.3d at 33 n.3 (1st Cir. 2019) (noting it could not consider "the clever argument that LCMs, like other magazines, are not 'arms' at all because they are not themselves '[w]eapons of offense, or armour of defence'" because it was raised by amici, not parties).  Around the time of the founding there was a common phrase used for military equipage,

"arms and accoutrements."  One example comes from a 1778 resolution of the Continental Congress, which promised that the United States would pay for ". . .[e]very horse and all arms and accoutrements, which shall be taken, by the enemy in action . . . " for cavalry troops to be provided by the states.  Congress Undertakes to Raise a Cavalry Corps., *in* 2 PUBLIC PAPERS OF GEORGE CLINTON, FIRST GOVERNOR OF NEW YORK 827, 828 (Wynkoop Hallenbeck Crawford Co. ed., 1900), available at Hathi Trust.  An examination of databases of the English language confirms this usage.  Declaration of Dennis Baron, Exhibit 2, attached as Exhibit G. While the category of objects that a solider might need or carry with him was known as his "accoutrements" this term was *separate* from arms; when "arms" was used alone the word encompassed only weapons.  *Id.* ¶ 61.

Large-capacity magazines are not arms and are not weapons, let alone weapons in common use for purposes of self-defense today.  The distinction between weapons and arms on the one hand and related accessories on the other would have been familiar to the founding generation.  At the time of the Founding, militiamen kept their ammunition in a cartridge box, an item often grouped together in the term "accoutrements" but not arms.  *Id.* ¶¶ 23-24. Similarly, magazines are not within the scope of the term Arms.  A large capacity magazine is a particular type of "magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device . . . ." § 11-47.1-2(2).  It is not a bullet or other type of ammunition. It contains no firing mechanism.  Modern firearms manufacturers often do not list magazines under "gun parts" but under "firearms accessories" sections of their websites.  *E.g.*, *compare* Parts PMR30, KELTEC, https://www.keltecweapons.com/collections/class/parts/?product_class=parts&weapon=pmr30&page=1&order=title&orderby=asc (last visited October 12, 2022) (listing firing pins) *with* Accessories                                         PMR30,                                         KELTEC

30

https://www.keltecweapons.com/collections/class/accessories/?product_class=accessories&weap on=pmr30&page=1&order=title&orderby=asc (last visited October 12, 2022) (listing magazines). One can have a perfectly functional, bearable weapon for self-defense without owning or possessing a large capacity magazine—any ammunition feeding device of lesser capacity will work just as well.  And with a large capacity magazine and without a compatible firearm, you would be left with the approximate equivalent of the same-sized rock to wield in self-defense. Under a textual analysis, Second Amendment protections do not extend to "accoutrements" like cartridge boxes, saddles, or large capacity magazines, whether in use at the Founding or today.

"When the Second Amendment's plain text" *does not* "cover[] an individual's conduct," there is no presumption that the Constitution protects that conduct.  *Bruen*, 142 S. Ct. at 2129-30. Ocean State Tactical has offered only a bare citation to *Fyock v. City of Sunnydale*, 799 F.3d 991, 998 (9th Cir. 2015) to support its contention that large capacity magazines are arms under the Second Amendment. ECF 8, 12.  But *Fyock* made no such holding; it merely upheld the conclusion of the district court in applying intermediate scrutiny when denying the plaintiffs' motion to enjoin a large capacity magazine restriction.  Along the way, the *Fyock* court did conclude, without analysis, that the district court had not erred in its conclusion that "magazines are in common use" but ultimately did "not determine . . . whether firing-capacity regulations are among the longstanding prohibitions that fall outside of the Second Amendment's scope." *Fyock*, 779 F.3d at 998, 997.

Here, by contrast, there is ample evidence to demonstrate that large capacity magazines are a firearms accessory that is not encompassed in the Second Amendment's plain text. This Court may therefore begin and end its inquiry as to likelihood of success on the merits by concluding

that large capacity magazines are not arms, they are accessories, which are not within the plain text of the Second Amendment's protection.

### 2.       Large Capacity Magazines are "dangerous and unusual."

Large capacity magazines render modern arms "dangerous and unusual" and are therefore doubly outside the meaning of the Amendment.  The Second Amendment does not "protect the right of citizens to carry arms for *any sort* of confrontation." *Heller*, 554 U.S. at 595 (emphasis in original).  "[S]ophisticated arms" such as "M—16 rifles and the like," are not covered by the Second Amendment. *Id.* at 627–28.  *Heller* reasoned that these types of restrictions were justified "by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627; *accord Bruen*, 142 S. Ct. at 2128.  *Heller* further acknowledged that "modern developments" meant that the types of arms covered under the Second Amendment today would never "be useful against modern-day bombers and tanks" in a war setting.  *Id.* But modern civilian parity with military firepower is not guaranteed or even suggested by the Second Amendment's protection.  *See id.*  "[T]he question is whether the proscribed weapons are in common use for lawful purposes like self-defense." *Worman*, 922 F.3d at 35.

The First Circuit has recognized that "how to plot the dividing line between common and uncommon use" outside the examples given in *Heller* of semiautomatic handguns (common), short barreled shotguns (uncommon), and M—16s (uncommon), remains unsettled law.  *Id.*  It declined to weigh in on whether large capacity magazines were common or uncommon, instead moving to apply the means-end scrutiny test it used before *Bruen* to uphold Massachusetts' regulation restricting large capacity magazines.  *Id.*; *accord New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015); *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (*Heller II*) (although magazines are numerous, "we cannot be certain whether" they are "used or are useful specifically for self-defense or hunting").  However, the First Circuit did pause to note

that it "agree[s] with the Seventh Circuit that measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical." *Worman*, 922 F.3d at 35 n.5.  The Seventh Circuit has observed that "[m]achine guns aren't commonly owned for lawful purposes today because they are illegal; semiautomatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal" but it would be absurd to determine that a ban on a particular weapon is permissible solely because there is a statute preventing its common use. *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015).

