Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **OCEAN STATE TACTICAL, LLC,** | : | |
| **d/b/a BIG BEAR HUNTING AND** | : | |
| **FISHING SUPPLY; JONATHAN** | : | |
| **HIRONS; JAMES ROBERT** | : | |
| **GRUNDY; JEFFREY GOYETTE;** | : | |
| **and MARY BRIMER** | : | |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | **C.A. NO. 1:22-cv-00246-JJM-PAS** |
| | : | |
| **STATE OF RHODE ISLAND** | : | |
| *Defendant.* | : | |

## DECLARATION OF RANDOLPH ROTH

1. My name is Randolph Roth. I am an Arts and Sciences Distinguished Professor History and Sociology at The Ohio State University. I have been retained by the State of Rhode Island's Office of the Attorney General to provide an expert opinion in the above-captioned matter.

2. I am an expert in the field of criminology and the history of crime. Attached hereto is my curriculum vitae, Exhibit 1.

3. I have been retained by the Rhode Island Office of the Attorney General to perform original historic research in this case at a rate of $250.00 per hour. The expert report I have prepared is attached as Exhibit 2. I hold all opinions expressed in Exhibit 2 to a reasonable degree of professional certainty.

Randolph Roth, Ph.D.

Date: 13 October 2022

# Exhibit 1

Randolph Roth                                                                 Page 1

Curriculum Vitae

RANDOLPH ROTH

Department of History                          6987 Grandee Cliffs Drive
The Ohio State University                       Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                                  (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

**Table of Contents**

**Personal**                                                               2

Education                                                                  2
Academic Positions                                                         2
Honorary Positions                                                         2
Professional Honors and Awards for Scholarship                             2
Professional Honors and Awards for Teaching                                3
Grants                                                                     3

**Bibliography and Research**                                            4-17

**Teaching**                                                            18-20

**Service**                                                             21-26

Randolph Roth                                                                                    Page 2

**Personal**

Marital Status:              Married              Allison Sweeney
Children:                    Alexander

**Education**

1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire? Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis and Howard R. Lamar, advisors)

1973, B.A., with honors and distinction, in History, Stanford University (thesis, "Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl Degler and Barton Bernstein, advisors)

**Academic Positions**

1985-present, The Ohio State University: College of Arts and Sciences Distinguished Professor of History and Sociology
1978-1985, Grinnell College: Assistant Professor of History
1978, University of Vermont: Instructor in History
1974-1977, Graduate Teaching Assistant, Yale University

**Honorary Positions**

2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa

**Professional Honors and Awards for Scholarship**

2013-2016, Member, Roundtable on Crime Trends in America, National Research Council, National Academy of Sciences

2012, Fellow, American Association for the Advancement of Science

2011, Michael J. Hindelang Award, American Society of Criminology, for the outstanding contribution to criminology over the previous three years

2010, Allan Sharlin Memorial Award, Social Science History Association, for an outstanding book in social science history

2010, Outstanding Academic Books, *Choice*

1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village Research Society, for distinguished work in the history of rural society

1982, Thorton Rockwell Field Prize, Yale University, for the outstanding dissertation in the Humanities

1982, George Washington Eggleston Prize, Yale University, for the outstanding dissertation in American history

1973, James Birdsdall Weter Prize, Stanford University, for the outstanding senior thesis in history

## Professional Honors and Awards for Teaching

2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and Mentoring, College of Arts and Humanities

2013, Outstanding Teaching Award, College of Arts and Sciences Student Council

2009, Ohio State University Alumni Award for Distinguished Teaching

2007, Distinguished Teaching Award, Ohio Academy of History

1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in History at Ohio State University

## Grants

2013-2014, Research Grant, Harry Frank Guggenheim Foundation

2012-2015, Research Grant, National Science Foundation (SES-1228406)

2000, Fellowship for University Teachers, National Endowment for the Humanities

1998-2000, Research Grant and Supplemental Research Grant, National Science Foundation (SBR-9808050)

1992, Fellow, Workshop on the Rhetoric of Social History, University of Iowa

Randolph Roth                                                                    Page 4

    1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

    1987, National Endowment for the Humanities, Summer Stipend

    1983, Research Fellowship for Recent Recipients of the Ph.D., American Council of Learned Societies

    1981, Fred Harris Daniels Fellowship, American Antiquarian Society

**Bibliography and Research**

**Books**

    *American Homicide* (an interregional study of violent crime and violent death in America from colonial times to the present). The Belknap Press of Harvard University Press (2009), 655 pp.

