## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **OCEAN STATE TACTICAL, LLC d/b/a BIG BEAR HUNTING AND FISHING SUPPLY; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER** | : | |
| *Plaintiffs,* | : | |
| | : | **Case No.: 1:22-cv-00246-JJM-PAS** |
| **v.** | : | |
| | : | |
| **PETER F. NERONHA, in his Official Capacity as the Attorney General for The State of Rhode Island; and DARNELL S. WEAVER, in his Official Capacity as the Superintendent of the Rhode Island State Police** | : | |
| *Defendants.* | : | |

### PLAINTIFFS' REPLY BRIEF TO DEFENDANTS' OBJECTION TO THE PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT

Pursuant to Fed. R. Civ. P. 7(b) and LR Cv 7(a)(4), the Plaintiffs, Ocean State Tactical, LLC d/b/a Big Bear Hunting and Fishing Supply (*hereinafter*, the "Business Plaintiff"), Johnathan Hirons, James Robert Grundy, Jeffrey Goyette, and Mary Brimer (*hereinafter*, referred to collectively as the "Citizen Plaintiffs") (*hereinafter*, all listed Plaintiffs collectively referred to as the "Plaintiffs"), file this Reply Brief to the Defendants', Peter F. Neronha, in his Official Capacity as the Attorney General for The State of Rhode Island, and Darnell S. Weaver, in his Official Capacity as the Superintendent of the Rhode Island State Police (*hereinafter*, collectively as the "Defendants") Response in Objection to the Plaintiffs' Motion for Preliminary Injunction (*hereinafter*, the "Defendants' Objection"). In response to the Defendants' Objection, the Plaintiffs hereby state as follows:

## HISTORICAL ANALYSIS THROUGH THE ERAS OF THE NATION

The Defendants' Objection asserts the key to *N.Y. State Rifle and Pistol Association v. Bruen*'s (*hereinafter*, referred to as "*Bruen*") new analysis is "an evaluation of relevant firearms regulations in the context of United States history." See *Defendants' Objection* at p. 9. Though the Defendants are correct, they omit the extensive framework articulated in *Bruen*, which provides a much greater in-depth standard of historical analysis than the Defendants care to express. In support of the full historical analysis of firearms regulation pertaining to the Second Amendment guarantees and limits established in *Heller v. The District of Columbia*, and later applied and expanded upon in *Bruen*, the Plaintiffs provide the report of firearms history historian and author, Ashley Hlebinbsky. See **Exhibit A**, a true and accurate copy of Ashley Hlebinsky's expert report attached hereto.

### a. Standard Articulated In Bruen

The most important aspect in considering the framework articulated in *Bruen*, is that the most relevant time frame considered regarding the constitutionality of modern regulation is the Founding Era, when the Second Amendment was ratified. See **Exhibit A**, at ¶¶ 10 - 11; see also *N.Y. State Rifle and Pistol Association v. Bruen*, 142 S. Ct. 2111, 2136 (2022) (quoting *District of Columbia v. Heller*, 544 U.S. 570, 634-635, 128 S. Ct. 2783 (2008) ("not all history is created equal… Constitutional rights are enshrined with the scope they were understood to have when the people adopted them"). Though other time periods, such as the creation of the Fourteenth Amendment were helpful in providing context, they do not take precedent over the Founding Era when analyzing the constitutionality of modern firearms regulations. See *Bruen*, 142 S. Ct. at 2137 (citing *Heller*, 544 U.S., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d. 637) ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms "took place 75 years

after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as the earlier sources."); see also *Heller v. District of Columbia*, 670 F. 3d, 1244, 1274, 399 U.S. App. D.C. 314 (CADC 2011) (Kavanaugh, J. dissenting) ("post ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.")

Of great importance to considerer however, is "Guarding against giving post enactment history more weight than it can rightly bear." *Id*. Meaning, the historical analysis to be applied demands that ***if later history contradicts the constitutional text, then the "text controls"***. See ¶ *Bruen*, 142 S. Ct. at 2137 ("laws that are adopted and accepted but do not align with the original text cannot alter that text"). Historical analysis of time periods later than the Founding Era exclusively serve to provide context in addressing whether a modern restriction has a historic counterpart. See *Id*.

Determination of whether a law has a historic counterpart does not require a court to "uphold every modern law that remotely resembles a historical analogue" but rather, requires the analogue must be "relevantly similar". See *Id*. at 2131-2133. The law may be considered under two metrics: 1) ***how*** the regulation burdens a law-abiding citizen's right to armed defense ("how" being defined as whether modern and historical regulations impose comparable burden on the right of armed self-defense); and 2) ***why*** the regulation burdens a law-abiding citizens right to armed defense ("why" is defined as "whether the burden is comparably justified"). See *Id*. at 2133 (citing *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010).

### b. The Founding Era

The Defendants' Objection implies that the Civil War / Reconstruction era was the first instance in which the Nation contended with the advent of High-Capacity Firearms. See

*Defendants' Objection* at p. 14. However, repeating firearms (including those firearms that were magazine fed, including magazines of greater than ten (10) round capacity) had been around long before the Reconstruction Era subsequent to the Civil War, and even before the ratification of the Second Amendment. See **<u>Exhibit A</u>**, at ¶¶ 21 - 22 (Ex. the Belton Fusil repeating firearm, produced in the (now) United States in 1758 that could fire eight (8) shots in three (3) seconds, and was advertised to Congress, and one hundred units (100) were purchased by the Continental Army, but ultimately never delivered); (Ex. The Girardoni air rifle produced in 1779, a repeating arm that held twenty two (22) rounds from a tubular magazine, used by Lewis and Clark on their expedition to the newly acquired Western Territory in 1804-1806).

During the Founding Era, the laws enacted were centered on restriction of access to certain classes of people rather than the arms themselves. See **<u>Exhibit A</u>**, at ¶ 4 see also *Id*. at p. 11 (<u>citing</u> 7 The Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619, p. 95 (W.W. Henning ed. 1823)) ("that all such free Mulattoes, Negros and Indians . . . shall appear without arms"); see also *Id*. (<u>citing</u> 1 Stat. 271 (Georgetown Law Journal, Vol. 80, No. 2, "The Second Amendment: Toward an Afro-Americanist Reconsideration," Robert Cottrol and Raymond Diamond, 1991, p. 331) ("the Uniform Militia Act intentionally left out Black Americans, calling "for the enrollment of every free, able-bodied white male citizen between the ages of eighteen and forty five."). Several laws of the time required these arms to be personally acquired by each service member entering the service, with many laws regulating the minimum (rather than maximum) amount of ammunition allowed.

Additionally, the Defendants Objection points to several regulations on the storage of gunpowder in the Colonial Period, particularly those regulations which require storage of gun powder of certain quantities in specific locations, usually being a central location designated by the colony. See *Defendants' Objection* at p. 11. However, laws centered around the storage of gunpowder were enacted for the sole purpose of fire prevention within and near the towns limits or proximity to a powder house. See **Exhibit A**, at ¶ 27. See Thomas Wetmore, Commissioner, *The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City Page 142-143*, Image 142 (1834) available at The Making of Modern Law: Primary Sources (An Act . . . Prudent Storage of Gun Powder within the Town of Boston. Whereas the depositing of loaded arms in the houses of the town of Boston, . . . is dangerous . . . when a fire happens to break out in said town"); see also Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 159, Image 159 (1856) available at The Making of Modern Law: Primary Sources ("The Mayor. . . may give such directions . . . relative to the location of any boat having on board gunpowder, gun cotton, hay or other combustible materials; . . .") Gunpowder regulations were strictly related to the fact that gunpowder in the Colonial Period was highly combustible and unstable, and thus was regulated as a combustible material to prevent fires. Such regulations are hardly rooted in the tradition of the Second Amendment.

