UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| OCEAN STATE TACTICAL, LLC, d/b/a BIG BEAR HUNTING AND FISHING SUPPLY; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER, <br><br> *Plaintiffs,* <br><br> v. <br><br> PETER F. NERONHA, in his Official Capacity as the Attorney General for the State of Rhode Island; and DARNELL S. WEAVER, in his Official Capacity as the Superintendent of the Rhode Island State Police, <br><br> *Defendant.* | Case No. 1:22-cv-00246-JJM-PAS |

**BRIEF OF *AMICI CURIAE* FIREARMS POLICY COALITION, FPC ACTION FOUNDATION, AND GLENN VALENTINE IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## *AMICI* CURIAE'S STATEMENT OF INTEREST

**Firearms Policy Coalition ("FPC")** is a nonprofit organization devoted to advancing individual liberty and defending individual rights, including those protected by the Constitution. FPC accomplishes its mission through legislative, regulatory, legal, and grassroots advocacy, education, and outreach programs. FPC Law is the nation's first and largest public interest legal team focused on the right to keep and bear arms and adjacent rights, and the leader in the Second Amendment litigation and research space.

**FPC Action Foundation ("FPCAF")** is a nonprofit organization dedicated to restoring human liberty and protecting the rights enshrined in the Constitution. FPCAF conducts charitable research, education, public policy, and legal programs. FPCAF's scholarship and research have been instrumental in aiding several courts across the nation. The scholarship and *amicus curiae* briefs of FPCAF's Director of Constitutional Studies, Joseph Greenlee, have been cited by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2133 (2022); *Chiafalo v. Washington*, 140 S. Ct. 2316, 2325 (2020); and *New York State Rifle & Pistol Association, Inc. v. City of New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., dissenting).

**Glenn Valentine** is a U.S. Citizen, a resident of the State of Rhode Island, and has served as the Vice President of the Rhode Island Firearm Owners' League for the past decade. Glenn is intimately familiar with Rhode Island's new law and owns magazines that are at issue in this case. He is directly impacted and harmed by Rhode Island's ban on the purchase and possession of those magazines. Glenn is and will continue to be injured by Rhode Island's law if this Court does not enjoin its enforcement.

**SUMMARY OF THE ARGUMENT**

*Amici* file this brief to aid the Court with its analysis of the text and history of the Second Amendment. This brief is limited to addressing Plaintiffs' likelihood of success on the merits of their Second Amendment claim against Defendants, and even further limited to the text and history analysis required by the Supreme Court in *District of Columbia v. Heller* and reiterated in *New York State Rifle & Pistol Association, Inc. v. Bruen*. Under that analysis, it is evident that the Second Amendment protects the purchase, sale, and possession of the magazines at issue in this case and that Defendants cannot meet their burden by showing any on-point or analogous historical prohibition to justify their modern regulation. Accordingly, it is likely that Plaintiffs will succeed on the merits of their Second Amendment claim and that Rhode Island's magazine ban is unconstitutional.

**ARGUMENT**

The Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), establishes that Plaintiffs must succeed in this challenge to Rhode Island's near-complete ban on magazines capable of holding more than ten rounds of ammunition. *Bruen* reaffirms that when a law is challenged on Second Amendment grounds, a court's analysis of the challenged restriction must be rooted in the text of the Second Amendment and the Founding Era tradition of firearm regulation. Indeed, *Bruen* clarified that the "only" way that a law burdening conduct falling within the Second Amendment's scope can be upheld is if the government demonstrates a "historical tradition" of regulations, rooted in the Founding Era, that burdened the right in a similar way and for similar reasons. *Id.* at 2130, 2133.

I.  ***Bruen* Reaffirmed that Second Amendment Challenges are to be Assessed Based on the Text of the Amendment and Contemporaneous Historical Regulation of the Right to Keep and Bear Arms**

