UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| OCEAN STATE TACTICAL, LLC d/b/a BIG BEAR HUNTING AND FISHING SUPPLY; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER<br>　　　*Plaintiffs,*<br><br>　　v.<br><br>PETER F. NERONHA, in his Official Capacity as the Attorney General for The State of Rhode Island; and DARNELL S. WEAVER, in his Official Capacity as the Superintendent of the Rhode Island State Police<br>　　　*Defendants.* | Case No.: 1:22-cv-00246-JJM-PAS |

## PLAINTIFFS' SUPPLEMENTAL BRIEF TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**NOW COME** the above-named Plaintiffs (*hereinafter*, collectively as "Plaintiffs"), and pursuant to the text order granted by this Court on November 10, 2022, presents this Supplemental Brief addressing several issues pertaining to the discussions that took place during oral argument at the Preliminary Injunction Hearing on November 3, 2022.

### I- Dangerous and Unusual Weapons Standard

#### a. Dangerous and Unusual

During the Preliminary Injunction Hearing, the Court inquired as to what defines a "dangerous and unusual weapon"[1]. As previously stated by the Plaintiffs, Standard Capacity Magazines are not "dangerous and unusual" weapons, as they are neither exceptionally dangerous,

---

[1] The Court correctly inquired as to whether a State could ban an automatic weapon pursuant to the "dangerous and unusual weapons" standard articulated in *District of Columbia v. Heller*, and later expressed in *Bruen*. To further answer the Court's inquiry, the State (along with the Federal Government) may permissibly ban automatic weapons, as the Supreme Court has declared automatic weapons to be dangerous and unusual in the case of *Staples v. United States*, 511 U.S. 600, 114 S. Ct. 1793 (1994).

nor unusual, and in fact are in common use among law abiding citizens in modern times. The Supreme Court has never provided a concrete definition of what constitutes a "dangerous and unusual" weapon, however, they have provided guidance in determination as to what constitutes a dangerous and unusual weapon through two (2) metrics of classification. The **first**, being *specific types of weapons that the Government (through legislation under the National Firearms Act, and/or other relevant acts) as well as the Supreme Court, have declared 'dangerous and unusual' through case law and specifically targeted federal legislation*. The **second**, being *whether the arms which the regulation targets are in 'common use' for lawful purposes such as self-defense*. See *District of Columbia v. Heller*, 544 U.S. 570, 634-635, 128 S. Ct. 2783 (2008). If the weapons subject to the challenged regulation are deemed to be in common use, they are generally considered not dangerous and unusual, and are thus provided Second Amendment protection.

Pursuant to the above-stated first metric of classification, the Supreme Court has had several cases in which it has declared specific types of weapons to be 'dangerous and unusual'. For example, the Supreme Court has held that machine guns are of "quasi-suspect character", in the same category as hand-grenades, generally falling "outside those categories of weapons that have traditionally . . . been widely accepted as lawful possessions". *Staples v. United States*, 511 U.S. 600, 612, 114 S. Ct. 1793 (1994); see also *Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) (quoting *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999) ("In another case, we put machine guns and pipe bombs into the same category, noting that both were "primarily weapons of war and have no appropriate sporting use for personal protection"). Though already stated in the Plaintiffs' Reply, the Court in *Staples* specifically expressed the characteristic that made machine guns 'dangerous and unusual' was their ***ability to fire automatically***, and not their ability

to accept high-capacity magazines. See *Id*. The Court expressed that the difference between the lawfully possessed civilian AR-15 (capable of accepting Standard Capacity Magazines[2]) to the unlawfully possessed M-16 Military Machine Gun (also capable of accepting Standard Capacity Magazines) was that the M-16 was capable of automatic fire, where the AR-15 was only capable of semi-automatic fire. See *Staples*, 611 U.S., at 608-12.

Other prohibitions under the 'dangerous and unusual' standard which have been upheld by Federal Courts include 1) short-barreled shotguns; 2) hand grenades; 3) pipe bombs; and 4) bump stocks. See *United States v. Dempsey*, 957 F.2d 831, 834 (11th Cir. 1992) (where the court upheld the conviction of the Defendant in possession of pipe bombs in violation of 26 U.S.C. § 5861, and reasoned that unlike firearms which may be used for sport . . . **pipe bombs had no legitimate purpose**); see also *State v. Fennell*, 95 N.C. App. 140, 382 S.E.2d 231, 233 (N.C. Ct. App. 1989) (noting the danger posed by a sawed-off shotgun because it may be readily concealed and because of its indiscriminate spraying of shot); see also *Roberts v. Bondi*, 2018 WL 3997979 (M.D. Fla. 2018) (where the court found valid the prohibition of "bump stocks" which could turn lawfully owned semi-automatic firearms into a machine gun **capable of automatic fire**. Four months after the Decision was issued, the National Firearms Act was amended to include bump stocks under the definition of "machine gun" **based on their capability of automatic fire).**

