THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| OCEAN STATE TACTICAL, LLC; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER<br>    Plaintiffs,<br><br>    v.<br><br>STATE OF RHODE ISLAND; COLONEL DARNELL S. WEAVER; and PETER F. NERONHA,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 22-CV-246 JJM-PAS |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, JR., United States District Court Chief Judge.

Four gun owners and a registered firearms dealer (collectively, "plaintiffs") have come to this Court challenging a six-month-old Rhode Island law that prohibits the possession of Large Capacity Feeding Devices[1] ("LCMs"), which turn firearms into multiple-shot weapons. The legislation was passed on June 21, 2022, with a grace period of 180 days, by which time all those in possession of such devices must have

---

[1] Large Capacity Feeding Devices are typically referred to as Large Capacity Magazines or High-Capacity Magazines. The plaintiffs refer to them as "Standard Capacity Magazines." The Court refers to them as LCMs. They are defined by R.I. Gen. Laws § 11-47.1-2, which became effective upon its passage on June 21, 2022, as "a magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device which is capable of holding, or can readily be extended to hold, more than ten (10) rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." Tubes which hold exclusively .22 caliber ammunition are explicitly excluded.

(a) permanently modified them to be incapable of holding more than ten rounds; or (b) divested themselves of them by selling them to a federally registered dealer or turning them in to law enforcement. R.I. Gen. Laws § 11-47.1-3(b) ("LCM Ban"). Although the law does not address other dispositions, its delayed effective date until December 18, 2022 allowed those owning such magazines to lawfully move them from the state by transporting them to a place where the owner could lawfully possess them or by selling them to an out of state firearms dealer. The LCM Ban declares unlawful possession after December 18, 2022 a felony. *Id.* § 11-47.1-3(a).

The plaintiffs, suing the State of Rhode Island, its Attorney General, and its Superintendent of State Police ("the State"), mount three constitutional challenges: (a) that the statute violates the Second Amendment (Count I); (b) that the statute's command amounts to a "taking" of the magazines without just compensation, in violation of the Fifth Amendment (Counts II and III); and (c) that the statute violates the Fourteenth Amendment's guarantee of Due Process in that its terms are vague and its reach is not justified by the police power of the State (Count IV).[2] These allegations, and their invocation of 42 U.S.C. §§ 1343(a)(3), 1983, 1988 to redress a deprivation of rights under color of state law, successfully call on the federal question jurisdiction of this Court under 28 U.S.C. § 1331.

---

[2] Both the Second Amendment and Fifth Amendment arguments are technically Fourteenth Amendment challenges, as the Second and Fifth Amendments control state action only because they are incorporated into the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) (2nd Amendment) and *Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 239 (1897) (due process taking). They are referred to throughout this opinion as simply "Second Amendment" and "Fifth Amendment" claims.

The plaintiffs moved for a preliminary injunction that the defendants oppose. ECF No. 8.[3]  Both sides have submitted extensive briefs, accompanied by evidentiary declarations from a number of expert witnesses.  They agreed the Court would accept those submissions as evidence in lieu of an evidentiary hearing.  On November 5, 2022, the Court heard oral arguments.  This Memorandum and Order follows and, for the reasons stated, the Court denies preliminary injunctive relief.[4]

In summary, the Court finds that the plaintiffs lack a likelihood of success on the merits, that they will not suffer irreparable harm if the law is allowed to take effect, and that the public interest is served by denying injunctive relief.  Specifically, regarding the merits, the plaintiffs have failed in their burden to demonstrate that LCMs are "Arms" within the meaning of the Second Amendment's text.   Moreover, even were they "arms," the plaintiffs have failed to prove that LCMs are weapons relating to self-defense.  There is no Second Amendment violation from the LCM Ban because of those two shortfalls of persuasion.  The Court must therefore consider the

---

[3] With consent of both parties, the Court on August 18, 2022, converted the Motion for Temporary Restraining Order (ECF No. 8) to a Motion for Preliminary Injunction.

[4] While the State has challenged Article III standing, the Court finds that the plaintiffs have standing.  The individuals have declared that they own firearms whose possession will be outlawed if the LCM Ban is not overturned before December 18th. ECF Nos. 8B, 22D, 22E.  The statute imposes an affirmative duty on them to modify those weapons or relieve themselves of possession.  The retail plaintiff has alleged a clear economic injury through his claim that his inventory of LCMs now cannot be sold. ECF No. 8C.  Other courts have found that plaintiffs have standing with respect to similar statutes and similar challenges. *See, e.g., N.Y. State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 358 (W.D.N.Y. 2013), *rev'd in part on other gnds.*, 804 F.3d 242 (2d Cir. 2015) (standing by virtue of ownership of large-capacity magazines and intention, but for the ban, to purchase them).

LCM Ban outside the core of Second Amendment protection.  The Court further finds that the statute is not vague.  Because the LCM Ban is a valid exercise of police power, there is no "taking" requiring just compensation and, consequently, no violation of the Fifth Amendment.  The Rhode Island General Assembly passed, and the Governor signed, legislation to lower the risk of harm that results from the availability of devices that assist someone intent on murdering large numbers of people.  This common-sense public safety legislation does not implicate the Second Amendment and violates no one's constitutional rights.

## I.   BACKGROUND

Chapter 47 of Title 11 of the Rhode Island General Laws, known as the "Firearms Act," has long regulated the type of firearms that may be lawfully possessed in Rhode Island.  Some weapons have been banned altogether, such as sawed-off shotguns and machine guns.[5]  Still others are lawful only when carried by persons licensed to possess them or in limited specified locations such as target shooting areas or the home.  R.I. Gen. Laws §§ 11-47-8 (license or permit except to keep at home), 11-47-10 (target range).  Some people are excluded altogether from possessing firearms.  *Id.* §§ 11-47-5 (possession by felons), 11-47-6 ("mental incompetents" and "drug addicts"), 11-47-7 (undocumented immigrants).

On June 21, 2022, Rhode Island amended Chapter 47.1 to prohibit additional weaponry that had become popular additions to the arsenals of some individuals

---

[5] *See* State's Memorandum for a more complete catalog of prohibited weapon-related items.  ECF No. 19 at 7-8.

relatively recently and have been employed in recent mass shootings.  For example, Chapter 47 added to its list of prohibited items "ghost guns," which are guns that lack serial or any other identifying numbers, *Id.* § 11-47-2(8);[6] "3D print[ed]" guns, which are assembled under computer control from computer files,  *Id.* § 11-47-2(1);[7] and "bump-fire stocks" which, by replacing a semiautomatic weapon's standard stock with

---

[6] The obliteration of serial numbers has been prohibited in Rhode Island for some time.  "Ghost guns," however, are privately made weapons that *never* had a serial number, nor any other identifying information on any of the parts.  Joseph Greenlee, a historian cited frequently by the plaintiffs, maintains that there was historically an unrelated practice of building guns, but the use of the phrase "ghost guns" is of recent origin.  Jake Charles, *Ghost Guns, History, and the Second Amendment*, DUKE CENTER FOR FIREARMS LAW (Apr. 27, 2022) https://firearmslaw.duke.edu/2022/04/ghost-guns-history-and-the-second-amendment/.  The parts are sold in kits, accompanying an "unfinished frame," and are easily assembled.  *What are Ghost Guns?*, BRADY: UNITED AGAINST GUN VIOLENCE: RESOURCES, https://www.bradyunited.org/fact-sheets/what-are-ghost-guns (last visited Nov. 15, 2022).  They cannot be traced.  *Id.*  Ghost guns were used in at least four mass shootings in California: in 2013 (Santa Monica), 2017 (Tehama County), 2019 (Santa Clarita), and Saugus (2019).  Carter Evans, *Santa Monica Shooter Built His Own Weapon*, CBS NEWS (June 14, 2013, 8:12 PM), https://www.cbsnews.com/news/santa-monica-shooter-built-his-own-weapon/; *Tehama County Rampage Puts Spotlight on Homemade 'Ghost Guns'*, KRON4 News (Nov. 16, 2017, 8:42 PM), https://www.kron4.com/news/tehama-county-rampage-puts-spotlight-on-homemade-ghost-guns/; Dakin Andone, *The Gunman in the Saugus High School Shooting Used a 'Ghost Gun,' Sheriff Says*, CNN (Nov. 21, 2019, 3:52 PM), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/index.html; Alain Stephens, *Officials Confirm Santa Clarita Shooter Used A Ghost Gun*, LAIST (Nov. 20, 2019, 2:45 PM), https://laist.com/news/feds-investigating-whether-saugus-santa-clarita-shooter-used-ghost-gun.

[7] 3D guns first appeared for popular consumption, according to *The New Republic*, when a "25 year old gun activist named Cody Wilson uploaded his open-design plans to the internet in 2013. Kim Kelly, *The Rise of the 3D-Printed Gun*, THE NEW REPUBLIC: THE SOAPBOX (May 21, 2020), https://newrepublic.com/article/157753/rise-3d-printed-gun.  By the time the U. S. Department of State closed the site down, more than 100,000 people had downloaded them and virtually any 3D printer at home could be used to assemble them." *Id.*

one that does not require a trigger-pull between rounds, makes the firearm function similarly to a machine gun, *Id.* § 11-47-2(4).[8]

None of the foregoing prohibitions is challenged here.  But, when it amended Chapter 47, the General Assembly enacted § 11-47.1-1 *et seq.*, which specifically ban LCMs.  Rhode Island was not alone in doing so.  In the wake of recent mass shootings, many of which have occurred in schools, a number of states have enacted limitations on the capacity of magazines that enable a firearm to fire multiple rounds.  While the maximum number of rounds permitted in a single magazine varies, the majority of states with bans prohibited the sale or possession of any magazine containing more than ten rounds.   ECF No. 22-1, Ex. B, at 2 (internal pagination).[9]   For the uninitiated—which, until this case appeared on its docket, the Court considered itself—magazines are devices holding extra ammunition and are inserted into and removed from the frame of the firearm, much as an extra battery-pack gets swapped

---

[8] The Department of Justice banned bump stocks in the wake of the 2017 massacre that killed 58 people in Las Vegas.  Luis Gomez, *A Brief History of Bump Stocks Leading up to the Ban by the Trump Administration*, The San Diego Union-Tribune:  The   Conversation   (Dec.   18,   2018,   3:15   PM),   https://www. sandiegouniontribune.com/opinion/the-conversation/sd-brief-history-bump-stocks-before-they-were-banned-20181218-htmlstory.html.   The   shooter   there,   using weapons with bump stocks attached, "sprayed" bullets into the crowd.  *Id.* This article claims that about the time bump stocks were temporarily (and mistakenly, it later maintained) approved by the ATF, videos of them first appeared on YouTube, showing viewers how to rig a semiautomatic rifle "to fire continuously with a single pull of the trigger."  *Id.*

[9] Where indicated, page numbers refer to the internal pagination of the document cited.  Where that is not indicated, page numbers refer to the electronically assigned page numbers of the filed document.  This distinction is made necessary because of the filing of multiple documents in the same electronic filing, particularly by the plaintiffs.

in and out of a battery-operated tool, like a leaf blower, for example. "Reloading," in this context, means removing an empty magazine and substituting it with a full one.[10] The process may be as simple as pressing a button to eject the spent magazine, in order to push a new one in. ECF No. 22-1, Ex. B at n.33.

The reader should have at least a cursory understanding of handguns and how they operate. Handguns are built with an internal mechanism that holds the bullets. They may be revolving cylinders or fixed chambers. "A 'magazine' is a vehicle for carrying ammunition. It can be either integral to the gun or detachable." ECF No. 22-1, Ex. B at n.2. The handguns that use magazines are built with slots into which the magazines are inserted. Magazines became prevalent around the mid-nineteenth century. ECF No. 22-1, Ex. A at 36. "Most pistols sold in the United States come equipped with magazines that hold between 10 and 17 rounds." ECF No. 22-1, Ex. B at 3 (internal pagination). "Most modern semi-automatic firearms, whether handguns or semi-automatic rifles like AR-15s, use detachable box magazines." ECF No. 19-3 at ¶ 5.