The Fourth Circuit took a different approach, seeking to avoid the question whether "unusual" was a matter of mere numerosity.  Instead, the Fourth Circuit found that an additional category of weapons is outside the scope of the Second Amendment and concluded that because "large-capacity magazines are clearly most useful in military service" they are also outside the scope of the Second Amendment's protection.  *Kolbe*, 849 F.3d at 137.  Large capacity magazines are certainly most useful in military application and have little use in self-defense or sporting.  *See Kolbe*, 849 F.3d at 137 (large-capacity magazines "are particularly designed and most suitable for military and law enforcement applications[;]. . . . enable a shooter to hit multiple human targets very rapidly; contribute to the unique function of any assault weapon to deliver extraordinary firepower; and are a uniquely military feature.") (internal quotations and citations omitted); Dep't of the Treasury, Bureau of Alcohol, Tobacco, Firearms & Explosives, *Report and Recommendation on the Importability of Certain Semiautomatic Rifles* 6 (Jul. 6, 1989) ("large capacity magazines are indicative of military firearms"), attached as Exhibit H; Dep't of the Treasury, *Study*

*on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 3 (April 1998) (weapons using detachable magazines are military in nature), attached as Exhibit I; Troiano Decl. ¶ 9.

Our history and tradition of restrictions on "dangerous and unusual weapons" reveals that there are other limiting principles that define this class that courts can apply to modern arms. When technological and social changes have created a scenario in which conflicts among civilian society are worsened by or center around the presence of a particular type of weaponry, especially when that presence introduces an element of unfairness, regulation follows. *Bruen*'s discussion of the Statute of Northampton illustrates this linkage. As the *Bruen* court noted, "[t]he Statute of Northampton was, in part, a product of . . . the acute disorder that still plagued England." 142 S. Ct. at 2139 (internal quotation omitted). It restricted "going or riding 'armed,'" which the *Bruen* court interpreted as prohibiting "armor and, perhaps, weapons like launcegays." *Id.* at 2140. As the court explained, "armor and lances were generally worn or carried only when one intended to engage in lawful combat or . . . to breach the peace." *Id.* The Statute of Northampton then is a limited restriction on a class of arms, restricting the particular use *even though* there was a lawful use—lawful combat—because of the societal conditions and the potential for the arms to be used to "breach the peace." As *Bruen* noted, later 17th Century commentators noted that the restriction included bearing arms combined "with such Circumstances as are apt to terrify the People." *Id.* at 2142 (quoting Serjeant William Hawkins, 1 Pleas of the Crown 136 (1716)). Statutes codifying this English common law existed in "the Colonies and early Republic," where they extended to any type of offensive weapon in New Hampshire and Massachusetts and specifically to "pocket pistols" in East New Jersey. *Id.* at 2142-43. Again as the *Bruen* court noted, "pocket pistols" "may have been targeted because colonial-era East New Jersey was riven with 'strife and excitement' between planters and the Colony's proprietors 'respecting titles to the soil.'" *Id.* at

34

2143-44. (citation omitted).  When a weapon has been perceived to be at the center of societal disorder, it is restricted.

The absence of regulation also bears out this connection.  Unlike the circumstances giving rise to East New Jersey's restriction on pocket pistols in 1686, on the eve of the Revolution homicide rates were at historic lows and only 10-15% of homicides were committed by firearms. Roth Decl. ¶ 8. It is therefore not surprising that firearms were not specifically subject to extensive restriction.  But restrictions on *concealed* weapons did arise in the antebellum period, as homicide rates rose in the Southern states.  *Id.*  ¶ 17-19.  The cause of these murders were often concealable weapons like pistols, dirk knives, Bowie knives, swing blade knives and switchblades.  *Id.*  These weapons were used to "'frequently insult others with impunity'" and to "gain 'secret advantages'" over opponents.  *Id.* ¶ 17.  Then, beginning in the early 20th century, technology evolved once more.  High-powered explosives like dynamite were used in anarchist attacks, including an attack on Wall Street. *Id.* ¶ 36-38.  And the submachine gun was used in gangland mass murders.  *Id.* Restrictions followed close on the heels of these societal disruptions.

High capacity has been treated as a feature that can render a weapon dangerous and unusual since the invention of such technologies.  Around the time of the Civil War, the first weapons designed to be used by one person and to hold more than ten rounds adopted in the United States, the Henry Rifle and the Winchester Repeating Rifle, came on the scene.  Vorenberg Decl. ¶¶ 12-13.  These weapons were designed for military use and their largest market was foreign armies. *Id.* ¶ 19.  Unlike a Spencer or Sharps rifle, popular repeating rifles capable of firing six or seven shots without reloading and that many returning soldiers brought with them to civilian life, the Henrys and Winchesters were the only weapons of the era that could hold more than ten rounds— they held 15 in an integrated lever-action mechanism. *Id.* ¶ 14.  In the United States during and

immediately following the Civil War, only certain units of the United States Army, state militia, and scattered law enforcement possessed these weapons. *Id.* ¶ 17-21. While no statutory regulation of Henrys and Winchesters existed, their use was policed by the United States Army and Governors seeking to ensure that state militias stayed loyal to the United States and did not engage in insurrection. *Id. passim*, *e.g.* ¶¶ 4-6. Shipments of Henrys or Winchesters to unknown individuals or groups were subject to seizure, and criminal groups like the Ku Klux Klan resorted to subterfuge to obtain them through shipping channels. *Id.* ¶ 68. Even when used lawfully by militias in Louisiana, these Henrys and Winchesters were subject to specific restrictions on their storage in the armory and use on parade from which other rifles were free. *Id.* ¶ 96. During this time of extreme social upset, these large capacity weapons were monitored, regulated, and channeled into only the hands of armies and law enforcement, ensuring that they remained "unusual" in the general population. *See id.* ¶ 87. This characteristic of "unusual" held whether or not there were pockets of local civilian ownership—in fact, if government authorities were to discover such pockets, those communities might be suspected of insurrectionary tendency. *See id.* ¶ 41.

Even as weapons capable of semiautomatic fire spread, concern, and then regulation, arose as a result of their capacity to inflict a large amount of damage in a short amount of time. In a 1913 treatise, a conservation advocate railed against the proliferation of these weapons, demonstrating their destructive force through a collection of anecdotes.[8] WILLIAM T. HORNADAY, OUR VANISHING WILD LIFE: ITS EXTERMINATION AND PRESERVATION (Charles Scribner's Sons ed.

---

[8] While the guns are described here as "automatic," the author describes them as being able to be shot without reloading and with each pull of the trigger. This appears to be a common use of the term "automatic" during this time period, although today we would refer to these weapons as semiautomatic.