    *The Democratic Dilemma:  Religion, Reform, and the Social Order in the Connecticut River Valley of Vermont, 1791-1850*. Cambridge University Press (1987), 399 pp.

**Edited Volumes**

    Co-founder and co-director, Historical Violence Database (on-line database on violent crime, violent death, and collective violence).  Web address: www.sociology.ohio-state.edu/cjrc/hvd

    American Homicide Supplementary Volume (on-line supplement to *American Homicide*, including detailed appendices on methods, supplemental tables, graphs, and statistical analyses), approx. 750 pp. Web address: http://cjrc.osu.edu/researchprojects/hvd/AHsup.html

**Essays on Historical Subjects**

    "Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with Richard Rosenfeld and Joel Wallman. *Homicide Studies* (forthcoming).

    "The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and Delinquency* 58: 1 (2021): 1-46.

"Homicide-Suicide by Women against Intimate Partners," co-authored with Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections* 44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing." *Crime, History, and Societies* 21: 2 (2017): 387-400.

"How Exceptional Is the History of Violence and Criminal Justice in the United States? Variation across Time and Space as the Keys to Understanding Homicide and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

"Emotions, Facultative Adaptation, and the History of Homicide," *American Historical Review* (2014) 119: 1529-1546.

"Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender, Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online: Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon, Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim

Randolph Roth                                                                   Page 6

Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is Empirically, Mathematically, and Theoretically Sound," *Crime, History, and Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology* (2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods* (2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods*. Randolph Roth, Cornelia Hughes Dayton, Kenneth Wheeler, James Watkinson, Robb Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

 "Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?" *Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds., *Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708.

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary*

*Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels, ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865*. Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont," in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.

**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a Naïve, Costly, and Misdirected Goal." *Journal of the American College of Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism?  The Rhetoric and Politics of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds., *Contesting the Master Narrative: Essays in Social History*. University of Iowa Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods*

Randolph Roth                                                                 Page 8

(1986) 19: 103-117.

**Public History Essays**

"Can Faith Change the World?  Religion and Society in Vermont's Age of Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.

**Works in Progress**

*Child Murder in America*. An interregional study of murders of and by children from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of Speaking for Nature" (essay in manuscript)

**Editorial Boards**

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*
2004- , *Crime, History, and Societies*

**Invited Lectures**

"The History of Police Involved Homicides in the United States," Mary Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime Historians Symposium, Leeds University, Great Britain, Scheduled for September 2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the Available Historical Data, and Why We Have to Worry about Learning the Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020. Postponed.

Randolph Roth                                                              Page 9

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan
University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the
Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15,
2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The
Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of
Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia
State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of
Buffalo, October 10, 2013.

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects
for a New Institute on History and the Sciences," Max Planck Institutes, Berlin,
Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina
Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and
Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law,
November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5,
2012

"Quantitative Analysis of the History of Crime and Violence: Achievements and
Prospects," Keynote Address, Conference on "Making Sense of Violence,"
University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences,

and the Social Sciences in the Study of Violence." Conference on Emerging Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May 25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Presidential Plenary Address, Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the "From Borderland to Backcountry Conference: Frontier Communities in Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15, 2007

 "American Homicide: Its History," Ohio State University at Newark, Nov. 6, 2007

 "American Homicide: A Political Hypothesis" and "The Case for Social Science History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the Historical Approaches in the Social Sciences series, State University of New York at Binghamton, Oct. 12, 2006

 "The History of American Homicide," Winter College, Ohio State University, Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group, Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western Democracies?  A Political and Psychological Hypothesis," Center for Historical Research and Documentation on War and Contemporary Societies, Belgian Ministry of Scientific Research, Brussels, Belgium, December 2004

"The History of American Homicide," Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family," Plenary Session, Society of Historians of the Early American Republic, July 22, 2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History, Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University, February, 2003

"American Homicide," School of Law, Northwestern University, September, 2003

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University, November, 2001

"Why Northern New Englanders Seldom Commit Murder:  An Interregional History of Homicide in America," and "The Historical Database Project on Crime and Violence in America," two lectures presented at the Charles Warren Center, Harvard University.  May, 2000

"Understanding Homicide in America:  An Interregional Approach," presentation to the Early American History Seminar, University of Pennsylvania, October, 1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the

Randolph Roth                                                                                     Page 12

Center for Research on Vermont, the University of Vermont, and the Vermont Council on the Humanities. The presentation was televised in Vermont. It also made the evening news in Burlington and an AP wire story on my presentation was printed widely in newspapers in New Hampshire and Vermont, April, 1999

## Papers Delivered at Professional Meetings (recent)

"The Difficulty of Counting the Number of Children Killed in Homicides in the United States, 1959-Present." Social Science History Association, November 23, 2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in the Future?" Social Science History Association, November 3, 2017, Montreal.