### c. *The Pre-Civil War Era and "Repeaters"*

The Defendants' Objection contends that the first high-capacity repeating rifles to come on scene, the Henry Rifle and the Winchester Repeating Rifle (*hereinafter*, the "Henry-Winchester Rifle"), did not gain wide popularity among the civilian market of the time in America, and were designed for military use, with their largest market being foreign armies. See *Defendants'*

*Objection* at p. 35. However, between 1866 and 1898, approximately 170,101 Model Winchester 1866s were produced, and of that production, only around 57,000 (1/3 roughly) were made for use by foreign militaries. See **Exhibit A**, at ¶¶ 30-31. The mass production of Winchester Repeating Rifles led to other companies participating in the same, such as the Evan's Repeating Rifle, produced between 1873 and 1879, and held capacities at 28, 34, and 38 rounds to meet market demand in the United States. See *Id*.

The Defendants' Objection points to several laws enacted during the Reconstruction Era which the Defendants assert constitute "enforcement" rather than "laws or enactments" governing the possession, carry, and use of firearm, including : 1) the United States Army's prevention of arms reaching insurgent groups; 2) comparison to modern laws (such as the Magazine Ban Law) which exempt ex-law enforcement and military from the restrictions imposed, where former United States soldiers used high capacity repeating rifles in combatting Native American nations against robberies; 3) and generally, accounts of Henry-Winchester Rifles being used in civilian life mostly relative to criminal activity. See *Defendants' Objection*, at pp. 17-19.

Though the Defendants have painted the historic recounting of regulations pertaining to Henry-Winchester Rifles as those arms serving as an aid provided exclusively to those who sought freedom among all classes of people in the Country during the Reconstruction Era, they fail to articulate upon the grim truth of firearms regulation during the time period, (particularly in the South) which served largely to disarm vulnerable groups of people based on race. Numerous laws were enacted between the mid-1800s, up to the Civil War (and in some cases, after the Civil War) that served only to restrict firearms ownership among African Americans. Take for example Florida, which enacted a law in 1828 that restricted African Americans from carrying a firearm without first obtaining court approval. See **Exhibit A**, at ¶ 38.  Further, even after the abolition of

slavery in 1865, discriminatory firearms regulations based on race continued to persist, such as Alabama's 1866 law that banned African Americans from owning firearms, and made it illegal for any person to sell or lend a firearm to an African American. See *Id*. at p. 20. Such discriminatory regulation was so severe in the South, that The Second Freedmen's Bureau Act was amended in 1866 to include the wording "full and equal benefit to all laws and proceedings for the security of person and estate *including the constitutional right to bear arms*." See *Id*. at ¶ 40.

Firearms regulation during the Reconstruction Era almost never served to protect minority classes of persons from extensive violence among groups such as the Ku Klux Klan, and indirectly promoted violent crime against African Americans by serving to disarm only African Americans. Take for example the case of *United States v. Cruikshank*[1], where the Supreme Court ruled the Federal Government had no right to protect against private action of a Ku Klux Klan member who sought to interfere with the rights of two African American men who sought to exercise their right to bear arms, and peacefully assemble. *United States v. Cruikshank*, 92 U.S. 542, 548-59 (1875). The Court expressed that it was the responsibility of the individual State to protect its citizens against private action, which proved detrimental to southern African Americans when taking into consideration the persecution of freed slaves, along with State sponsored discrimination that occurred during the post-Civil War years in the Southern States. As such, government regulation

---

[1] In *United States v. Cruikshank*, 92 U.S. 542, 548-59 (1875) A member of the KKK, Cruikshank had been charged with violating the rights of two black men to peaceably assemble and to bear arms. The U.S. Supreme Court held that the federal government had no power to protect citizens against private action (not committed by federal or state government authorities) that deprived them of their constitutional rights under the 14th Amendment. The Court held that for protection against private criminal action, individuals are required to look to state governments. "The doctrine in *Cruikshank*, that blacks would have to look to state government for protection against criminal conspiracies gave the green light to private forces, often with the assistance of state and local governments, that sought to subjugate the former slaves and their descendants... With the protective arm of the federal government withdrawn, protection of black lives and property was left to largely hostile state governments."

of firearms during the time period only served to harm, rather than help African American communities. See *Id*.

In response to many instances such as the one just referenced, the National Colored Press Association actually encouraged African Americans to purchase Henry-Winchester rifles to protect their families from "the two legged animals . . . growling around your home in the dead of the night." See **Exhibit A**, at ¶ 22; see also *Id*. (<u>citing</u> Ibid, pg 521 referencing Wells, Ida B. *Southern Horrors.* N.Y. Age June 25, 1892. Reprinted in Wells, Ida B. *The Light of Truth: Writings of an Anti-Lynching Crusader*, pg. 84) (where Ida B. Wells, an activist and journalist in the South in 1892 wrote "that a Winchester rifle should have a place of honor in every black home, and it should be used for the protection which the law refuses to give").

## ARGUMENT

### I- Plaintiffs Have Established A Strong Likelihood of Success On The Merits Where The Magazine Ban Law Burdens The Plain Text of The Plaintiffs' Second Amendment Rights.

The Defendants' Objection contends that "Rhode Island's restriction on large capacity magazines 'is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.' *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022)." See *Defendants' Objection,* at p. 27. However, such assertion, when considered in light of the Decision issued in *Bruen*, is categorically untrue for two (2) distinct reasons, that being: 1) the Defendants' attempts to persuade this Court that the relevant standard for review is to the history of Rhode Island's regulation of the Second Amendment, where the proper review pertains to the regulation of the Second Amendment in the nationally recognized context; and 2) there is just no definitive historical evidence that suggests the issue of magazine capacity alone has been regulated in a manner that is consistent with the Second Amendment.

**A. Rhode Island's Historical Regulations of Firearms Are Irrelevant in The Review of Their Constitutionality Under Bruen.**

The Defendants' Objection asserts that Standard Capacity Magazines are not "Arms", as the term "Arms" was understood at the founding or at the ratification of the Second or Fourteenth Amendments, and therefore are outside of the scope of the Second Amendment's protection. See *Id*. at 29.

However, confusingly, the Defendants' entire subsection following that assertion is extremely persistent in attempting to prove that Standard Capacity Magazines are "dangerous and unusual", a categorization reviewed by the United States Supreme Court as being unprotected by the Second Amendment, as "longstanding prohibitions on the possession of 'dangerous and unusual *weapons*' have uniformly been recognized as falling outside the scope of the Second Amendment." See *United States v. Miller*, 307 U.S. 174, 59 S. Ct. 816, 83 L. Ed 1206 (1939). The Defendants, in two separate sections, have argued (in one section) that Standard Capacity Magazines are not "Arms" protected by the Second Amendment, and (in another section immediately following the first section) that "Large Capacity Magazines are 'dangerous and unusual'", and thus are "weapons" not protected under the definition of "arms" as established in the Defendants' Objection.

However, the Magazine Ban Law is codified in Title 11, Chapter 47 of the Rhode Island General Laws, titled as "Weapons", and implies that Rhode Island designates magazines as weapons, and regulates them as such. See *R.I. Gen. Laws § 11-47-51* ("Loaded *weapons* in vehicles" – "It is unlawful for any persons to have in his or her possession a loaded rifle or loaded shotgun or a rifle or shotgun *from the __magazine__ of which* all shells and cartridges have not been removed . . ." where the state considers magazines as weapons under said section.); compare to

9

*Defendants' Objection,* at p. 30 ("Large capacity magazines are not arms, and are not weapons") *R.I. Gen. Laws § 11-47-42* ("Weapons other than firearms prohibited" fails to include any variation of an object that could be considered a "Magazine" as defined separately from a firearm, with other specific objects defined separately). The General Laws of Rhode Island suggest that the State of Rhode Island clearly considers magazines as synonymous with the definition of "firearms", "arms", and/or "weapons", and thus, the State cannot then assert Standard Capacity Magazines are not considered "arms" covered under the Second Amendment.