In *Bruen*, the Supreme Court reaffirmed *Heller*'s "standard for applying the Second Amendment." 142 S. Ct. at 2129. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2129–30. Once this *prima facie* textual showing has been made, "[t]he *government must then justify its regulation* by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130 (emphasis added). "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Accordingly, this case "demands a test rooted in the Second Amendment's text, as informed by history." *Id.* at 2127. In distilling this test, the *Bruen* Court spent significant time describing how courts, like this one, are to proceed in Second Amendment cases. As particularly relevant here, *Bruen* described the proper analysis of the term "Arms." That word has a "historically fixed meaning," but one that "applies to new circumstances." *Id.* at 2132. It thus "covers modern instruments that facilitate armed self-defense." *Id.* (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam) (stun guns)). Accordingly, the text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). The Court then explained that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Id.* In considering history, courts are to engage in "reasoning by analogy." *Id.* This "analogical reasoning

requires only that the government identify a well-established and representative historical analogue, not a historical twin" to the challenged regulation. *Id.* at 2133. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the court today. *Id.* at 2132. Two "metrics" are particularly salient in determining if a historical regulation is "relevantly similar": "[1] how and [2] why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. By considering these two metrics, a court can determine if the government has demonstrated that a "modern-day regulation" is "analogous enough" to "historical precursors" that the regulation may be upheld as consistent with the Second Amendment's text and history. *Id.* And importantly, the burden rests on the government to identify a sufficiently close historical analogue to justify the challenged restriction. *Id.* at 2135.

Three aspects of *Bruen*'s clarification of the Second Amendment's text-and-history standard are especially relevant here. First, the only way lower courts are to assess challenges to regulations is through the "text, as informed by history"—not any other inquiry, and not so-called "intermediate scrutiny" or any of the other "tiers" of constitutional scrutiny that apply in the context of some other constitutionally protected rights. *Id.* at 2127–28. Second, the term "Arms" encompasses "modern instruments that facilitate armed self-defense." *Id.* at 2123. Third, when considering whether "history" and "tradition" support a restriction on "arms," the burden shifts to the government to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.[1]

---

[1] Nor is *Bruen* silent about how the text-and-history test applies in the context of blanket bans on the possession of specific arms. Both *Bruen* and *Heller* identified only one aspect of our history and tradition that is sufficiently analogous to—and therefore capable of justifying—such a law: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons" that are not "in common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of

## II. Rhode Island's Magazine Ban is Unconstitutional Under the Standard Established in *Heller* and Reiterated in *Bruen*

Because the text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms," *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582), the banned magazines are covered by the Second Amendment's plain text. Thus, Defendants can only justify the regulation by demonstrating that it is consistent with the historical tradition rooted in the Founding Era. But Defendants cannot possibly do so, because there is no tradition of banning firearms capable of firing more than 10 rounds without reloading, nor magazines or their historical predecessors.

### A. Magazines Capable of Holding More than 10 Rounds, and their Historical Analogues, Predate the Second Amendment and Were Known to and Embraced by the Founders and Framers

#### 1. The Pre-Colonial History of Magazines and their Predecessors

Magazines capable of holding more than ten rounds of ammunition can trace their historical lineage back to the late-15th or early-16th century, with the advent of repeating firearms (or repeaters). The first known repeaters were invented between 1490 and 1530.[2] King Henry VIII (reigned 1509-1547) even owned one.[3] The first known repeater capable of firing more than 10 shots—a 16-round German wheellock rifle—was invented around 1580.[4]

---

arm is in "common use," there is no historical tradition of banning it. For this type of restriction, then, the Supreme Court has already analyzed the relevant historical tradition and established its scope: "dangerous and unusual" weapons may be restricted, but arms "in common use at the time" may not. *Id.* Given Plaintiffs more fully address this issue in their opening memorandum and their reply, *Amici* will not address it further.

[2]  M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492-1792 50 (1980).
[3]  W.W. Greener, THE GUN AND ITS DEVELOPMENT 81–82 (9th ed. 1910).
[4]  Lewis Winant, FIREARMS CURIOSA 168–70 (1955); *16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM (May 10, 2014), http://bit.ly/2tngSDD.

By 1660, both the Kalthoff and Lorenzoni repeaters had gained popularity throughout Europe.[5] The capacity of Kalthoff "magazines ran all the way from six or seven to thirty" charges. Peterson, TREASURY, at 230. "[A]t least nineteen gunsmiths are known to have made [Kalthoffs] in an area stretching from London . . . to Moscow . . . and from Copenhagen . . . to Salzburg." *Id.* Kalthoffs saw "active service during the siege of Copenhagen in 1658, 1659, and again in the Scanian War of 1675-1679." *Id.* "The Lorenzoni also was developed during the first half of the Seventeenth Century." *Id.* The repeating mechanism of this magazine-fed Italian pistol was soon adopted in rifles and spread throughout Europe and the colonies. *Id.* at 232.