    b. *Common Use*

The Second Amendment's protection extends to those sorts of weapons that are in common use, and typically possessed by law abiding citizens for lawful purposes at the time. See *N.Y. State Rifle and Pistol Association v. Bruen*, 142 S. Ct. at 2143 (citing *Heller*, 554 U.S., at 627, 128 S.

---

[2] "Standard Capacity Magazines" in this brief refers to those magazines classified as "Large Capacity Feeding Devices" under Chapter 47 of the Rhode Island General Laws, "Large Capacity Feeding Device Ban of 2022", being those Magazines capable of accepting over ten (10) rounds of ammunition.

Ct. 2783, 171 L. Ed. 2d 637. The key distinction regarding common use is not whether the regulated weapon is in common use for criminality, but **whether it is in common use among law abiding citizens**. See *Friedman v. City of Highland Park*, 784 F.3d 406, 416 (7th Cir. 2015) (where the Court declined to recognize the argument of a particular weapons favorability among gangsters in Chicago during the early 1900s, stating "It matters not whether fifty or five thousand mob enforcers used a particular weapon, the question is ***whether a critical mass of law-abiding citizens did***").

Additionally, "*Heller* created 'a rebuttable presumption' that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, not just to a small subset.'" *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) (citing *Maloney v. Singas*, 351 F. Supp. 3d 222, 232 (E.D.N.Y. 2018) (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo ("NYSRPA")*, 804 F.3d 242, 255 (2d Cir. 2015). As recognized by the District Courts, "[W]hat line separates 'common' from 'uncommon' ownership is something the Supreme Court did not say." See *Friedman v. City of Highland Park, III.*, 784 F.3d 406, 409 (7th Cir. 2015). However, every Court since *Heller* has "relied on statistical data of some form, creating a consensus that ***'common use'*** is an ***objective* and *largely statistical inquiry*"**. See *Hollis*, 827 F.3d at 448 (quoting *NYSRPA*, 804 F.3d at 256). Several Courts have understood the total number of a particular weapon to be the relevant inquiry, whereas other Courts have looked to the regulated arm's legality in other jurisdictions, coupled with a raw number analysis.

Though the Supreme Court has been unclear as to what metric to measure "common use", Justice Alito and Thomas' concurrence *in Caetano v. Massachusetts* was particularly persuasive whereby the Supreme Court held stun guns were in fact weapons in common use, measuring common use by using a conjunctive test, whereby the Court blended the raw number of stun guns

4

(200,000) with a review of how many jurisdictions permit them (stun guns legal in 45 states), stating:

> The number of Tasers and stun guns is dwarfed by the number of firearms. This observation may be true, but it is besides the point . . . the more relevant statistic is that [200,000] . . . stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States . . . While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country.
> *Caetano v. Massachusetts*, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016)

The variety of methodological approaches suggest these statistics (raw numbers, percentage and proportion, jurisdiction counting, etc.) ***identify relevant data*** for the common use inquiry rather than a balancing of whether one standard is more favorable than another. See *Hollis*, 827 F.3d at 449. Here, Standard Capacity Magazines are lawful in thirty-eight (38) states, with three (3) of the twelve (12) states that prohibit them having outlawed them within the past year (many of which have faced constitutional challenges yet to be decided)[3] The number of Standard Capacity Magazines owned and used among American citizens is enormous, and hard to generate a concrete number. However, the Second Circuit in *NYSRPA* found Standard Capacity Magazines to affirmatively be "in common use" where the Court recognized previous statistics from over twenty (20) years ago as evidencing the gravity of the number of Standard Capacity Magazines that are likely in circulation today. See *NYSRPA*, 804 F.3d at 255 ("those statistics suggest that about 25 million large-capacity magazines were available in 1995 . . . and nearly 50 million such magazines – or nearly two large-capacity magazines for each gun capable of accepting one – were approved for import . . . accepting the most conservative estimates, . . . large capacity magazines at issue are 'in common use' as the term was used in *Heller*").