When a multiple-round device like an LCM is attached, a handgun becomes a "semiautomatic" weapon, meaning that it is capable of rapidly firing several bullets,

---

[10] The declarations and exhibits from the parties, the briefs of the parties, and some published material the Court has unearthed on its own, provide explanations to the unfamiliar of how these weapons and their accessories work. Facts such as how a magazine works, *when undisputed,* are presented by the Court largely without citation. Any facts *found* by the Court from disputed assertions carry citations to where in the record they are supported. In addition, the Court has taken care to cite outside sources—articles not cited by the parties—only for non-controversial and presumably undisputed matters. The facts on which the Court actually relies are gleaned from the evidentiary submissions of the parties.

one right after another. However, the gun still requires a trigger-pull for each round fired. *Semiautomatic*, MERRIAM-WEBSTER (Dec. 8, 2022), https://www.merriam-webster.com/dictionary/semiautomatic. Nevertheless, a semiautomatic weapon can fire at rates of 300 to 500 rounds per minutes. *Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017) (en banc). A fully automatic weapon, such as a machine gun, differs from a semiautomatic weapon in that only one trigger-pull is necessary to release a barrage of bullets that are then sprayed continuously from the barrel until a manual action is taken to stop them.

As described *infra*, there is no legacy provision in the LCM Ban and thus, on the day it is effective, those who already possess such magazines will be guilty of a felony. The law, however, granted a 180-day period for those individuals to avoid that predicament. These individuals can modify the magazine to a lower capacity, they can sell or transfer the magazine to a person or location where it is lawful, or they can surrender it to law enforcement. The plaintiffs maintain that the whole LCM Ban—lock, stock and barrel—violates the Second Amendment as an unconstitutional restriction on gun ownership and the Fifth Amendment because it is a "taking" without just compensation by forcing "the mandatory dispossession" of previously lawful LCMs. ECF No. 12 at 4.

## II.   STANDARD OF REVIEW

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). "To secure a preliminary injunction, a plaintiff must show '(1) a substantial likelihood of success on the merits,

(2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.2d 108, 120 (1st Cir. 2003)). As the Court examines how this case measures up against these criteria, it is mindful that "the first two factors, likelihood of success and of irreparable harm, [are] 'the most important' in the calculus." *Brunx v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014) (quoting *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009)).[11]

In evaluating whether the plaintiffs have met the most important requirement of likelihood of success on the merits, a Court must keep in mind that the merits need not be "conclusively determine[d];" instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (partially quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success − rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato*

---

[11] Some courts have held that certain preliminary injunctions are "disfavored" and that a plaintiff seeking one of those has an even "heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors." *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019) (stating that an injunction that "grants all the relief that the moving party could expect from a trial win" falls into the disfavored category). In this case, the plaintiffs seek a declaration that the statute is unconstitutional and an injunction against its enforcement, precisely the relief sought on the merits.

*Puertorriqueno de Trabajadores, SEIU Local 1996 v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam).

### III.    DISCUSSION

### A.    The Second Amendment and Magazines

#### 1.    Background on the Second Amendment

The Court finds that the plaintiffs have failed to show that their claim that the LCM Ban violates the Second Amendment enjoys a likelihood of success.  The Second Amendment, which protects the right to bear arms, is intended at its core to safeguard the individual's right to self-defense.  For the reasons discussed below, the Court finds that the plaintiffs have not demonstrated that LCMs are "Arms" within the textual meaning of the Amendment, nor have they demonstrated that LCMs are weapons of self-defense.  LCMs therefore fall outside the embrace of any guarantee the Second Amendment confers.

In the twin cases of *Heller v. District of Columbia*, 554 U.S. 570 (2008), and *N.Y State Rifle & Pistol Assoc., Inc. v. Bruen*, ___ U.S. ___, 142 S. Ct. 2111 (2022), the Supreme Court instructs us that a Second Amendment approach to the constitutionality of a weapons restriction must entail a journey into America's history.  Courts must examine not only the text itself, but the historical context in which the text was written. *See Heller*, 554 U.S. 570; *Bruen*, 142 S. Ct.  There are questions that the Court needs to answer in order to follow the analytical path dictated by *Bruen*.  For the most part, those answers are found only after a historical analysis.  For example, are LCMs even "Arms" within the embrace of the Second

Amendment's text?  If so, are they by virtue of their function central to the "core" right to self-defense inside *or* outside the home?  In assessing the constitutionality of a restriction, courts must inquire whether LCMs were in common use during the relevant historical period and whether they were unusual and dangerous.  *See Bruen*, 142 S. Ct.

In both *Heller* and *Bruen*, the five-justice majorities undertook their own historical analyses.  Both majority opinions are replete with direct references to ancient tomes and original research.[12]  As Justice Breyer noted in his *Bruen* dissent,

---

[12] Note, for example, these references:

> William Blackstone, for example, wrote that Catholics convicted of not attending service in the Church of England suffered certain penalties, one of which was that they were not permitted to "keep arms in their houses." 4 Commentaries on the Laws of England 55 (1769) (hereinafter Blackstone); see also 1 W. & M., ch. 15, § 4, in 3 Eng. Stat. at Large 422 (1689) ("[N]o Papist ... shall or may have or keep in his House ... any Arms ..."); 1 W. Hawkins, Treatise on the Pleas of the Crown 26 (1771) (similar).

*Heller*, 554 U.S. at 584.

> Henry VIII issued several proclamations decrying the proliferation of handguns, and Parliament passed several statutes restricting their possession. See, *e.g.*, 6 Hen. 8 c. 13, § 1 (1514); 25 Hen. 8 c. 17, § 1 (1533); 33 Hen. 8 c. 6 (1541); Prohibiting Use of Handguns and Crossbows (Jan. 1537), in 1 Tudor Royal Proclamations 249 (P. Hughes & J. Larkin eds. 1964). ...
> Similarly, James I considered small handguns—called dags— "utterly unserviceable for defence, Militarie practise, or other lawful use." A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols (R. Barker printer 1616). But, in any event, James I's proclamation in 1616 "was the last one regarding civilians carrying dags,"

*Bruen*, 142 S. Ct. at 2140.

"[t]he majority in *Heller* undertook 40 pages of textual and historical analysis." "Two years later, [however,] 21 English and early American historians (including experts at top universities) told us in *McDonald v. Chicago* ... [that historical analysis was] wrong." *Bruen*, 142 S. Ct. at 2177-78 (internal citations omitted). He warned that *Bruen's* reliance almost exclusively on history for constitutional interpretation "will pose a number of practical problems ... especially acute in the lower courts."

> Lower courts – especially district courts – typically have fewer research resources, less assistance from *amici* historians, and higher caseloads than we do. They are therefore ill equipped to conduct the type of searching historical surveys that the Court's approach requires.

*Id.* at 2179. Nevertheless, the majority commands this Court to undertake such an analysis.

There is another difference beyond resources between the Supreme Court and district courts, however, that redounds to our benefit. Unlike the Supreme Court, trial courts have the ability to receive evidence and rely on that evidence to find facts that support the legal reasoning and lead to conclusions. *Bruen* itself was decided on no factual record. *See id.* The district court had granted a motion to dismiss in what was then known as *State Rifle & Pistol Assn., Inc. v. Beach*, which, of course, took allegations at their face value. *N.Y. State Rifle & Pistol Assn., Inc. v. Beach*, 354 F. Supp. 3d 143 (N.D.N.Y. 2018). Even more significantly, the issue raised by the plaintiffs in the case was the *very same* that had previously been rejected by the Second Circuit six years earlier in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012). The only purpose in litigating *Beach* was to get another Second Circuit rejection of plaintiff's Second Amendment theory so that the plaintiffs could try to

bring the issue to the United States Supreme Court. They forthrightly acknowledged to the district court that "the result they seek is contrary to *Kachalsky*, [they] do not dispute that the precedential effect of its holding binds [the district court], and [they] have not advanced any other factual allegations suggesting legally plausible claims." *Beach*, 354 F. Supp. 3d at 149. Thus, dismissal was granted as a matter of law without the development of a factual record. *Id.* The Second Circuit then summarily affirmed. *N.Y. State Rifle & Pistol Assn., Inc. v. Beach*, 818 Fed. Appx. 99 (2d Cir. 2020) (Mem).

Unlike the *Bruen* Court, this Court *has* an evidentiary record upon which to base its findings.[13] The parties agreed to submit documentary declarations and exhibits in lieu of an evidentiary hearing, and the Court has pored over them. Both parties have retained expert historians to inform the Court's factfinding. The curricula vitae ("CVs") of some of the experts are before the Court as are their writings directed at pivotal factual disputes, and both parties have submitted additional helpful exhibits. While this Court professes no independent scholarly historical knowledge, it does have solid experience in resolving disputes between experts. Parties, in both civil and criminal cases, routinely rely on expertise in topics well beyond the ken of any particular factfinder to decide contested issues of fact. For example, does a criminal defendant have a mental disorder that is sufficient to excuse her from criminal responsibility? Was a steel slab made defectively and did that

---

[13] The State noted in its opening Memorandum that no court has developed a full evidentiary record concerning LCMs post-*Bruen*. ECF No. 19 at 2 (internal pagination).

defect cause it to give way?  Did a product infringe on a pre-existing patent by employing the same basic design?  Without any expertise in psychiatry, metallurgy, or industrial design, courts regularly resolve factual disputes between expert witnesses, and they do so relying on tried-and-true, conventional considerations related to credibility and reliability.

In the ordinary course of an opinion, the Court might examine the applicable law before addressing the facts to which it would then apply that law.  In this case, however, it is useful to discuss the facts, and the Court's assessment of the evidence before it, before engaging in the *Heller/Bruen* analysis.

### 2.    The Court's Findings of Fact

In the procedural posture of a motion for preliminary injunction, the Court does not have to make final findings of fact.  Instead, an examination of all the evidence and consideration of the expertise of those proffering opinions occurs in the framework of an inquiry into whether the plaintiffs have shown a *likelihood* that their experts' opinions will be accepted.  In that context, the Court has, in considering the evidence, asked itself basic questions that courts pose all the time and, indeed, direct juries to employ when making decisions based on expert opinions.  These questions include: what are the experts' respective qualifications?  Are their opinions intelligible to a lay judge or jury?  Is there other evidence that casts doubt on the opinions or corroborates them?  *See Woodman v. United States*, ___ F. Supp. 3d ___, 2022 WL 1444529, *2 (D.N.H. May 6, 2022) (plaintiff's non-specialist expert's opinion given less weight than others because his testimony was contradicted by treating

14

providers). Do the opinions appear to have sufficient support? *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 84 (1st Cir. 1998) (whether articles relied on by expert were published and subject to peer review was an indicum of the reliability of the expert's opinion). Are they based on sufficient data? *Malden Transp., Inc. v. Uber Tech., Inc*, 404 F. Supp. 3d 404, 423 (D. Mass. 2019) (expert's opinion unreliable where he excluded major variables). And did the expert approach the problem objectively or with a partisan bias? *See Collazo-Santiago v. Toyota Motor Corp.*, 149 F.3d 23, 28 (1st Cir. 1998) (jury could find defendant's expert not a disinterested witness because he was a former employee of the defendant and testified often on its behalf).

In this case, the credentials of the proffered experts weigh heavily in the Court's view of which opinions to accept where there is a conflict. The Court must discount to some extent the declaration of both the plaintiffs' experts because neither has been engaged in relevant *neutral* scholarly research.