1913) available at Project Gutenberg Aug. 22, 200, https://www.gutenberg.org/files/13249/13249-h/13249-h.htm. He described that the new technology allowed five to six shots without reloading, and blamed gunmakers for "engag[ing] in a mad race to see who can turn out the deadliest guns, and the most of them." *Id.* at 146. The new guns, the commentator claimed, including those manufactured by Winchester, were an "unfair advantage" akin to "punt guns for ducks, [or] dynamite for game fish." *Id.* This outrage stemmed from the sheer number of game one could bag in a short period of time with the new weapons, as depicted in this picture from the book:



THE CHAMPION GAME SLAUGHTER CASE
One Hour's Slaughter (218 Geese) With Two Automatic Shot-Guns

*Id.* Legislators agreed. Laws regulating unfair methods of hunting co-evolved with the United States, with prohibitions on place and time of hunting in the 18th Century and restrictions on method, including prohibition of "fire-hunting," "punt guns," and "swivel guns" in the 19th Century. *See* Spitzer, *Gun Law History in the United States and Second Amendment Rights* at 73.

And, as weapons evolved, so did prohibitions on their use in hunting. *Id.* at 74. In 1907, Pennsylvania enacted a statute stating "it shall be unlawful for any person to use what is commonly

known as an automatic gun for the killing of game within this commonwealth." *Commonwealth v. McComb*, 76 A. 100 (Pa. 1910) (quoting Act May 31, 1907 (P. L. 329)).  The law carried with it criminal penalties of fines and jail time.  Mr. McComb was convicted under the law, and appealed his conviction arguing that the law was unconstitutional on the grounds that it was "an unreasonable exercise of police power by the Legislature, arbitrarily interfering with private property and unjustly discriminating against the owner of a certain kind of gun."  *Id.*  While an intermediate court agreed with Mr. McComb, two Pennsylvania appellate courts disagreed, finding that the law was in fact constitutional.  The law defined automatic guns broadly, to include all whose mechanisms resulted in automatic reloading (not automatic fire), such that "all that is required to discharge it is to pull the trigger." *Id.*  As discussed above, these types of rifles came in capacities from five all the way to 15, for a Winchester.  Interestingly, it does not appear that any party or the court considered whether Pennsylvania's law could impede Mr. McComb's Second Amendment rights.  But in holding the hunting prohibition a constitutional exercise of the Commonwealth's traditional police powers, the court looked back at similar laws prohibiting similarly unfair technologies and concluded "that a specially designed gun, which is made particularly effective and proportionately dangerous to game, comes within the class of dangerous agencies either to be regulated or prohibited, as the Legislature may decide." *Id.*  In other words, when used for hunting, these weapons were "dangerous and unusual."  That categorization holds true today; Rhode Island, for example, has strict capacity regulations for permitted firearms in its hunting season. 250-RICR-60-00-9.7.5(A).

Large capacity magazines render the semiautomatic handguns approved of in *Heller* and semiautomatic rifles into weapons with limited lawful purpose and with significant ability to inflict injury and terror.  This had been true from the earliest days of the technology, and became more

apparent as technology advanced.  Following Prohibition and with an increase of firepower used in gangland murders, Roth Decl. ¶ 36-38, states began to legislate with regard to these weapons. In 1927, Rhode Island, Michigan, and Massachusetts enacted statutes defining a machine gun by its capacity to fire a certain number of rounds without reloading.  1927 R.I. Pub. Laws 256 (twelve); 1927 Mich. Pub. Acts 887, 888 (sixteen); 1927 Mass. Acts 413, 413–14.  Nine other states followed, with various numerical limits, through the first half of the 1930s.  47 Stat. 652; 1932 La. Acts 336; 1933 Minn Laws 231; 1927 N.J. Laws 180; 1917 N.C. Sess. Laws 309; 1933 Ohio Laws 189; 1934 S.C. Acts 1288; 1933 S.D. Sess. Laws ch. 206, 245; 1934 Va. Acts 137.  In 1934 and 1938 Congress passed the National Firearms Acts, restricting ownership of machine guns and submachine guns because of those weapons' ability to fire rapidly from large capacity magazines.  Roth Decl. ¶ 39.  As firearms technology evolved, it migrated from military use to civilian use, blurring the lines between the two as the military sought to cabin rapid fire while civilian weapons matched or outpaced military rates.  The U.S. Army defines "rapid fire" as 45 rounds per minute, while an expert can fire 30 rounds from a Glock 17 semiautomatic handgun equipped with large capacity magazine in just *five seconds*.  Roth Decl. ¶ 41-42.

In 1989, ATF found that "large capacity magazines are indicative of military firearms" and that "most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity," perhaps because it found at that time that "some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less."  Dep't of the Treasury, Bureau of Alcohol, Tobacco, Firearms & Explosives, *Report and Recommendation on the Importability of Certain Semiautomatic Rifles* 6 (Jul. 6, 1989).  And in 1998, during the pendency of the assault weapons ban, the Department of the Treasury "did not find any evidence that the

ability to accept a detachable large capacity military magazine serves any sporting purpose," observing Congress found that rifles possessing that feature "have military purposes and are a crime problem." Dep't of the Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 3 (April 1998).

The danger and unusualness of large capacity magazines remains palpable today, no matter how many have been sold into private hands. Semiautomatic rifles "equipped with LCMs have been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)." *Worman*, 922 F.3d at 39. "In Thousand Oaks, California, a shooter equipped with large-capacity magazines murdered twelve people at a bar in 2018." *Duncan*, 19 F.4th at 1106. As the Fourth Circuit observed,

> Other massacres have been carried out with *handguns* equipped with magazines holding more than ten rounds, including those at Virginia Tech (thirty-two killed and at least seventeen wounded in April 2007) and Fort Hood, Texas (thirteen killed and more than thirty wounded in November 2009), as well as in Binghamton, New York (thirteen killed and four wounded in April 2009 at an immigration center), and Tucson, Arizona (six killed and thirteen wounded in January 2011 at a congresswoman's constituent meeting in a grocery store parking lot).

*Kolbe*, 849 F.3d at 120 (emphasis added). Increased number and caliber of gun-shot wounds over the last decade explain the increased severity of firearms injuries, increasing mortality rates and increased chance that, even if a patient receives treatment, it will not be life-saving, that has occurred during that time period. Declaration of Megan L. Ranney, Exhibit 2 ¶ 9, attached as Exhibit J. Emergency room physicians describe how multiple wounds and organ lacerations lead to bleeding that cannot be staunched, oxygen that cannot be provided, and where multiple victims strain limited hospital and blood supply resources. *Id.* ¶¶ 10-11. Studies show that large capacity magazines are more likely to be associated with violent crimes and firearm

homicides, and that high-volume gunfire tends to be associated with increased injury.  *Id.* ¶ 15. At least one study has demonstrated that mass shootings carried out with firearms and large capacity detachable magazines had a higher rate of fatality than those where these magazines were not used. *Id.*; *see also* Roth Decl. ¶¶ 47-48. Large capacity magazines are undeniably dangerous and they are unusual in their ability to facilitate some of the most viscerally shocking crimes in our modern life, where victims going about their daily business are suddenly subjected to hails of gunfire. Bruzda, *Veteran's Quick Reactions Saved Lives During Las Vegas Shooting*, supra 23 (Iraq veteran survivor described occasions under fire in a war zone as "very few and far between, as opposed to however many rounds were shot at us that night").  Large capacity magazines are a firearms accessories giving criminals an unfair and persistent advantage over others in society, an advantage the large capacity magazine restriction seeks to erode.