"Comparing Data Sources on the Police Use of Lethal Force," American Society of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and Rania Issa.

 "The History of Mass Murder," American Historical Association, January 6, 2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social Behavior," American Historical Association, New York City, January 4, 2015

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

"Author Meets Critics" session on *American Homicide* at the European Social Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic,"Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

 "The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports," Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April 12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the Presidential Panel on "History in the Social Science History of Association: Disciplinary Developments," Social Science History Association, Chicago, Nov. 15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable?  The Impact of

Non-Emergency Medicine," Social Science History Association, Chicago, Nov. 15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-Century West Was Violent." Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had Enough Money to Study It Properly? Possibilities for Collaborative Research Projects," Social Science History Association, Portland, Oregon, November 3-6, 2005

## Reviews

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*. (Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at the Power Cabin, 1918*. (Western Historical Quarterly, 2020).

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Randolph Roth                                                                                    Page 15

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont History, 2006).

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty: A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic: Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness: Management of Christian Service Organizations* (American Historical Review, 1996).

N. Prabha Unnithan, *The Currents of Lethal Violence:  an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love:  Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America:  Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws:  Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

David G. Hackett, *The Rude Hand of Innovation:  Religion and Social Order in Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen:  The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change:  Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power:  The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life:  Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture* (Journal of the Early Republic, 1988).

William Lynwood Montell, *Killings:  Folk Justice in the Upper South* (International Journal of Oral History, 1987).

David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early Industrial New England* (Journal of American History, 1987).

Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of*

Randolph Roth                                                                    Page 17

> *Rational Religion in New England* (New England Quarterly, 1985).

## Languages

German
Spanish
French (reading)

## Quantitative Skills

Probability and Statistics (including econometric techniques of political analysis, exploratory data analysis, and log-linear and logit analysis)
Calculus and Analytical Geometry
Linear Algebra and Nonlinear Dynamics
Differential and Series Equations
Abstract Algebra

Randolph Roth                                                                          Page 18

**Teaching**

### Graduate

| History 7000 | Topics in American History to 1877 |
|---|---|
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| History 2001 | American Civilization, 1607-1877 (and Honors) |
|---|---|
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| | |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

## Publications on Teaching

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

## Ph.D Students Supervised

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

Randolph Roth                                                          Page 19

University fellowship for senior graduate students. Assistant Professor of History, University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in Santa Fe, New Mexico, 1837-1853," June 2012. Assistant Professor of History, University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in Western Virginia, 1844-1865," December 2011. Former Assistant Professor of History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education and the Defining of the Midwest," January 1999. Professor of History, Reinhardt College. Author of *Cultivating Regionalism: Higher Education and the Making of the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in Popular Culture, 1765-1820," May 1995. Professor of Social and International Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-1850," November 1993. Professor of History, Union College

**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do Americans Commit Suicide More Often during Economic Crises?" (Anticipated 2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated 2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020). Prospective applicant to graduate school in history.

Randolph Roth                                                                                Page 20

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities,
Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017).
Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points,
New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at
the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in
Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West
Virginia's Multiracial Community" (2010). Ph.D. candidate in early American
history at the College of William and Mary. Recipient of the first Annual Prize at
Ohio State for the outstanding senior honors thesis in the Department of History.