Further, recent activity on several firearms challenges based on magazine capacity restrictions have been recognized as Second Amendment challenges, where several Federal Circuits have been directed by the Supreme Court to re-consider their previous decisions in light of new Second Amendment precedent established in *Bruen*. See *Duncan v. Bonta*, 19 F.4th 1087, 1099 (9th Cir. 2021), cert. granted, 142 S. Ct. 2895 (2022), vacated and remanded 49 F. 4th 1228 (9th Cir. 2022) (where Supreme Court review was pending on the 9th Circuit's decision to uphold California's ban on magazines capable of holding an excess of ten (10) rounds of ammunition, applying the two-step approach applied in firearms challenges, and then remanded back to the 9th Circuit by the Supreme Court to reconsider the case in light of the standard established in *Bruen* for firearms challenges); see also *Association of New Jersey Rifle and Pistol Clubs v. Bruck*, 910 F.3d 106 (3rd Cir. 2018), remanded by the Supreme Court 142 S. Ct. 2894 (where plaintiffs challenged New Jersey's ban on magazines capable of holding an excess of ten (10) rounds of ammunition, and the 3rd Circuit upheld the regulation, upon which cert. was granted to the Supreme Court, and then remanded to the lower court by the Supreme Court in light of the precedent established in *Bruen* pertaining to Second Amendment challenges).

These cases remanded back to the lower courts by the Supreme Court in light of the new precedent established in *Bruen* are recognized as challenges to magazine capacity restrictions as arms under the Second Amendment, otherwise the Supreme Court would not have directed further review under the *Bruen* standard. Magazines are provided protection and recognition under the Second Amendment as "modern instruments", covered by the definition of "arms" under the Second Amendment, as expressed in *Bruen*. See *Bruen*, 142 S. Ct. 2132 (citing *Caetano v. Massachusetts*, 577 U.S. 411-412, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016)) (". . . The Second Amendment extends . . . to *all instruments* that constitute bearable arms, even those that were not in existence at the time of the founding. . . The Second Amendment's definition of 'arms' is fixed according to its historical understanding that general definition covers *modern instruments* to *facilitate armed self-defense*").

The Defendants further cite to re-construction period culture relating to firearms regulations, specifically, the unpopularity of the repeating rifle, as well as the attempts to restrict firearms from insurrection groups in the South during the post-civil war reconstruction period. See *Defendants' Objection* at pp. 14-15. Not considering the countless factual inaccuracies the Defendants' experts assert regarding the lack of popularity of repeating arms at the time, the Defendant fails to point to any regulation of these repeating arms that has been upheld today, and further elevates reconstruction sentiments and regulations above the plain text of the Second Amendment, directly in contravention of Supreme Court Precedent. The Defendants assert that "Henry's and Winchesters were consistently regarded as uniquely dangerous weapons because of their high capacity, suited for military purposes. Accounts of their use in other aspects of civilian life from this period are incredibly rare, and usually relate to criminal activity or prevention of criminal activity by former soldiers and armed guards." See *Defendants Objection*, at p. 19. This

assertion is not only patently false, but holds no bearing on the review of the Second Amendment's historical text. See *Heller*, 670 F. 3d at 1274, n. 6 ("Post ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text."); see also *Bruen*, 142 S. Ct. at 2137 (citing *Heller*, 544 U.S. at 614 128 S. Ct. 2783, 171 L. Ed. 2d 637 ("As we recognized in *Heller* itself, because post-civil war discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.").

## B. Dangerous and Unusual Weapons

Further, Though the Defendants are correct in their assertion that the Second Amendment does not protect a right to carry "dangerous and unusual" weapons, and only protects those weapons in common use for self-defense "at the time", they wrongfully assert that Standard Capacity Magazines (i.e. those magazines that are capable of holding more than ten (10) rounds of ammunition, as defined in the Magazine Ban Law) are "not arms, are dangerous and unusual, and are not in common use for self-defense today." See *Defendants' Objection,* at p. 28. However, the Defendants' definition of what constitutes "dangerous and unusual" weapons is at best overly broad, and more accurately factually incorrect. Further, the Defendants' Objection relies on the fact that the First Circuit has specifically declined to address whether Standard Capacity Magazines were in common or uncommon use, with the Court briefly agreeing with the Seventh Circuit's comment that measuring 'common use' by the sheer number of weapons is "somewhat illogical" in the case of *Worman v. Healey*. See *Id*. at p. 33 (citing *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019)). However, the Defendants fail to express this Court's recent view pertaining to the "In Common Use" standard articulated in more recent decision(s).

The relevant question for this Court, is "whether the proscribed weapons are in common use for lawful purposes like self-defense." *O'Neil v. Neronha,* No. 19-612 WES, 2022 U.S. Dist. LEXIS 45475 (D.R.I. Mar. 15, 2022) (citing *Worman*, 922 F.3d at 35). Weapons which are in common use at the time are those protected by the Second Amendment. *Heller*, 544 U.S. at 627. Courts have generally grappled with the question of whether a weapon is in common use by inquiring into an objective, and statistical analysis. See *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("NYSRPA").

The Courts have been divided on the topic of what measure to use when determining if a weapon is "in common use" at the time. See *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (where the Court used raw number percentage and proportion, and jurisdiction counting); see also *NYSRPA*, 804 F.3d at 255 (holding that large capacity magazines were in common use where 50 million units were available for purchase.). However, this Court has provided very recent guidance in *O'Neil v. Neronha*. In *O'Neil*, the State of Rhode Island enacted a statute banning tasers and stun guns, where the Plaintiffs challenged the law as a violation of their Second Amendment Rights. See *O'Neil* generally. The question the Court contended with was whether the proscribed weapons were in common use for lawful purposes like self-defense. *Id*. at 14. The Court ultimately found that Stun Guns and Tasers are in fact in "common use" for purposes of the Second Amendment, relying on the record, and case law from other jurisdictions. *Id*. Of particular note, this Court relied on Justices Alito and Thomas' concurrence in *Caetano v. Massachusetts* in response to the State's assertions that Stun Guns were not as common as handguns and other arms, so thus were not in common use.

In *Caetano v. Massachusetts*, Justice Alito expressed the statistical gap between the number of stun guns or tasers and firearms "may be true, but is beside the point." *Caetano v.*

*Massachusetts*, 577 U.S. 411, 420, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (1026). He went on to express that if it were "otherwise, a State would be free to ban all weapons except handguns, because 'handguns are the most popular weapon chosen by Americans for self-defense in the home." *Id*. (quoting *Heller*, 544 U.S. at 629). He went on to express that "the more relevant statistic is that 'hundreds of thousands of tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 states." *Id*. (quoting *People v. Yanna*, 297 Mich. App. 137, 824 N.W.2d 241, 245 (Mich. Ct. App. 2012)); see also *Id*. at 1031 (explaining that the dangerous and unusual test "is a conjunctive test: a weapon may not be banned unless it is **both** dangerous **and** unusual") (Alito, J., concurring). According to recent studies, there are over 20 million "Modern Sporting Rifles" as defined by the National Shooting Sports Foundation (semi-automatic assault weapons) owned by Americans today. See *Joe Walsh*, U.S. Has At Least 20 Million Assault Rifles. A Ban Wouldn't Reduce That Number, Forbes Magazine (March 25, 2021). Though difficult to pin-point an exact number of Standard Capacity Magazines in private ownership today, the Department of Justice reported in 2004 there were 25 million Standard Capacity magazines available in the United States as of 1995, with roughly 1.5 million privately owned Assault Weapons in the United States, and nearly 25 million guns equipped with Standard Capacity Magazines. See *Christopher S Koper*, Updated Assessment of the Federal Assault Weapons Ban : Impacts on Gun Markets and Gun Violence, 1994-2003, Report to the National Institute of Justice, United States Department of Justice (June, 2004). Today, the number of privately owned assault weapons alone (not including other firearms that come standard with, and/or accept Standard Capacity Magazines) has jumped to 20 million from 1.5 million in 1995. As such, it is reasonable to estimate that there could exist hundreds of millions of Standard Capacity Magazines in the United States today.