On July 3, 1662, famed London diarist Samuel Pepys observed "a gun to discharge seven times, the best of all devices that ever I saw, and very serviceable, and not a bawble; for it is much approved of, and many thereof made."[6] On March 4, 1664, Pepys wrote about "several people [] trying a new-fashion gun" that could "shoot off often, one after another, without trouble or danger, very pretty." 7 *id.* at 61. Pepys was referring to Lorenzoni-style firearms.

"Many . . . English gunsmiths . . . made guns with the Lorenzoni action during the next two or three decades." Peterson, TREASURY, at 232. So did "a host of others throughout the 18th century."[7] "[A]t least two New England gunsmiths actually manufactured such guns." *Id.* at 232.

The advent and innovation of repeaters and proto magazines carried through the 17th century into our early history in the 18th century.

---

[5] Harold Peterson, THE TREASURY OF THE GUN 229 (1962).
[6] 4 THE DIARY OF SAMUEL PEPYS 258 (Henry Wheatley ed., 1893)
[7] Harold Peterson, ARMS AND ARMOR IN COLONIAL AMERICA 215 (1956).

### 2. The Pre- and Post-Ratification History of Magazines and their Historical Predecessors

Innovation and proliferation of these Arms continued through our early history. Some pre-American, colonial repeaters in the mid-1600s employed a revolving cylinder rotated by hand.[8] "A few repeating arms were made use of in a military way in America," for example, "[Louis de Buade de] Frontenac[9] in 1690 astonished the Iroquois with his three and five shot repeaters."[10]

In 1722, John Pim, a Boston gunsmith, demonstrated a repeater he sold.[11] "[L]oaded but once," it "was discharged eleven times following, with bullets, in the space of two minutes, each which went through a double door at fifty yards' distance."[12]

The most common American repeaters of the early 18th century were probably Lorenzoni variants known as Cooksons—named after English gunsmith John Cookson. Peterson, TREASURY, at 230. A 10-round Cookson, later displayed at the National Museum, "found its way into Maryland with one of the early English colonists."[13]

A Boston gunsmith, also named John Cookson, manufactured repeaters in the 18th century. The American Cookson advertised a repeater in the *Boston Gazette* on April 12 and 26, 1756, explaining that the rifle was "to be sold at his house in Boston . . . the said gun will fire 9 Times distinctly, as quick, or as slow as you please." Peterson, ARMS AND ARMOR, at 215. "Thus this

---

[8] *See, e.g.,* Charles Winthrop Sawyer, 2 FIREARMS IN AMERICAN HISTORY 5 (1939) (six-shot flintlock); Charles Edward Chapel, GUNS OF THE OLD WEST 202–03 (1961) (revolving snaphance).
[9] Frontenac was the governor of New France at the time. *See* Alan Gallay, COLONIAL WARS OF NORTH AMERICA, 1512–1763, at 240–42 (2015).
[10] Charles Winthrop Sawyer, 1 FIREARMS IN AMERICAN HISTORY 29 (1939).
[11] Pim produced other repeaters, including a "six-shot, .52 caliber snaphaunce revolver." Brown, FIREARMS IN COLONIAL AMERICA, at 257.
[12] Samuel Niles, *A Summary Historical Narrative of the Wars in New England*, *in* MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS, 4th ser., vol. 5, at 347 (1837).
[13] *The Cookson Gun and the Mortimer Pistols*, AM. RIFLEMAN, Sept. 29, 1917, at 3, 4.

type of repeating flintlock popular in England from the third quarter of the 17th century, was known and manufactured in Massachusetts early in the 18th century." *Id.*

In the late-1700s, Joseph Belton created a rifle capable of firing "Sixteen Balls loaded at one time."[14] Belton demonstrated his rifle before leading military officers (including General Horatio Gates and Major General Benedict Arnold) and scientists (including David Rittenhouse), who verified its functionality. Belton, *Letter*, at 139. In 1777, the Continental Congress ordered one hundred of Joseph Belton's rifles,[15] which could "discharge sixteen, or twenty [rounds], in sixteen, ten, or five seconds." Belton, *Letter*, at 123. Although the deal fell through when Belton demanded "an extraordinary allowance,"[16] the exchange proves that the Founders embraced repeaters capable of firing more than 10 rounds.