---

[3] Such as *National Association for Gun Rights v. Baker, et al.*, which is an action recently filed challenging the constitutionality of Statute banning certain semi automatic firearms, and certain Standard Capacity Magazines.

As previously stated, a conservative estimate places today's number of Standard Capacity Magazines on the civilian marker at over seventy million (70,000,000) for AR-15's alone, with literally hundreds of millions of Standard Capacity Magazines in existence and circulation in the Country when all magazines are considered (i.e. rifles, pistols, shotguns, etc.). Several of the Business Plaintiff's customers own firearms which they do not make magazines with a capacity of less than ten (10) rounds for. These individuals would be deprived of their right to armed self defense in the firearms they choose to utilize for self defense purposes due to the Magazine Ban Law's indirect "phasing out" of their firearms via unconstitutional regulation.

**II-   Magazines are considered "Arms" protected under the Second Amendment**

Standard Capacity Magazines are considered "Arms", as they are modern instruments included in the classification of "Arms", thus falling under the protection of the Second Amendment.

As the Supreme Court stated in *Bruen,* "The Second Amendment extends . . . to all ***instruments*** that constitute bearable arms, ***even those that were not in existence*** at the time of the founding . . . The Second Amendment's definition of 'arms' is fixed according to its historical understanding that general definition covers modern instruments to facilitate armed self-defense". *Bruen*, 142. S. Ct. at 2132 (citing *Caetano v. Massachusetts*, 577 U.S. 411-412, 136 S. Ct. 1027, 194 L. Ed. 2d 99 (2016)); see also *Heller*, 544 U.S., at 582, 128 S. Ct. 2783, 2792, 171 L. Ed. 2d 637, 651 ("Just as the First Amendment protects modern forms of communications . . . and the Fourth Amendment applies to modern forms of search, . . . the Second Amendment extends. . . to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding"). *Heller* has given guidance on what defines the term "arm" as provided Second Amendment protection, stating "[w]eapons of offence, or armour of defense" or "anything that a

man wears for his defense, or takes into his hands, or useth in wrath to cast or strike another". See *Id*. at 581.

Standard Capacity Magazines enjoy Second Amendment protection because without the magazine, many weapons would be useless, including the "quintessential" self-defense weapons like the handgun. See *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020) (citing Heller, 554 U.S. at 629); see also *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (where the Court stated where firearms "are commonly possessed by law abiding citizens for lawful purposes", then "there must be some corollary . . . right to possess the magazines necessary to render those firearms operable"). Court's have held, relative to those instruments necessary for self-defense, that the necessary components of a firearm are afforded the same protection as the firearm itself. See *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (where the court found the right to possess a firearm for self defense implies a corresponding right to acquire the ammunition necessary to use them for self-defense. Implying that ammunition is a necessary component of a firearm because without ammunition, the firearm cannot function); unlike *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (where the Court found a suppressor (i.e. silencer) was a mere "accessory" to a firearm, distinguishing that a suppressor is not necessary for the firearm's operation); see also *United States v. Hasson*, No. GJH-19-96, 2019 U.S. Dist. LEXIS 160498 (D. Md. Sep. 20, 2019) (stating "A silencer . . . does not contain, *feed*, or project ammunition, and does not serve any intrinsic purpose").

It cannot be disputed that the magazine to a firearm is necessary for the operation of a semi-automatic firearm. Unlike a suppressor, which is considered a firearm accessory due to the fact that the firearm can operate without a suppressor, a Standard Capacity Magazine is a necessary instrument in the operation of many lawful arms chosen by citizens for armed self-defense, thus

included under the definition of "arm", falling under the scope of the Second Amendment. The Defendants have presented to this Court, that although magazines are a necessary and essential component of many firearms in common use for self defense purposes, the Plaintiffs are provided ample alternative options in the form of lower capacity magazines. However, the Defendants' argument fails to recognize that once an "arm" is deemed to fall under the scope of Second Amendment, *Bruen* dictates that a means-end scrutiny analysis that contemplates the "least restrictive means necessary" (i.e., a ban on Standard Capacity Magazines being the least restrictive means where lower capacity magazines are still available for use) is impermissible to Second Amendment challenges. *Bruen* rejects the former two-part approach and refuses to recognize the second part of the traditional analysis, that being the "means-end" scrutiny analysis, as such step is "**one too many**." See *Bruen* at 142. S. Ct. at 2117.

As such, Standard Capacity Magazines are modern instruments necessary to facilitate armed self-defense, and provided protection as "arms" under the Second Amendment.