- Ashley Hlebinsky, a historian versed in the history of firearms, is a private consultant. Her only academic appointments seem to have been a decade ago as a course-specific teaching assistant at the University of Delaware, while she received both her Bachelor's and Master's in American History from that institution. She is a co-founder and senior fellow of the University of Wyoming's College of Law's Firearms Research Center.[14] She has extensive

---

[14] While the aim of the Center will be to promote academic research, it has yet to be formally founded, according to an article authored by Ms. Hlebinsky. The Center is "going through the University of Wyoming's approval process...." but

experience in firearms museums and appears to be very active in the National Shooting Sports Foundation. She has many published pieces, the majority of which have appeared in niche magazines such as *American Frontiersman*, *Recoil Magazine*, and *Glock Magazine*. ECF No. 22-1 at 35-37. One of the disadvantages of relying on documentary submissions is that the Court has no opportunity to explore the nature of an expert's research or how politically neutral or advocacy-oriented her prior work has been. The Court can only take at face value an expert's CV. Matthew Larosier, the plaintiffs' second expert, was at the time he wrote the article a legal researcher employed by the CATO Institute, a public policy thinktank. His submission is entitled "Losing Count: The Empty Case for 'High-Capacity' Magazine Restrictions," that appeared in CATO's Legal Policy Bulletin's July 17, 2018, issue. ECF No. 22-2. The submission's only note "about the author" reveals that he is a former legal associate. ECF No. 22-2 at 59. CATO lists several fellows whom it terms

---

apparently is not yet formally affiliated. Ms. Hlebinsky does not appear to have a faculty appointment at the College of Law. *Faculty: College of Law*, UNIV. OF WYOMING, https://www.uwyo.edu/law/directory/ (last visited Dec. 13, 2022). The Center does not appear to have a website of its own, nor is it listed as a Department on the University of Wyoming's website, but the article appears under the auspices of the United States Concealed Carry Association (USCCA). Ashley Hlebinsky, *University of Wyoming Law School's Firearms Research Center*, U.S. CONCEALED CARRY ASS'N (Apr. 27, 2022), https://www.usconcealedcarry.com/blog/firearms-research-center/. The USCCA on its website solicits members with the following pitch: "Let's face it: There are people who HATE the fact that you and I carry guns. They're determined to teach us a lesson just for exercising our inalienable God-given right to self-defense." *Are You Prepared to Face Our "Justice" System?*, U.S. CONCEALED CARRY ASS'N, https://www.deltadefense.com/offers/5f6c9c07df964/join-the-uscca-today?tID=61e9a2b6538f0 (last visited Dec. 13, 2022).. Ms. Hlebinsky's biases are obvious.

"scholars," but Mr. Larosier is not one of those, nor is he identified as an "adjunct scholar" or as an "expert" fellow, formerly or presently. *Experts: Fellows*, CATO INST., https://www.cato.org/people/fellows (last visited Dec. 13, 2022). The Court has no information about his background or credentials, except that he seems to no longer be associated with CATO. Beyond that, while the CATO Institute is a well-known repository of research, it is not a neutral actor in the raging gun control vs. gun rights debate. Its website proclaims that it exists to "promote libertarian ideas in policy debates." *About*, CATO INST., https://www.cato.org/about (last visited Nov. 22, 2022). Thus, while the Court casts no aspersions on Mr. Larosier's scholarship, his report does not carry the indicia of reliability of a scholarly article published in a respected peer-review forum.[15] *See, e.g., Ruiz-Troche*, 161 F.3d at 84 (exposure to peer review demonstrates "a measure of acceptance of the methodology within the scientific community"). Nor has the Court been provided with a CV for him. "Though DACO cries foul due to the court's 'gratuitous swipe' at Dr. Logan's bona fides, such credibility determinations are the prerogative — indeed, the duty — of the district judge in a bench trial." *Texaco P. R., Inc. v. Dep't of*

---

[15] Mr. Larosiere's opinion strikes the Court as flawed for another reason. He opens the section on "Legal Background and Constitutional Concerns" by describing *Heller* as protecting "arms in 'common use,' ... which would cover the 20-round magazines that are standard equipment for a significant portion of weapons currently in lawful use." ECF No. 22-B at 46. The Second Amendment extends, he declares, "to all instruments that constitute bearable arms in common use...." *Id.* at 47. In describing *Heller* that way, he completely untethers it from the required use for self-defense.

*Consumer Affairs ("DACO")*, 60 F.3d 867, 878 n.5 (1st Cir. 1995) (finding such where appellant's expert was "intimate[ly] involve[d]" with one of the parties). The State's historians are more traditional neutral academics.

- Randolph Roth, an expert in the history of crime, is a Distinguished Professor of History and Sociology at The Ohio State University. He received his B.A. from Stanford University and his Ph.D. from Yale University, both in History. He has taught at several institutions and was an Assistant Professor of History at Grinnell College for seven years before moving to Ohio State. His two books were published by Cambridge University Press and the Belknap Press of Harvard University. Like Ms. Hlebinsky, Prof. Roth has published a number of articles, but, unlike hers, his have appeared primarily in scholarly journals. ECF No. 19-1 at 4-8. Michael Vorenberg is a tenured Associate Professor of History at Brown University, previously an assistant professor at The State University of New York at Buffalo, and before that, a post-doctoral fellow and lecturer at Harvard University. His A.B., A.M., and Ph.D. were all awarded by Harvard University. He has published three books and contributed to well over a dozen more. While there is no contest of numbers here, his writings have appeared primarily in academic texts, and his list of fifty-seven lectures during the last two decades, generally in university settings, is impressive. ECF No. 19-2 at 4-13. Dennis Baron is a professor of English and Linguistics at the University of Illinois. His Ph.D. was obtained from the University of Michigan and his Master's from Columbia University. A Professor Emeritus

now, he taught for 47 years, wrote ten published books and contributed chapters to twenty-two more. ECF No. 19-7 at 4-16.[16]

The opinions offered by the experts for both parties, and the Court's reaction to them, are discussed below, as relevant.

### 3.    Legal Landscape of the Second Amendment

The pertinent application of the Second Amendment begins with *District of Columbia v. Heller*, which concerned a challenge to the prohibition of handguns in the District of Columbia.[17]   Specifically, the plaintiff, a D.C. special police officer, claimed a Second Amendment right to possess such firearms in his home without registering or licensing them.  *Heller*, 554 U.S. at 575-76.  The Court held that the prefatory words "[a] well-regulated Militia, being necessary to the security of a free State," did not confine the Amendment's protection to those connected to military or law enforcement.  *Id.* at 627-28.  Instead, the Court held, the Amendment protected the right of the unaffiliated individual to protect herself.  *Id.*  at 628-29.

---

[16] The State has presented the opinions of two other experts relevant to factual issues.   Edward Troiano is Chief of the Bureau of Criminal Identification and Investigation, R.I. Office of the Attorney General, and is a former Special Agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  ECF No. 19-3.  Megan L. Ranney, M.D. is a Professor of Emergency Medicine at Brown University Medical School, as well as Professor of Behavioral and Social Sciences and Health Services, Policy, and Practice at the Brown University School of Public Health.  ECF No. 19-10.   Because these two experts have expressed opinions that are not directly contradicted by the plaintiffs' experts, the Court need not choose between them.  It suffices to say that their credentials show them to be well-qualified to render the opinions they hold.

[17] The D.C. law also regulated certain aspects of maintaining other weapons, such as long guns that had to be kept unloaded and either disassembled or locked. *Heller*, 554 U.S. at 575.

The right established in *Heller*, however, was not without context or limitation. Instead, the right of the individual is circumscribed by the "use [of handguns] for self-defense in the home." *Id.* at 636. The Amendment was not adopted, the majority made clear, "to protect the right of citizens to carry arms for *any sort* of confrontation...." *Id.* at 595. Rather, the right was understood historically to be tied to "the right of having and using arms for self-preservation and defence." *Id.* at 594 (citing, *inter alia*, 1 BLACKSTONE, 140). In addition, the Court cautioned, nothing in *Heller* was intended to confer a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

The holding of *Heller* was relatively narrow. It linked the right to possess firearms tightly to self-defense and the home, but even in the home it did not confer unlimited freedom to the gunowner. In particular, the majority cautioned, only those weapons "in common use at the time" are entitled to Second Amendment protection, and in particular, that would not include "weapons that are most useful in military service...." *Id.* at 627. Laws promoting safety, such as those regulating storage could coexist with the Amendment so long as they did not "burden the right of self-defense." *Id.* at 632. The Court specifically eschewed "cast[ing] doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. And in granting relief to Heller, it directed that "the District [of Columbia] must permit him to register his handgun and must issue him a license

to carry it in the home," *Id.* at 635, thus implicitly validating at least in concept both registration and licensing schemes.

That *Heller* was specifically concerned with protecting an individual's right to exercise self-defense in her home was confirmed two years later in *McDonald v City of Chicago*, 561 U.S. 742, 749-50 (2010), the case that held the Second Amendment applicable to the states through the Fourteenth Amendment. *McDonald* was decided by a Court almost identical to the one issuing the *Heller* opinion. The five-justice majority remained the same and, in the minority, retiring Justice David H. Souter had been replaced by Justice Sonia M. Sotomayor.

*McDonald* granted *certiorari* on the single question of "[w]hether the Second Amendment right to keep and bear arms is incorporated as against the States by the Fourteenth Amendment's Privileges or Immunities or Due Process Clauses." *McDonald v. Chicago*, No. 08-1521, 2009 WL 1640363, at *1 (June 9, 2009) (Petition for Writ of Certiorari). In answering "Yes," the Court did not address the scope of *Heller* but merely considered whether its holding was binding on the states. The plaintiffs had asserted only a right to be free from state restriction on the ability to "keep handguns in their homes for self-defense," *McDonald*, 561 U.S. at 750, and that is all that was decided. The discussion of incorporation itself reflected the Court's long-held view that the application of incorporated rights to the states is identical with that when applied to the Federal Government. *Id.* at 765.

*McDonald* described *Heller* as holding "that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense...." *Id.* at 749-50.

"[W]e stressed [in *Heller*] that the right was also valued because the possession of firearms was thought to be essential for self-defense.  As we put it, self-defense was 'the *central component* of the right itself.'"  *McDonald*, 561 U.S. at 787 (quoting *Heller*, 554 U.S. at 599) (emphasis in original).  More than a decade passed before the Court addressed the *scope* of *Heller*, and the scope of the Second Amendment protection in *N.Y State Rifle & Pistol Assoc., Inc. v. Bruen*.

In the interim, the Circuit Courts of Appeals were busy applying *Heller*.  They were near-unanimous on two things.  First, they agreed that *Heller* conferred maximum protection only with respect to the exercise of self-defense in the home.  Second, as to the world outside the home, *Heller* determined that intermediate scrutiny was appropriate, requiring only that those statutes be "substantially related" to a compelling government interest and that there be a reasonable fit between that interest and the means outlined in the statute to advance it.  The First Circuit applied *Heller* first in *Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018), reviewing a challenge to the state licensing statute as implemented by the cities of Boston and Brookline.  *Id.* at 662.  The plaintiffs sought the right to carry firearms generally.  *Id.* at 664.  While allowing unrestricted possession in the home, the licenses issued for public carry were restricted at the discretion of the municipality, which made determinations based on the purported purpose of carrying the firearm, such as an individualized need for self-defense, employment, hunting, or target practice.  *Id.*

The question posed in *Gould* was precisely that later answered—differently—in *Bruen*: "Does the Second Amendment protect the right to carry a firearm outside the home for self-defense?" *Id.* at 666.[18]  In answering the question in the negative, the First Circuit employed the same construct adopted by its sister Circuits. *Id.* at 668-69.  This construct used a two-step analysis that determined first "whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee."[19]  *Id.*  This first step "is a backward-looking inquiry, which seeks to determine whether the regulated conduct 'was understood to be within the scope of the right at the time of ratification.'"  *Id.* at 669 (quoting *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)).  The second step, if the desired conduct falls *outside* the "core" and some regulation is therefore permitted, is to decide what

---

[18] The second question put to the Court was, if the answer to the first were "yes," may the granting of a license be conditioned on an applicant's showing a particularized need to defend herself beyond that of the general public—i.e., a "good reason (beyond a generalized desire for self-defense) for carrying a firearm outside the home?" *Id.*

[19] The two-step analytic paradigm adopted in *Gould* was identical to that adopted by nearly all the Circuit Courts of Appeals. *See Gould*, 907 F.3d at 668-69 (citing *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 93 (2d Cir. 2012)); *Drake v. Filko*, 724 F.3d 426, 429 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865, 874 (4th Cir. 2013); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of ATFE (NRA)*, 700 F.3d 185, 194-95 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 703-04 (7th Cir. 2011); *Young v. Hawaii*, 896 F.3d 1044, 1051 (9th Cir. 2018); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *Heller v. Dist. Of Columbia (Heller II)*, 670 F.3d 1244, 1252-53 (D.C. Cir. 2011). "*Bruen* resoundingly repudiated the 'two-step analysis' widely embraced in the lower courts.... As the last decade of experience shows, the lower courts have in virtually every case used the two-part test to balance away Second Amendment rights." Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms – and a Strong Rebuke to "Inferior Courts*," 2022 Harvard. J. Law & Pub. Pol'y Per Curiam 24, at *6 (2022).