Even if Ocean State Tactical's allegation (which has not been supported by evidence at this preliminary injunction stage) that there are "millions" of large capacity magazines in circulation, ECF 12, 4, is accepted as true, mere numerosity does not make an accoutrement or weapons accessory "a weapon already in widespread *use* across the Nation."  *Caetano v. Massachusetts*, 577 U.S. 411, 421 (2016) (Alito, J., concurring) (emphasis added).  The relevant inquiry is whether the weapon or weapon accessory is in widespread *use for self-defense*.  In fact, the available empirical evidence, well-explored by courts, is that large capacity magazines are rarely if ever *used* in self-defense. *Duncan*, 19 F.4th at 1104–06 ("the record here, as in other cases does not disclose" whether the benefit of "being able to fire more than ten bullets in rapid succession" "has *ever* been realized in self-defense in the home"); *Worman*, 922 F.3d at 37  ("not one of the plaintiffs or their six experts could identify . . . even a single example of a self-defense episode in which ten or more shots were fired");  *ANJRPC*, 910 F.3d at 121 n.25 ("most homeowners only use two to

three rounds of ammunition in self-defense"); *Kolbe*, 849 F.3d at 145 ("scant evidence in the record" that "large-capacity magazines are possessed or suitable for self-protection"); *Heller II*, 670 F.3d at 1262 (pointing to the lack of evidence that "magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport"); *see also* Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 J. L. & CONTEMP. PROBS. 244-45 (2020) (summarizing study findings, including study of National Rifle Association database finding that between 2011-2013, there were no instances of a person using more than 10 rounds in defense of their home); Troiano Decl. ¶ 9.  Moreover, historical tradition does not appear to place any special importance on numerosity.  Semiautomatic firearms capable of firing multiple rounds without reloading were commonly used for hunting when they were banned from that activity by several states—there were, at least by one count, 103,000 such guns being sold annually in 1911. Hornaday, *Our Vanishing Wildlife* at 143.  Nevertheless, restrictions that persist today were enacted to curtail their use.

Similarly, modern firearms regulation does not support that numerosity alone defines what is "dangerous and unusual."  Before their federal ban in 2019, the Bureau of Alcohol, Tobacco and Firearms estimated that 280,000-520,000 bump-stock-type devices were in circulation. Bump-Stock-Type Devices, 83 Fed. Reg. 66,514, 66,538 (Dec. 26, 2018) (to be codified at 27 C.F.R. pts. 447, 478-79).  No court has found that these weapons accessories, which are capable of converting semiautomatic weapons into automatic-fire weapons, are protected by the Second Amendment. Conversely, in *Caetano*, Justice Alito pointed to evidence that there were around 200,000 tasers in circulation as support for his conclusion that tasers are commonly used for self-defense.  577 U.S. at 420 (Alito, J., concurring).  The overarching consideration is whether the weapon under

consideration is a first-line choice for self-defense, or whether instead it is ill-suited and rarely used for that purpose, even if commonly possessed.

Another major reason to expressly de-link numerosity of lawful possession from the assessment whether a weapon is "dangerous and unusual" is the perverse incentive it would grant legislatures to legislate.  Nowhere else in the law is it the case that if a regulation is constitutionally *permissible* it is therefore *mandatory* to promptly enact the most robust and restrictive form of regulation lest the permission dissipate.  Take, for example, an analog in the First Amendment context.  While "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech," there is no mandate that cities impose a requirement to use city-owned sound amplification equipment (permissible) rather than impose a decibel limit (also permissible, but less restrictive).  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). It is certainly constitutionally preferable for the government to judiciously limit the imposition of any such restrictions.  In the Second Amendment context there arises a tradition of government restraint—it is not until a weapon's manner of actual use in society arises to the level of "dangerous and unusual" that restrictions are imposed; however, when those sets of circumstances occur, government restriction follows.

Large capacity magazines transform the semiautomatic weapons granted constitutional protection in *Heller* into weapons of war, rendering them, "like" "M—16s", the types of dangerous and unusual weapons that have never been included in the scope of the Second Amendment or its predecessors.  Restricting the possession of large capacity magazines, as discussed below, is a way to limit the unique social ills caused by these "dangerous and unusual" weapons while minimally affecting the rights of people under the Second Amendment—under the restriction, they may

lawfully keep their semiautomatic weapon *and bear or use it* freely, subject only to the need to change magazines or reload.

> ### 3. Any Burden Imposed by the Restriction on the Right to Keep and Carry Arms is Analogous to Burdens Imposed Throughout History.

"The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132. The use of large capacity magazines in mass shootings is an "unprecedented societal concern" spurred by "dramatic technological changes" unimaginable to the Founders or the Reconstruction generation, and analysis of historic analogues will not be "relatively simple to draw," and instead calls for "a more nuanced approach." *Id.* To the extent that large capacity magazines are viewed as weapons at all, and further viewed as something other than a "dangerous and unusual" weapon, a nuanced approach of analogizing "how and why," *id.* at 2133, regulators in the past have addressed the law-abiding citizen's right to armed self-defense in light of the vast criminal utility of firearms is required. To do this, *Bruen* calls for "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* To identify that analogue, the central consideration is whether the modern regulation "impose[s] a comparable burden on the right of armed self-defense and whether that burden is comparably justified" as to the historic regulation. *Id.*

With regard to a magazine capacity restriction, the historic record is replete with close analogues that restricted access to and use of particular arms when that access and use posed specific safety concerns beyond those inherent in the lawful keeping and carrying of arms or presented a social problem of unfair use of arms. None could be termed a "a dead ringer" for Rhode Island's large capacity magazine restriction, but the restriction's limited scope and similar safety and fairness justifications are "analogous enough to pass constitutional muster." *Id.*

A first step in this inquiry is to analyze what the challenged statute does and does not do. Rhode Island's magazine capacity restriction is not "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose" of self-defense. *Heller*, 554 U.S. at 628. As discussed above, a magazine does not fall within the category of "arms" at all. But even putting that argument to the side, Rhode Island's capacity restriction is not a prohibition of an entire class of anything—Rhode Islanders remain free to use any type of ammunition feeding device, or otherwise lawful ammunition, under the restriction. Instead, the restriction *narrowly* limits capacity of those ammunition feeding devices to a number of rounds that, as recognized by multiple appellate courts, is *more than sufficient* for armed self-defense purposes. *Duncan*, 19 F.4th at 1104–06; *Worman*, 922 F.3d at 37; *ANJRPC*, 910 F.3d at 121 n.25; *Kolbe*, 849 F.3d at 145; *Heller II*, 670 F.3d at 1262. The law further exempts traditional large capacity tubular magazines with rimfire ammunition used for target shooting. § 11-47.1-2(2). And, most importantly, it imposes no limit on the *type* of magazine a person can possess, the *number* of magazines a person can possess, or *where* or *how* magazines can be used. It only restricts the capacity of permissible magazines to ten or fewer rounds. These features demonstrate that any potential "burden on the right of armed self-defense" imposed by a large capacity magazine restriction is extremely limited.