Randolph Roth                                                                    Page 21

## Service

### Service in Professional Organizations

2018-present, Allen Sharlin Book Prize Committee, Social Science History Association

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

1987-1993, Chair, Methods and Theory Network, Social Science History Association

Randolph Roth                                                                 Page 22

1987, Program Committee, Social Science History Association

**Reviews of Manuscripts**

American Historical Review
Journal of American History
William and Mary Quarterly
Journal of the Early Republic
Social Science History
Journal of Interdisciplinary History
Historical Methods
Journal of Women's History
Journal of the Family
Crime, History, and Societies
European Journal of Criminology
American Journal of Sociology
Sociological Quarterly
Criminology
Criminal Justice Review
Journal of Criminal Law and Criminology
Law and Social Inquiry
Homicide Studies
International Criminal Justice Review
International Journal of Law, Crime, and Justice
Law and Society Review
City and Community
Eras Review
Western Historical Quarterly
Canadian Journal of Sociology
Journal of the Gilded Age

**Memberships in Professional Organizations (current)**

American Historical Association
Organization of American Historians
Social Science History Association
European Social Science History Association
American Society of Criminology
Homicide Studies Working Group
American Association for the Advancement of Science

**Service at Ohio State University**

Randolph Roth                                                                Page 23

**Department**

2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

1994-2015, 2018-present, Undergraduate Teaching Committee

2017-2018, Chair of Grievance Committee

2015-2017, 1991-1993, Chair of Graduate Studies

2012-2013, Chair of Undergraduate Studies

2011-2013, Advisory Committee and Salary Committee

1987-1991, History Department Promotion & Tenure Committee

**College of Humanities**

2007-2009, Curriculum Committee, College of Humanities

2002-2005, College of Humanities Computing Advisory Committee

1996-1997, College of Humanities Committee on the Center for the Study and Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-

**College of Arts and Sciences**

2006-2009, Alternate, Arts and Sciences Faculty Senate

2006- , Advisory Board, Criminal Justice Research Center, Department of Criminology and Sociology

2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of Law

2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior Sciences

**Graduate School**

2018- , Graduate Awards Review Committee

Randolph Roth                                                    Page 24

**Ohio Department of Higher Education**

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer Network

**Service at Grinnell College**

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

**Community Service**

2001-2008, Chair, Community Services Advisory Commission, City of Dublin: advises City Council on all matters concerning utilities, policing, transportation, parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit Badge Counselor / Eagle Scout Association / Philmont Staff Association / Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic association officers and city commission members

1995-1998, Vice-Chair, Transportation Task Force, City of Dublin

1995-1997, Community Plan Steering Committee, City of Dublin

Randolph Roth                                                               Page 25

    1988-present, President / Vice President / Trustee, East Dublin Civic Association

    1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew Leader

**Outreach / Media Appearances**

    Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on so-called "Stand Your Ground" laws.

    B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility Equality and Dignity), January 13, 2020, on gun violence in central Ohio.

    Testimony to Federalism Committee of the Ohio House of Representatives, June 12, 2019, on concealed carry laws.

    Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019

    Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S. with Undergraduate Students, April 10, 2019

    "Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.

    "How the Erosion of Trust Leads to Murders and Mass Shootings," invited editorial, *Washington Post*, October 6, 2017

    "Mass Murder in American History," CSpan-3, April 2, 2017

    All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism," December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the United States," March 14, 2017.

    Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-2014

    Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-span.org/LocalContent/Columbus/)

    Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E Home Video)

    "It's No Mystery: Why Homicide Declined in American Cities during the First Six Months of 2009," History News Network, November 22, 2009

Randolph Roth                                                          Page 26

(http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-22-2009%205-2010.pdf and http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%20Thoughts%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of 2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL, Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio, KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009; The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury, Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC, Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9, 2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012; and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012; *American Homicide* was the subject of an editorial by op-ed writer Gregory Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010 **(http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-2010apr12,0,3217212.column)**

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*, Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine* in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the *Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the *Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*, the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's work in a Sunday edition

Exhibit 2

## BACKGROUND AND QUALIFICATIONS

1.        I received a B.A. in History from Stanford University in 1973 and a Ph.D. in History

from Yale University in 1981.  I have taught courses in history and the social sciences since 1978,

with a focus on criminology and the history of crime.

2.        I am the author of *American Homicide* (The Belknap Press of the Harvard

University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American

Society of Criminology awarded annually for the book published over the three previous years that

"makes the most outstanding contribution to research in criminology over the previous three

years,"[1] and the 2010 Allan Sharlin Memorial Prize from the Social Science History Association

for outstanding books in social science history.[2]  *American Homicide* was also named one of the

Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by

*reason.com*.  The book is an interregional, internationally comparative study of homicide in the

United States from colonial times to the present.  I am a Fellow of the American Association for

the Advancement of Science, and I have served as a member of the National Academy of Sciences

Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board of the *American

Historical Review*, the most influential journal in the discipline.  I am the principal investigator on

the National Homicide Data Improvement Project, a project funded by the National Science

Foundation and the Harry Frank Guggenheim Foundation to improve the quality of homicide data

in the United States from 1959 to the present.  I have published numerous essays on the history of

violence, including "Why Guns Are and Aren't the Problem: The Relationship between Guns and

Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds.,

*A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second

Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019); and "The Opioid

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

[2] See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

1

Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of Research in Crime and Delinquency* (2021).