Though some courts have made the analysis to both "not in common use" and "dangerous and unusual" synonymous with each other, for the sake of rebuttal, the Plaintiffs express that Standard Capacity Magazines are not in fact dangerous and unusual weapons and are in fact in common use. The Defendants' Objection asserts that Standard Capacity Magazines are "dangerous and unusual", and thus not protected under the Second Amendment. Though the Supreme Court has not articulated an exact definition of what the term "dangerous and unusual" encompasses, they have given several examples of arms that are considered dangerous and unusual. See *Staples v. United States*, 511 U.S. 600, 608-12, 114 S. Ct. 1793, 128 L. Ed. 2d 608, 612 (1994) (where the Supreme Court found machine guns (i.e. automatic rifles), are of "quasi-suspect character", in the same category as hand-grenades, and these weapons generally fall outside those categories of weapons that have traditionally been "Accepted as lawful possessions"); see also *Heller*, 554 U.S. at 675 (discussing how sawed-off shotguns are permissibly prohibited arms due to their dangerous and unusual nature). The Court in *Staples* contended with a violation of the National Firearms Act, 26 U.S.C. §§ 5801-5872, which defined a machinegun as "any weapon which shoots, . . . or can be readily restored to shoot, *automatically* more than one shot, without manual reloading, by a single function of the trigger. See Id at §5845(b). The characteristic making a Machine Gun "dangerous and unusual" is **its ability to fire *automatically***, and not its capability of being able to accept Standard Capacity Magazines. *See* Staples 511 U.S. at 612 (where the Court directly compared the difference of the *lawfully possessed* civilian AR-15s (capable of accepting Standard Capacity Magazines) and the *unlawfully possessed* M-16 Military Machine Gun (also capable of accepting Standard Capacity Magazines) being that the M-16 ***fires automatically***, and the AR-15 is only capable of semi-automatic firing).

Several sources indicate that Standard Capacity Magazines are in extraordinarily wide circulation, and are purchased, possessed, and used by American gun owners in common fashion. See *Matthew Laroisiere*, <u>Losing Count: The Empty Case for "High-Capacity" Magazine Restrictions</u>, Caito Institute, Legal Policy Bulletin No. 3 (July 17, 2018), <u>https://www.cato.org/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions</u> ("There is no firm figure for the number of magazines currently in circulations . . .. it is reasonable to assume that there could be up to a billion magazines in circulation, since more magazines than firearms are produced"). Referenced Article attached hereto as **<u>Exhibit B</u>**.

The Defendants assert that "When technological and societal changes have created a scenario in which conflicts among civilian society are worsened by or center around the presence of a particular type of weaponry . . . regulation follows." See *Defendants' Objection* at p. 34. The Defendants go on to cite the Statute of Northampton (also cited in *Bruen*) which restricted riding armed in pre-colonial England. However, the Statute of Northampton was enacted in 1382, in pre-colonial England, and was replaced in 1689 by the English Bill or Rights, which guaranteed that "Protestants . . . may have Arms for their Defense suitable to their Conditions, and as allowed by Law." See *Bruen*, 142 S. Ct. at 2141 (*citing* 1 Wm. & Mary c. 2, §7, in 3 Eng. Stat. at Large 417 (1689).

As previously stated, the exclusively controlling time period for historical analysis of firearms regulation in the United States remains the Founding Era.  See *Id*. at 2136. The Defendants' support their assertions of historical firearms restrictions relative to regulation of particular weaponry based on societal conflict by citing to The Statute of Northampton, a statute that was enacted nearly 400 years before the ratification of the Second Amendment, and repealed nearly 100 years before the first European set foot in North America. The Statute of Northampton

holds as much of a bearing to the historical analysis of firearms regulations since the ratification of the Second Amendment as the extinction of the Mammoth does to the modern study of the African Elephant.  See *Bruen*, 142 S. Ct. at 2136) (citing *Spring Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 311, 128 S. Ct. 2531, 171 L. Ed. 2d 424 (2008); *Dimick v. Schiedt*, 293 U.S. 474, 477, 55 S. Ct. 296, 79 L. Ed. 603 (1935)) ("It is one thing for courts to 'reach back to the 14th century' for English practices that 'prevailed up to the period immediately before the framing of the Constitution'. . . 'It is quite another to rely on an "ancient" practice that had become "obsolete in England at the time of the adoption of the Constitution, and never "was acted upon or accepted in the colonies").

Further, the portion of the Defendants' Objection that emphasizes the "dangerous and unusual" nature of large capacity firearms relative to the enactment of hunting regulations which restricted ammunition capacities, as well as certain classes of arms, is irrelevant to this analysis, as hunting does not concern the "central component" of self-defense that is the main component of Second Amendment review. See *Bruen*, at 142 S. Ct. 2133 ("As we stated in *Heller* and repeated in *McDonald*, 'individual **self-defense is the 'central component'** of the Second Amendment right"). However, in the interest of thoroughly providing this Court with context to the Defendants' assertions, Plaintiffs have several points to raise.

The Defendants tend to focus on ammunition capacities for [2]"automatic shotguns" while hunting for waterfowl, stating that "In other words, when used for hunting, these weapons were

---

[2] The Defendants refer (and provide a picture from) the book "Our Vanishing Wildlife" by William T. Hornady. In the referenced portion of the book, the author lumps pump shotguns into the same category as semi-automatic shotguns (called "automatic" shotguns in the book), and expresses how these weapons were capable of mass eradication of wildlife. However, both semi-automatic shotguns, as well as pump shotguns are the most common shotguns used for waterfowl hunting today, with every shotgun listed out of fourteen (14) shotguns announced in Field and Streams "The Best Duck Hunting Shotguns of 2022" being either a pump action or semi-automatic shotgun.

'dangerous and unusual'". See *Defendants' Objection* at p. 38. However, neither pump shotguns, nor semi-automatic shotguns are illegal to use while waterfowl hunting in any State today. In fact, the most popular shotguns for waterfowl hunting today are semi-automatic shotguns and pump action shotguns. The Defendant has no evidence other than a citation to a factually inaccurate book to assert that these shotguns were deemed "dangerous and unusual" in any context, never mind for purposes of Second Amendment review.

However, restrictions on hunting particular species of wildlife in both America as a whole, and the individual States bear no weight toward proving that particular weapons are being "dangerous and unusual" for wildlife, and everything to do with laws centered around the preservation of natural resources (i.e. wildlife), and fairness to other hunters. Take for example federal hunting regulations for migratory birds (i.e. waterfowl and other migratory species) which states "No person shall take migratory game birds: . . . (b) with a shotgun of any description capable of holding more than three shells, unless it is plugged with a one-piece filler. . ." See *50 CFR § 20.21(b)*. However, Federal regulation has exceptions for these capacity limits for species whose populations are not of the same concern as certain species of waterfowl. These species of less concern include the Snow Goose (a very populous species of waterfowl), and the Canada Goose (when all other waterfowl seasons are closed), of which, the Federal Government expresses the capacity restrictions do not apply. See *CFR § 20.21(b)(1)-(2)*.

Additionally, the Federal Government, and State Governments are permitted to enact regulations for the preservation of their natural resources which only apply to those persons actively engaged in hunting. Take for example a waterfowl hunter who decides to go duck hunting

---

See **Exhibit C**, a true and accurate copy of Field and Stream's Best Duck Hunting Shotguns of 2022 List attached hereto.

during the duck season. That duck hunter is required to have a plug restricting his magazine ("tube") capacity to be able to fit no more than two (2) shotgun shells in the reserve tube of the gun (i.e. one (1) round in the chamber, and two (2) rounds in the reserve tube, an allowable total of three (3) rounds). However, once that same duck hunter (with the same gun) is no longer actively engaged in duck hunting, there are no laws, neither State nor Federal, that restrict him from removing the plug within the reserve tube of the shotgun, allowing the shotgun to hold more than two (2) rounds in the reserve chamber. Thus, laws pertaining to hunting that pose restriction on capacities do not implicate the same standard of review as Second Amendment challenges, as those hunting laws serve exclusively as promoting the preservation of wildlife where they merely regulate firearms capacity while engaged in the activity of hunting, and do not require an individual to permanently modify their firearm to restrict capacity while no longer actively engaged in hunting.