The British similarly recognized the advantage of repeaters, employing the Ferguson Rifle during the Revolutionary War, which "fired six shots in one minute" during a government test on June 1, 1776.[17]

At the time of the Second Amendment's ratification, the state-of-the-art repeater was the Girandoni air rifle, which could shoot 21 or 22 rounds in .46 or .49 caliber.[18] The Girandoni was ballistically equal to a powder gun,[19] and powerful enough to take an elk.[20] At the time, "there were many gunsmiths in Europe producing compressed air weapons powerful enough to use for big game hunting or as military weapons." Garry, WEAPONS OF LEWIS AND CLARK, at 91. The

---

[14] Joseph Belton, *Letter to the Continental Congress*, Apr. 11, 1777, *in* PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774-1789, vol. 1 A-B, at 139.
[15] 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789, at 324 (1907).
[16] 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774-1789, at 361.
[17] Roger Lamb, AN ORIGINAL AND AUTHENTIC JOURNAL OF OCCURRENCES DURING THE LATE AMERICAN WAR 309 (1809).
[18] James Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).
[19] John Plaster, THE HISTORY OF SNIPING AND SHARPSHOOTING 69–70 (2008).
[20] Jim Supica, *et al.*, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

Girandoni was invented for the Austrian army—1,500 were issued to sharpshooters and remained in service for 25 years, including in the Napoleonic Wars between 1796 and 1815.[21] Isaiah Lukens of Pennsylvania manufactured such rifles,[22] along with "many makers in Austria, Russia, Switzerland, England, and various German principalities." Garry, WEAPONS OF LEWIS AND CLARK, at 99.

Meriwether Lewis seemingly acquired the Girandoni rifle he famously carried on the Lewis and Clark Expedition from Isaiah Lukens. *Id.* Lewis mentioned it in his journal 39 times, always demonstrating the rifle to impress various Native American tribes encountered on the expedition—often "astonishing" or "surprising" them and making the point that although the expedition was usually outnumbered, the smaller group could defend itself.[23]

All in all, it is clear that the Founders and Framers were well aware of the advent, existence, and popularity of magazines capable of holding more than ten rounds of ammunition, as well as repeating arms that were capable of firing more than ten rounds without reloading.[24]

---

[21] Gerald Prenderghast, REPEATING AND MULTI-FIRE WEAPONS 100–01 (2018); Garry, WEAPONS OF LEWIS AND CLARK, at 91–94.

[22] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CENTER FOR THE AMERICAN WEST (Aug. 3, 2014), https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/.

[23] *See, e.g.*, Meriwether Lewis and William Clark, 6 THE JOURNALS OF THE LEWIS & CLARK EXPEDITION 233 (Gary Moulton ed., 1983) (Jan. 24, 1806 entry: "My Air-gun also astonishes them very much, they cannot comprehend it's [*sic*] shooting so often and without powder; and think that it is *great medicine* which comprehends every thing that is to them incomprehensible.").

[24] Additionally, the innovation surrounding these magazines and the historical analogues continued through the 19th century and became some of the most popular Arms. *See, e.g.*, *Newly Invented Muskets*, N.Y. EVENING POST (Apr. 10, 1822), *in* 59 Alexander Tilloch, THE PHILOSOPHICAL MAGAZINE AND JOURNAL 467–68 (1822) (In 1821, the *New York Evening Post* lauded Isaiah Jennings for inventing a repeater, "importan[t], both for public and private use," whose "number of charges may be extended to fifteen or even twenty . . . and may be fired in the space of two seconds to a charge."); R.L. Wilson, WINCHESTER: AN AMERICAN LEGEND 11–12 (1991) (recounting the testing of the popular Henry Rifle at the Washington Navy Yard in 1862 and noting that "one full fifteen-shot magazine was fired in only 10.8 seconds.").

Given that "Arms" has a "historically fixed meaning" but one that "applies to new circumstances," the *Bruen* Court established that it thus "covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132 (citing *Caetano*, 577 U.S. at 411–12). Accordingly, the text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," which, as evidenced above, include the magazines at issue in this case.

### B. Rhode Island's Restriction on Magazine Capacity has no Historical Justification

Defendants cannot point to *any* on-point or analogous historical prohibition on firearms capable of firing more than ten rounds without reloading or magazines capable of holding more than ten rounds.

The *Bruen* Court explained that "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." 142 S. Ct. at 2132. In considering history, courts are to engage in "reasoning by analogy," which "requires only that the government identify a well-established and representative historical analogue, not a historical twin" to the challenged regulation. *Id.* at 2132–33. But to be a genuine "analogue," the historical tradition of regulation identified by the government must be "relevantly similar" to the restriction before the court today. *Id.* at 2132. And the burden rests on the government to identify a historical analogue to justify the challenged restriction. *Id.* at 2135.