**III-     Defendants' Experts and Historical Analysis**

There exists no issue of fact as between the Experts Declarations, as the Defendants' Expert Declarations do not touch on repeaters in the Founding Era, whereas Plaintiffs' Expert does.

The Defendants' Expert in criminology, Mr. Randolph Roth, fails to make any claim that repeating arms were not in existence during the ratification of the Second Amendment and Founding Era. Rather, he merely states that "Firearm use in homicides was generally rare because muzzle-loading firearms had significant limitations as murder weapons in the colonial era." See *Declaration of Randolph Roth, at ¶ 9*. Additionally, the Defendants' Expert, Michael Vorenberg, failed to cover repeating arms during the Founding Era in his declaration, and focused entirely on

the Reconstruction Era. See *Declaration of Michael Vorenberg, at ¶ 7* ("The time period covered in this declaration is Reconstruction. . .).

As previously stated, *Bruen* mandates that the Founding Era as the controlling time period for determination of whether modern regulation is in conformance with the burdens imposed on the Second Amendment when they were understood at the time the people adopted the Second Amendment. See *Bruen*, 142 S. Ct. at 2136 (citing *Heller*, 544 U.S. 570, 634-635, 128 S. Ct. 2783 (2008)). The Declaration of Michael Vorenberg only explores regulation of repeaters in the Reconstruction Era, and fails to acknowledge any regulation or history of repeaters during the controlling Founding Era. See *Bruen*, 142 S. Ct. at 2137 (citing *Heller*, 544 U.S., at 614, 128 S. Ct. 2783, 171 L. Ed. 2d. 637) ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as the earlier sources."); see also *Heller v. District of Columbia*, 670 F. 3d, 1244, 1274, 399 U.S. App. D.C. 314 (CADC 2011) (Kavanaugh, J. dissenting) ("post ratification adoption . . . of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.").

The Plaintiffs' Expert provided several examples of the historical accounting of the existence of repeaters leading up to, and during the Founding Era. See *Declaration of Ashley Hlebinsky*, at ¶ 21 ("While some repeaters were employed . . . on the battlefield, repeating technology would not be widely popular for use in war until the late nineteenth century. That did not mean however that innovation in repeating technology was stymied. In fact, it was quite the opposite"). Further, The Plaintiffs' Expert cited to multiple accounts evidencing the existence of repeaters during the Founding Era, and time periods leading up to the Founding Era. See

*Declaration of Ashley Hlebinsky*, at ¶ 22 for several examples of repeaters in existence at the time of the Founding Era.

Of great relevance, the Court expressed concern regarding the weight it was permitted (or not permitted) to give each competing expert in light of the newly issued decision in *Bruen*. However, *Bruen* has given controlling guidance, that where the constitutionality of a regulation burdening the plain text of the Second Amendment is at question, it is the State's burden to affirmatively prove that the regulation is part of the "historical tradition" recognized under the Second Amendment. See *Bruen*, 142 S. Ct. at 2111. *Bruen* has further provided clear guidance that no time period takes precedent over the Founding Era in evaluation of the historical tradition. See *Id*.

As such, the Defendants' Experts (Vorenberg and Roth) have failed to either: 1) point to any regulation of repeaters, magazine fed firearms, etc. during the Founding Era; or 2) cite to historical events involving repeaters in the Reconstruction Era, without reference to the Founding Era. Thus, the Defendants have failed to satisfy their burden of proof in showing the Magazine Ban Law is consistent with the historical tradition of regulation under the Second Amendment.

***[Signature Block and Certificate of Service on following page.]***

Respectfully Submitted,

**OCEAN STATE TACTICAL, LLC d/b/a BIG BEAR HUNTING AND FISHING SUPPLY; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER**

*By and through their counsel,*

*/s/ Michael A. Kelly*
Michael A. Kelly, Esq. (#2116)
Dane E. Ardente, Esq. (#10263)
KELLY, SOUZA & PARMENTER, P.C.
128 Dorrance Street, Suite 300
Providence, RI 02903
Tel: (401) 490-7334 | Fax: (401) 490-7874
mkelly@ksplawpc.com
dardente@ksplawpc.com

Dated: November 14, 2022

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that, on this 14th day of November, 2022, a copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record. The document is available for viewing and downloading from the ECF system.

Keith Hoffmann, Esq.
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
khoffmann@riag.ri.gov

*/s/ Michael A. Kelly*
KELLY, SOUZA, & PARMENTER, P.C