23

level of scrutiny must be brought to bear upon the regulation. *Id.* The Circuit Courts of Appeals, including the First Circuit, again acting in harmony, determined that intermediate scrutiny was appropriate. *Gould*, 907 F.3d at 668-69; *see supra* at n. 13 (citing cases from other circuits).

In *Bruen*, the Supreme Court bluntly cast aside the reasoned analysis of all these Circuit Courts of Appeals. While acknowledging that "the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," *Bruen*, 142 S. Ct. at 2125, the high court nonetheless "decline[d] to adopt that two-part approach." *Id.* at 2126. In its place, the Court raised a presumptive umbrella of protection whenever "the Second Amendment's plain text covers an individual's conduct...." *Id.* Rather than looking at the scope of the *right* to determine whether a statute such as the LCM Ban is constitutional (and then applying a means-end analysis), the focus is on the *restriction* to determine whether it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.[20]

Although *Bruen* did not purport to define the parameters of lawful purposes, it stressed that "individual self-defense is 'the *central component*' of the Second

---

[20] *Bruen* did not appear out of the blue in 2022. In 2015, Justice Clarence Thomas, who would ultimately write the majority opinion in *Bruen*, joined by the late Justice Antonin G. Scalia, dissented from a denial of *certiorari* in an opinion that hinted at what would become the *Bruen* analysis. *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting). The ultimate question under *Heller*, Justice Thomas wrote, is "whether the law bans types of firearms commonly used for a lawful purpose – regardless of whether alternatives exist." *Id.* at 449 (citing *Heller*, 554 U.S. at 627-29).

Amendment right." *Id.* at 2133 (quoting *McDonald*, 561 U.S. at 767). The *Bruen* opinion opens with the declaration that "[W]e . . . now hold, consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun *for self-defense outside the home.*" *Id.* at 2122 (emphasis added). This Court's focus, therefore, must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense. That this is the primary focus of the Second Amendment analysis is the constant refrain of *Bruen*—e.g., "[w]e therefore turn to whether the plain text of the second Amendment protects [plaintiffs'] proposed course of conduct – carrying handguns publicly for self-defense." *Id.* at 2134. And, later, "[t]he Second Amendment's plain text thus presumptively guarantees petitioner's [ ] a right to 'bear' arms in public for self-defense." *Id.* at 2135.

### 4. Magazines Do Not Constitute "Arms"

The threshold issue in this Second Amendment analysis must be whether a detachable magazine is "Arms" within the meaning of the text of the Constitution.[21] The Amendment on its face protects only "the right of the people to keep and bear Arms, [which] shall not be infringed." If a magazine is not encompassed by "Arms,"

---

[21] It is worth noting now that Rhode Island's statute avoids the pitfall of being directed against the *firearm* and not the magazine. Some other states' statutes "proscribe weapons that are 'capable of accepting' a large-capacity magazine, however defined." ECF No. 22-B. That language, according to plaintiffs' expert Matthew Darosiere, is problematic because many weapons designed to use limited magazines will actually accept large-capacity magazines instead. ECF No. 22-1 at 44-45. Rhode Island's statute prohibits the LCM because of what it *does*, not the firearm for what it *could do*.

25

it falls outside the protection of the Second Amendment.[22] In the First Circuit, Courts address this question on a nearly blank slate. In *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019), which upheld a ban on LCM's and assault rifles pre-*Bruen*, the First Circuit "assume[d], without deciding, that the proscribed weapons have some degree of protection under the Second Amendment." *Id.* at 30.[23]

There appear to be no Circuit Courts of Appeals holding that LCMs are not "Arms." Some, like *Worman*, have assumed *arguendo* that they are. This issue, that large-capacity magazines are entirely outside of Second Amendment protection for the independent reason that such magazines constitute firearms "accessories" rather than protected "Arms," was raised by *amici* in *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 263 n. 127 (2d Cir. 2015). Like the First Circuit, the Second Circuit found it sufficient to "proceed on the assumption that these laws ban weapons protected by the Second Amendment" because it upheld the prohibition of LCMs.[24] *Id.* at 257. In *Kolbe v. Hogan*, the Fourth Circuit reviewed and vacated a panel

---

[22] The Court discusses separately, *infra*, whether LCMs fail to achieve *Bruen's* protection because they are not weapons of self-defense. In fact, two issues—"arms" and "self-defense" —are related, as *Bruen* states, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments *that facilitate armed self-defense.*" *Bruen*, 142 S. Ct. at 2132 (emphasis added).

[23] The issue of whether LCMs are "Arms" at all was raised only by *amici* in *Worman*, and explicitly for that reason, although terming it a "clever" argument, the Court declined to consider it. *Worman*, 922 F.3d at 33 n.3.

[24] The Second Circuit did strike down the provision of the statute that forbade the *loading* of a magazine with more than seven rounds, but it upheld the restriction on the *capacity* of the LCM at ten rounds. *New York State Rifle & Pistol Ass'n*, 804 F.3d at 269.

decision that had declared magazines protected "Arms" without addressing that issue, finding LCMs not protected by the Second Amendment for other reasons. *Kolbe v. Hogan*, 849 F.3d 114, 136, 137 n.12 (4th Cir. 2017) (en banc).

Courts that have held that LCMs *are* "Arms" have for the most part equated LCMs with bullets and, by doing so, have been able to declare that LCMs are an integral part of firearms such that the weapons are useless without them. Thus, they reason, LCMs must be protected as "Arms" in the same way that the firearms themselves are. Although it is their burden to show that large-capacity magazines fall within the purview of the Second Amendment, the plaintiffs offer no expert opinion on the meaning of the word "Arms." Instead, the plaintiffs simply assert that "without the magazine, many weapons would be useless" (ECF No. 32 at 7) and rely on *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020), *rev'd*, *Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc), which stated that "[f]irearm magazines are 'arms' under the Second Amendment" because "[w]ithout a magazine, many weapons would be useless." The plaintiffs' reliance on the panel decision in *Duncan* in light of its reversal *en banc* is suspect. What is more concerning, though, is that the panel opinion engaged in no textual or historical analysis of the word "Arms." Further, this Court finds the panel opinion's equation of "magazines" with "bullets" unpersuasive.[25]   The Ninth Circuit also noted that the statement, "without a

---

[25] Indeed, *Duncan* specifically relied on its previous holding in *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), which applied the Second Amendment to bullets. *Jackson*, however, noted the lack of historical evidence in the record. The *Duncan* court relied on *Jackson* without recognizing the distinction between bullets and magazines, between ammunition and the *holder* of

magazine, [the] weapon would be useless," is not really true. Without *bullets*, a firearm would be useless. But a firearm can fire bullets without a detachable magazine, and in any event, a firearm does not need a magazine containing more than ten rounds to be useful.

The analysis under *Bruen* is twofold. First, the plain text itself must be examined; second, the Court can consider the historical context to discern what would have been the meaning accepted at the time. To assist our analysis, we turn first to *Heller*:

> Before addressing the verbs "keep" and "bear," we interpret their object: "Arms." The 18th-century meaning is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "[w]eapons of offence, or armour of defence." 1 Dictionary of the English Language 106 (4th ed.) (reprinted 178) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary; see also N. Webster, American Dictionary of the

----

ammunition. Moreover, the judgment in *Duncan* was vacated and rehearing *en banc* was granted. *Duncan v. Becerra*, 988 F.3d 1209 (9th Cir. 2021). On rehearing, the district court was reversed, *Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc), the Court holding that the ban "outlaws no weapon, but only limits the size of the magazine that may be used with firearms...." While there is no discussion of whether magazines are included under "Arms," the Ninth Circuit's description of the complete ban on large-capacity magazines as "outlaw[ing] no weapon" is consistent with finding a magazine an accessory, not itself a firearm. In any event, the current status of *Duncan* is that it has been remanded again to the district court post-*Bruen*. *Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022) (Mem).

*Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014), upon which the State relies, did not distinguish between magazines and ammunition. It reasoned that if "magazines and ammunition" were not Arms, any state could end-run *Heller* by banning them. The Court did not recognize any difference between bullets and the container from which they are fed into the firearm. *Fyock,* however, ultimately refused to preliminarily enjoin the ban on LCMs, and that decision was affirmed with no discussion of whether LCMs are "Arms." *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).

English Language 1828) (reprinted 1989) (hereinafter Webster) (similar).

*Heller*, 554 U.S. at 581. Whether LCMs were in existence in the 18th century is of little concern. *Heller* teaches that "the Second Amendment extends prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. But *Heller* is of little help in resolving whether LCMs are "Arms." *Heller* dispensed quickly with the discussion of the meaning of "Arms," as there was little question that the handguns at issue there were "weapons of offence." It is less clear that a magazine is such a weapon because, while it is something that a person "takes into his hands," it is not a "thing . . . useth in wrath to *cast at or strike* another." *Heller*, 554 U.S. at 582 (emphasis added). In this Court's view, LCMs, like other accessories to weapons, are not used in a way that "cast[s] at or strike[s] another." What one judge has said of silencers is equally apt when applied to LCMs: they "generally have no use independent of their attachment to a gun" and "you can't hurt anybody with [one] unless you hit them over the head with it." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019), *aff'd*, 26 F.2d 610 (4th Cir. 2002), *cert. den.* 2022 WL 6572217 (Oct. 11, 2022); *accord United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence.')").

This is where it is useful to turn to the opinion of historians and linguists. In interpreting the word "Arms," we look to the word's ordinary meaning, "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words

and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 577. To the ordinary reader, magazines themselves are neither firearms nor ammunition. They are *holders* of ammunition, as a quiver holds arrows, or a tank holds water for a water pistol, or a pouch probably held the stones for David's sling.[26]

The plaintiffs' expert Ashley Hlebinsky, a firearms historian, seems to agree with the characterization of a magazine as less of a weapon and more of a *holder* of ammunition: She wrote, "[a] magazine is a container, detachable or fixed, that holds ammunition while it feeds into a repeating firearm." ECF No. 22-1 at 8 ¶ 12. The fact that a magazine is an *attachment* to a firearm, rather than a necessary or integral part of the firearm itself, is acknowledged by her in the following language: "In the periods being discussed, there are repeating firearms that do not use magazines, such as revolvers, which use a rotating cylinder." *Id.* Neither Ms. Hlebinsky nor the plaintiffs' other proffered expert addresses whether a magazine is encompassed by the definition of "Arms."[27]

---

[26] This view accords with the way at least some gun manufacturers themselves understand "magazines." As the State points out, "Modern firearms manufacturers often do not list magazines under "gun parts" but under firearms "accessories" sections of their websites. ECF Nos. 19 at 30 (internal pagination), 19-4.