Restrictions on the manner of armed self-defense are common in history. Access to unlimited amounts of gunpowder, for example, has never been permitted since colonial times, as discussed above, and these gunpowder storage laws have been historically regarded as appropriate exercises "of the police power." *Brown v. Maryland*, 25 U.S. 419, 443 (1827). Rhode Island's large capacity magazine restriction is also aimed at public safety, beyond the threat to safety always inherent in firearms—using a large capacity magazine as an accessory in conjunction with lawfully

possessed semiautomatic arms enhances their dangerousness and the risk of injury from violent confrontation.  Ranney Decl. ¶ 16.

Another category of widespread and accepted regulations are those that constrain "the manner by which one carried arms." *Bruen*, 142 S.Ct. at 2156.  As *Bruen* noted, concealed carry laws were permissible because "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly."  *Id.* at 2150.  Similarly, Rhode Island's large capacity magazine restriction curtails the ability of firearms owners to use their lawfully possessed semiautomatic firearms in just one particular way—to fire without cessation for as long as the shooter pleases.  Under the restriction, the shooter must pause to change magazines or reload every 10 rounds.  For purposes of the right of armed self-defense, this is a restriction in search of a viable, factual self-defense scenario to burden.  *See* above at 41 (discussing a decade of findings that more than ten rounds are almost never used in self-defense).  And, under the restriction, many other options to keep and use semiautomatic firearms are "left open."

Capacity restrictions themselves have existed since Reconstruction and the adoption of the Fourteenth Amendment—either by practical enforcement, restrictions on hunting, or by the statutes that many states enacted in response to gang murder surrounding Prohibition, including Rhode Island, beginning in 1927.  Before Reconstruction they didn't exist—because capacity was not a feature of firearms that made them particularly dangerous or particularly unfair.  However, when technology changed, so did legislative response to it.  Beginning with the unfairness and danger of these new weapons to Black Americans who had long suffered subjugation and threats to their personal safety, resulting in Reconstruction-era governments seeking to restrict access to large capacity weapons by insurrectionists, continuing to game, and ultimately resulting in the

46

passage of statutes based on capacity like Rhode Island's 1927 ban on "automatic" weapons (really a capacity restriction on semiautomatic weapons given the definitions in use at the time), semiautomatic large capacity weapons have been restricted in various ways since their advent. These restrictions pose a comparable burden (they limit the manner by which one carries arms) and have a comparable justification (reducing a particularly large risk to public safety and restoring fairness to armed confrontation) as concealed carry restrictions approved in *Bruen*.

The fact that sometimes these capacity restrictions were rolled back and then re-enacted has no bearing on their constitutionality.  For example, Rhode Island changed the definition of capacity from 12 to 15 in 1959 and then, in 1975 altered the ban to apply to fully automatic weapons only, before capacity was once again limited between 1994-2004 under the FFA.  Finally, the legislature enacted § 11-47.1-3 last June.  But changing attitudes toward what is an effective policy at a particular time is similar to the legislative reaction in California to concealed carry, where statutes were enacted and re-enacted in response to cultural attitudes. Roth Decl. ¶ 29-30. This is entirely typical of regulation for public health and safety. When a regulation does not burden a fundamental right and is simply an exercise of the police power, "what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not." *Jacobson v. Massachusetts*, 197 U.S. 11, 35 (1905).  Where the regulation is consistent with historical tradition, as capacity restrictions are, legislatures should be free to experiment to strike precisely the right balance between effective intervention and preference of the people.  If that preference changes, legislatures should be able to repeal the regulation without fear that such an action would suddenly enshrine a new species of constitutional right.

There should also be no concern that the large capacity restriction indirectly burdens the right to self-defense.  Restricting firearms accessories does not burden the functioning of lawfully

possessed semiautomatic firearms, which remain operable simply by substituting or modifying the ammunition feeding device. *Contrast Heller*, 554 U.S. 570, 635 (2008) (restriction rendered firearm totally inoperable for immediate self-defense). A magazine is not an "individual component[] of a handgun, such as the firing pin," without which the firearm would be rendered inoperable. *Kolbe v. Hogan*, 813 F.3d 160, 175*, overturned on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017). Unlike a firing pin, which is a necessary and integral gun part, magazines are designed to be replaceable firearms accessories and firearms owners currently substitute and replace the magazines that come with their weapons. ECF 12, ¶ 28 (alleging many people purchase aftermarket magazines). The large capacity magazine restriction here does not prevent an individual from owning magazines categorically, and it places no limit on the number of magazines a person may own. A firearms owner may even modify the magazines she already owns to comply with the law and maintain an operable firearm. *See* Exhibit E (commercially available kits for this purpose are available). Before and after the law, there is no evidence in the record that anyone's firearm would be rendered inoperable by the restriction, nor is there any logical support for such a conclusion.

At least one court has concluded that "the right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). But even if this proposition were adopted by the First Circuit or United States Supreme Court (it has not been), magazine capacity restrictions would not burden this right. Individuals remain free to use as many magazines as desired at firing ranges or other sporting events.

In sum, § 11-47.1-3, when examined in the context of historic tradition, is a narrow restriction on a firearms accessory that essentially does not burden the right to armed self-defense

at all.  Any burden it does impose is comparably justified to other burdens, like concealed carry prohibitions, or manners of *use* of covered firearms. The Constitution "must[] apply to circumstances beyond those the Founders specifically anticipated." *Bruen*, 142 S. Ct. at 2132.  In light of the pressing societal problem of unchecked mass shootings, and "consistent with the Second Amendment's text and historical understanding" that weapons accessories may be regulated for the public health and safety, especially when they render weapons particularly dangerous or unfair, Rhode Island has taken measured legislative action to restrict the capacity of a subset of firearms within the state.  This action is consistent with the Second Amendment.