3.      I am also co-founder and co-director of the Historical Violence Database.  The HVD is a collaborative project to gather data on the history of violent crime and violent death (homicides, suicides, accidents, and casualties of war) from medieval times to the present.  The web          address          for          the          Historical          Violence          Database          is: http://cjrc.osu.edu/research/interdisciplinary/hvd.

4.      My work on data collection has helped me gain expertise on the causes of homicide and mass violence, and on the role technology has played in changing the nature and incidence of homicide and mass violence.

## OPINIONS

### I.   SUMMARY OF OPINIONS

5.      I have been asked by the State of Rhode Island's Office of the Attorney General to provide opinions on the history of homicides and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides and mass murders.

6.      My opinion will address in turn: 1) firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur; 2) the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives; 3) the spread of restrictions on carrying concealed weapons in every state but Vermont by World War I,

as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I—a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century; 4) the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups; and 5) the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder.

## II.    GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A.    Homicide and Firearms in the Colonial Era (1688-1763)

7.      In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[3]  But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons.  First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[4]  By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[5]  Violence among colonists was not a pressing problem on the eve of the Revolution.

---

[3] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016).  Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

[4] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together.  The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[5] Roth, *American Homicide*, 61-144, and especially the graphs on 38, 39, and 91.  By way of comparison, the average homicide rate for adults in the United States from 1999 through

8.      Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.[6]  Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.[7] And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 to 15 percent.[8]

9.      Firearm use in homicides was generally rare because muzzle-loading firearms had significant limitations as murder weapons in the colonial era.[9]  They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology; and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[10]  They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[11]  And more important, muzzle-loading firearms could not be used impulsively unless they were already loaded for some other purpose.[12]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if

---

2016—an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year.  See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[6] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[7] Roth, "Why Guns Are and Aren't the Problem," 116.

[8] Ibid., 116-119.

[9] Ibid., 117.

[10] Ibid.

[11] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[12] Roth, "Why Guns Are and Aren't the Problem," 117.

powder, wadding, and shot or ball were at hand.[13]  The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[14]  The firing mechanism also had to be readied, often with a fresh flint.[15]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[16]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage.[17]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[18]

10.     The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[19]  It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured servitude or the early years of racial slavery.[20]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[21]

---

[13] Ibid.

[14] Ibid.

[15] Ibid.

[16] Ibid.

[17] Ibid.

[18] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[19] Roth, "Why Guns Are and Aren't the Problem," 117.

[20] Ibid.

[21] Ibid.  Contrary to popular belief, dueling was also rare in colonial America.  Roth, *American Homicide*, 45, 158.

11.     When colonists anticipated violence or during times of political instability gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[22] so the proportion of homicides committed with firearms was at that time forty percent and rose even higher in contested areas on the frontier.[23]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so three-fifths of homicides of Native Americans by European Americans in New England were committed with firearms.[24]  And slave catchers and posses kept their firearms at the ready, so ninety percent of runaway slaves who were killed in Virginia were shot.[25]  Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[26]  That is why firearms had a modest impact on homicide rates among colonists.

> **B.    The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

12.     The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.  At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and could thus threaten the security of the government and the safety of citizens.[27]  The threats that such citizens posed to public safety could be checked

---

[22] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[23] Ibid., 116-117.

[24] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

[25] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[26] Ibid., 118-119.

[27] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969); Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996); Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989); and Andrew S. Trees, *The*

in most instances by ordinary criminal statutes, drawn largely from British common law. But at times those threats could be checked only by statutes that placed limits on basic rights.[28]

13.    The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[29]  And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[30] But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England.  Only New York City stood out, at 6 per 100,000 adults per year.[31]  And the proportion of domestic and nondomestic homicides committed with firearms was correspondingly low—between 0 and 10 percent— because people once again generally refrained, as they had from the Glorious Revolution through

---

*Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003).

[28] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121.

[29] Roth, *American Homicide*, 145-179; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017); Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006); John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998); Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000); and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[30] Roth, "Why Guns Are and Aren't the Problem," 119-120.