Further, though it is true that Rhode Island has strict capacity limits for permitted firearms during its hunting seasons, those restrictions only apply to certain regulated species of wildlife, and not others, based on their sensitivity to over-hunting. For example, Rhode Island has no magazine capacity restriction while engaged in coyote hunting. See *250-RICR-60-00-9.12(N)* ("On private lands from April 1 to September 30 . . . centerfire rifles not larger than .229 caliber may be used . . . and any means allowed during any concurrent hunting season." Note that Rhode Island does not have an ammunition capacity restriction, nor magazine restriction, for unsensitive species of wildlife such as coyote); compare to *RI Hunting Regulations for "Migratory Game Birds"* ("No person shall take migratory game birds: . . . with a shotgun capable of holding more than three shells, unless plugged. . .").

19

**C. The Burden Imposed On The Second Amendment Rights of the Plaintiffs is Not Analogous To Burdens Imposed Throughout History.**

The Defendants' Objection continuously asserts that the burdens imposed on the Plaintiffs' Second Amendment rights via the Magazine Ban Law are analogous to the burdens imposed throughout history, and as such, serves as a permissible regulation under the Second Amendment. Interestingly, the Defendants continue to argue that the Magazine Ban Law is permissible when reviewed under the Second Amendment, even though they previously state that a Magazine is not an "arm" and therefore not entitled to Second Amendment review. Regardless, the Defendants assertions mislead this Court as to 1) the legality and recognition of historical regulations cited to; and 2) the proper standard imposed for review.

The Defendants assert the Magazine Ban Law is analogous to historical regulation of the Civil War Era where they compare magazine's to "Henry-Winchester Rifles," and state: "capacity restrictions themselves have existed since reconstruction and the adoption of the Fourteenth Amendment – either by practical enforcement, restrictions on hunting, or by statutes that many states enacted in response to gang murders surrounding Prohibition. . ." See *Defendants' Objection* at p. 46. The Defendants support this assertion throughout their Objection with historical accounts of the Civil War and Post Civil War period regarding regulation of the higher capacity Henry-Winchester Rifles. However, it is very important to note, that the Defendants concede several times throughout the Defendants' Objection that ***there were no statutes, nor laws in place that regulated Henry-Winchester Rifles based on their capacity at all, at any time in history***. See *Id*. at p. 36 ("***While no statutory regulation of Henrys and Winchesters existed***, their use was policed by the United States Army and Governors seeking to ensure that state militias stayed loyal to the United States and did not engage in insurrection"). These laws did not actually concern themselves with

capacity or magazines, but rather more often the size and/or other levels of concealment. See also **Exhibit A**, at p. 21. Further, not only were there no actual laws targeted at the Henry-Winchester Rifles directly, the Defendants continue to rely on the accounts of "enforcement" against these arms during the Civil War and Post Civil War period, which *Bruen* expressly states as merely a period helpful for guidance, but does not take precedence over the Founding Era. See *Bruen.* 142 S. Ct. at 2137 (citing *Heller*, 544 U.S. at 614, 128 S. Ct. 2783, 171 L. Ed. 2d 637) ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources"). As the Plaintiffs express previously in this Reply, the "enforcements" the Defendants refer to were aimed at restricting *who* was gaining access to Henry-Winchester Rifles, rather than restrictions pertaining to the rifle or the rifle capacity itself.

Additionally, the Defendants point to other regulations throughout history that are "analogous enough to pass constitutional muster" when attempting to provide examples of laws acting as historic analogues to the Magazine Ban Law, such as Rhode Island's 1927 ban on "automatic" weapons. The Defendants state "The fact that sometimes these capacity restrictions were rolled back and then re-enacted has no bearing on their constitutionality. For example, Rhode Island changed the definition of capacity from 12 to 15 in 1959 and then, in 1975 altered the ban to apply to fully automatic weapons only, before capacity was once again limited between 1994-2004 under the FFA." See *Defendants' Objection* at p. 47.

However, it is preposterous to imply that the rolling back of these regulations is not relevant to the historical analysis of firearms regulations expressed in *Bruen*. When engaging in analogical inquiry of historical firearms regulations, *Bruen* sought guidance from the analysis used in *Heller*,

where the Supreme Court specifically precluded from Second Amendment protection only three (3) categories of firearms regulation: 1) longstanding prohibitions on the possession of firearms by felons and the mentally ill; 2) laws forbidding the carrying of firearms in sensitive places; and 3) laws imposing the conditions on the commercial sales of arms. See *Batty v. Albertelli*, Civil Action No. 15-10238-FDS, 2017 U.S. Dist. LEXIS 26124 (D. Mass. Feb. 24, 2017) (citing *Heller*, 544 U.S. 626-25); see also *Bruen* 142 S. Ct. at 2133 (citing *Heller*, 544 U.S., at 626 128 S. Ct. 2783, 171 L. Ed. 2d 637) (Where the Court expressed regulations such as the "sensitive places" doctrine, prohibiting firearms in certain classes of sensitive places, was permissible because of its "longstanding application").

The regulations the Defendants cite to are anything but longstanding. The Defendants express that Rhode Island changed the definition of capacity from 12 to 15 in 1959, and then in 1975 altered the ban to apply to fully automatic weapons only (changing the definition of "machine gun" to exclude semi-automatic firearms). See *Defendants' Objection* at p. 47. However, unlike the "sensitive places" doctrine, Rhode Island's regulation of semi automatic firearms, which lumped them into the definition of "machine guns" based on capacity is not long standing, nor is it consistent with the historical regulation of any other State or Federal Act. Rhode Island's 1927 ban on "automatic" weapons is a law that is no longer in place, as the National Firearms Act conclusively established the definition of "Machine Gun" as being a firearm capable of automatic fire, making Rhode Island's prohibition on Semi-Automatic weapons under the definition of "machine gun" an improper characterization, and superseded by Federal Law. See *26 U.S.C. § 5845(b)*.

Further, the Defendants cite to the 1994-2004 Assault Weapons Ban (*hereinafter*, the "Assault Weapons Ban") as historically analogous to the Magazine Ban Law, as it too regulated

magazine capacity. See *Defendants' Objection* at p. 47. However, the Defendants cannot justifiably rely on the Assault Weapons Ban as historically analogous, as the main distinction is that the Assault Weapons Ban, unlike the Magazine Ban Law, had a "sunset provision", whereby the ban had a set expiration date, being September 13, 2004. Though the Assault Weapon Ban's constitutionality remains questionable (especially in light of *Bruen*) it is undoubtedly of extreme importance to note that **the Assault Weapons Ban was a <u>temporary restriction</u> with a set expiration date**, whereas the Magazine Ban Law serves to limit the Plaintiffs' Second Amendment rights indefinitely. Further, Congress allowed the Assault Weapons Ban to expire in 2004 after a Department of Justice-commissioned study on the effectiveness of the ban showed no real impact on gun violence. *What Should America Do About Gun Violence?*: Hearing Before U.S. S. Comm. On Judiciary, 113th Cong. 11 (2013).

Finally, the Defendants continue to contend that the Magazine Ban Law passes constitutional muster because it does not burden a fundamental right, and is a reasonable restriction that leaves open many options for firearms owners to pursue, such as lower capacity magazines, different firearms, etc. See Defendants' Objection at ¶ 47. In doing so, the Defendants continue to apply the incorrect standard to the review of the Second Amendment challenge, and continue to assert the Magazine Ban Law passes some form of scrutiny, as it is not the least restrictive means.

However, the Court in *Bruen* made expressly clear that when applying analogical reasoning to a historical analogue of firearms regulation, Court's may absolutely not rely on means-end scrutiny when examining the challenged regulation. See *Bruen*, 142 S. Ct. at 2133, ft. n. 7 ("Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances . . . **It is not an invitation to revise that balance through means-end scrutiny**"). The Defendants continuously assert that the Magazine Ban Law is justified

where the Plaintiffs' rights are only slightly burdened. See *Defendants' Objection* at p. 48 (". . . restriction here does not prevent an individual from owning magazines categorically, and it places no limit on the number of magazines a person can own"); see also *Id*. at p. 47 ("there should be no concern that the large capacity magazine restriction indirectly burdens the right to self-defense").

Though irrelevant whether the Defendants' generalized assertions in support of limiting the Plaintiffs' Second Amendment rights hold any factual weight, even assuming those assertions were plausible, the Supreme Court has spoken regarding the application of scrutinized review pertaining to firearms regulations, stating "Since *Heller* and *McDonald*, the Court of Appeals have developed a "two-step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. The Court rejects that two-part approach as having ***one step too many***." See *Bruen* at 142. S. Ct. at 2117.