As demonstrated above, when the Second Amendment was ratified in 1791, repeating arms were already three centuries old. The state-of-the-art as of 1791 was a 22-shot rifle. Yet, despite the prevalence of repeaters and magazines that allowed operators to fire more than ten rounds

–11–

without reloading and to quickly reload their arms, there are no Founding Era prohibitions on magazine capacity.

Moreover, should this Court look to the period surrounding the ratification of the Fourteenth Amendment, it will come to the same result.[25] By the Fourteenth Amendment's ratification in 1868, Americans had seen 24-barreled pistols,[26] 12-barreled rifles,[27] 21-shot revolvers,[28] 20-round belt-fed chain pistols,[29] 42-shot Ferris Wheel pistols,[30] and rifles capable of firing 60 shots in 60 seconds.[31] The 16-shot Henry Rifle and 18-shot Winchester Model 1866 were becoming American legends. And yet, there were also no 19th century prohibitions on firearm or magazine capacity.

"The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after

---

[25] Importantly, the Founding Era, and not the time surrounding the ratification of the Fourteenth Amendment, is the key historical guide when engaging in this inquiry. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-*Bruen *World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4248297 (working draft). This is evident for, at minimum, two reasons. First, in *McDonald v. Chicago*, the Supreme Court held that the Second Amendment bears the *same meaning* as applied against the federal government as it does against the states. 561 U.S. 742, 765 (2010). Second, the Supreme Court has always treated ratification of the Bill of Rights as the key historical period for understanding the scope of those rights—regardless of whether the Court is applying the Amendments against the federal government or against the states. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004); *Virginia v. Moore*, 553 U.S. 164, 168–69 (2008); *Nevada Comm'n on Gaming Ethics v. Carrigan*, 564 U.S. 117, 122–25 (2011); *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984). Regardless, even if this Court considers the 1868 historical period in this case, the result is the same.
[26] Lewis Winant, PEPPERBOX FIREARMS 7 (1952).
[27] Norm Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 711 (9th ed. 2007) (Bennett and Haviland Rifle).
[28] Supica, TREASURES, at 48–49; Winant, PEPPERBOX FIREARMS, at 67–70 (pin-fire revolvers).
[29] Winant, FIREARMS CURIOSA, at 204, 206.
[30] Winant, FIREARMS CURIOSA, at 208.
[31] Sawyer, 2 FIREARMS IN AMERICAN HISTORY, at 147 (Porter Rifle).

the adoption of the Fourteenth Amendment." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALBANY L. REV. 849, 864 (2015). Even then, those laws were quickly repealed. During a seven-year period between 1927–1934, six states enacted restrictions involving ammunition capacity. *See* 1927 R.I. Pub. Laws 256, §§ 1, 4 (banning sales of guns that fire more than 12 shots semiautomatically without reloading); 1927 Mich. Pub. Acts ch. 372, § 3 (banning sales of firearms "which can be fired more than sixteen times without reloading"); 1933 Minn. Laws ch. 190 (banning "machine gun[s]" and including in the definition semiautomatics "which have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers"); 1933 Ohio Laws 189 (license needed for semiautomatics with capacity of more than 18 rounds); 1933 Cal. Laws, ch. 450 (licensing system for machine guns, defined to include semiautomatics with detachable magazines of more than 10 rounds); 1934 Va. Acts ch. 96 s137, §§ 1(a), 4(d) (defining machine guns as anything able to fire more than 16 times without reloading, and prohibiting possession for an "offensive or aggressive purpose"; presumption of such purpose when possessed outside one's residence or place of business, or possessed by an alien; registration required for "machine gun" pistols of calibers larger than .30 or 7.62mm).

All these statues were repealed, with all but one being fully repealed by 1975. *See* 1959 Mich. Pub. Acts 249, 250 (sales ban applies to only actual machine guns); 1959 R.I. Acts & Resolves 260, 263 (exempting .22 caliber and raising limit for other calibers to 14); 1975 R.I Pub. Laws 738, 738–39, 742 (sales ban applies only to actual machine guns); 1963 Minn. Sess. L. ch. 753, at 1229 (following federal law by defining "machine gun" as automatics only); 1965 Stats. of Calif., ch. 33, at 913 (defining a "machine gun" as firing more than one shot "by a single function of the trigger"); 1972 Ohio Laws 1866 (exempting .22 caliber; for other calibers, license required

for more rounds); H.R. 234, 2013-2014 Leg., 130th Sess. § 2 (Ohio 2014) (full repeal); 1975 Va. Acts, ch. 14, at 67 (defining "machine gun" as automatics only).