[27] Ms. Hlebinsky's opinion is confined, in her words, to the technology of repeaters and magazine-fed repeaters, the relationship between civilian and military weaponry, and the history of regulation. *Id.* at 1, 3-4. The plaintiffs' expert Matthew Larosier focused on the history of restrictions, the plaintiffs' vagueness argument that asserts a lack of common understanding for "high capacity," and an argument that high-capacity magazines render firearms safer than other firearms because they have a greater likelihood of malfunctioning. His assertion that magazines are "Arms" was supported only by citation to *Duncan v. Becerra,* which, as the Court has noted *supra* at note 25, was reversed.

In this case, only the State has supported its argument with historical analysis. The Court finds credible the state's expert, Prof. Dennis Baron, a professor of linguistics with an emphasis on "historical language usage," and accepts his opinion. According to Prof. Baron, there was a clear distinction between "Arms" and "accoutrements" from the founding era through the period following ratification of the Fourteenth Amendment. The word "Arms" was a general term for weapons such as swords, knives, rifles, and pistols, but it did not include ammunition, ammunition containers, flints, scabbards, holsters, or "parts" of weapons such as the trigger, or a cartridge box. The reader is referred to State's Exhibit G for a detailed analysis, but Prof Baron points out that in the 18th Century, bullets were kept in cartridge boxes or cases, called "accoutrements," and the word "magazine," which was used at that time to mean "storehouse" did not come to mean a compartment holding ammunition until the late 19th Century.

For the purposes of a preliminary injunction, it suffices for the Court to conclude that the plaintiffs have failed to meet their burden of establishing that LCMs are "Arms" within the textual meaning of the Second Amendment.

### 5.   LCMs Are Not Instruments of Self-Defense

There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not. [28]  This Court has painstakingly examined the

---

[28] In *Worman v. Healey*, the constitutionality of restrictions on the possession of LCMs (and assault rifles) was squarely presented to the First Circuit. *Worman*, 922 F.3d at 26. *Worman* was abrogated by *Bruen*, which rejected its use of a two-step

evidence put forth by the plaintiffs on this point and finds it wanting.[29]  On the other

hand, the State's experts address the question head-on.  Edward Troiano, who spent

_____

intermediate tier scrutiny standard, but its significance to this case is that *Worman* sidestepped the question of whether LCMs were weapons of self-defense.  It

> assume[d] without deciding that [assault weapons and LCMs] have some degree of protection under the Second Amendment.  We further assume, again without deciding, that the Act [prohibiting them] implicates the core Second Amendment right of self-defense in the home by law-abiding, responsible individuals.

*Id.* at 30.  While the First Circuit posed the question of "whether the proscribed weapons are in common use for lawful purposes like self-defense," it specifically eschewed the need "to plunge into this factbound morass." *Id.* at 35.  The *Worman* analysis did not depend upon an answer to the question because it went on to determine, applying the pre-*Bruen* ends-means balancing, that any burden on the right of self-defense was minimal.  "Viewed as a whole, the record suggests that wielding the proscribed weapons for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut." *Id.* at 37.

*Bruen* does not allow the Court to balance the extent of an intrusion into a Second Amendment protected right against the strength of the public interest served by the LCM Ban or the closeness of the means of the statute and its end.  The Court cannot, like *Worman*, conclude that the impairment is "modest" and "the fit between [legislative] interests and the restrictions imposed by the Act is both close and reasonable."  Instead, any intrusion into a right protected by the Second Amendment thrusts us into the territory of justifying the regulation as one historically placed on similar weapons.  That latter issue is hotly contested between the parties.

[29] The plaintiffs' evidentiary package consists of the following: Ex. 8-1A is the statute.  Ex. 8-1B is the Affidavit of Plaintiff Jonathan Hirons who owns a number of LCMs but makes no reference at all to their use.  Ex. 8-1C is the Affidavit of Andre Mendes, principal of the retailer plaintiff, which describes an inventory that includes LCMs but makes no reference to their use by him or his customers.  Ex. 22-1A is the Declaration of expert Ashley Hlebinsky, a firearms historian.  While Ms. Hlebinsky provides an extensive history of firearm development, use, and regulation in the founding era specifically, she offers no discussion at all about what LCMs were actually used for.  In her discussion of the development of target shooting, for example, she mentions rifles and, in passing, "repeaters of all sorts" in models "indicating sporting vs. military variants." *Id.* at 11 ¶ 17.  She particularly elaborates on the interchangeability between civilian and military uses for weapons, *Id.* at ¶ 18, but fails to connect any of that information to the use of LCMs in self-defense.  Her exposition on the development of repeating firearms is similarly lacking. *Id.* at 12

25 years as a Special Agent for the Bureau of Alcohol, Tobacco & Firearms ("ATF"), and now is the Chief of the Rhode Island Bureau of Criminal Identification and Investigation, conducted a review of self-defense incidents in Rhode Island in which a semiautomatic firearm was used. That review, combined with the awareness of firearm investigations that his job requires, led him to assert that he is "unaware of any incident in which a civilian has ever fired as many as 10 rounds in self-defense." ECF No. 19-3 ¶ 10. In contrast, LCMs have "frequently" been used by persons committing criminal offenses "in the course of their criminal conduct." *Id.*

---

¶ 21. The closest Ms. Hlebinsky comes to linking LCMs to lawful use is a quotation from William F. "Buffalo Bill" Cody who pronounced Winchesters his favorite for "hunting or Indian fighting." *Id.* at 19 ¶ 31. In short, Ms. Hlebinsky's report does nothing to inform the discussion of whether LCMs are in any way connected to the purpose of self-defense. Ex. 22-1B is an article written by Researcher Matthew Larosiere, then of the Cato Institute. It challenges restrictions on LCMs. It asserts that "[d]efensive uses of firearms can preserve human life," *Id.* at 43. Nowhere does Mr. Larosiere discuss the actual use of LCMs in self-defense. The only empirical data he offers concerns the lower percentage of "hits" novice shooters have compared to more experienced shooters. "That [, he argues,]combined with the fact that an assailant is rarely stopped by a single bullet, makes magazine capacity all the more important for the effective defensive use of firearms." *Id.* at 52. Mr. Larosiere presents only one anecdote of a victim of an attempted ambush firing 12 times at his assailants. *Id.* at 52-53. Ex. 22-1C is a brochure entitled "The Best Duck Hunting Shotguns of 2022." Ex. 22-1D is an Affidavit of a plaintiff firearms dealer directed primarily at the allegation of "vagueness" of the term "permanent" modification. It does not mention self-defense. ECF No. 22-1, Ex. E is a second Affidavit of Plaintiff Jonathan Hiron, elaborating on his plans should the injunction not issue and the difficulty of modifying the plastic magazines he owns.

The Plaintiffs attempted to file an additional affidavit from Mr. Worthy, introducing new factual allegations, after the deadline for submissions had expired, without requesting permission to do so. ECF No. 23. The affidavit was signed two days before the hearing but not filed until the day before the hearing. The defendants' Motion to Exclude the Affidavit (ECF No. 24) is GRANTED.

The Court finds credible the submission of Prof. Michael Vorenberg, a historian with expertise particularly concerning the Civil War and Reconstruction periods. Prof. Vorenberg offered the direct opinion that "high-capacity firearms during the era were understood to be weapons of war or anti-insurrection, not weapons of individual self-defense." ECF No. 19-2 at 16 ¶ 3. Veterans who retained them after their military service had concluded possessed the same understanding. *Id.* at 25 ¶ 21.

> If [owners of LCMs] along with their weapons were transported by a time machine back to the Reconstruction-era South, they would find themselves suspected of being outlaws by law enforcement officers. If they then gathered together into organized companies, they would be considered insurrectionary militias, which is precisely how the Ku Klux Klan was regarded during Reconstruction by the U.S. army, the state militias, and other legitimate, pro-Union law enforcement officials.

ECF No. 19-2 at 63 ¶ 99.

In its supplemental memorandum, the plaintiffs fail to discuss whether there is a link between LCMs and the use of firearms for self-defense. They argue vociferously that LCMs were "in common use" (ECF No. 32 at 3 (citing *Bruen*, 142 S. Ct. at 2143)), but their argument is untethered from the concept of self-defense. Instead, the plaintiffs proceed on the premise that "[t]he Second Amendment's protection extends to those sorts of weapons that are in common use, and typically possessed by law abiding citizens for lawful purposes at the time." ECF No. 32 at 3. The selective citation ignores the sentences in *Bruen* that *immediately* follow what the plaintiffs cite: "Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common

use' *for self-defense today.* They are, in fact, 'the quintessential *self-defense* weapon.'"
*Bruen*, 142 S. Ct. at 2143 (emphasis added) (citation omitted).

The Court finds, on the evidence submitted, that the plaintiffs have failed to establish that they have a likelihood of success in demonstrating that LCMs are weapons of self-defense, such that they would enjoy Second Amendment protection.

### 6.   Historical Tradition

*Bruen* sets forth the standard for analyzing Second Amendment claims: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.   The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.   The parties vehemently dispute whether LCMs were in common usage at various historical times.   They talk at length about long guns and repeaters. *See generally* ECF No. 19-1 (State's expert Roth) and ECF No. 22-1 (plaintiffs' expert Hlebinsky).   And in doing so, they disagree on *which* historical era is most appropriate to examine:   the "founding era" or the "reconstruction era."   The Second Amendment itself was drafted during the former; however, it was made applicable to the states only through the adoption, during the Reconstruction era, of the Fourteenth Amendment.

The Court has already, for reasons expressed *supra* made clear that it finds the plaintiffs' proffered experts less credible than those of the State, and it could resolve the historical tussle by simply crediting the latter and rejecting the former on

this point. But a simpler path is available which, while also looking to the record, is more straightforward.

Because of its holding that LCMs are neither "Arms" within the meaning of the Second Amendment's text, nor weapons of "self-defense," the Court need not investigate whether the LCM Ban's restrictions are consistent with the regulations of history, regardless of which historical period is more apt. The Court does not have to choose a historical backdrop, because the overwhelming evidence before it is that at *no* time were LCMs considered "Arms," nor were they used in any significant way for self-defense. They were not then, and they are not today.

What remains, then, is where the Court goes in its analysis after it has found that LCMs deserve no "presumptive protection" under the Second Amendment. *Bruen*, 142 S. Ct. at 2135. Does it examine the restriction using a routine rational basis analysis? Is there any basis for turning to intermediate scrutiny, not for the now-abrogated rationale of *Worman*,[30] but because weapons that are neither "Arms" nor used for self-defense deserve some favorable treatment anyway like a contender who fails to win a ribbon but nonetheless deserves honorary mention?

The answer, it seems, is that the Court's Second Amendment analysis simply ends here. It has found that because LCMs appear to be neither "Arms" nor weapons related to self-defense, they are entitled to no presumptive protection under the

---

[30] *Worman* chose intermediate scrutiny because it found the Massachusetts ban "implicated" the right to possess weapons of self-defense but did not "heavily burden" that right. *Worman*, 922 F.3d at 38.

Second Amendment. On Count I, therefore, the plaintiffs have failed to demonstrate a likelihood of success on the merits so as to warrant preliminary injunctive relief.

**B.  Banning High-Capacity Magazines and Takings Without Just Compensation**

**1.    Background on Takings**

The plaintiffs contend that the LCM Ban amounts to a "taking without just compensation" in violation of the Fifth and Fourteenth Amendments to the United States Constitution because it forces them to divest themselves of any LCMs designed to hold more than ten rounds of ammunition. While compliance with the LCM Ban does prohibit continued physical possession of LCMs, the statute gives LCM owners four options from which to choose by December 18, 2022. They may modify the magazine's capacity to hold ten or fewer rounds, they may sell the offending LCM to a registered gun dealer, they may transport the offending gun to a place where it is lawfully possessed, or they may forfeit the LCM to a law enforcement entity. The statute provides no payment in the event of forfeiture.