**B.    Rhode Island's Large Capacity Magazine Restriction Does Not Take Private Property for Which Compensation Is Due.**

Plaintiffs' takings claim also fails. The State's police powers allow it to protect the public from dangerous items without implicating constitutional rights. Additionally, Rhode Island's large capacity magazine restriction is neither an actual or regulatory taking, and thus the Fifth Amendment does not require compensation to be paid to Ocean State Tactical. Numerous courts have reached the same conclusions in analogous cases, and the U.S. Supreme Court's ruling in *Bruen* left unchanged the landscape in takings jurisprudence. *Cf. Bruen*, 142 S.Ct. 2111 (not considering the Fifth Amendment's Takings Clause in its analysis of New York's pistol permitting scheme and the Second Amendment).

**1.    The State May Protect the Public from Dangerous Items Without Implicating the Fifth Amendment's Takings Clause.**

The State may protect the public from dangerous items without having to provide compensation. *See, e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 668-69 (1887) (any "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an

appropriation of property for the public benefit."); *see also Duncan*, 19 F.4th at 1112 (noting that "[n]othing in the case law suggests that any time a state adds to its list of contraband—for example, by adding a drug to its schedule of controlled substances—it must pay all owners for the newly proscribed item."); *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. 1979) ("Such a taking for the public benefit under a power of eminent domain is, however, to be distinguished from a proper exercise of police power to prevent a perceived public harm, which does not require compensation.").

Courts considering challenges to laws involving restrictions related to firearms or their accessories have held that no compensation is due because the actions taken by the state are a proper exercise of its police power. *Duncan*, 19 F.4th at 1112 (holding that "California reasonably chose to prohibit the possession of large-capacity magazines due to the danger that they pose to society" and upholding the lower court's dismissal of plaintiffs' takings claim); *Palmer v. Sisolak*, 2022 WL 960594, at *7 (D. Nev. Mar. 29, 2022) (dismissing takings claim challenge to Nevada's ban on unserialized firearms and component parts); *Roberts v. Bondi*, 2018 WL 3997979 at *3-4 (M.D. Fla. 2018) (dismissing takings claim challenge to Florida's ban on bump stocks and finding the law to be an appropriate exercise of the state's police power); *Rupp v. Becerra*, 2018 WL 2138452 at *7-9 (C.D. Cal. 2018) (finding a ban on assault weapons represented a proper exercise of the state's police power and no compensation due to plaintiffs); *Akins v. U.S.*, 82 Fed. Cl. 619, 622-23 (Fed. Cl. 2008) (rejecting takings claim regarding an order that the plaintiff register or surrender a machine gun); *Fesjian*, 399 A.2d at 866 (D.C. 1979) (rejecting takings claim challenge to law that required the disposal of unregistrable guns capable of firing more than twelve rounds without reloading).

For those who possess large capacity feeding devices that will become unlawful (absent modification) under Rhode Island's law, such ownership came contingent on the understanding that "by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027-28 (1992); *see also Mugler*, 123 U.S. at 669 (noting that while the property in question had previously been lawful to own, "the state did not thereby give any assurance . . . that its legislation upon that subject would remain unchanged."). Thus Rhode Island's law regulating large capacity feeding devices is a valid exercise of the State's police powers and no compensation is due Ocean State Tactical.

## 2. The Large Capacity Magazine Restriction Has Not Deprived Ocean State Tactical of All Economically Beneficial Use of Property.

Ocean State Tactical's takings claim also cannot succeed on the merits because plaintiffs have not been deprived of all economically beneficial use of their large capacity magazines. The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. "The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). In addition, a government regulation "may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster," and "such 'regulatory takings' may be compensable under the Fifth Amendment." *Id*.

Here, the compliance measures in the law do not result in either an actual or regulatory taking. There is no actual taking because owners have the option to transfer or sell their large capacity feeding devices to an individual or entity who can lawfully possess them, or modify them to accept fewer than eleven rounds, or transfer them to a jurisdiction outside the State of Rhode

51

Island prior to the law taking effect. *ANJRPC*, 910 F.3d at 124 (holding that New Jersey's similar magazine capacity restriction did not constitute an actual taking when there were a number of options available to lawful gun accessory owners that did not result in the accessory begin surrendered to the government); *see generally* § 11-47.1-3(b). With these alternatives, Rhode Island's large capacity magazine restriction "does not require that owners turn over their magazines to law enforcement." *Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1198 (E.D. Cal. 2018) (finding that the state had therefore not effected an actual taking); *Rupp v. Becerra*, No. 8:17-cv-00746, 2018 WL 2138452, at *8 (C.D. Cal. May 9, 2018) (dismissing takings claim where "[t]he law offers a number of options to lawful gun owners that do not result in the weapon begin surrendered to the government"). While the law may impose some burden on owners of large capacity magazines with a greater-than-ten-round capacity, any alleged "impracticality of any particular option, such as the alleged lack of a market for these magazines, the burden in removing these magazines from the state, or the lack of guidance on what constitutes a permissible permanent modification does not transform the regulation into a physical taking." *Wiese*, 306 F. Supp. 3d at 1198. In any event, Ocean State Tactical has not even presented evidence to support any impracticality by the individual defendants at all, with a singular individual averring that he will "forfeit" his noncompliant magazines with no explanation as to why that option was selected. ECF 8-1, Exhibit B ¶ 9. And the law does not apply to the business plaintiff at all, § 11-47.1-3(a), who can continue to sell any noncompliant inventory through channels separate from its storefront. ECF 8-1, Exhibit C ¶ 6.

The law also does not result in a regulatory taking because it does not deprive large capacity feeding device owners of all economically beneficial or productive uses of their magazines. *See Murr v. Wisconsin*, 137 S.Ct. 1933, 1942 (2017) (stating that "a regulation which denies all

economically beneficial or productive use of [property] will require compensation under the Takings Clause") (internal citation and quotation marks omitted); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992) (describing a "total taking" where a regulation "declares 'off-limits' all economically productive or beneficial uses of [property]"). Simply modifying the magazine to hold fewer rounds of ammunition than before does not "destroy[ ] the functionality of the magazine." *Wiese*, 306 F. Supp. 3d at 1198 (internal quotation marks omitted). The law provides alternative means for owners to receive some compensation for their large capacity magazines, to transfer them out of the State of Rhode Island, or to modify them to comply with the law prior to the law taking effect. Provided Ocean State Tactical has not been deprived of all economic benefit, even if their property has been deprived of its most profitable use, the constitution does mandate that compensation be paid by the State. *Andrus v. Allard*, 444 U.S. 51, 66-67 (1979).