[31] Roth, *American Homicide*, 163, 180-198; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[32]

14.     The keys to these low homicide rates and low rates of gun violence in New England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and the degree to which the promise of the democratic revolution was realized.  Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[33]  And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread.  By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[34]  African Americans still faced discrimination and limits on their basic rights in most Northern states.  But despite these barriers, most African Americans in the North were optimistic, after slavery was abolished in the North, about earning their own living and forming their own churches and voluntary organizations.[35]

15.     That is why there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels.  They took a strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the practice posed

---

[32] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/research/interdisciplinary/hvd/ahsv, accessed September 9, 2022).  On weapons use in homicides in the North, see Figures 25 through 46.

[33] Roth, *American Homicide*, 180.

[34] Ibid., 180-198.

[35] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

for the nation's democratic polity and the lives of public men: editors, attorneys, military officers, and politicians.[36]

16.    Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states,[37] where violence among citizens increased after the Revolution to extremely high levels.  Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year.[38]  Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical.[39]  Prominent whites were subjected to the rough and tumble of partisan politics and their position in society was threatened by people from lower social positions.[40]  African Americans despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of African American rebellion.[41]  As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killings.[42]  The violence spread to frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever Southerners settled in the early national period.[43]  During the Early National period, the proportion of homicides committed with firearms went up

---

[36] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847.

[37] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999).

[38] Roth, *American Homicide*, 199-203.

[39] Ibid., 182.

[40] Ibid.

[41] Ibid.

[42] Ibid., 182, 199-224.

[43] Ibid., 162, 180-183, 199-243; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

accordingly, to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[44]

17.    Citizens and public officials in these states recognized that concealable weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an alarming proportion of the era's murders and serious assaults.[45]  They were used to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights. As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

> The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[46]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[47]  These concealed weapons laws were notably difficult to enforce, however, and did not address underlying factors that contributed to rising homicide rates.  Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

18.    The pistols of the early national period represented a technological advance. Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of

---

[44] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[45] Roth, *American Homicide*, 218.

[46] Ibid., 281-219.  See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[47] Roth, *American Homicide*, 219.

10

air and moisture to the chamber. Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[48] The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting. Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[49]

19.    The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838. These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct. Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive. It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers. But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances. Indiana made an exemption for travelers.[50]

---

[48] Roth, "Why Guns Are and Aren't the Problem," 117.

[49] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

[50] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws. Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols. See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022). Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms. That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

20.     Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[51]

### C. Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

21.     By the early twentieth century, every state except Vermont either banned concealed firearms or placed severe restrictions on their possession.[52]  They did so in response to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse. Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[53]  But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Americans,

---

[51] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22.  Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836.  On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361; Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

[52] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22.

[53] Roth, *American Homicide*, 297-299.

12

especially men, were more willing to kill friends, acquaintances, and strangers.  And so, the United States became—and remains today—by far the most murderous affluent society in the world.[54]

22.    The increase occurred because America's heretofore largely successful effort at nation-building failed catastrophically at mid-century.[55]  As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust.[56]  Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors.[57]  They were losing the sense that they were participating in a great adventure with their fellow Americans.[58]  Instead, they were competing in a cutthroat economy and a combative political system against millions of strangers whose interests and values were antithetical to their own.[59]  And most ominously, law and order broke down in the wake of the hostile military occupation of the Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[60]

23.    The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[61]  Because the pistols, muskets, and rifles in use in the early years of the crisis of the mid-nineteenth

---

[54] Ibid., 297-385.

[55] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

[56] Roth, *American Homicide*, 299-302, 384-385.  See also Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

[57] Roth, *American Homicide*, 300.

[58] Ibid.

[59] Ibid.

[60] Ibid., 299-385.

[61] Roth, "Why Guns Are and Aren't the Problem," 116-117.

century were still predominantly single-shot, muzzle-loading, black powder weapons, the proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[62]  Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons.  But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

24.     Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[63]  They retained some of the limitations of earlier firearms, because their rotating cylinders—two of which came with each revolver—had to be loaded one chamber at a time.  Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever.  Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun.  But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[64]

25.     Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway.  But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers. It could be loaded quickly and easily because it did not require powder, wadding, and shot for each

---

[62] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

[63] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

[64] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[65]  And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[66]  As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
>
> The convenience and safety with which both the arm and ammunition may be carried;
>
> The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
>
> Certainty of fire in damp weather;
>
> That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[67]

26.    Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[68]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading.  The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[69]

27.    These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality,

---

[65] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

[66] Ibid., 38-57.