As such, the Defendants cannot hide the Magazine Ban Law's unconstitutionality behind the guise of regulations implemented for the public health and safety where the regulation burdens the Second Amendment beyond the scope of that allowed by historical precedent.

**II-**    ***The Plaintiffs' Takings Claim***

The Defendants make two arguments in support of the claim that the Magazine Ban Law is not likely to succeed on the merits under the Takings Clause: 1) The Magazine Ban Law is a valid exercise of the State's police powers which allow it to protect the public from danger without implicating constitutional rights; and 2) The Magazine Ban Law is neither an actual, nor regulatory taking requiring compensation. See *Defendants' Objection* generally.  Both arguments are without merit.  The Magazine Ban Law is not a valid exercise of the State's police power and even if it was, it is still a physical taking, requiring just compensation.  Additionally, the Magazine Ban Law is so burdensome on property rights that is constitutes a taking requiring just compensation.

### A. The State's Police Power

**1. The Cases Cited by The Defendants Are Distinguishable from The Magazine Ban Law**

The Defendants cite to numerous cases where courts have held a taking did not occur and upheld firearm restriction laws as a valid exercise of police power. See *Id*. at p 50.  However, the cases cited by the Defendants are distinguishable from Rhode Island's Magazine Ban Law for two reasons.  First, as discussed further below, several of the cases cited by the Defendants involved laws prohibiting the sale and possession of ***automatic* weapons**, which the Supreme Court has characterized as a type of "dangerous or unusual" firearm subject to regulation and thus, a valid exercise of a State's police power, obviating the requirement of just compensation for the taking. As previously stated, Standard Capacity Magazines are <u>NOT</u> dangerous and unusual weapons.

Second, many of the cases cited by the Defendants involved laws that included *"grandfather clauses"*, where firearms that were lawfully possessed prior to the enactment of the statute in question, were not subject to dispossession and/or criminal penalties. These laws did not take private property that was lawfully possessed prior to enactment and therefore was not a taking.

The first case cited by the Defendants, *Duncan v. Bonta*, was granted certiorari by the U.S. Supreme Court and remanded to the 9th Circuit for consideration of the Court's ruling in *Bruen*. See *Duncan v. Bonta*, 142 S. Ct. 2895 (2022). Although the Supreme Court did not address the takings issue in its order granting certiorari, the 9th Circuit's ruling is unlikely to stand given the language in *Bruen*.  Additionally, and highly relevant to the takings analysis, the 9th Circuit's classification of magazines capable of capacity in excess of ten (10) rounds as posing a "danger" to society, in order to justify the use of the State's police power is a dubious proposition given the Supreme Court's discussion of "dangerous and unusual" weapons in *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (*Heller* I) (noting the right to keep and carry arms under the 2nd

Amendment was limited to weapons in common use and the historical tradition of prohibiting "dangerous and unusual weapons.") It is unclear how California in *Duncan,* and Rhode Island here, could classify a magazine capable of holding more than ten (10) rounds as "dangerous" for purposes of exercising its police power, given the common use and historical tradition of these magazines in the United States. Based on the Supreme Courts holding in *Heller* I, justification of taking the Plaintiffs' magazines without providing compensation due to the magazines being "dangerous" would not withstand constitutional scrutiny in the Supreme Court.

The Defendants cite to another 9th Circuit case, *Palmer v. Sisolak*, 2022 WL 960594 (D. Nev. Mar. 29, 2022), in support of their claim that the Magazine Ban Law is a valid exercise of the State's police power. It should be noted the District Court's ruling in *Palmer* is currently under appeal. Further, *Palmer* dealt specifically with **un-serialized firearms** and the need to register and track firearms throughout the State. *Palmer*, 2022 WL 960594, at *8. ("public safety and the **importance of firearm tracing** necessitates the prohibition of unsterilized firearms and component parts.")

The Defendant's use of *Roberts v. Bondi*, 2018 WL 3997979 (M.D. Fla. 2018) is also unavailing. *Roberts*, **a pro se matter**, involved the prohibition of "bump stocks", which was defined by the Florida legislature as "a device used to alter the rate of fire or a firearm to mimic automatic weapon fire or which is used to increase the rate of fire to a faster rate than is possible for a person to fire such semiautomatic firearm unassisted by a … device." *Id.* at *1. The *Roberts* court found this was a valid exercise of Florida's police power because the prohibited "bump stocks" could turn any legally owned weapon in common use into a machine gun. *Id.* at *4. This is highly distinguishable to Rhode Island's ban here, Standard Capacity Magazines for common semiautomatic weapons are banned under the State's alleged police power. The magazines

prohibited here having nothing to do with an automatic rate of fire or the conversion of a semiautomatic weapon into an automatic weapon.[3]

*Rupp v. Becerra*, 2018 WL 2138452 (C.D. Cal. 2018) involved California's Assault Weapons Control Act. This case is also highly distinguishable because the plaintiffs in that case were not physically dispossessed of their property. The law provided that a person who lawfully acquired and possessed weapons described in the statute must either (1) **register the weapon prior to July 1, 2018**, (2) sell the weapon either out of state or to a licensed gun dealer, (3) modify the weapon to fix the magazine or move the enumerated features, or (4) store the weapon outside the state. *Id.* at *2, (citing Cal. Penal Code § 30915). The obvious difference in California's law and the Magazine Ban Law here is that California provided a grandfather clause which allowed weapons that were lawfully acquired and possessed prior to the enactment of the law, to still be possessed as long at they were registered – **this was not a physical taking**. The Magazine Ban Law has no grandfather clause and is a complete physical taking of private property.

Similar to *Rupp*, the Defendant's use of *Akins v. U.S.*, 82 Fed. Cl. 619, 622-23 (Fed. Cl. 2008) is distinguishable because the challenged law provided **a grandfather clause**, where citizens were not physically dispossessed of their property. The federal statue in question, 18 U.S.C.A. § 922(o), made it unlawful for any person to transfer or possess a ***machine gun***.[4]   The

---

[3] A bump stock that makes a semi-automatic weapon into an automatic weapon would also be classified as "dangerous or unusual" under the standard articulated under *Heller* I, which also makes *Roberts* distinguishable from the Magazine Ban Law here. In December of 2018, the Bureau of Alcohol, Tobacco and Firearms amended the definition of "machine gun" under the Firearm Owners Protection Act to specifically include Bump Stocks to the definition of Machine Gun. See *26 U.S.C. § 5845(b)*.   Thus, bump stocks accomplished "automatic" rate of fire, and were appropriately added to the definition of "Machine Guns", already prohibited expressly as a dangerous and unusual weapon.

[4] The Defendant's citations to numerous cases where the courts have upheld the use of a state's police power for **banning machine guns or automatic weapons** should give this court pause over

law provided a grandfather clause which stated the law did not apply to "any lawful transfer or lawful possession of a machine gun that was lawfully possessed before the date this subsection takes effect."   U.S.C.A. § 922(o)(2)(B). Any person who lawfully possessed the now banned firearm, prior to the law taking effect, was legally allowed to possess the firearm, making the statute not a physical taking.

The Defendants reliance on *Fesjian v. Jefferson,* 399 A.2d 861 (D.C. 1979) is also distinguishable from Rhode Island's Magazine Ban Law.   *Fesjian* involved Washington D.C.'s 1975 Firearms Control Regulation Act, which prohibited (among other things) the purchase, sale, transfer, and possession of handguns by D.C. residents, with the exception of a **grandfather clause**, which allowed the lawful possession of handguns possessed prior to the law taking effect as long as they were re-registered. *Id.* at 864. Like several other cases cited by the Defendants, *Fesijian* involved a valid exercise of police power because ***the law did not physically dispossess people of their property***. D.C. residents could choose to re-register their handgun and lawfully possess it.   Rhode Island's Magazine Ban Law provides no such grandfather clause and is a physical taking of private property, requiring just compensation.