Importantly, even though these statutes would themselves have been constitutionally suspect under a *Bruen* analysis, no state law actually prohibited possession of standard firearms and their magazines. California was the only state to limit magazine capacity to 10 rounds, but even then, it established a licensing system, not an outright prohibition. Ohio did not require a license to purchase any firearm or magazine but did require a license for only the simultaneous purchase of the magazine and the relevant firearm.[32] Rhode Island and Michigan limited sales, but not possession. Minnesota had no capacity limit and forbade only altering firearms from how they had been manufactured. Virginia's law forbade carry of some arms in public places and registered some handguns.

Only the District of Columbia banned possession. A 1932 law banned any firearm that "shoots automatically or semiautomatically more than twelve shots without reloading." Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652. In 1975, the District broadened its law and prohibited functional firearms in the home, and handguns altogether. When the *Heller* Court ruled these prohibitions unconstitutional in 2008, the District enacted a new ban on magazines capable of holding more than 10 rounds. 2008 District of Columbia Laws 17-372 (Act 17-708). Thus, only the District of Columbia banned possession entirely, and even then, not until the 20th century.

First and foremost, none of these laws can be said to provide a historical antecedent to Rhode Island's current prohibition. Defendants cannot point to a single Founding Era law that limited magazine capacity or banned the sale of magazines or their historical predecessors. And the Supreme Court specifically disclaimed consideration of 20th century law in conducting the

---

[32]    *See* Kopel, *History of Firearm Magazines*, 78 ALBANY L. REV. at 865.

Second Amendment analysis when it contradicts the earlier Founding Era evidence, as is the case here. *See Bruen*, 142 S. Ct. at 2154 n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence."). Accordingly, under both *Heller* and *Bruen*, Rhode Island's law point to an appropriate historical antecedent and thus cannot survive constitutional scrutiny.

Moreover, none of the above laws are "longstanding." First, no law can pass constitutional muster under *Heller* and *Bruen* without grounding in the Founding Era, and these laws do not meet that standard. Moreover, all have been repealed and thus cannot be said to be "standing," in any way. Something that is "longstanding" has two characteristics: being "long" and being "standing." 1 SHORTER OXFORD ENGLISH DICTIONARY 1625 (1993) ("adj. Of long standing; that has existed a long time, not recent."). As for modern bans, like New Jersey's, the District of Columbia's handgun ban was 33 years old when the Supreme Court struck it down in *Heller*; thus proving that 33 years is certainly not "longstanding." The earliest modern magazine ban is New Jersey's 15-round limit enacted in 1990. Act of May 30, 1990, ch. 32, §§ 2C:39-1(y), -3(j), 1990 N.J. Laws 217, 221, 235 (codified at N.J. Stat. Ann. § 2C:39-1(y), -3(j) (West 2014)). Because the oldest magazine bans occurred in the 20th century, have been repealed, and any modern bans are newer than the handgun ban struck down in *Heller*, no magazine ban can be considered longstanding.

## CONCLUSION

Based on the existence and prevalence of magazines and their predecessors, combined with the lack of comparable historical regulation, it is substantially likely that Plaintiffs will succeed on the merits of their Second Amendment claim that Rhode Island's magazine ban is unconstitutional.

DATED the 9th day of November 2022.

          Respectfully submitted,

          */s/ Thomas W. Lyons*
          Thomas W. Lyons, #2946
          Strauss, Factor, Laing & Lyons
          One Davol Square, Suite 305
          Providence, RI 02903
          (401) 456-0700
          tlyons@straussfactor.com

          Cody J. Wisniewski*
          FIREARMS POLICY COALITION
          5550 Painted Mirage Road, Suite 320
          Las Vegas, NV  89149
          (916) 378-5785
          cwi@fpchq.org

          Joseph G.S. Greenlee*
          FPC ACTION FOUNDATION
          5550 Painted Mirage Road, Suite 320
          Las Vegas, NV 89149
          (916) 517-1665
          jgreenlee@fpclaw.org

          **Pro hac vice* applications forthcoming*

          *Attorneys for* Amici Curiae

## CERTIFICATE OF SERVICE

    I hereby certify that, on November 9, 2022, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

                                              /s/ Thomas W. Lyons
                                              Thomas W. Lyons