The parties dispute the prevalence of magazines that cannot be converted to lower capacity, but the Court need not resolve this dispute and accepts that there are some LCMs that cannot be modified.[31] Even assuming that the only way to comply with the statute for some plaintiffs vis-à-vis some weaponry is to forfeit them, the Court finds that no "taking" within the meaning of the Fifth Amendment has occurred and there is, therefore, no entitlement to "just compensation."

---

[31] None of the plaintiffs through their affidavits professes to own an LCM that definitively cannot be modified.

There are two types of "takings" that may require compensation. First, there is a physical taking where property is appropriated by the government for public use. *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017). This type of taking is accomplished by direct seizure or "the functional equivalent of a practical ouster of the owner's possession." *Id.* A second type of "taking," deemed a regulatory taking, is accomplished when the owner is deprived of all economic or productive use of the product. *Id.* at 1942-43.

More than a century ago, the United States Supreme Court declared that "[a] prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler v. Kansas*, 123 U.S. 623, 669 (1887).

> The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law.

*Id.*; *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. 1979) (holding that a "proper exercise of police power to prevent a perceived public harm[] does not require compensation"). "Property seized and retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *Akins v. United States*, 82 Fed. Cl. 619, 622 (Fed. Cl. 2008) (quoting *AmeriSource Corp. v. United States*, 525 F.3d 1149, 1152 (Fed. Cir. 2008)). If legislation is a valid exercise of police power, "the fact that it

deprives the property of its most beneficial use does not render it unconstitutional." *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 592 (1962).

The plaintiffs attempt to characterize the LCM Ban as a "physical taking," in order to avoid the valid police power doctrine, and cite *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). In *Loretto*, the Supreme Court held that the installation of cable equipment on private property was a valid exercise of police power but nonetheless required just compensation. *Loretto* is restricted, however, only to concrete takings, not use restrictions: "Although this Court's most recent cases have not addressed the precise issue before us, they have emphasized that physical *invasion* cases are special and have not repudiated the rule that any permanent physical *occupation* is a taking." *Id.* at 432 (emphasis in original). While the LCM Ban does include a forfeiture option, it does so as one option among several, not as a compelled taking. The gunowner has a series of other options she may exercise, at least two of which—modification and transfer to a state where LCMs are not banned—allow retention of the LCM and substantial beneficial use. Sale to a registered gun dealer is another option that gives the owner beneficial use. Only as a last resort—and only if the gun owner voluntarily eschews other options—might one choose forfeiture. That recourse to forfeiture is possible does not turn the LCM Ban into a physical taking and *Loretto* is not applicable here.

Thus, the Court returns to the doctrine that a regulatory restriction that is a valid exercise of police power does not entitle the property owner to compensation. In order to constitute a valid exercise of police power, legislation is required (A) to serve

the public interest, (B) the means must be reasonably designed to accomplish the purpose, and (C) they must not be unduly oppressive upon individuals. *Goldblatt*, 369 U.S. at 594-95.

### 2. Public Interest

On top of an epidemic of violence in American society there has been layered the ultra-lethal pathogen of mass murders—shootings in which multiple people are killed and, often, dozens of others injured.[32] The shootings are the acts usually of a single stranger,[33] mowing down random bystanders in the line of fire only because of where they happened to be at a tragic moment in time. On August 1, 1966, Charles Whitman climbed twenty-eight stories to the observation deck of the main building on the campus of The University of Texas at Austin and began indiscriminately shooting at people below. He fired for ninety-six minutes, killing fourteen and wounding thirty-one others. At the time, such murders seemed unthinkable. David Montgomery, *Texas Marks '66 Sniper Attack as University Prepares for 'Campus Carry' Law*, NEW YORK TIMES (July 30, 2016),

---

[32] Mass shootings are defined by the Gun Violence Archive as a shooting in which at least four people are wounded in the same place at the same time. By that definition, there have been more than 600 mass shootings in 2022 as of November, an average of 1.8 per day. There have been thirty-six mass murders in the same time period, shootings in which at least four people are killed. *Gun Violence Archive 2022: Charts and Maps*, GUN VIOLENCE ARCHIVE, https://www.gunviolence archive.org/ (last visited Nov. 28, 2022). The number has more than doubled since 2014 and increased by 50% from 2019 to 2020. *Id.*

[33] The mass shootings and killings that occupy our attention are those of a lone shooter. American history contains numerous instances of mass shootings perpetrated by mobs, *e.g.,* Nat Turner's rebellion, Bloody Monday in Louisville, and the massacres of countless unarmed Native Americans. ECF No. 19-1 at 50 ¶ 34.

https://www.nytimes.com/2016/07/31/us/university-of-texas-marks-sniper-attack-with-memorial-and-new-gun-law.html.   But while the Texas sniper is often considered the first of the modern wave of mass shootings, a New Jersey man mowed down thirteen people with a semiautomatic weapon in 1949.   David M. Zimmer, *America's First Mass Shooting: 70 Years Ago, A WWII Veteran Killed 13 of His Neighbors*,   USA   TODAY   (Aug.   28,   2019), https://www.usatoday.com/story/news/nation/2019/08/28/wwii-veteran-became-americas-first-mass-shooter-1949/2139054001/.

At the time of this writing, what is more unthinkable is that mass murders have become a weekly—and sometimes daily—event.   For example, on Sunday, November 13, a University of Virginia student opened fire on a bus, killing three of his classmates and leaving a fourth seriously wounded.   Six days later, on Saturday, November 19, a shooter opened fire at a gay and lesbian nightclub in Colorado Springs, killing five and injuring twenty-five others.   Three days later, a Walmart employee in El Paso walked into a break room and started shooting at fellow employees, killing six and wounding at least six more.   According to *The Washington Post*, "[n]ot a single week in 2022 has passed without at least four mass shootings." Júlia Ledur, *There Have been More than 600 Mass Shootings So Far in 2022*, WASHINGTON   POST   (Nov.   23,   2022,   11:49   AM), https://www.washingtonpost.com/nation /2022/06/02/mass-shootings-in-2022/.

The events are referred to now simply by shorthand name, which sadly is enough without elaboration to bring the grizzly details to mind.   Remember just a

few: San Ysidro, California (July 18, 1984, twenty-one dead and nineteen wounded); Columbine, Colorado (Apr. 20, 1999, thirteen dead and twenty-four wounded); Edmond, Oklahoma (Aug. 20, 1986, fourteen dead and six injured); Red Lake, Minnesota (Mar. 21, 2005, seven dead); Virginia Polytechnic Institute, Blacksburg, Virginia (Apr. 16, 2007, thirty-two killed and seventeen wounded); Bingham, New York (Apr. 3, 2009, thirteen dead and four wounded); Fort Hood, Texas (Nov. 5, 2009, thirteen dead and thirty-one injured); Oakland, California (Apr. 2, 2012, seven dead and three wounded); Cinemark Century Theater in Aurora, Colorado (July 20, 2012, twelve killed and fifty-eight wounded); Sandy Hook Elementary in Newtown, Connecticut. (Dec. 14, 2012, twenty-six dead and two wounded); Marysville, Washington (Oct. 24, 2014, four dead and four wounded); San Bernardino, California (Dec. 2, 2015, fourteen killed and twenty-two wounded); Pulse Night Club in Orlando, Florida (June 12, 2016, forty-nine dead and fifty-three wounded); Dallas, Texas (July 7, 2016, five dead and eleven injured); Las Vegas, Nevada (Oct. 1, 2017, fifty-eight dead and 850 wounded); Sutherland Springs, Texas (Nov. 5, 2017, twenty-six dead and twenty wounded); Stoneham-Douglas High School in Parkland, Florida (Feb 14, 2018, seventeen dead and seventeen wounded); Santa Fe, Texas (May 18, 2018, ten dead and thirteen wounded); Temple of Life Synagogue in Pittsburgh, Pennsylvania (Oct. 27, 2018, eleven dead and six wounded); Midland-Odessa, Texas (Aug. 31, 2019, seven killed and twenty-five injured).[34]  And then there was Uvalde,

---

[34] Sources: Matthew Lynch, *Definitive List of School Shootings in The United States In The 21st Century*, THE EDVOCATE (June 8, 2022) https://www.theedadvocate.org/definitive-list-of-school-shootings-in-the-united-

Texas, where video cameras inside Robb Elementary School on May 24, 2022, allowed a stunned and horrified public to watch 376 law enforcement officers stand by while a lone gunman murdered twenty-one victims, mostly children, in a seventy-five-minute massacre; eighteen more, also mostly children, were wounded.  Six weeks later, a shooter opened fire on a July 4th parade in Highland Park, Illinois, killing seven people and wounding thirty.

The asserted governmental interest of public safety stemming from mass gun murders could not be more undeniably compelling.

### 3.   Reasonably Designed to Accomplish the Purpose

The prohibition against LCMs is a reasonable response to the public safety interest of the state.   Indeed, it is "substantially related to the promotion of the

---

states-in-the-21st-century/; Mandi Cai, *Texas has had eight mass shootings in the past 13 years, while lawmakers have steadily loosened restrictions on carrying firearms*, THE TEXAS TRIBUNE (Nov. 12, 2019) https://apps.texastribune.org/features/2019/texas-10-years-of-mass-shootings-timeline/?_ga=.2.137769844.599227537.1669671525-424901157.1669671525;   Mark Berman, *I'm Not Gonna Lay Here and Just Get Shot:' Survivors Describe the Terror and Chaos of Las Vegas Massacre*, WASHINGTON POST (May 17, 2018), https://www.washingtonpost.com/news/post-nation/wp/2018/05/16/im-not-gonna-lay-here-and-just-get-shot-survivors-describe-the-terror-and-chaos-of-las-vegas-massacre/; *A Study of Active Shooter Incidents in the United States*, U.S. DEPT. OF JUSTICE BULLETIN (Sept. 16, 2013); Zach Despart, *"Systemic Failures" in Uvalde Shooting Went Far Beyond Local Police, Texas House Report Details*, THE TEXAS TRIBUNE (July 17, 2022), https://www.texastribune.org/2022/07/17/law-enforcement-failure-uvalde-shooting-investigation/; Christine Hauser & Livia Albeck-Ripka, *Victims of Highland Park Shooting Sue Gun Maker and Retailers*, NEW YORK TIMES (Sep. 29, 2022), https://www.nytimes.com/2022/09/29/us/highland-park-shooting-victims-lawsuit.html; (ECF No. 19-11); Campbell Robertson, Christopher Mele & Sabrina Tavernise, *11 Killed in Synagogue Massacre; Suspect Charged with 29 Counts*, N.Y. TIMES (Oct. 27, 2018), https://www.nytimes.com/2018/10/27/us/active-shooter-pittsburgh-synagogue-shooting.html.

general welfare." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 138 (1978).  While a ban on LCMs does not prevent mass shootings, it unquestionably makes them less deadly.[35]  As the District of Columbia Circuit Court said in its consideration of *Heller* after remand, LCMs are designed to "shoot multiple human targets very rapidly" and to "allow the shooter to spray-fire from the hip position." *Heller II*, 670 F.3d at 1262-63.  An LCM may be designed for quick reloading, but logic dictates that any reloading time saves lives.