### C.   Rhode Island's Large Capacity Magazine Restriction Is Consistent with Due Process, Whatever the Theory.

In their Amended Complaint, Ocean State Tactical alleges a sweeping due process claim without particular specificity about the way in which it alleges the due process clause could possibly be violated by the large capacity magazine restriction. Amended Complaint at ¶¶ 67-72. In its motion for preliminary injunction, Ocean State Tactical has apparently curtailed its claims, making some means-end scrutiny argument (puzzling, in light of *Bruen*), and contending that the statute should be void for vagueness on the narrow issue of whether the exception for permanent modification of magazines is sufficiently concrete.  ECF 8, 13-15.

To the extent Ocean State Tactical makes any overarching due process claim, it either merges with the Second Amendment claim or is easily disposed of.  As *McDonald v. Chicago* explained, the "right to bear arms" is "a substantive guarantee," 561 U.S. 742, 780 (2010), and

therefore to the extent the large capacity magazine restriction implicates that right (it does not), the contours of that substantive guarantee are framed by the Second Amendment, not the Fourteenth. *Cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994) (explicit textual source, "not the more generalized notion of substantive due process" is the proper source when present in Bill of Rights) (plurality).  And since the regulation falls outside the scope of the Second Amendment, only rational basis review could conceivably apply.  *Kenyon v. Cedeno-Rivera*, 47 F.4th 12, 24 (1st Cir. 2022); *Hightower v. City of Bos.*, 693 F.3d 61, 83 (1st Cir. 2012) (when Second Amendment claim fails, regulations subject only to rational basis review).  To succeed under that standard, Ocean State Tactical "must negate any and all conceivable bases upon which the challenged regulation might appropriately rest."  *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 9 (1st Cir. 2011).  Given the above discussion detailing the connection between a restriction on large capacity magazines and a reduction in fatalities from mass shootings, not to mention the First Circuit's conclusion that Massachusetts' restriction on large capacity magazines survived intermediate scrutiny, *Worman*, 922 F.3d at 26, Ocean State Tactical surely cannot demonstrate a substantial likelihood of success on this point.

Ocean State Tactical goes on to claim that Rhode Island's large capacity magazine ban is void-for-vagueness insofar as it contends it does "not define what conduct is prohibited and what conduct is permissible when expressing the exception for 'Permanent Modfication.'" ECF 8, 14. Without so much as pointing to what language is alleged to be vague, Ocean State Tactical raises the prospect of arrest and conviction for "the citizen who makes a good faith attempt to permanently modify their Standard Capacity Magazine for the purpose of conforming his or her conduct to law, but fell short of an arbitrarily defined requirement."  *Id.*  Not only does Ocean State Tactical fall short of describing an instance where this could conceivably take place, none of

the individual plaintiffs[9] allege or aver that they will attempt to modify a single one of their unspecified number of magazines.  Amended Compl. ¶¶ 6-8, 11 (individual allegations silent as to plans for magazines after the law takes effect); ECF 8 Exhibit B, ¶ 9 (Mr. Hirons avers he will dispose of his magazines and makes no mention of plans to modify them).

These missing pieces of information mean that plaintiffs have not established Article III standing, let alone a likelihood of success on the merits, for their void-for-vagueness claims.  "An allegation as to what the plaintiff personally intends to do is necessary to show" that the plaintiff and "her intended conduct are at least plausibly within the potential reach of the statute or ordinance" in order to demonstrate standing.  *McCollester v. City of Keene*, 668 F.2d 617, 620 (1st Cir. 1982).  This is especially so here, where there is not even a suggestion of what kind of modification one could make to a magazine so as to create an ambiguity in the application of the statutory exception for any person who "[p]ermanently modifies the large capacity feeding device such that it cannot hold more than ten (10) rounds of ammunition." § 11-47.1-3(b)(1)(i).

For a facial challenge to a statute on vagueness grounds to succeed, "plaintiffs must surmount a dauntingly high hurdle" and "must demonstrate that the law is impermissibly vague in all of its applications."  *URI Student Senate v. Narragansett*, 631 F.3d 1, 13 (1st Cir. 2011) (quotations and citations omitted).  To survive a vagueness challenge, a criminal statute must define the offense with "sufficient definiteness [such] that ordinary people can understand what conduct is prohibited" and that definition must not "encourage arbitrary and discriminatory enforcement."  *Id.* at 13-14 (quotations and citations omitted).  However, "because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our

---

[9] As explained above, Ocean State Tactical, LLC is not subject to the criminal provisions of Rhode Island's large capacity magazine restriction as a federally licensed firearms dealer.

language.'" *Hill v. Colorado*, 530 U.S. 703, 732–33 (2000) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)).

Ocean State Tactical appears to take issue with the term "permanently modifies," contending that it "leaves open vast discretion to law enforcement." ECF 8, 14.  How it does so is left unexplained.  *Id.*  It is difficult to imagine what ambiguity could result from the term "permanently modifies"—the term is "quite different from the sorts of terms," like "annoying or indecent," that indicate "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" that have been disapproved by the United States Supreme Court in the past.  *Holder v. Humanitarian Law Project,* 561 U.S. 1, 20–21 (2010).  Instead, "permanently modifies" has a discernible meaning—to forever change the magazine such that it accepts less than eleven rounds—and is therefore more similar to terms like "training" and "personnel" that the Court has held do not require "untethered, subjective judgments."  *Id.* at 21.  "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications."  *Hill*, 530 U.S. at 732.  Ocean State Tactical, lacking standing and any grounds for its assertion that the statute is vague, is unlikely to succeed on the merits of its vagueness claim.

Lastly, the Amended Complaint appears to contain a few stray allegations that the statute is impermissibly retroactive in its effects.  Amended Compl. ¶ 70.  But these allegations are not pressed in Ocean State Tactical's motion for preliminary injunction,  ECF 8, 13-14, and this Court should therefore not consider any such argument in weighing likelihood of success on the merits.  Even if this Court were to consider such a contention, the statute plainly has no retroactive or retrospective effect because it contains a compliance period and permits individuals to modify, sell, transfer out of the State of Rhode Island, or dispose of their newly prohibited magazines.