[67] Ibid., 39.

[68] Ibid., 38-57.

[69] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

but because they were used in novel ways.[70]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[71]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.[72]  Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history.[73]  That is why the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers— reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[74]  And that is why every state in the Union except one restricted the right to carrying certain concealable weapons.  The lone holdout was Vermont, the state with the lowest homicide rate.[75]

28.    It is important to note that state legislators experimented with various degrees of firearm regulation, as the nation became more and more violent.  In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June, 1865, to June, 1868,[76] the

---

[70] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).

[71] Ibid., 124-125.

[72] Ibid., 125-127.

[73] Ibid., 125.

[74] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[75] Roth, *American Homicide*, 184; and Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000).

[76] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192.

legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed

carry of a wide range of weapons, including firearms, on social occasions;[77] and it followed in

1871 with a bill banning in most circumstances the carrying, open or concealed, of small deadly

weapons, including pistols, that were not designed for hunting or militia service.[78]  These laws

---

[77] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610.  "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."  An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63.

[78] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611.  Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.'  An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25.  The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk,

were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[79]

29.    California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[80] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons. A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[81]

30.    But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection

---

dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.' Id. § 3." The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces. Also, the deadly weapon law did not apply to all guns or firearms but just pistols. The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'"

[79] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620. The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication.

[80] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354-384.

[81] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7.

18

law-abiding citizens could hope for was to arm themselves.  And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[82]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[83]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[84]    And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[85]

31.    Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[86]

The burden of proof remained with the person who carried the concealed weapon.

32.    It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

---

[82] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[83] Ibid., 11.

[84] Ibid., 11-13.

[85] Ibid., 13-15.  Note that the title of the Cramer and Olson essay is misleading.  It does not refer to the origins of the laws discussed here or to the ways in which they were enforced.  It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

[86] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

### III.  ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY TWENTIETH CENTURY

33.    The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing technologies.[87] The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own.  Mass killings of this type were rare in the colonial, Revolutionary, and Early National eras, outside of massacres of Native Americans or irregular warfare among citizens seeking political power.[88]  But from the 1830s into the early twentieth century, mass killings were common.

34.    Examples include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871.  Because these mass killings were almost always spontaneous and loosely organized, they

---

[87] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996).

[88] For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644]. For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 39-31]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

were difficult for government to prevent.  Worse, in some incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[89]

35.    The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments.  The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[90]  But when federal troops were withdrawn, white supremacist mass killings resumed.  In New Orleans, for example, an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[91] And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes.  Rioters and vigilantes remained a threat well into the twentieth

---

[89] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates*, The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney*, The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

[90] Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

[91] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158.  See also LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

century. In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[92]

## IV. Addressing Threats to the Republic and Its Citizens from Mass Murderers from the Early Twentieth Century to the Present

36.    The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time. These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers. The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the submachine gun, invented by General John T. Thompson in 1918.

37.    The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare. The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[93]

38.    Criminals and terrorists quickly discovered how accessible and useful these new technologies were. They could be purchased legally by private citizens. In the 1920s, Thompson submachine guns were expensive. They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, when a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as

---

[92] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

[93] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

$10).[94]  That is why Thompsons were favored by those with resources: law enforcement, the Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers.  Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08 today), so it was favored by labor activists and anarchists.[95]  Federal, state, and local officials and law enforcement officers suddenly confronted novel threats to their personal safety.  Submachine guns were used most notoriously in gangland slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day Massacre and the Kansas City Massacre.[96]  Dynamite was used in a string of anarchist bombings in 1919-1920.  Those included the murder of 38 people and the wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[97]  Dynamite was also used effectively for malicious, private ends.  For example,

---

[94] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022.  The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed October 4, 2022.  The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[95] Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6.  Note that a pound of dynamite would be far more expensive today—potentially hundreds of thousands of dollars—because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker.  See U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012* (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download), accessed October 4, 2022.