There is a reason why most of the cases cited by the Defendants in their opposition involved State or Federal Laws with a grandfather clause for previously lawfully possessed firearms – the legislatures enacting those laws knew that without a grandfather clause, the statues would not withstand a Takings Clause challenge. The Magazine Ban Law cannot withstand it either.

***A valid exercise of police power may still require compensation***

---

the use of that same police power to ban magazines with the ability to carry more than ten rounds which are in common use and are not "dangerous or unusual".

Even if the Magazine Ban Law is a valid exercise of the State's police power, Supreme Court precedent cast doubt on the Defendants' theory that an exercise of police power cannot constitute a physical taking, requiring just compensation. See *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). In *Loretto*, the Supreme Court held that a law requiring physical occupation of private property was both "within the State's police power" and an unconstitutional physical taking.   The Court held that whether a law effects a physical taking is "a separate question" from whether the State has the police power to enact a law. The Court stated, "[i]t is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid.   We conclude that a permanent physical occupation authorized by government **is a taking without regard to the public interests it may serve**.". *Id.* at 425-26.

Similarly, the Supreme Court has held that a law enacted pursuant to the State's "police powers to enjoin a property owner from activities akin to public nuisances" is not immune from scrutiny under the regulatory takings doctrine. *Lucas v. South Carolina Coastal Council* 505 U.S. 1003, 1020-27 (1992). The Court explained that it was true "*[a] fortiori*" that the "legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorial rule that total regulatory takings **must be compensated**." *Id.* at 1026.

Here, even if the Magazine Ban Law is a valid exercise of the State's police power, it is still a taking that must be compensated. Any justification for the taking, such as danger to society, cannot be the basis for departing from the categorical rule that total regulatory taking requires just compensation.

### B. The Magazine Ban Law Is Still A Taking Even If It Does Not Deprive The Owner Of All Economically Beneficial Use.

The U.S. Supreme Court case *Murr v. Wisconsin* 137 S. Ct. 1933 (2017) is instructive. Noting that Takings jurisprudence is flexible, *Murr* set out two guidelines for determining when

government regulation is so burdensome that it constitutes a taking. "*First*, with certain qualifications a regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause. *Second*, when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment backed expectations; and (3) the character of the governmental action." *Id.* at 1942-43 (citations and quotations omitted). Additionally, "a physical appropriation of property g[ives] rise to a per se taking, without regard to other factors." *Horne v. Dep't of Agric.*, 576 U.S. 350, 360.

Here, R.I. General Laws § 11-47.1-3 imposes a hybrid taking, implicating both a physical appropriation of property (a per se taking), and regulation on that property that is unduly burdensome (depriving economically beneficial use). § 11-47.1-3(b)(ii) is a physical appropriation of property in that it forces owners of large capacity magazine to "surrender" the magazine to the police. R.I. Gen. Laws § 11-47.1.3(b)(iii) forces the owner to transfer or sell their magazines to a federally licensed firearm dealer or to someone outside the state of Rhode Island. It is a fair assumption that the fair market value for any such magazine will be zero within the state of Rhode Island and subsection (b)(iii) requires an owner to rely on other state laws to transfer out of state at a cost to the owner. Subsection (b)(i) provides for an owner to permanently modify the magazine so it can no longer hold more than ten (10) rounds, without specifying how this can be done nor does it give any consideration to the cost to modification.  The economically beneficial use of the owner's magazine after transfer, sale, or modification is practically zero.

The Magazine Ban Law deprives Plaintiffs of not just the use of their property, but of possession, one of the most essential qualities in takings jurisprudence. Whatever expectations

people may have regarding property regulations, they "do not expect their property, real or personal, to be actually occupied or taken away. *Horne*, 135 S. Ct. at 2427. Therefore, whatever authority the Defendants' claim, enabling them to ban the sale or use of magazines over ten (10) rounds, the Takings Clause prevents it from compelling the physical dispossession of such lawfully-acquired private property without just compensation.

The Plaintiffs have demonstrated a likelihood of success on the merits of their Takings Clause claim. Without compensation, Plaintiffs will be irreparably harmed as they will no longer be able to use or possess "large" capacity magazines while residing in Rhode Island. In cases where constitutional rights are chilled, the balance of hardships weighs in the citizen's favor.  See *Doe v. Harris*, 772 F. 3d 563, 583 ("As to the balance of equities, we recognize that while the preliminary injunction is pending, there will be some hardship to the State").

**III-**    **Rhode Island's Large Capacity Magazine Restriction is Not Consistent with The Due Process.**

The Defendants' Objection claims the Plaintiffs have not pointed to what language is alleged to be vague based on the Plaintiffs' lack of providing an instance in which the scenario could conceivably take place where one of the Citizen Plaintiffs attempts, in good faith, to make a "permanent modification" to their Standard Capacity Magazines to conform their conduct to law, and falls short of what an enforcement agency defines as a sufficient permanent modification. See *Defendants' Objection* at p. 54. Further, in the Defendants assert that the Plaintiffs have not established Article III standing due to none of the Plaintiffs expressing that they intend to exercise permanent modification as an option for conforming their conduct to the Magazine Ban Law. See *Id*. at 55.

However, the Plaintiffs have established Article III Standing because the Citizen Plaintiffs need not violate the Magazine Ban Law in order to have Article III standing where the Citizen

Plaintiffs meet the injury requirement by showing "an intention to engage in a course of conduct arguably affected with constitutional interest, but proscribed by a statute, and . . . a credible threat of prosecution thereunder." *National Rifle Ass'n of America, Inc. v. McCraw*, 719 F.3d 338, 345 (2013) (<u>quoting</u> *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)). The Citizen Plaintiffs are reluctant to engage in permanent modification where there is no defined course of action that permissibly falls within the "permanent modification" standard. The State, nor any of their enforcement agencies have provided guidance on what constitutes adequate "permanent modification" to any citizen, or gun shop owner to communicate to their customers. See **Exhibit D**, the Affidavit of Will Worthy, Principle of Big Bear attached hereto, at ¶¶ 4-5 ("Neither the State, nor any agency tasked with enforcement of the Magazine Ban Law has provided any guidance to myself, or Big Bear on what constitutes "permanent" modification of a Standard Capacity Magazine in order to conform to the Magazine Ban Law. There are several different methods of modification which I am aware of, and none which any enforcement agency has declared sufficient, or not sufficient, to constitute permanent modification under the Magazine Ban Law").

Ironically, the Defendants assert (in previous sections) that the Magazine Ban Law is not a Taking, because the Plaintiffs have the option to permanently modify their Standard Capacity Magazines rather than "turn them in" via FFL and/or police station turn in. See *Defendants' Objection* at p. 54-55. This assertion forces the Citizen Plaintiffs into a tough corner, where they are now forced to either a) give up their property without compensation; or b) modify their Standard Capacity Magazines in a manner that leaves them unsure whether the modification will leave them being law abiding citizens, or serious felons. As stated in the Affidavit executed by Plaintiff Johnathan Hirons (attached hereto as **Exhibit E**), Mr. Hirons was aware of the option to

"permanently modify" his Standard Capacity Magazines from the inception of this suit, but is unsure as to what constitutes "permanent modification". See **Exhibit E**, at ¶¶ 4. Part of the reason none of the Citizen Plaintiffs expressed pursuing the avenue of permanently modifying their Standard Capacity Magazines because they want to be absolutely sure they remain law abiding citizens, and the permanent modification option casts large shadows of doubt on what conduct is legal, and what is not, leaving forfeiture the only "sure" option for conforming their conduct to law. See **Exhibit D** at ¶ 5 ("Several individuals (both customers and people who have come to the store front) have asked what method of modification is sufficient to constitute "permanent modification" under the Magazine Ban Law, to which I have not been able to provide a definitive answer for"); see also **Exhibit E**, at ¶¶ 7, and 9 (". . . I do not feel there is sufficient guidance within the Magazine Ban Law Statute to define what constitutes 'permanent modification' enough to pursue permanent modification over forfeiture" . . . "I have researched magazine modification, and found at least five (5) different methods of modification, none of which are definitely approved as "permanent" by any enforcement agency in Rhode Island").