The plaintiffs rebut by minimizing estimated reloading time, to two or three seconds, in an attempt to shrink its life-saving impact.[36]  "Such a minuscule difference in practical fire rate would be unlikely to have any appreciable effect on lethality." ECF No. 22-1 at 50.  But the Court finds as fact that in those two or three seconds a child—or two children, or even three—may escape the fire of a mad person.  In Las Vegas, one young woman who got up and ran during a moment's pause was able to get as far as the door before being shot in the arm.  Berman, *supra* note 34.  Others

---

[35] The analogy to automobiles and speed limits comes to mind.  Imposing a national highway speed limit of fifty-five miles per hour in 1974 did not eliminate accidents, but it made them significantly less deadly. *Long Term Effects of Repealing the National Maximum Speed Limit in the United States*, AM J. PUB. HEALTH, at 1626-31 (Sept. 2009) (noting that in the year after enactment, fatalities were reduced by 16.4%).

[36] The plaintiffs also argue that, because LCMs are complex machinery, they are subject to jamming and breakdowns.  These fortuitous events allow victims to escape, making firearms fitted with LCMs *safer* in the plaintiffs' opinion than those with lower-capacity chambers.  "One can argue that true high-capacity magazines would be 'safer' in a mass shooting situation than multiple low-capacity magazines." ECF No. 22-1 at 50.  The plaintiffs omit mentioning the irony of this position:  what they point to as a fatality-reducing event that they would rely on to promote safety happens only occasionally, but it is *exactly* what the legislation tries to achieve by plan and design – a pause in the shooting.

describe running for cover in the few pauses where the shooter reloaded.  ECF No. 19-1 at 23 (citing Natalie Bruzda, *Veteran's Quick Reactions Saved Lives During Las Vegas Shooting*, LAS VEGAS REV. J. (Nov. 10, 2017)) (internal pagination).   A gunman's need to reload twice using three ten-round magazines instead of a single thirty-round magazine, clearly saves lives.  It is undisputed that requiring a pause in the shooting saves lives.  This assertion is based on society's experience with what is now a catastrophic number of these incidents, not merely conjecture.  In Tucson, while two bystanders tackled the gunman, a sixty-one-year-old woman wrestled a fresh magazine from him as he tried to reload.[37]  In California, twelve people were able to escape out the back window of the bar while the gunman paused to reload.[38]  As the *en banc* Fourth Circuit observed in *Kolbe v. Hogan*, the use of ten-round magazines instead of LCMs would afford "six to nine chances" for bystander intervention for every 100 rounds fired.  *Kolbe*, 849 F.3d at 128.

The plaintiffs' estimate of "two seconds" to reload a new magazine presumably assumes ideal circumstances.   In reality,  however, "[m]any criminals are not

---

[37] Jessica Hopper et al., *Heroes of Tucson Shooting: 'Something Had to Be Done'*, ABC NEWS (Jan. 10, 2011), https://abcnews.go.com/US/heroes-rep-gabrielle-giffords-shooting-tucson-arizona-subdued/story?id=12580345; Kevin Dolak & Justin Weaver, *Women Wrestled Fresh Ammo Clip from Tucson Shooter as He Tried to Reload*, ABC News (Jan. 9, 2011), https://abcnews.go.com/Politics/patricia-maisch-describes-stopping-gunman-reloading/story?id=12577933.

[38] *California Bar Shooting: Witnesses Describing Escaping as Gunman Reloaded*, CBS Mornings (Dec. 7, 2018), https://www.cbsnews.com/news/borderline-bar-shooting-thousand-oaks-california-12-dead-witnesses-describe-gunman-storming-in/; *Witnesses on "Utter chaos" and Escape from California Bar Shooting*, CBS News (Nov. 8, 2018), https://www.cbsnews.com/video/witnesses-on-utter-chaos-and-escape-from-california-bar-shooting/.

practiced in changing magazines, and the stress of a confrontation can also increase the time to change a magazine ... allowing valuable moments for victims or law enforcement to act." ECF No. 19-3, Affidavit of Edward Troiano ¶ 13.

The reduction of how many rounds can be shot in a given time period, due to the need to reload, serves public safety in another way as well. "[C]riminals' use of large capacity magazines increases the likelihood of their indiscriminate fire resulting in a strike, or multiple strikes, to a victim." *Id.* Because bullets "can travel through the walls of homes and even car doors, [and] the use of large capacity magazines in criminal activity also increases the risk that innocent bystanders will be injured." *Id.*

The more shots fired, the greater the number of people wounded, the more bullets that hit a single person, the more serious the injuries, and the less able emergency rooms are to treat them or save lives. The state has supplied a declaration of Dr. Megan Ranney, an expert in the field of emergency medicine with impeccable credentials. She received her A.B. *summa cum laude* from Harvard College, her medical degree from Columbia University, and a Master of Public Health from Brown University. She is a Diplomate of the American Board of Emergency Medicine and a Fellow of the American College of Emergency Medicine. Her awards, appointments, and publications in peer-reviewed journals, reflecting original research in this field, are numerous. ECF No. 19-10 at 4-71.

The State has submitted the credible evidence of Dr. Ranney's first-person description of care and treatment of gunshot wounds that takes the reader into the

trauma rooms of an emergency medicine facility. It describes, from the arrival of the ambulances to the patient outcomes, a play-by-play of treatment procedures. The ability to spray a crowd with bullets results in more injuries per person, and "cases with multiple bullet wounds are more complex, have a higher likelihood of injury that requires surgical intervention, and have a higher likelihood of death in the emergency department." *Id.* at 2 ¶ 8.

> Trying to simultaneously stop the blood loss from a lacerated liver, spleen, and lung is much more complex than addressing a single such injury. Internal organs bleed a lot; a heart with a hole in it doesn't work; blood in the lungs makes us unable to get enough oxygen to the body; and we simply can't stem all of these at the same time, even with multiple physicians in the room.

*Id.* at 3 ¶ 10. When there are multiple victims arriving at the same time, the inability to treat adequately is exacerbated. From her practice for the past fourteen years as an attending physician in emergency medicine at both Miriam and Rhode Island Hospitals she reports, "I have worked evenings when the number of patients arriving in the emergency department with gunshot wounds stretches our staff, our number of available operating rooms, and even our number of blood supplies available." *Id.* at ¶ 11.

The data provided by Dr. Ranney, while in her estimation are still sparse, nonetheless support the direct connection between employment of LCMs and increased injuries, both in number and seriousness. Among the explicit findings were that cases in which LCMs were used "had an average of 11.8 deaths per incident (compared with 7.3 per incident when a large-capacity magazine was not used.)." ECF No. 19-J at 78-79. In Tucson, Arizona, the shooter who wounded U.S.

47

Representative Gabby Giffords fired thirty-one rounds, *each* of which found a human target, resulting in six dead and twelve injured—an average of 1.6 bullets hitting each person.   ECF No. 22A ¶ 49.   One preeminent researcher in this field has estimated that "restrictions on magazine capacity would decrease the number of deaths in mass shootings by 11-15%."  *Id.* (citing Koper, C.S., *Assessing the Potential to Reduce Deaths and Injuries From Mass Shootings through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, CRIMINAL PUB. POL'Y 2020, Vol. 19, 147-170); *see also* ECF No. 22A, Affidavit of Randolph Ross ¶ 46 ("[T]he development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present.").[39]

Beyond the feeble argument that the Court described *supra* at note 36, the plaintiffs have nothing to say to rebut this argument, save for the suggestion that the reloading time is so *de minimus* that any loss of life or bloodshed it achieves is

---

[39] From 1966 to the present, mass shootings with non-semiautomatic weapons resulted in an average of 5.4 persons killed.  The use of a semiautomatic handgun raised that to 6.5—an additional person dead; and the use of a semiautomatic rifle produced an average of 9.2 persons killed—an increase of 50%.  The number of those wounded was even more dramatically affected.  The use of non-semiautomatic weapons produced an average of 3.9 wounded (but not killed); use of a semiautomatic handgun increased the number wounded by more than 50% to 5.8, and the use of a semiautomatic rifle nearly *tripled* the number of people wounded, to an average of 11.0.  ECF No. 22A ¶ 46.  "[W]ith extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and semiautomatic handguns 184 percent more than regular firearms.  In combination, semiautomatic firearms and extended magazines are extraordinarily lethal."  *Id.* at ¶ 48.

*de minimus* as well.[40]  The Court rejects that assertion:  the eleven children who escaped the Sandy Hook massacre during an apparent reloading[41] are compelling evidence that the LCM Ban is a reasonable public safety regulation designed to reduce harm to society.

### 4.    Not Unduly Oppressive on Individuals

The statute clearly has an adverse impact on individuals who own LCMs.  It places a burden on them to disengage from the weapon, by modifying it, selling it, transporting it elsewhere, giving it away, or forfeiting it.  The Court considers this burden minor.  It is not at all clear, at least from the evidence the plaintiffs have offered, that it is impossible to modify the LCMs in current use to accept fewer than eleven rounds.  While the plaintiffs assert that, they have given the Court no way to quantify the resulting "injury":  which, exactly, are the magazines that cannot be modified?  How many of them are in use in Rhode Island?  Even if there are some, at a cost as little as under $14.95 for some thirty-round magazines (ECF No. 19-4 at 15, 30), it does not seem much of a burden even if they must be discarded in favor of another, lower-capacity one.  The same failure of proof affects the plaintiffs' assertion

---

[40] The plaintiffs' expert declared, "Such a minuscule difference in practical fire rate would be unlikely to have any appreciable effect on lethality."  ECF No. 22-1 at 50.

[41] Corky Siemaszko, *Want to Save Lives in Mass Shootings? Ban Large-Capacity Magazines, Researchers Say*, NBC NEWS (Oct. 17, 2019), https://www.nbcnews.com/news/us-news/want-save-lives-mass-shootings-ban-large-capacity-magazines-researchers-n1066551.  Nine children had managed to run out of Classroom 10, and two had escaped to the classroom's restroom.  ECF No. 6 at 15.  In one of the two classrooms in which children were massacred, three separate 30-round magazines were found; one had twenty-four rounds in it, one had ten, and the third was empty.  Eighty empty casings were found on the classroom floor.  *Id.* at 26.

that there are certain handguns that can *only* accept an LCM and cannot accommodate a lower-capacity magazine made by any manufacturer. The plaintiffs have submitted no data to support that assertion. "The impracticability of any particular option, such as the alleged lack of a market for these [large-capacity] magazines, the burden in removing these magazines from the state, or the lack of guidance on what constitutes a permissible permanent modification does not transform the regulation into a physical taking. *Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1198 (E.D. Cal. 2018). Nor does a physical modification of an LCM to accept no more than 10 rounds "destroy[s] the functionality." *Id.; see Goldblatt*, 369 U.S. at 592 (a valid exercise of police power does not become a "taking" even if it "deprives the property of its most beneficial use").

To the extent that the statute, by prohibiting LCMs, diminishes the shooting ability of the person holding the firearm, it is truly *de minimus*. The law puts no limit on the number of ten-round magazines an owner may have at her feet at any one time. The ground can be littered with magazines that, in the aggregate, give the recreational shooter dozens, or even hundreds, of bullets to fire. It is worth noting again that there is no evidence that any person has ever had any need to fire more than ten rounds in self-defense. But even if such an occasion existed, by the plaintiffs' own admission, the reloading process is so quick and easy, it would seem hardly burdensome for a person to fire thirty rounds from three ten-round capacity magazines instead of from two fifteen-round capacity magazines or a single thirty-

round device.  If this is even a burden at all, it pales in comparison to the substantial nature of the public safety interest at stake.