**II.    PLAINTIFFS HAVE ALSO FAILED TO DEMONSTRATE THE REMAINING THREE FACTORS NECESSARY TO OBTAIN A PRELIMINARY INJUNCTION.**

### A.    Ocean State Tactical Has Not Demonstrated Irreparable Harm.

To establish irreparable harm, a plaintiff must show a likelihood that she will suffer irreparable injury, irremediable by monetary relief or other legal remedy, before a decision may be reached on the merits. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc*., 645 F.3d 26, 32 (1st Cir. 2011). Ocean State Tactical has not and cannot do so.

Ocean State Tactical first relies on an observation from *Elrod v. Burns*, endorsed by only three justices, that "[t]he loss of *First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976) (Brennan, J.) (emphasis added). This stray observation is not the law governing issuance of preliminary injunctions; even in the First Amendment context, issuance of an injunction "does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits" without demonstration of the other three factors. *Benisek v. Lamone*, 138 S. Ct. 1942, 1943-44 (2018); *accord Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983) (even threat of state prosecution not sufficient to demonstrate irreparable harm).

Here, Ocean State Tactical has only identified a conjectural harm, stating that "Citizen Plaintiffs *may* turn in their Standard Capacity Magazines out of fear of prosecution prior to" the expiration of the 180-day exceptions period in the law. ECF 8, 15. While one individual, Mr. Hiron, has averred that he "would forfeit" his magazines "prior to the expiration of the" exceptions period for fear of prosecution, ECF 8-1 at 7, he does not explain why he would not instead choose to modify his magazines to comply with the law or how many compliant magazines he currently owns or would purchase to substitute for the restricted magazines. There is no explanation in Ocean State Tactical's motion for how exactly Mr. Hiron's Second Amendment right to armed

self-defense would be impeded even if he were to forfeit his non-compliant magazines.  This is not surprising; if Mr. Hiron has compliant magazines or can purchase them, as is likely, he will have the same continuous access to his lawfully possessed, operable firearms as he did before the law.

Moreover, Ocean State Tactical's own delay between filing its complaint on June 23, 2022, and its motion for preliminary injunction on August 9, 2022, belies the exigency of the purported harm. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek*, 138 S. Ct. at 1944.  The First Circuit has described a several months' long delay between threat of legal action and filing an injunction as a demonstration of the plaintiffs' "leisurely pace and lack of urgency," which "undercut" the claim of irreparable harm.  *Voice of the Arab World*, 645 F.3d at 36; *see also Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016) (delay of "even only a few months" "militates against a finding of irreparable harm."); *Citibank , N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985); *Equity in Athletics, Inc. v. US Dep't of Educ.*, 291 Fed.Appx. 517, 521-22 (4th Cir. 2008); *Doe v. Banos*, 713 F. Supp. 2d 404 (D.N.J. 2010), *aff'd on other grounds,* 416 F. App'x 185 (3d Cir. 2010); *Utah Gospel Mission v. Salt Lake City Corp.,* 316 F. Supp. 2d 1201 (D. Utah 2004), *aff'd,* 425 F.3d 1249 (10th Cir. 2005).

Next, Ocean State Tactical proffers that individuals will suffer economic loss if their takings claim is successful and "the Business Plaintiff will continue to suffer decreased sales, canceled orders and substantial costs incurred" because of changes to the business needed due to the law (from which it is exempt).  ECF 8, at 15.  Any economic loss due to Ocean State Tactical's Takings Clause claims is not remediable by equitable relief; "equitable relief is generally unavailable" for such claims.  *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2176 (2019). "Given the availability of post-taking compensation, barring the government from acting will

ordinarily not be appropriate." *Id.* at 2177.  Rhode Island's just compensation remedies have long been considered adequate.  *See, e.g.*, *Downing/Salt Pond Partners, L.P. v. Rhode Island & Providence Plantations*, 643 F.3d 16, 24 (1st Cir. 2011).  As for the business, all Ocean State Tactical avers is that before the law, Ocean State Tactical sold roughly $50,000 of magazines (without any specification as to capacity) on an annual basis, and that under the law, it will lose some unspecified portion of that revenue.  ECF 8-1, ¶ 7, 8.  But "a temporary loss of income which may be recovered later does not usually constitute irreparable injury."  *DeNovellis v. Shalala*, 135 F.3d 58, 64 (1st Cir. 1998).  All of the harms identified by Ocean State Tactical plaintiffs, business or individual, are remediable by money damages if they are successful on the merits.

### B.   The Public Interest and Balance of the Hardships Weigh in Favor of the State.

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King,* 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (quoting *New Motor Vehicle Bd. of Col. v. Orrin W. Fox Co.,* 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).  Here, the Rhode Island General Assembly enacted a statute aimed at securing public health and safety, demonstrating a legislative judgment that the large capacity magazine restriction is in the public interest.  The only evidence Ocean State Tactical points to supporting its contention that the statute is not in the public interest is a solitary study about a *different* large capacity magazine restriction that did not restrict possession of large capacity magazines all together.  ECF 8, 20.  Furthermore, the same report describes how semiautomatics equipped with large capacity magazines are often used in mass violence and violence against law enforcement officers.  CHRISTOPHER S. KOPER, DANIEL J. WOODS & JEFFREY A. ROTH, AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994-2003 18-19, Report to the National

Institute of Justice, United States Department of Justice (June 2004), attached as Exhibit K. Multiple other studies have produced similar results, demonstrating that in incidents where large capacity magazines are used, there is an increase in fatality and injury.   Ranney Decl. ¶ 15. Plaintiffs here seek to enjoin the legislature's chosen tool to address this public harm, without demonstration of any immediate irreparable injury or any particular threat to the public's interest, considering that any member of the public may still access whatever semiautomatic firearms and ammunition he or she was permitted to access before the law.   The only change is that shooters may no longer possess or use a specific firearms accessory that would permit them to shoot, at-will, without pause.   Any damage resulting from that deprivation for the time it takes to reach a full adjudication on the merits (there is none) is remediable at law, and therefore the preliminary injunction should be denied.

## CONCLUSION

For the reasons set forth above, Ocean State Tactical's motion for preliminary injunction should be denied in its entirety.

Respectfully submitted,

PETER F. NERONHA
ATTORNEY GENERAL

_____/s_____
Sarah W. Rice, Bar No. 10465
Keith Hoffmann, Bar No. 9874
Special Assistants Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400, Extension 2054 / 1882
Fax: (401) 222-3016
SRice@riag.ri.gov
KHoffmann@riag.ri.gov

*Attorneys for Defendants Peter F. Neronha and Darnell S. Weaver, in their official capacities*

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2022, I filed and served this document through the ECF system upon all parties of record. This document as electronically served is available for viewing and/or downloading from the ECF system.

*/s/ Sarah W. Rice*
Sarah W. Rice (#10465)