[96] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

[97] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110.  Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

Osage Indians were murdered by an individual in Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[98]

39.    Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons. Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[99] and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[100] And the Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives, building upon regulations that began in 1917 with the passage of the Federal Explosives Act, which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[101]

40.    Since 1970, public officials have continued to reserve the right to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder. The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder. The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[102]

---

[98] For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[99] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238. In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[100] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

[101] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

[102] Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a -

And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks. It gave owners 90 days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[103]

41.    In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons with large capacity magazines. These weapons, which were designed for offensive military applications rather than individual self-defense, emerged from technologies developed for military use during the Cold War. The signature military firearm of that era—the M-16 rifle with a 30-round magazine and a muzzle velocity of over 3,000 feet per second[104]—was capable of firing 750 to 900 rounds per minute when set on fully automatic. But the M-16 was used more often in combat—and more accurately, effectively, and sustainably as a weapon for inflicting mass casualties—when set on semiautomatic, which was standard military procedure. That is why the U.S. Army defines "rapid fire" as 45 rounds per minute, not 750 to 900.[105] And that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which replaced the "fully automatic" switch with a three-round burst—an alteration that slows the potential rate of fire, conserves ammunition, and improves accuracy.[106]

---

Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J). The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007. Accessed August 31, 2022.

[103] *New York Times*, December 18, 2018 (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html), accessed October 4, 2022.

[104] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[105] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016). Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022.

[106] See military-today.com (http://www.military-today.com/firearms/m16.htm), accessed October 4, 2022.

42.    The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower than that of an M-16 or its civilian counterparts: around 1,350 feet per second.  But technological advances have increased the speed at which semiautomatic handguns can be fired.  An expert can fire an entire 30-round clip from a Glock 17 handgun in five seconds.[107] And they are affordable. A new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15.[108]

43.    It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire semiautomatic handguns and rifles with large capacity magazines that poured onto the domestic market in the 1970s and 1980s.  These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff.

44.    Manufacturers soon discovered ways to increase the rate of fire of these new semiautomatic weapons even further.  Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*—a modification that doubles the rate at which semiautomatic weapons can be fired.[109]

---

[107] See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM." YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs), accessed September 1, 2022.

[108] See guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms/handguns/semi-auto?priceRange=Less%20than%20%24250) and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.

[109] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download), accessed October 4, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement.  Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida.  (https://lundestudio.com/are-binary-triggers-legal/), accessed October 4, 2022.  See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed October 4, 2022.

45.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[110]

46.     The threat to public safety and law enforcement posed by semiautomatic rifles—with or without dangerous modifications—is a modern phenomenon that has a direct correlation with mass murder and mass shootings.  The danger these firearms pose is intrinsically different from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

Figure 1

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |

---

[110] See "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed October 4, 2022.

| Number of Mass Shootings | 52 | 82 | 40 | 8 |
|---|---|---|---|---|

Note that mass shootings with semiautomatic rifles have been as deadly as mass shootings with fully automatic weapons.[111]

47.      And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

Figure 2

|  | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

48.      Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and semiautomatic handguns 11 percent more than regular firearms.  But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and semiautomatic

---

[111] The data are from the Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022.  The Violence Project, which has compiled data on mass shootings from 1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least one of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)."  The Violence Project database provides information on the weapons used in the shootings.  It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons.  Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic.  I have not participated in Violence Project or in the collection of their data.  In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, that fit the Violence Project's definition of a mass shooting.  Three were committed with semiautomatic rifles and three with semiautomatic handguns.  The table does not include the Las Vegas shooting of 2017 (58 killed, 887 wounded).

handguns 184 percent more than regular firearms. In combination, semiautomatic firearms and extended magazines are extraordinarily lethal.[112]

49.    For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004.  And local governments have banned the sale of large capacity magazines, because they allow mass murderers to prolong their attacks before citizens or law enforcement can intervene—usually when the shooter is reloading.  For example, the shooter who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011 was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before bystanders could disarm him as he changed magazines.  Every one of those rounds hit an individual, killing six and injuring twelve.[113]

## V.    CONCLUSION

50.    From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions.  That is why the majority of states passed and enforced laws against the carrying of concealable weapons, why the federal government passed the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership or control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit mass murder.  Public officials are not required to pass such laws, of course, but historically, they have always retained the ability to do so.  There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on weapons and armed voluntary organizations.  And mass murders by individuals, including mass shootings, are a recent phenomenon, caused by changes in technology

---

[112] The data are from the Violence Project.

[113] "2011 Tucson Shooting," Wikipedia (https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed September 2, 2022.

that emerged in the late nineteenth through the late twentieth century.  Public officials today are confronting a criminological problem that did not exist in the Founding Era, nor during the first century of the nation's existence.