As such, the Defendants assertions that "permanently modifies' has a discernible meaning – to forever change the magazines in such that it accepts less than eleven rounds. . ." is comprehensive from a first glance, but when the potential consequence to the Citizen Plaintiffs are sentences and punishments as severe as those born by the Magazine Ban Law, it is crucial they are provided with information sufficient to conform their conduct to law. See *Defendants' Objection* at p. 56.

**IV- Plaintiffs Have Satisfied Demonstration of The Remaining Three Factors Necessary To Obtain A Preliminary Injunction.**

    **A. The Plaintiffs Have Suffered, and Continue To Suffer Irreparable Harm.**

A violation of 'personal' constitutional rights is a per-se irreparable harm where the protected right has been personal and the violation non-compensable. See *Flower Cab Co. v. Petitte*, 685, F.2d 192, 194-95 (7th Cir. 1982)

Further, the Defendants assert that the Plaintiffs were the result of their own delay in filing their preliminary injunction on August 9, 2022. See *Defendants' Objection* at p. 58. Though the Plaintiffs did file their motion for preliminary injunction two months after the commencement of this suit, the time in which the Plaintiffs filed was not a delay and was extremely reasonable considering the issues presented, as well as events which occurred relative to the Second Amendment claims nationally. Of particular relevance, the *Bruen* Decision was issued the day the Plaintiffs filed suit, effectively changing the precedent for Second Amendment challenges going forward. Additionally, the "delay" that the Defendants contend the Plaintiffs engaged in was only two (2) months after the filing of suit, justified by explanation, which does not reflect the length of time adjudged by the District Courts as constituting delay. See *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) (reasonable diligence standard not met where Appellants did not move for a preliminary injunction in the District Court until ***six years*** . . . after plaintiffs' first complaint was filed"); see also *Hornig v. Trs. Of Columbia Univ. in City of New York*, No-17-CV3602, 2018 U.S. Dist. LEXIS 189268, 2018 WL 5800801, at 7 (S.D.N.Y. Nov. 5, 2016) (quoting *Gidatex, S.r.L v. Campaniello Imports, Ltd.*, 12 F. Supp. 2d 417, 419 (S.D.N.Y. 1998)) (finding that plaintiffs' two and a half month delay in bringing motion for preliminary injunction in employment discrimination case undermined 'a finding of irreparability because courts typically decline to grant preliminary injunction in the face of ***unexplained delays*** of more than two months"); see

also *Rebox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949 (N.D. III. 2018) (where the court considered an **18 month delay** from the time plaintiff learned of defendant's copyright infringement until the time the plaintiff brought its motion for preliminary injunction as evidence undercutting irreparable harm"); see also *Wallikas v. Harder*, 78 F. Supp. 2d 36, 42 (N.D.N.Y. 1999) (where the court found when seeking protection of constitutional rights, delay in **commencing the lawsuit** tends to negate a finding of immediate and irreparable harm).

Here, the Plaintiffs commenced suit on June 23, 2022, only two (2) days after the Magazine Ban Law was signed into effect. Further, the Decision in *Bruen* was issued on the same date as the filing of this action (June 23), which completely re-set the framework for both 1) Second Amendment challenges, as well as 2) Takings Claims relative to magazine restrictions based on several Takings challenges that the Supreme Court remanded back to the lower courts from other States' laws directly analogous to the Magazine Ban Law. Additionally, the Plaintiffs' law firm made extraordinarily good time in filing the Preliminary Injunction in only two months in consideration of the enormity of constitutional challenges which this suit involved. No diligent attorney would file papers in a case with such grand constitutional implications as this case without very carefully researching the issues, drafting the pleadings, and reviewing the pleadings prior to filing the Injunction Papers. The firm's patriarch, Michael A. Kelly, who was fully in charge from the outset of the filing of this lawsuit, was forced to go on medical leave due to emergency health issues from September 19, 2022 until late August of 2022, as evidenced by his Emergency Court Excusal attached hereto as **Exhibit F**. During this time, Michael Kelly was unable to review, approve, or assist in the filing of the Preliminary Injunction papers due to his medical condition, and acted diligently in directing the other attorneys in the firm upon his return, despite the severity of his condition at the time.

Finally, the Defendants assertion that irreparable harm was not apparent where the filing of the Preliminary Injunction papers is without merit considering the time period set by the Magazine Ban Law itself. The Magazine Ban Law gives Rhode Island citizens until December 18, 2022 to comply with the Standard Capacity Magazine "turn in", or modification (i.e. 180 days after the date of passage). Thus, part of the "purported harm" to occur is the date of December 18. Plaintiffs filed their Preliminary Injunction as quickly as time would allow, and well within the turn in period set by the Statute. Even in consideration of the "turn in" date, the Plaintiffs still were able to move for injunctive relief expeditiously relative to the enormity legal questions posed.

**B.** **The Public Interest and Balance of The Hardships Does Not Weigh In Favor of The State.**

The Defendants' Objection asserts the State's legislature enacted the Magazine Ban Law as "in the public interest" whereby (they claim) it would secure the public health and safety. See *Defendants' Objection* at p. 59. However, in cases where there is a violation of a party's constitutional rights, the determination of where the public interest lies is dependent on the strength of the likelihood of success on the merits. See *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)). Courts have spoke to the issue of preliminary injunctions relative to the State's violation of constitutional rights in the First Amendment context, stating "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties . . . the public interest would be advanced by issuance of a preliminary injunction enjoining the enforcement of those portions of challenged statutes that are of *questionable constitutionality*". See *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (quoting *Daytona Area Visually Impaired Persons, Inc. v. Fischer*, 70 F.3d 1474, 1490 (6th Cir. 1995)). The Second Amendment carries with it the same constitutional weight as the First Amendment, and thus is

36

entitled to the same protections. See *Jones v. Bonta*, 34 F. 4th 704, n. 7 (9th Cir. 2022) (citing *McDonald v. City of Chicago*, 561 U.S. 742, 780, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)) ("Because the Second Amendment is not a 'second class right', we must treat it the same as other rights").

Here, despite the Defendants' assertions, the Plaintiffs have gone above and beyond in satisfying their burden to show a successful likelihood on the merits that at the very minimum, the Magazine Ban Law bears "questionable constitutionality". See *Id*. Further, the Court in *Duncan v. Beccerra* is directly analogous to the case at bar, where California criminalized the possession of high-capacity magazines, and the plaintiffs filed a Preliminary Injunction against the enforcement of the statute. *Duncan v. Beccerra*, 265 F. Supp. 3d 1106, 1136 (S.D. Cal. 2017). The court focused on the severity of the possible criminal sanctions plaintiffs would face for failure to dispossess themselves of their Standard Capacity Magazines, and found the balance of hardships weighed in the Plaintiffs' favor, denying to recognize the hardship imposed on the State for their inability to enforce the statute after the ban. See *Id*. The case at bar here is indistinguishable, the Citizen Plaintiffs face two choices: 1) dispossess themselves of their lawfully acquired private property prior to a decision is reached regarding the constitutionality of the Magazine Ban Law; or 2) face enormous and severe criminal penalty for failure to do so.

## **CONCLUSION**

For the reasons stated in this Plaintiffs' Reply, the Plaintiffs' Motion for Preliminary Injunction should be granted in its entirety.

Respectfully Submitted,

**OCEAN STATE TACTICAL, LLC d/b/a BIG BEAR HUNTING AND FISHING SUPPLY; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER**

*By and through their counsel,*

*/s/ Michael A.  Kelly*
Michael A.  Kelly, Esq.  (#2116)
Dane E.  Ardente, Esq.  (#10263)
KELLY, SOUZA & PARMENTER, P.C.
128 Dorrance Street, Suite 300
Providence, RI  02903
Tel: (401) 490-7334 | Fax: (401) 490-7874
*mkelly@ksplawpc.com*
*dardente@ksplawpc.com*

Dated: October 27, 2022

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on this 27th day of October, 2022, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record. The document is available for viewing and downloading from the ECF system.

Keith Hoffmann, Esq.
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
*khoffmann@riag.ri.gov*

*/s/ Michael A. Kelly*
KELLY, SOUZA, & PARMENTER, P.C