### 5.    Conclusion

The Court finds the LCM Ban to be a valid exercise of the police power. Statutes similar to Rhode Island's, which outlaw possession of LCMs with no provision for compensation, have been upheld against Takings Cause challenges, as have a number of laws prohibiting particularly deadly firearm accessories.  *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*, 910 F.3d 106, 124-25 (3d Cir. 2018), *vac. on other gnds sub nom, Assn. of N.J. Rifle & Pistol Clubs, Inc. v. Bruck*, 142 S. Ct. 2894 (June 30, 2022) (LCMs); [42] *Duncan v. Bonta*, 19 F.4th at 1112 (California statute similar to Rhode Island's); *Wiese v. Becerra*, 306 F. Supp. 3d at 1198 (California prohibition of LCMs); *Cf. Akins*, 82 Fed. Cl. at 622-23  (no taking by the ATF's classification of a certain weapon as a "machine gun," thus prohibiting its sale to civilians); *Fesjian*, 399 at 866 (D.C. 1979) (Firearm Control Act of 1975 prohibiting registration of machine guns not a 5th Amendment taking); *Maryland Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 417 (D. Md. 2018) (ban of bump stocks and other rapid-fire trigger activators not a taking); *McCutchen v. United States*, 14 F.4th 1355, 1368 (Fed. Cir. 2021) (inclusion of bump stocks in category of

---

[42] While a number of these decisions have either been implicitly abrogated by *Bruen* because of their Second Amendment "intermediate scrutiny" holdings, or remanded for reconsideration, *Bruen* did not address a "takings" argument and therefore cast no doubt on the integrity of these decisions on that account.  Indeed, *certiorari* was not granted to address the takings portion of the Second Circuit's decision.

prohibited machine guns not a taking, even though ATF changed its position); *Mitchell Arms, Inc. v. United States*, 26 Cl. Ct. 1, 5 (1992), *aff'd*, 7 F.3d 212 (Fed. Cir. 1993), *cert. den.*, 511 U.S. 1106 (1994) (declaration by ATF that semiautomatic assault-type rifles were not suitable for "sporting" purposes, which made them not importable, not a taking); *Roberts v. Bondi*, No. 8:18-cv-1062-T-33TGW, 2018 WL 3997979, at *3 (M.D. Fla. 2018) (prohibition of bump stocks not a taking); *Rupp v. Becerra*, No. 8:17-cv-00746-MLS-JDE, 2018 WL 2138452, at *8 (C.D. Cal. May 9, 2018), *rem. for cons. of Bruen*, 2022 WL 2382319 (9th Cir. June 28, 2022) (prohibition of "bullet buttons," which allowed a quick detaching and replacement of magazine, used in San Bernardino 2015 mass shooting to shoot thirty-six people in less than four minutes, not a taking).

For these reasons, the Court finds the LCM Ban to be a valid exercise of police power, and therefore not a taking that would implicate Fifth Amendment protection. The plaintiffs have failed to show the likelihood of success of their Fifth Amendment claims.

## C.    The Rhode Island Statute and Due Process and Vagueness

The plaintiffs challenge the LCM Ban with two direct Fourteenth Amendment arguments: that it violates due process and that it is vague in its failure to define what constitutes "permanent modification" of an LCM to accept no more than ten bullets. ECF No. 8 at 13-14. They claim by affidavit and in their memorandum that they are in a "tough corner" where they have to choose between forfeiture without

compensation or modification without knowing exactly whether the modification that they choose will be sufficient.

It is unclear to the Court upon which theory of due process the plaintiffs are proceeding, although presumably it is substantive due process. To the extent that the plaintiffs challenge the rationality or capriciousness of the LCM Ban, the Court has found it is a valid exercise of police power. *See supra*. Moreover, the First Circuit has already ruled that a similar Massachusetts restriction on LCMs survived intermediate scrutiny. *Worman*, 922 F.3d at 26.

The Court sees nothing vague about the statutory language. The necessary modification is defined in the statute itself as "such that [the magazine] cannot hold more than ten rounds of ammunition." Permanent in ordinary parlance uniformly means "in a way that continues without changing or ending; in a way that is not brief or temporary." *Permanently*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/permanently (last visited Dec. 14, 2022). It means "lasting for a long time or for all time in the future." *Permanent*, OXFORD ADVANCED LEARNER'S DICTIONARY, https://www.oxfordlearnersdictionaries.com/us/definition/english/permanent_1#:~:te xt=permanent-,adjective,future%3B%20existing%20all%20the%20time (last visited Dec. 14, 2022). It is defined similarly in dictionaries of common usage. "Lasting for a long time or forever." *Permanent*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/permanent (last visited Dec 14, 2022).

This statute "provide[s] people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). And it is hard to see how it could encourage "arbitrary and discriminatory enforcement." *Id.* There seems no discretion for a law enforcement officer to exercise in a way that abuses power: either a given magazine has a place to insert an eleventh bullet or it does not. The plaintiffs have provided no evidence that modifying an LCM could leave a law enforcement officer unable to discern how many bullets it will accept.

At the least, the plaintiffs have failed to carry their burden of demonstrating a likelihood of success with their direct Fourteenth Amendment arguments.

### D.    Irreparable Injury and Balance of the Harms

In addition to demonstrating a likelihood of success on the merits, a plaintiff seeking a preliminary injunction must show that, without the requested relief, she will suffer irreparable harm.[43] "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (finding that imminent foreclosure qualified as irreparable injury). In this

---

[43] As the Court has found insufficient likelihood of success on the merits, it need not examine the other factors relevant to the issuance of a preliminary injunction. *Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020) (*quoting New Comm. Wireless Servs, Inc. v. SprintCom, Inc.*, 287 F.3d 1, 19 (1st Cir. 2002)) ("If the movant 'cannot demonstrate that he is likely to succeed in his ques, the remaining factors become matters of idle curiosity."). The Court has continued beyond the first step, however, in order to provide the parties with a complete opinion.

case, the plaintiffs claim several potential injuries. The plaintiffs first cite *Flower Cab Co. v. Petitte*, 685 F.2d 192, 194-95 (7th Cir. 1982), for the proposition that "[a] violation of 'personal' constitutional rights is a per-se irreparable harm where the protected right has been personal and the violation non-compensable." ECF No. 22 at 34. That may be, but the essence of the injury here is clearly economic. Indeed, by virtue of their Fifth Amendment Takings Clause argument, the individual plaintiffs virtually concede that there exists "just compensation" for their being deprived of their LCMs or for firearms that cannot use any magazine but an LCM. The injury alleged by the firearms dealer is entirely economic—an inventory that can no longer be lawfully sold and, perhaps, lost profits on what may have been future sales of the prohibited LCM. Plaintiff Jonathan Hirons alleges he would suffer irreparable harm by having to forfeit his LCMs—a compensable event. ECF No. 8-1, Ex. B. He also complains that he would become a felon if he did not dispossess himself of his LCMs. But, like any "if it were not assizes-time" statement,[44] the harm does not come to pass if he complies with the statute. "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). The retail plaintiff alleges any number of harms—all economic injuries: financial harm from being unable to sell LCMs in-store, loss of business revenue from selling LCMs,

---

[44] The phrase is reported to come from *Tuberville v. Savage*, 1 Mod. Rep. 3, 86 ER 684 (1669); it refers to a conditional event that is avoided if the condition does not occur.

having to find another business location from which to sell LCMs in-store, and the inability to sell models for which lower-capacity magazines are made.  ECF No. 8-1 at 11-15.

None of these feared consequences constitutes irreparable harm.  Besides, the Court in fashioning its Order is ensuring that any forfeited magazines be retained in a safe manner so that they may be returned to their owners if a permanent injunction is granted in the future.  *See San Francisco Veteran Police Officers Ass'n v. City & Cty. of San Francisco,* 18 F. Supp. 3d 997, 1005 (N. D. Cal. 2014) ("In the event that plaintiffs prevail on the merits, however, the City and County of San Francisco is ordered to return plaintiffs' surrendered magazines back to them.").  Any plaintiff who is confident of ultimate victory may ensure that the loss of enjoyment of her LCM is temporary by choosing forfeiture and safekeeping of the weapon.

To the extent that the plaintiffs complain that their right to self-defense may be imperiled, the Court is persuaded by the Declaration of Rhode Island Bureau of Criminal Identification and Investigations Chief Edward Troiano that an occasion in which a victim threatened with violence might need to rapidly fire that eleventh, twelfth, or twentieth bullet is so speculative as to be non-existent.  In Mr. Troiano's experience, from 1994 to the present, confirmed by his review of self-defense incidents, there has not been "any incident in which a civilian has ever fired as many as 10 rounds in self-defense." ECF No. 22-C ¶ 10.  Rhode Island is not alone with no incidents of self-defense use of LCM-equipped firearms.  *Kolbe,* 849 F.3d at 127 ("neither the plaintiffs nor Maryland law enforcement officials could identify a single

incident in which a Marylander has ... needed to fire more than ten rounds, to protect herself."). *See also Worman*, 922 F.3d at 37 ("[N]ot one of the plaintiffs or their six experts could identify ... even a single example of a self-defense episode in which ten or more shots were fired."). *See Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *11 (D. Ore. Dec. 6, 2022) (NRA Armed Citizen Database found more than ten bullets fired by self-defender only twice in 736 incidents).

Finally, to the extent that the plaintiffs or other recreational gun enthusiasts might somehow enjoy firing dozens of rounds in quick succession, that is hardly impaired. Nothing prevents such people from having dozens of lower-capacity magazines at their feet, allowing them to spray as many bullets as they like, with only the inconvenience of—as the plaintiffs concede—two seconds at a time to reload. That momentary interruption is not the kind of irreparable harm required for a preliminary injunction to issue.

Against what the Court has found is an absence of irreparable harm on the part of the plaintiffs, it must still consider the hardship to the nonmovant if enjoined and the impact of the Court's decision, either way, on the public interest. *Ryan*, 974 F.3d at 18. Earlier, the Court examined the tightness of the relationship between the LCM Ban and public safety, finding that in a mass shooting incident every pause to reject a spent magazine and load a new one represents the opportunity to preserve a specific life—or more than one. That finding need not be embellished here. Suffice it to say that in very real terms, the plaintiffs' proffered harm caused to them by an

injunction pales in comparison to the unspeakable devastation caused by mass shooters wildly spraying bullets without end into a crowd of bystanders. Rhode Island has yet to suffer the kind of massacre that occurred just across our border at Sandy Hook Elementary. But, if and when it does, at least while this lawsuit is pending, the State is entitled to enforcement of R.I. Gen. Laws § 11-47.1-1 *et seq.*

## IV.   CONCLUSION

It is not entirely accurate to say that the victims of mass shootings are chosen randomly. True, they are random in that their identities are usually not known to the shooter, and it appears to matter not to the shooter whether the next one killed is a particular person or the woman standing next to him. But in actuality, victims have not been chosen randomly. They have been chosen because they were attending synagogue in Pittsburgh or church in Sutherland Springs. Or because they were sitting in an elementary school classroom in Newtown or a high school classroom in Parkland. Or because they were at a concert in Las Vegas or a nightclub in Orlando. They were not chosen because of anything they did, but because of what they represented to a particular person with a gun and a lot of ammunition.

Consistent with its obligation to protect public safety, but consonant with its fealty to the Constitution, the Rhode Island General Assembly has responded with, among other firearms regulations, the LCM Ban. It is perhaps inevitable that Rhode Island will one day be the scene of a mass shooting. The LCM Ban is a small but measured attempt to mitigate the potential loss of life by regulating an instrument associated with mass slaughter. It prohibits a device that itself is neither "Arms" nor

embraced by the core right to self-defense. The LCM Ban is reasonable, it is measured, and the plaintiffs have failed to persuade the Court that it is likely unconstitutional.

The motion for preliminary injunction (ECF No. 8) is DENIED.[45]

IT IS SO ORDERED:

_John J. McConnell, Jr.
Chief Judge
United States District Court_

John J. McConnell, Jr.
Chief Judge
United States District Court

December 14, 2022

---

[45] The defendants Attorney General and Rhode Island State Police Superintendent shall make arrangements with state and local law enforcement to preserve in safe and undamaged condition any LCMs turned in by citizens in compliance with the LCM Ban so that they may be returned to their owners should the plaintiffs ultimately prevail on the merits. If the plaintiffs do not prevail, the Court and parties will work together to ensure a grace period during which owners may make arrangements to direct a disposition of their LCMs out of safe keeping in a way that complies with the statute.