1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF RHODE ISLAND
2

3

4    * * * * * * * * * * * * * * 22-CV-246-JJM
                                *
5    OCEAN STATE TACTICAL,      *
     LLC, et al                 *
6                               *
            VS.                 * NOVEMBER 3, 2022
7                               *
     STATE OF RHODE ISLAND,     *
8    et al                      *
                                * PROVIDENCE, RI
9    * * * * * * * * * * * * * *

10

11

12        BEFORE THE HONORABLE JOHN J. McCONNELL, JR.

13                      CHIEF JUDGE
                       Courtroom 1
14
           (Motion for Temporary Restraining Order))
15

16   **APPEARANCES:**

17
     FOR THE PLAINTIFF:        MICHAEL A. KELLY, ESQ.
18                             DANE EVAN ARDENTE
                               Kelly, Souza, Rocha & Parmenter
19                             128 Dorrance Street, Ste 300
                               Providence, RI  02903
20
     FOR THE DEFENDANT:        SARAH RICE, ESQ.
21                             RI Department of Attorney
                               General
22                             150 South Main Street
                               Providence, RI  02903
23
     Court Reporter:           Denise P. Veitch, RPR
24                             One Exchange Terrace
                               Providence, RI  02903
25

1    3 NOVEMBER 2022 -- 2:00 P.M.

2            THE COURT:  Good afternoon, everyone.  We're

3    here on Plaintiffs' request for a temporary restraining

4    order and a preliminary injunction in the case of

5    Ocean State Tactical, LLC, et al v. The State of Rhode

6    Island, criminal action 22 -- I'm sorry -- civil action

7    22-246.  Would counsel identify themselves for the

8    record, please.

9            MR. KELLY:  Michael Kelly for the Plaintiffs,

10    your Honor.

11            THE COURT:  Good afternoon, Mr. Kelly.

12            MR. KELLY:  Good afternoon.

13            MR. ARDENTE:  Dane Ardente for the Plaintiffs,

14    your Honor.

15            THE COURT:  Good afternoon, Mr. Ardente.

16            MS. RICE:  Sarah Rice, Special Assistant

17    Attorney General, for the Defendants.

18            MR. HOFFMAN:  Keith Hoffman, Special Assistant

19    Attorney General, for the Defendants.

20            THE COURT:  Great.  Welcome, all.

21            Mr. Kelly, it's your motion.  And while you're

22    coming up, I've told counsel this, for those watching,

23    we're limiting arguments to no more than 45 minutes,

24    either side.  Split, if you want to split it or not,

25    it's all up to you.  We're going to stay very strict to

1     that because an hour and a half is as long as our court

2     reporter can go in any one sitting.

3           So, Mr. Kelly, the floor is yours.

4           MR. KELLY:  Thank you, your Honor.

5           THE COURT:  Mr. Kelly, were you tested before

6     you came in?

7           MR. KELLY:  Yes.

8           THE COURT:  And I assume it was negative.

9           MR. KELLY:  Yes.

10          THE COURT:  So you're welcome to take your mask

11    off if you were vaccinated and tested.

12          MR. KELLY:  Good afternoon, your Honor.

13          THE COURT:  How are you?

14          MR. KELLY:  Michael Kelly for the Plaintiff.

15    And I'm sure you're well aware of the issue before the

16    Court, and that is whether or not the so-called

17    magazine ban enacted by the Legislature in July of this

18    year violates the Second Amendment and/or the Fifth

19    Amendment which applies to the state through the

20    Fourteenth Amendment.  And it's been the subject, this

21    issue has been the subject, as I'm sure you know from

22    reading the briefs of extensive litigation, and there

23    were approximately seven or eight pending cases before

24    the Supreme Court of the United States at the time it

25    decided the *Bruen* case, which has changed the landscape

1     in regard to the analysis of the Second Amendment, and

2     making it a historical review as opposed to other of

3     the second step which was applied in the *Heller* and

4     other cases as to whether or not the so-called firearm

5     in fact was protected and were there public reasons for

6     such an enactment.

7          Now, the statute itself provides that as of

8     December 18th that the -- I'm going to call them

9     large-capacity magazines, and that's over 10 rounds,

10    and I'm going to be referring to standard-capacity

11    magazines as those that are issued with the gun.

12    Typically when you buy a firearm it comes, of course,

13    with a magazine.  That's the only way you can shoot it.

14         THE COURT:  Mr. Kelly, can you help me on that

15    because I was looking at this earlier.  Are there guns

16    that are manufactured that have an in-place magazine

17    capacity in excess of 10?

18         MR. KELLY:  Most guns these days have magazines

19    that exceed 10.

20         THE COURT:  Okay.  But is the magazine a

21    permanent part of the gun, or is it a replaceable

22    cartridge, so to speak?

23         MR. KELLY:  If I may, your Honor.

24         THE COURT:  I was kind of queueing up your

25    show-and-tell.

1          MR. KELLY:  It's not much of a show-and-tell,

2     but if I may --

3          THE COURT:  First of all, have you shared it

4     with the State's counsel?

5          MR. KELLY:  Yes.

6          THE COURT:  Mr. Kelly was kind enough to check

7     with us and Marshals Service before he brought this in,

8     which we appreciate.

9          MR. KELLY:  The magazine such as that which are

10    made of plastic, at this time most of these type of

11    magazines, that's for an AR-15, are plastic, and which,

12    as you'll hear, presents quite a problem in terms of

13    how you permanently modify a plastic magazine.  But

14    there are, as you'll hear and as I'll present through

15    some affidavits, most guns these days come with a

16    magazine that exceeds 10 rounds, and there are several

17    if not many firearms where there is no available

18    magazine of 10 rounds or less.  Either they're not made

19    or you cannot obtain them at this time, which gets to

20    the issue of whether it's a firearm, which I will

21    address in detail later on.

22          So it has to be either permanently modified.  As

23    you know, there are no regulations, criteria whatsoever

24    in regard to what "permanently modified" actually

25    means; or it can surrender the magazine, one can

1    surrender magazines to the police department or

2    transfer to a federally-licensed firearm dealer.  That

3    is the extent of what has to be done with these

4    magazines.  As you can see, the fact that there are

5    many that are in fact plastic presents quite a problem,

6    particularly with no criteria whatsoever.

7         THE COURT:  Well, as to that aspect, I mea,

8    there's other options that the owner has; right?

9    Modifying is one of them, sending it to a licensed

10    dealer, sending it to, turning it in to the

11    authorities, so it is --

12         MR. KELLY:  Yes, your Honor.  Excuse me.  And we

13    presented some affidavits as to why those options

14    frankly not options at this point.  I'm sure you well

15    know what the standard is for this type of relief,

16    preliminary injunction, which is likelihood of success

17    on the merits, irreparable harm, and balancing of the

18    hardships.  Excuse me.

19         Now, prior to the *Bruen* case there was a

20    two-step analysis of whether a firearm in fact was

21    protected by the Second Amendment, and the criteria

22    used was established as a challenge that law regulation

23    regulates activity falling outside the scope.  If it

24    fell beyond the scope it was categorically unprotected.

25    However, in the Walberg (indecipherable) right, in the

1    Second Amendment there was a strict scrutiny test in
2    which basically it was narrowly tailored to compel, to
3    serve a compelling government interest, and there was
4    also intermediate scrutiny as to whether the government
5    could show the law was substantially upgraded to the
6    achievement of an important government interest.
7    *Bruen* changed all of that. *Bruen* indicated that the
8    courts have gone one step too far.  If it's a
9    regulation that's inconsistent with the plain text of
10   the Second Amendment, it impermissibly burdens the
11   Second Amendment after historical analysis as to
12   whether the firearm was previously regulated in the
13   Founding Era, which is when the Second Amendment was,
14   in fact, adopted.  However, no matter what the
15   regulation is, it cannot overcome the plain text of the
16   Second Amendment.
17        THE COURT:  So Mr. Kelly, let's stop right
18   there, and it seems to me that the issue of the plain
19   text analysis is where we begin, the court tells us,
20   the *Bruen* court tells us, and it seems to me the
21   singular issue there for our analysis for purposes of
22   this case is is a magazine an arm or is it an
23   accoutrement, an accessory; and assuming that you agree
24   with me that that's kind of the first level of the
25   textual analysis, what is the Plaintiff's position as

1    to the distinction between an arm and an accoutrement

2    and why is it your position that a magazine is an arm

3    textually?

4           MR. KELLY:  I would just quote the Supreme Court

5    case of *Jackson* where the Supreme Court indicated

6    through Judge Thomas quoting that case, (Reading)

7    Without bullets, the right to bear arms would be

8    meaningless and indeed a regulation eliminating a

9    person's ability to obtain or use ammunition would

10    thereby make it impossible to use their firearms for

11    their core purpose.

12           Now, there was at the time of the *Bruen* decision

13    over six cases pending before the court had come up

14    from the various circuit courts and that challenged the

15    possession of large-capacity magazines, and, in fact,

16    in each of those cases the courts had done the analysis

17    in regard to whether it was protected by the Second

18    Amendment and therefore all those cases reviewed the

19    Second Amendment and the magazine as if it were a

20    firearm based upon the fact that without the magazine

21    the gun can't be shot and the fact that you have to

22    have bullets, obviously, to shoot the gun; and those

23    were the *Duncan* and *Barton* case, the *Association of*

24    *Jersey Rifle and Pistol Clubs v. Bruck*, the *Kolbe v.*

25    *Hogan* case, *Friedman v. City of Highland Park*,

1    *Bianchi v. Frosh*, and *Young v. Hawaii*.  So in all those

2    cases both the district court and the courts of appeals

3    held that it was, that the magazine was in fact a

4    firearm and did the analysis in regard to whether the

5    magazine was protected by the Second Amendment.

6         THE COURT:  Those cases didn't determine that.

7    They accepted the argument as part of the legal

8    argument that the magazine was subject to the arms

9    textual analysis.  They didn't hold after a hearing

10   that a magazine is an arm, did they?  I mean that's my

11   understanding of what --

12        (Overlapping speech)

13        MR. KELLY:  They didn't specifically hold that

14   clearly as you just enunciated, but they analyzed it

15   under the Second Amendment.  It seems to me, just as

16   we've done today, the first step is to determine

17   whether it's a firearm before you even get to the fact

18   as to whether it's protected.

19        THE COURT:  Sure.  So define for me the

20   definition, give me the definition of arm that includes

21   magazine, according to the Plaintiff.  How does one use

22   that, how does one interpret that word "arm" when

23   determining between an accoutrement and an arm?

24        MR. KELLY:  Well, my response to that is that

25   the magazines are provided; they are part of the gun as

1    modern instruments at this point.  The Rhode Island

2    statute also defines, and I've got that right here.

3    There it is; thank you.  So Rhode Island has its own

4    statute in which they have defined -- excuse me.  The

5    case in *Bruen* included all instruments that constitute

6    bearable arms, even those that were not in existence at

7    the time of Founding, and the Second Amendment's

8    definition of arms is fixed according to its historical

9    understanding the general definition covers modern

10   instruments.

11         THE COURT:  Say that one more time.  It

12   covers -- what did you say?

13         MR. KELLY:  The Second Amendment's definition of

14   arms is fixed according to its historical understanding

15   that general definition covers modern instruments to

16   facilitate armed self-defense, citing the *Caetano* case

17   from Massachusetts.

18         THE COURT:  But no one has given us guidance,

19   that I've seen, either the First Circuit or the Supreme

20   Court, on how one determines what is an arm versus what

21   is an accoutrement.  Because you would agree with me

22   that it's a distinction with a difference; right?  That

23   arms falls under the Second Amendment; accoutrements or

24   accessories, depending upon what century you live in,

25   don't; right?  You agree with that distinction?

1          MR. KELLY:  Yes.

2          THE COURT:  Okay.  So what's the definition of

3     arms that we should use to determine whether an item

4     like that is an accessory or not?  In other words the

5     analogy is, you know, you have a car, that's a car, and

6     then you might have a rooftop on top of it.  Is the

7     rooftop, is the luggage carrier a car, or is it an

8     accessory to the car?  So how do I determine which it

9     is?

10         MR. KELLY:  Well, I would just go back to the

11    definition used in *Bruen*.  The modern instrument as

12    defined as -- covers, Second Amendment, modern

13    instruments to facilitate armed self-defense.  As I

14    previous stated and as set forth in our affidavit from

15    Mr. Worthy and others, the magazine in fact is

16    necessary to fire the gun and in fact it therefore

17    facilitates the arm of self-defense.

18         In addition, the Rhode Island General Laws

19    Title 11 Chapter 47 titled Weapons very strongly

20    implies that magazines are weapons and regulates them

21    as weapons.  It refers to chapter -- Section 51, Loaded

22    Weapons in a Vehicle, it indicates that it is unlawful

23    for any person to have in his or her possession a

24    loaded rifle or loaded shotgun or rife or shotgun from

25    the magazine of which all shells and cartridges have

1    not been removed.

2           So the magazine in that statute is indicated to

3    be a part of the weapon due to the fact that it cannot

4    have any shells in the magazine or it's considered a

5    loaded weapon.  It also goes on to, it says that other

6    objects separately from the weapon or firearm, in fact,

7    are covered as weapons.  So I believe that that

8    statute, common sense reading, indicates that the state

9    statute considers the magazine part of the gun.

10          And as I said, the courts have all reviewed the

11   magazines to determine whether or not under the Second

12   Amendment whether they're covered.

13          THE COURT:  Well, Mr. Kelly, let's flip to the

14   second preliminary question which you raised in one of

15   your quotes, which is, do you agree that the Second

16   Amendment only applies to arms used in self-defense?

17          MR. KELLY:  No, I don't, your Honor.

18          THE COURT:  Okay.  Tell me why *Heller* and *Bruen*

19   don't so hold.

20          MR. KELLY:  Well, one of the cases, in fact,

21   addresses that issue, and I don't have it right in

22   front of me, but basically the court indicated that it

23   is not just limited to self-defense, but includes

24   sporting and other shooting activities; and, in fact,

25   target shooting is at page 7 of the report that we

1    filed from Ashley Hlebinsky which indicates that target

2    shooting was part of American culture before the

3    formation of the United States with colonists taking

4    part in competitions known as rifle frolics, frolics,

5    and this in fact took place back in the Founding Era

6    and also increased in the post-Civil War.

7         THE COURT:  But Mr. Kelly, even now -- or feel

8    free to send me a, you know, letter brief afterwards

9    and show me -- but I was under the impression having

10   read all of the cases that the Supreme Court was rather

11   clear in its limitation on the extent of the Second

12   Amendment to arms for purposes of self-defense.  That

13   was the basis of *Heller* and it was incorporated into

14   the *Bruen* case.  So if you have a Supreme Court case

15   that says that the Second Amendment applies to weapons

16   outside of for use of self-defense, then I need to know

17   that because that's not my understanding of what they

18   require for the analysis.  Again, if you don't have it

19   now feel free to let me know later.  But that's the

20   analysis that I am working under and what the Supreme

21   Court requires us to do initially before we even get to

22   the Second Amendment analysis of the historic

23   tradition.

24        MR. KELLY:  Very good, your Honor, I will.

25        THE COURT:  Okay.  Thank you.

1          MR. KELLY:  Getting to the analysis under the

2     historic investigation which the *Bruen* court in fact

3     has indicated is the test to be done, pursuant to our

4     report from Ashley Hlebinsky there were none at the

5     time of the Founding Era.  There was no regulations

6     concerning the number of bullets that a gun could in

7     fact hold and in fact at that time there were

8     requirements according to the government that each

9     person or able-bodied man, so to speak, be required to

10    carry a musket and a certain amount of rounds for

11    ammunition with him at all times.

12          THE COURT:  Can I just back us up, Mr. Kelly, on

13    this because another perplexing part of the Supreme

14    Court's analysis in *Bruen* or the Supreme Court's

15    mandate to district courts and courts of appeal has to

16    do with how do you determine this historic tradition,

17    and it may be one thing if you could look at history

18    and see it's either red or blue and make a

19    determination, but there's clearly analysis that goes

20    into that, and we can see that by competing historical

21    affidavits that say directly opposite things about our

22    history.

23          So my first question to you is what advice do

24    you have under the *Bruen* required analysis on this

25    historic tradition?  How does the Court make that

1    determination between competing, potentially competing

2    pieces of evidence?  You've chosen, you both -- you all

3    have chosen to present it by way of affidavit which I

4    think is the efficient way to look at it, but how am I

5    to determine who is right on these two affidavits, two

6    competing affidavits?

7         MR. KELLY:  A close reading of the Defendant's

8    affidavit in regard to that issue will indicate that

9    there were no regulations in effect in the Founding Era

10   for the number of rounds of ammunition that any type of

11   weapon could in fact hold.

12        THE COURT:  Right.  But the State's affidavit

13   says that as of at least into the 1700s there were no

14   firearm, there were no arms that required -- that

15   allowed multiple shootings without reloading, so one

16   would be -- if you follow the State's expert, one

17   wouldn't be surprised that there's no regulation

18   prohibiting that which doesn't exist.

19        MR. KELLY:  That is not the case, your Honor.

20        THE COURT:  I know, but I just want to get to my

21   initial question, and I won't beat a dead horse here,

22   but how am I to determine, how am I supposed to

23   determine under this new *Bruen* mandate between

24   competing affidavits?  You know, Judge Carlton Reed

25   down in Mississippi yesterday, a couple of days ago

1    issued an opinion on this very issue, talking about the

2    difficulty that district courts will have under the

3    *Bruen* mandated analysis and it was actually looking at

4    appointing a court expert to come to that

5    determination.  Is there a way -- am I to judge

6    credibility between the affidavits and, if so, how?

7         MR. KELLY:  Let me suggest this, your Honor, if

8    I may.  At page 10 of our expert's report she cites

9    several examples of so-called repeaters that were in

10   effect as early as the 1750s that at least one was a

11   12-shot repeater made by gunmaker John Shaw in Boston;

12   and then there was two or three others that have been

13   mentioned here, the Belton rifle, which actually a

14   hundred of those were ordered by George Washington for

15   the Continental Army, and then a few decades later,

16   around 1779 an air rifle was developed which held

17   22-rounds from a tubular magazine, and that was

18   actually used by Lewis and Clark in their expedition.

19        I think it would be very easy for the Court to

20   determine if in fact those were in effect by

21   checking -- that those were in existence by checking

22   the citations that were given.  One of them is an

23   advertisement in a newspaper and others are reported in

24   the newspaper also.  And I believe they're well

25   documented, your Honor, and I think that's the way for

1    one to check to see which expert is in fact addressing

2    that issue accurately; and that is, were there

3    magazines or guns which held more than 10 rounds -- and

4    that's an arbitrary figure, your Honor, of course, some

5    states are eight, some are 10, some are 12 -- and

6    whether or not those guns were in existence.  There

7    certainly were no regulations at the time.  And I don't

8    believe that the Defendant's expert pointed to one

9    regulation that limited in the Founding Era the number

10   of rounds of ammunition that was restricted for a

11   firearm.

12         THE COURT:  Do you think that the state can

13   constitutionally impose any amount of limitation on a

14   magazine, or does it have to be unlimited to meet

15   constitutional muster?  What if it were 20 or 30?

16         MR. KELLY:  Yes, I think that they have a

17   problem regulating these magazines based upon

18   historical analysis because in fact, as I've just said,

19   there were about four or five guns in existence in the

20   Founding Era, 1750s through 1770s that in fact held

21   more than 10 rounds.  Some held up to -- the Giardoni

22   rifle which I mentioned held 22 rounds.

23         THE COURT:  The State's expert says that except

24   for weapons of war -- that they were, that multiple

25   round arms at that period was an uncommon weapon of

1     war, as opposed to for public use.

2            MR. KELLY:  Obviously -- I do not believe there

3     were any actual citations to that reference and, as

4     I've indicated, there were multiple rifles available in

5     that time period which had more than 10, more than 12

6     rounds of ammunition.  And there were no regulations.

7     They don't point to a regulation.  So I think that the

8     Court could easily determine the issue by checking to

9     see whether or not the citations and the sources here

10    that we've cited at page 10 of our report in fact are

11    correct, and I believe that they would be easily

12    documented.

13           George Washington wrote a letter in 1776 asking

14    that the Continental Congress order a hundred Belton

15    rifles.  1779, the Girardoni was created.  To my

16    knowledge there wasn't a war going on at that point.

17    And, as I said, it was used by Lewis and Clark on their

18    expedition, certainly not a war.

19           THE COURT:  Mr. Kelly, under your client's

20    analysis, could the State ban machine guns?

21           MR. KELLY:  Pardon me?

22           THE COURT:  Could they prohibit machine guns?

23           MR. KELLY:  Yes, because that's a completely

24    different animal than we're talking about.  Machine

25    guns are different because they're automatic.  You pull

1    the trigger once and it keeps firing until it's out of

2    ammunition.  The large-capacity magazines that we're

3    talking about are used in semi-automatics which you

4    have to pull a trigger each time.

5         THE COURT:  Right.

6         MR. KELLY:  And to tell you the truth, I'm a

7    shooter; there are many individuals that can change

8    that magazine in a matter of two or three seconds.  So

9    I would suggest that the difference between that type

10   of conduct and having 20 bullets in a magazine is not

11   that different.

12        THE COURT:  Well, the evidence in common logic

13   tells us the two or three seconds could save two or

14   three children in a crowded classroom.

15        MR. KELLY:  That's speculation.

16        THE COURT:  It's common sense.  It takes a

17   couple of seconds at a minimum to reload.  The chance

18   that a child can run or duck or hide, I think I could

19   almost take judicial notice of that as a fact.

20        MR. KELLY:  I stand by my statement, but I

21   understand, I understand the issue, your Honor.

22        THE COURT:  Okay.

23        MR. KELLY:  And under this historical analysis

24   the regulation or the law that one would be pointing to

25   as a basis for a regulation, it's got to be relevantly

1    similar, which is evaluated under two metrics; and that

2    is, the regulation burdens law-abiding citizens have

3    the right to armed defense, and then there's the

4    whether modern and historical regulations impose

5    comparable burdens in the right to armed defense --

6    which here there are none, in our opinion -- why the

7    regulation burdens law-abiding citizens the right to

8    armed defense and whether that is comparably justified.

9         There's been a conflict between some of the

10   scholars trying to compare later day regulations such

11   as the one you just referred to on machine guns, which

12   were not enacted until the 20s when we had quite a few

13   gangsters around the country using these machine guns.

14   And if you look at the National Firearms Act which

15   regulates machine guns, it does not limit capacity.  In

16   other words whether it's a machine gun or not is not

17   dependant on the number of rounds of ammunition that it

18   can hold; it's on the firing mechanism which is

19   automatic, which certainly is something that's far

20   different than a semi-automatic or a pistol, et cetera.

21   Actually pistols these days come with almost like a

22   magazine, you pop the area which, the round cylinder

23   which holds the bullets, the whole thing pops out, you

24   pop one in.  So the technology has moved along.  And as

25   the scholars have all agreed, but that doesn't mean

1    that these magazines using the new technology, guns

2    using new technology are not covered.

3         As I said, the Founding Era there were several

4    guns in existence which held more than 10, 12 rounds,

5    and I've given you several examples of those.  I won't

6    repeat myself.  There was --

7         THE COURT:  Mr. Kelly, can I interrupt for a

8    second again and go back to the machine gun analogy,

9    and I understand the difference between a machine gun

10   and a semi-automatic -- that's the difference in terms

11   of whether a bullet gets sent out or not.  But why is

12   that a distinction that matters for constitutional

13   analysis?  What is it about the trigger that makes it

14   okay to -- or the lack of trigger that makes it okay to

15   regulate, but the trigger itself is regulatable?

16        MR. KELLY:  Because it shoots much faster.  A

17   machine gun shoots much faster.  As I said, it's

18   automatic.

19        THE COURT:  So the State can regulate arms if

20   they shoot bullets too fast?

21        MR. KELLY:  Well, I think that the analysis for

22   the machine guns is is it a dangerous and unusual

23   weapon; and obviously the statutes that regulate those

24   type of arms, they were intended to prevent the, having

25   an automatic weapon that could continuously fire.  And

1   as I said, the statutes, the National Firearms Act does

2   not focus on capacity, so capacity is not part of the

3   definition of machine gun.  It's the type, how it can

4   shoot.

5        THE COURT:  Right.  But again I don't want to

6   beat a dead horse, but so what for constitutional

7   analysis, and why is that part of the legal analysis?

8   Why is that a legal distinction that has any relevance

9   to what the *Bruen* court tells us we should be looking

10  at?

11       MR. KELLY:  Because it's an unusual and

12  dangerous weapon, even if --

13       THE COURT:  Because it expels bullets fast.

14       MR. KELLY:  Much faster than a semi-automatic,

15  yes.

16       THE COURT:  Okay.  So the constitutionality

17  turns on the degree of speed of the bullet?

18       MR. KELLY:  No, it --

19       THE COURT:  I'm just trying -- I'm not trying to

20  give you a hard time, Mr. Kelly, honest.  I'm trying to

21  figure out legally as we analyze this, it's very

22  complicated and there's not a lot of direction because

23  the Supreme Court just came down with this, --

24       MR. KELLY:  I agree.

25       THE COURT:  -- so I'm trying to figure out where

1    this all fits into a legal analysis appropriately, and

2    the part, that part I just can't get my head around,

3    where it belongs, one way or the other how it goes.

4    You know what, I don't want to take up all of your --

5    you only have about 10 minutes left, so I'm assuming

6    you want to talk about the takings clause because that

7    intrigues me as well.  I don't know if there's anything

8    else you want to say about this before.

9            MR. KELLY:  In our brief we address that issue

10   about machine guns --

11           THE COURT:  Okay.

12           MR. KELLY:  -- and as I said, the machine guns

13   are not protected because they're dangerous and unusual

14   weapons and certainly were not in common use in any

15   way, shape or form either in the 1920s or in the

16   Founding Era, so --.  And the examples of dangerous and

17   unusual weapons are M16s which in fact shoot

18   automatically, machine guns, regulation on sawed-off

19   shotguns, hand grenades.  And the sawed-off shotguns,

20   as I understand it, was intended to prevent people from

21   carrying those around under their jacket.  There were

22   also carry permit laws in -- at the time, but they

23   focused on little carry guns that could be concealed so

24   people couldn't see them.  And you have bump stocks,

25   which a bump stock turns a semi-automatic basically

1     into an automatic.  So the rationale for that is that

2     as a result of them being able to fire continuously,

3     they were determined to be dangerous and unusual, and

4     dangerous and unusual firearms are not protected by the

5     Second Amendment; and the courts have unanimously

6     upheld that based upon that holding that in fact

7     they're dangerous and unusual.  The common use standard

8     was applied to be a standard, to be the large-capacity

9     magazines, and the *New York State Rifle case v. Cuomo*

10    went to the Second Circuit and that's the basis for

11    that, your Honor.

12          Now I've addressed, I believe, the issues of the

13    history.  The Second Founding Era, just as we've

14    discussed, although not as important as the Founding

15    Era, the Second Founding Era could give some guidance.

16    In fact, the Defendants cite the Winchester repeater

17    rifle, et cetera, and indicate clearly as an admission

18    there were no regulations restricting Winchester

19    rifles, some of which had 12 capacity, some had 22,

20    et cetera.  So even in the Second Founding Era there

21    were no restrictions on capacity.  It was the 20s where

22    machine guns, in fact, were considered dangerous and

23    unusual and were regulated.  But the *Bruen* case clearly

24    stated that later in time regulations do not affect the

25    historical precedent issue which we've described.

1          The magazines, I would posit to you, are not

2     dangerous and unusual.  And once again, the

3     First Circuit has declined to address whether a

4     standard capacity, large-capacity magazines were

5     commonly used or uncommonly used; however, this court

6     held that stun guns were weapons in common use at that

7     time for lawful purposes for self-defense.

8          THE COURT:  This Court didn't; my colleague

9     Judge Smith did.

10          MR. KELLY:  Yes.  I referred to this.

11          THE COURT:  Okay.

12          MR. KELLY:  And in terms of the number of

13     magazines in existence right now of large capacity, at

14     this point there's about over 20 million ARs owned by

15     individuals in the United States, upwards of 70 million

16     large-capacity magazines for AR-15s; far more than that

17     for the number of other rifles and pistols that have

18     magazines that exceed 10 rounds.  And frankly now if

19     one were to take a look at the types of firearms,

20     particularly pistols that are being manufactured with

21     the standard magazine, exceeds 10, there's actually a

22     lot of carry pistols that far exceed 10; they have 12,

23     15, 17.

24          THE COURT:  Can I ask you, Mr. Kelly, I know you

25     don't believe that the Second Amendment is limited to

1    arms for purposes of self-defense.  Putting that aside

2    for a second, is there any evidence in this record that

3    large-capacity magazines are intended to or have been

4    used for purposes of self-defense, and is it the

5    Plaintiff's position that a gun equipped with a

6    large-capacity magazine is for the purpose of

7    self-defense?

8         MR. KELLY:  Well, I would suggest any firearm

9    you have in your home is, can be used for self-defense.

10   Whether people have large-capacity magazines in those

11   firearms is really I would say somewhat irrelevant to

12   the fact that it's a firearm that can be used for

13   self-defense.  Whether it's got 20 rounds or 10 rounds

14   or 12 rounds, all of those can be used for

15   self-defense.  And as I said, there's a lot of

16   manufacturers and they've been in existence for a long

17   time that there're pistols, and let's assume for the

18   purpose of discussion which I do not agree with, the

19   large number of handguns now come with a magazine that

20   far exceeds 10 rounds.

21        THE COURT:  But the mere fact that it comes with

22   it doesn't mean it's for the (indecipherable)

23   self-defense.  I would imagine people -- I don't know

24   the shooting sport, but I would well imagine people

25   using guns in shooting might, you know, might want the

1    rapid without reloading ability.  Again, I'm just

2    assuming that, but I don't see where it comes around to

3    for purposes of self-defense which, you know, *Heller*

4    began by saying that, I think Justice Scalia said in

5    *Heller* that it was for purposes of self-defense in the

6    home and added the in the home part; and then *Bruen*

7    obviously came forward and took it out of the home but

8    continued with the purposes for personal self-defense.

9    And under your analysis then the language of for

10   self-defense is meaningless, right, because any arm

11   regardless of capacity can be used for self-defense and

12   therefore checks that box; right?

13        MR. KELLY:  Well, I wouldn't say any arm.  If

14   it's a dangerous and unusual firearm, no, it can't,

15   because it's not protected.  However, I would ask what

16   is the difference between one having an AR with a 20

17   round or 25 round magazine, and a pistol that has 12,

18   14, 17 rounds?  No one could argue that a pistol is not

19   used or cannot be used for self-defense in the home.  I

20   would suggest that's probably that, that shotguns are

21   the most prevalent firearms used for self-defense in

22   the home.

23        THE COURT:  But legislation doesn't prohibit the

24   pistol.  I don't think it prohibits the magazine.

25        MR. KELLY:  Right.  As we've indicated in our

1    affidavits, there are many firearms, pistols, that

2    there is no magazine with 10 rounds or less.  They

3    don't make them.  In fact there's quite a few customers

4    of Ocean State that come in with older guns trying to

5    buy a 10-round magazine and the manufacturers don't

6    make them or the manufacturers aren't in existence

7    anymore, et cetera.  So to say that you could use it,

8    just throw in another clip, a magazine into a pistol,

9    that's not true, and none of the evidence indicates

10   that.  It's --

11            THE COURT:  But it's also --

12            MR. KELLY:  -- to the contrary.

13            THE COURT:  -- they could make it if there was a

14   market for it, and there could be a market for it if

15   the state limited it.  I mean --

16            MR. KELLY:  Well, 80 percent of the states do

17   not regulate the number of rounds in a magazine, so

18   what you can do with those -- and whether there's a

19   market for Rhode Island, Connecticut, and Massachusetts

20   and a few others, I don't know.

21            But what I do know from the affidavit we

22   submitted that there are handguns and there are rifles

23   at the present time for which there is no magazine

24   available that complies with this law.  It begs the

25   question what does one do with the firearm that they

1   can't get a magazine for?  It's worthless.  So we would

2   suggest that since the magazine is a crucial part or

3   necessary part of the firearm, whether it's an AR or

4   whether it's a pistol.

5          Now, this statute does not differentiate between

6   either.  It doesn't say that pistols can have a

7   magazine larger than 10, and it doesn't say --

8          THE COURT:  In fact it says the opposite, they

9   can't.

10         MR. KELLY:  That's right, it says they can't

11  have a magazine with more than 10 rounds, and it

12  applies to any firearm.  So it is in fact affecting

13  one's right to self-defense with a pistol that has more

14  than 10 rounds, whether it's a pistol or an automatic

15  rifle.  And automatic is an oxymoron because they're

16  not, as you know.  So I would say just based on that,

17  this affects a core right.  So if you don't have a --

18  if you can't get a magazine that complies with the law

19  for whatever firearm, you've been basically

20  dispossessed of your gun and your self-defense.  I

21  don't think anyone has looked at it that way, but

22  that's the way I think the Court should look at it.  It

23  affects the right to self-defense for the reasons I

24  just stated.  Now, why is it --

25         THE COURT:  Mr. Kelly, your time is just about

1    up, so if you want to wrap up.

2         MR. KELLY:  Yes.

3         I would just like to address the takings issue.

4    We cited the cases that clearly said if the government

5    physically takes possession of personal property, even

6    if it's done under the guise of public good, there has

7    to be compensation.  Now, as we've indicated in our

8    affidavits, the gun store, Ocean State, they've

9    indicated, (1) they cannot send any of these magazines

10   back to the manufacturer, they will not take them; (2)

11   they cannot sell used magazines for liability reasons,

12   other dealers will not buy used magazines due to the

13   potential liability if it doesn't work right, it's

14   defective, there's a problem with the gun, et cetera.

15        THE COURT:  Mr. Kelly, let's assume that there's

16   a taking -- and I know that's hotly contested and

17   well-briefed -- but I want to jump ahead to the

18   argument of the public safety exception to the takings

19   clause and tell me why this doesn't fall squarely

20   within that.

21        MR. KELLY:  Well, I've just indicated that there

22   are cases.  I've just cited a case which stands for the

23   proposition that -- that's the *Tahoe-Sierra Council v.*

24   *Tahoe Regional Planning* -- that if the government takes

25   possession of personal property, even if disposed in

1    the guise of public good, there has to be compensation.

2        THE COURT:  But that's public good, not the

3    public safety exception.  The public good, you know,

4    can be them taking over a Walmart to build a rotary in

5    the road.  But the public safety exception is specific

6    to public safety.

7        MR. KELLY:  I would say they're one and the

8    same.  The public condition and public safety, I would

9    suggest that they're the same.  The public condition,

10   if it's a safety issue you're affecting the public

11   condition, et cetera.  So I would -- in the *Horne*

12   case Justice Holmes noted "A strong public desire to

13   approve the public condition is not enough to warrant

14   achieving desire by a shorter cut than the

15   constitutional way, regarding condemnation.  The

16   district court in *Duncan* held there was a taking, and

17   of course the ban was illegal, and the Ninth Circuit

18   initially upheld the district court on prohibiting the

19   ban, and *en banc* the Ninth Circuit reversed that,

20   although with all due respect, the Ninth Circuit hasn't

21   seen a gun control law yet that they (indecipherable)

22   upheld.

23       THE COURT:  I'll have you end on that note.

24   It's brought a smile to my face.

25       And let's hear from the State.  I will say that

1    the briefing by all sides on all of the issues was

2    incredibly helpful and incredibly well done.

3         MR. KELLY:  Thank you.

4         THE COURT:  I truly appreciate that.

5         MR. KELLY:  A lot of reading.

6         THE COURT:  Yes.

7         Ms. Rice.  Do you have your own show-and-tell,

8    Ms. Rice?  Do I need to pull up my screen?

9         MS. RICE:  Not on the screen, thank you.  I do

10   have Mr. Kelly's glasses, which I'm returning to him.

11        And I did want to make care of a little

12   housekeeping off the top if I can.  Mr. Kelly -- and I

13   apologize for not doing this in the very beginning --

14   but Mr. Kelly submitted this morning on the docket an

15   affidavit of Will Worthy at 10:00 a.m. and this comes

16   in well after briefing was due.  It is cumulative.

17        THE COURT:  I haven't seen it.

18        MS. RICE:  Okay.  So I thought that that might

19   be the case.  I would like to put on the record our

20   objection because it is out of time and cumulative.

21   But in the event that your Honor is inclined to admit

22   it, I have an exhibit that goes to one point in that

23   affidavit that I would like --

24        THE COURT:  Why don't you do this, Ms. Rice.

25   Rather than take up your valuable time on the meat of

1    your argument, why don't you put that in a notice or

2    pleading and attach what you would.  If I do decide to

3    accept it, attach what you would anyways so we have it

4    all there.

5              MS. RICE:  We'll do that, your Honor.  No

6    problem.

7              THE COURT:  Thanks.

8              MS. RICE:  Good afternoon.  As *Bruen* noted,

9    firearms restrictions are an active response to a

10   particular general societal problem that exists at the

11   time that that regulation was enacted.  Today, Rhode

12   Island's large capacity feeding device restriction was

13   enacted in response to mass shootings and gun violence

14   enabled by an unfettered civilian access to weapons and

15   weapons accessories that are most well-suited for war.

16   That problem continues today.  Since the State's

17   opposition was filed, there had been numerous incidents

18   involving large capacity magazines.  Probably the most

19   notable occurred on October 24th where there was the

20   school shooting in St. Louis, Missouri, that left two

21   killed, four who were shot and injured.  Recovered at

22   the scene were over 600 rounds of ammunition and 12

23   30-round large-capacity magazines.  Just up the road in

24   Raleigh --

25             THE COURT:  Can I interrupt you, Ms. Rice.

1    Didn't *Bruen* teach us or at least the dissent in *Bruen*

2    believed that *Bruen* teaches us that current analysis

3    that the Supreme Court requires doesn't have a place

4    for considering public safety as part of the

5    constitutional analysis.  It does on the takings

6    clause, but on the Second Amendment part didn't *Bruen*

7    wipe that out of what was then the *Heller* analysis?

8         MS. RICE:  So *Bruen* certainly got rid of the

9    tight nexus of means and scrutiny that evolved in

10   post-*Heller* circuit court precedent, but it did not

11   take away the fact that regulations enacted in response

12   to facts on the ground.  That's what history and

13   tradition are made out of.

14        THE COURT:  Right.  But if facts on the ground

15   showed that it was dangerous for people to keep a

16   single-shot revolver in their home, *Heller* would strike

17   that down under the Second Amendment.  That's not part

18   of the analysis anymore.

19        The part of the analysis is does the Second

20   Amendment apply, textual analysis; secondly, based on

21   case law that the (indecipherable) I think it's pretty

22   clear as to they're for self-defense, and then if not

23   then you go into the full Second Amendment analysis,

24   right, of historic tradition, however that's going to

25   play out over the years in the analysis that way,

1   doesn't it?  I mean...

2       MS. RICE:  Certainly I agree that there are two

3   steps in scope on the Second Amendment and then we get

4   to history and tradition.  It's not unless you get to

5   history and tradition that facts really come into play.

6   But I would submit that even *Heller* needs to be

7   justified under that historic and tradition analysis

8   that both *Bruen* and *Heller* ultimately went through.  So

9   when we're talking about the facts, we're looking at

10  societal historic facts.  We're looking at are the

11  facts analogous in history to the times that we imposed

12  regulations and --

13      THE COURT:  Can I ask you the same question I

14  asked Mr. Kelly, which is the overriding difficult

15  issue when one has to sit and figure out how one

16  analyzes under this new Supreme Court opinion, which is

17  how are district courts, how am I to deal with

18  competing affidavits that in many instances say the

19  exact opposite?  How is this Court based on those

20  affidavits to evaluate the information that each side

21  submits?

22      MS. RICE:  Your Honor, that's certainly a

23  difficult problem, but *Bruen* gives us some hints.  It

24  talks about party presentation of the evidence, and I

25  think that our system is prepared to look through party

1    presentation of the evidence of competing experts.  We

2    do it in other contexts all the time.  The difference

3    here is that the experts are historians.  That is a

4    little bit odd; we don't have a lot of other areas of

5    the law with which I'm familiar where the expert

6    evidence is being presented by historians.

7         I think there's another danger there, which is

8    that the Court obviously and lawyers are usually pretty

9    interested in history and have some ability, unlike say

10   perhaps soil samples, to do their own digging in the

11   historic record.  But that impulse needs to be resisted

12   because this issue, just like any other, needs to be

13   decided through the normal mechanisms of party

14   presentation.  And I think our normal mechanisms also

15   answer why it's so difficult now here at preliminary

16   injunction to look at these two sets of competing

17   affidavits.  But fortunately we still have our

18   traditional preliminary injunction standard to help us

19   out.

20        So under the standard for review for preliminary

21   injunction, The Plaintiffs are never awarded injunctive

22   relief as of right, and they're required to make a

23   showing of a strong likelihood of success on the

24   merits.  So in the event that the Plaintiffs have

25   not -- there is equipoise between the two evidentiary

1    records, then the Plaintiffs have not made that strong

2    likelihood of success on the merits and the case can

3    continue on to develop the facts further so that

4    hopefully in the end you wouldn't have balanced

5    competing affidavits.

6         THE COURT:  So let's -- thank you, that was

7    actually helpful to begin to think about this.  Let's

8    jump to the first what I'll call preliminary question

9    that I questioned Mr. Kelly about, which is, is a

10   magazine an arm or an accoutrement -- or an

11   accoutrement, depending on who you ask how to pronounce

12   it, or whether you're French or not.

13        First of all do you think that's, is that an

14   appropriate distinction and, if so, why is a magazine

15   in the State's opinion an accoutrement and not an arm?

16   And let me throw in to respond to Mr. Kelly's argument

17   where Justice Thomas said the bullet is part of the arm

18   because without a bullet you can't have a gun.

19        MS. RICE:  Certainly, your Honor, and thank you.

20   So the State does believe that it is extremely relevant

21   whether or not something is an arm or an accoutrement,

22   and that's because we've been tasked with *Bruen* to

23   start with the text of the Second Amendment, and the

24   text of the Second Amendment is clear.  In *Heller* the

25   court explained that the object of the Second Amendment

1   is arms.  It then went on to look at a number of

2   historic definitions of arms, which are usually weapons

3   of offense or armor or defense, and anything that a man

4   wears for his defense or takes into his hands or uses

5   in wrath to cast out or strike another.  So we really

6   have something that can be used to hurt someone.

7          Now, as to why the State believes that a

8   large-capacity magazine is not an arm, we just saw an

9   example, a very common example of a large-capacity

10  magazine, and when you pick it up, it is not something

11  that you can immediately use to injure somebody else

12  any more than you could a stapler or something that

13  everybody would accept is not an arm.

14          THE COURT:  But doesn't that argument also apply

15  to bullets?

16          MS. RICE:  This is where I think a distinction

17  needs to be made about the burden on the Second

18  Amendment right and the Second Amendment right itself.

19  So the Second Amendment, the scope of the Second

20  Amendment covers arms.  You can burden that right by a

21  regulation that might not have as its direct object to

22  arms.  You see this in the First Amendment context as

23  well where you get indirect burdens sometimes.  So you

24  could have a burden on the Second Amendment by

25  regulating bullets.  It would be an indirect burden.

1    You could similarly have, say if you did bar magazines

2    entirely perhaps at some point and there was no

3    technical alternative to feeding bullets, then you

4    might have an indirect burden on the right to bear

5    arms, the firearm, the actual weapon itself.  But that

6    doesn't mean that the bullet or the large-capacity

7    magazine is in the scope of the Second Amendment, if

8    that makes sense.

9            THE COURT:  It absolutely does.  Thank you.

10            MR. KELLY:  Okay.  And I think that's really

11    important because we do regulate bullets.  Rhode Island

12    has a law that prohibits armor-piercing bullets, for

13    example, so there are times of regulations that the

14    state and federal government have made on various

15    munitions.  There are other kinds of bullets that have

16    import restrictions.  There are just very many examples

17    where you're going to have this question of like what

18    exactly is a firearm, and it's a complex one.  The ATF

19    has many, many regulations about what makes up a

20    firearm.  The federal register is full of discussion

21    about this.  I think at the moment it is the lower

22    register of the gun that defines what is and is not a

23    firearm, and so that epistemological question of what

24    is a firearm is complicated.

25            But I think, here, it's not so complicated.  A

1       large-capacity magazine clearly is not a firearm.

2               THE COURT:  Again, I have no factual knowledge

3       of guns, so you all with more knowledgeable can correct

4       me.  But if they did or could manufacture a gun that

5       had a permanent magazine attached into it in excess of

6       10 rounds, is that prohibited under the Rhode Island

7       statute?

8               MS. RICE:  So the Rhode Island statute has

9       exemptions that would exempt almost all existing

10      firearms or if not all -- we were not, the State was

11      not able to definitively rule out the fact there might

12      be one or two types of firearms that might be in that

13      configuration that you're talking about.  But primarily

14      the configuration would be something with an integrated

15      magazine, and we talk about it here, a tubular

16      magazine.  Those are kind of -- I've been told they're

17      Boy Scout guns, that they're ones the Boy Scouts use

18      for shooting practice or others use for shooting

19      practice.  So those are exempted and not included in

20      the ban.  Other kinds of guns that generally have that

21      type of an integrated magazines are bolt action

22      shotguns, or perhaps lever actions, something that's

23      not actually semi-automatic.  This restriction is

24      two-fold.  You have to have a semi-automatic firearm

25      and a large-capacity magazine combined to trigger the

1     ban on the large-capacity magazine, so if the weapon

2     itself is not semi-automatic then the Large Capacity

3     Feeding Device Ban does not apply.  Oftentimes also,

4     it's my understanding that those integrated magazines

5     in other applications don't hold more than 10.  So that

6     was what we were able to discover.  That's backed up by

7     the affidavit of Mr. Troiano who avers that most

8     firearms would not be in that configuration of an

9     internal magazine.

10          THE COURT:  I think he testified before me once.

11          MS. RICE:  Probably, yes.  And these are all

12    extremely helpful questions.

13          THE COURT:  Let's jump to the second, for lack

14    of a better term, preliminary analysis issue, and that

15    is whether the Second Amendment is for the purposes of

16    self-defense, and how do you respond to Mr. Kelly's

17    argument that a shotgun in the home in the bedside

18    stand with, you know, a 15-round magazine in it isn't

19    appropriate for self-defense from an intruder into the

20    home.

21          MS. RICE:  I think it is important to understand

22    why a gun would have a 15-round magazine in it, and

23    that's because of marketing.  It's a commercial choice

24    that guns began to be sold with these larger capacity

25    magazines.  There is no evidence in this record at all

1  that self-defense requires the use of more than 11

2  bullets, because you can have one in the chamber, and

3  it's been the uniform experience of courts that have

4  considered this matter that they have not found

5  evidence that more than 10 rounds are useful for

6  self-defense. And again, we have the affidavit of

7  Mr. Troiano on that point as well, that even law

8  enforcement officers almost never fire even 10 rounds

9  in offensive cases. And you can look in other cases,

10  other records, and you'll see the same set of evidence.

11  There have been statistical analyses, published studies

12  in medical journals that all come to the same

13  conclusion, and that is that there are very few and

14  sometimes no, depending on what database you're looking

15  at, instances where people successfully use more than

16  10 rounds in self-defense. There's maybe a handful of

17  incidents that have come up through the decade of

18  litigation on this issue. And it is very clear that

19  the question is whether the proscribed weapons are in

20  common use for lawful purposes like self-defense.

21  That's a direct quote from *Worman*, our First Circuit

22  case.

23       THE COURT: How applicable or how controlling is

24  *Worman* to me now in light of -- I think it was one of

25  those remanded post-*Bruen*. So just this is purely like

1    a legal wonky question, but how am I controlled by
2    *Worman* when it's in that procedural setting.
3         MS. RICE:  Yes, your Honor.  I would say that
4    you probably are not probably controlled by *Worman* at
5    this point, that it is in the process of being vacated.
6    But that doesn't mean that it can't be persuasive, and
7    it also doesn't negate the fact that you can take
8    judicial notice of the many myriad published opinions
9    of factual findings that all courts come to on this
10   issue.
11        And I think another interesting point that
12   *Worman* and also *Friedman* in the Seventh Circuit --
13   which I do not think was vacated -- make is that this
14   issue of dangerous and unusual really does hinge on the
15   use of for self-defense.  It can't be mere numerosity.
16   It can't be the fact that there are just many, many,
17   many of an object that are the controlling test for
18   whether or not it's unusual.
19        THE COURT:  Why wouldn't it be controlling as to
20   the unusual or at least a factor in determining
21   unusual?  I understand it's not a factor in the
22   dangerousness part of that, but why wouldn't numerosity
23   be relevant to whether an object is usual or not?
24        MS. RICE:  I wouldn't go so far to say it's not
25   relevant, but it's not controlling, and that's because

1    if it were controlling many of the decisions wouldn't

2    make senses.  The ban on machine guns, for example,

3    wouldn't make sense because Tommy guns like were

4    already in widespread use at the time that they were

5    banned; and it doesn't make sense because it gives the

6    legislature the severe perverse incentive to ban all

7    new technology as soon as it comes on the line; and

8    that's kind of what the Seventh Circuit in *Worman*,

9    their reasoning shows is that it's very difficult to be

10   consistent.  It's kind of a -- that would mean that

11   your constitutional rights were at the whim of the

12   marketplace, and there's no other constitutional right

13   that we allow that to happen.  So I think that it needs

14   to have very little relevance.

15        You can also look at the numbers at issue in

16   *Caetano* and the numbers at issue in the bump stock ban.

17   So we have Plaintiffs who --

18        THE COURT:  I'm trying to get my head my around

19   what a bump stock is, but you don't have to go into it.

20   It's not a clear definition of bump stock when one does

21   a peripheral look at the internet to see that's what it

22   means.

23        MS. RICE:  I just think that that's true, that's

24   one of the things about gun regulation is that because

25   we're talking about kind of a mechanical object there

1    are many different ways that you can modify it and

2    therefore it's hard to define; you get back to this

3    sort of philosophical epistemological what is a gun

4    issue.  But for -- in terms of looking at Tasers, it

5    was around 200 to 300,000 is what Justice Alito cited

6    to as being in common use for self-defense, whereas

7    bump stocks was many more hundreds of thousands for

8    that.  And Plaintiffs even concede that bump stocks

9    probably are permissibly regulated under the Second

10   Amendment.  So it can't turn on the actual number in

11   circulation.

12          And the State has offered a theory about how we

13   can think about dangerous and unusual, and that is how

14   is the weapon used in its social context.  And you see

15   this in regulations that *Bruen* held up as probably

16   constitutional, like concealed carry.  If you look at

17   the history of open carry and concealed carry, and you

18   look at *Bruen* analysis of those laws you see that *Bruen*

19   notes when the statute of North Hampton was enacted

20   there was societal unrest.  When concealed carry was

21   prohibited of pistols in East New Jersey was

22   prohibited, that was a reaction to societal unrest.

23   And that pattern marches on through Reconstruction into

24   Post-Reconstruction into the regulation of

25   semi-automatic weapons by capacity, which started in

1     1927.  So for each of those time periods you see that

2     societal unrest and some perception that there was an

3     imbalance or unfairness in people's ability to defend

4     themselves because of the excessive fire power, there's

5     regulation to curtail the use of those kinds of

6     weapons.  And that's exactly what we have here today is

7     the curtailment of use of automatic, semi-automatic

8     weapons that we know are constitutional from *Heller* by

9     limiting the capacity of those weapons through this

10    regulation.

11         It's only if the Court finds that these

12    large-capacity magazines are in fact arms, and if the

13    Court finds that they are not dangerous and unusual

14    that we get down to the *Bruen* text and history

15    analysis.  And it is there that a closer read of the

16    relevant history and tradition is required.  But there

17    is no need to find a dead ringer analogue for the

18    regulation.  You don't need to find an historic

19    regulation that banned capacity of firearms in the

20    Founding Era, and in fact it would -- -

21         THE COURT:  Says who?

22         MS. RICE:  Says *Bruen*.  That specifically said

23    that we need a well-established and representative

24    historical analogue, not an historical twin and said

25    that you would not necessarily find a dead ringer;

1    instead we analogize the how and the why and find the

2    comparable burden and comparable justification.

3            And this is why you're not going to find in the

4    Founding Era a limit on capacity.  We talked a little

5    bit about the content of the affidavits on what kinds

6    of firearms existed at the Founding, and I would submit

7    that what kinds of firearms that existed at the

8    Founding isn't in real factual dispute here, but what

9    is disputed is what does the existence of each of those

10   firearms mean in terms of if there was an experimental

11   idea for a gun or a prototype, one of which survives in

12   the Smithsonian, does that have relevance to the

13   absence of regulation, and we would submit that it does

14   not.  There was no widespread use.  We don't have

15   evidence of wide-spread use from Ms. Hlebinsky's

16   affidavit.  We have one instance in which the Giardoni

17   air rifle was used.  If you look at the sources, you

18   see that the Lewis and Clark Expedition only used that

19   rifle in the broadest sense.  They brought it as an

20   example of European technology to show it off.

21           And, you know, we know this also from our

22   general knowledge of history, but in our affidavits we

23   talk about how at the time most people had black powder

24   weapons, and these weapons themselves are black powder

25   weapons; very difficult to load, you couldn't keep them

1    loaded in your home.  They were very rarely used.  Even

2    when people committed murder they were only used in

3    about 10 or 15 percent of murders, any gun, any

4    firearm.  So we didn't have this problem of widespread

5    gun violence or murder by guns.  And it turns out too

6    that around the Founding there was a period of relative

7    social harmony at least in the North, so it's another

8    reason why you're not going to find historical

9    analogues from that time.

10            When you do start to see historic analogues is

11   when you have a period of societal unrest, and there

12   are in fact technological advances that show this

13   difference in firepower that we've been talking about,

14   and that's during Reconstruction.  There is some I

15   think tension between the two affidavits here as well,

16   but most of that can be explained if you drill down on

17   the time period.

18            So we know that immediately prior to

19   Reconstruction and during the Civil War and immediately

20   prior to the Civil War, there were many racist gun

21   restrictions enacted in slave holding states; but these

22   are not gun restrictions to which we ask the Court to

23   analogize?  Everyone agree or -- we agree and that

24   those restrictions are not appropriate analogues.

25   Instead, we look at the actual history of

1    Reconstruction.  That's after the Civil War is over,

2    when the Fourteenth Amendment is being ratified by the

3    states, and when the United States Army is working very

4    hard to protect these new-found and hard-won rights for

5    Black Americans; and it's that period of time that we

6    have shown that there is a regulation of these guns

7    through enforcement, that the state militias, the Army

8    worked very hard to keep these larger capacity more

9    powerful weaponry out of the hands of the

10   insurrectionists.  They intercepted shipments.  They

11   made sure that these guns were not going to the KKK.

12        THE COURT:  Is enforcement equal in our analysis

13   of historic tradition with regulation and statute?

14        MS. RICE:  I would say that regulations and

15   statute do not have to be just the written regulations

16   and the written statutes.  The court looked very

17   closely at the common law when it talked about the

18   history of regulation in both *Bruen* and *Heller,* and the

19   common law is in part made up of enforcement.  At the

20   time -- and this is still history that is being

21   uncovered and researched.  As we speak people are

22   starting to unearth the court records, things like

23   grand jury records and other arrest records as kind of

24   we are looking; it's newly relevant history that people

25   have not necessarily done before.

1        But yes, this enforcement at the time, we're

2    talking about a period of extreme societal unrest and

3    it can happen.  It explains kind of how are these

4    weapons treated at the time, who had access to them and

5    why, and only certain limited populations, mostly law

6    enforcement, had access to the weapons.  And why,

7    because they were viewed as dangerous and unusual at

8    the time and so there was concerted action by the

9    government to restrict them.

10        We don't talk about the First Amendment only in

11    terms of published regulation or published law.  We

12    look to see how governments actually treat speakers

13    before them as well.  So I would think that, yes,

14    enforcement would also be a good source.

15        So we do have -- Dr. Vorenberg's affidavit goes

16    into a lot of detail on this, which I could never hope

17    to repeat here so I will not attempt to do that.

18        THE COURT:  I was actually fascinated by it as

19    an historic piece.

20        MS. RICE:  Yes,/ so, but that was --

21        THE COURT:  I'm not saying like it's relevant to

22    the analysis.  I'm not saying...

23        MS. RICE:  Understood, your Honor, yes.  But we

24    do believe that that is relevant to the analysis and we

25    do believe that it's important to note that all of that

1   enforcement action was being taken in defense of Black

2   Americans' right to arms self-defense.  Black Americans

3   at the time for the first time were getting access to

4   Second Amendment rights, and those rights were

5   vindicated with weapons that were less powerful than

6   the Henrys and the Winchesters at the time.

7        Of course technology keeps going, so, you know,

8   shortly thereafter we're going to get to a period of

9   time where there are more powerful weapons than the

10  Henrys and the Winchesters when semi-automatics come on

11  the scene, because those rifles were bolt action, so

12  they were not semi-automatic, and so if anyone has one

13  hanging around today they wouldn't be covered by the

14  large-capacity magazine ban.  But at the time they were

15  dangerous and unusual.  As throughout history dangerous

16  and unusual weapons were regulated, they were

17  regulated, and when they were displaced with even more

18  powerful weapons, those weapons were also regulated

19  first in the hunting context and then in bans that 13

20  states passed between 1927 and 1934, and then the

21  federal government began to ban machine guns.  So you

22  see that arc repeating itself.

23        I think one other thing that I wanted to address

24  was the issue of whether sporting could be a part of

25  the Second Amendment right.  It is, of course, the

1    State's position that we know from *Heller* and we know

2    from *Bruen* that that's not the case; that's

3    self-defense.  There was a Seventh Circuit case, *Ezell*,

4    that we do cite to in our briefing that made some

5    reference to a corresponding right to acquire and

6    maintain proficiency in the use of weapons, but there's

7    nothing about the large-capacity magazine ban that

8    would implicate that in any event because you can take

9    your firearm that you own to the gun range and fire any

10   number of bullets to your satisfaction and go home and

11   watch the football game.  That's all permitted under

12   this regulation.

13        THE COURT:  So when one looks perhaps only in

14   the takings analysis, but when one looks at the public

15   safety aspect of this ban, the benefit to the public

16   that supports it is really pause a moment; right?

17        MS. RICE:  Yes.

18        THE COURT:  And the amount of time it takes for

19   a shooter to switch magazines, ending one, starting

20   another, is the benefit of this ban; right?

21        MS. RICE:  That's the benefit of the ban.  And I

22   think you can see that discussed at length in the

23   *en banc* opinion in *Colgate* which really gets into the

24   detail of all of the events that have happened where a

25   chance would have helped.  So the Newtown report

1    demonstrates that.  There's evidence from the Las Vegas

2    shooting that people ran for cover during pauses in

3    magazine changes.  And that was a shooter who was very

4    skilled, had a lot of ability.

5        THE COURT:  What do you say to Mr. Kelly's

6    argument that the marksmen or, you know, marksmen

7    oftentimes within a second or two can change the

8    magazine.  What is the public benefit there?

9        MS. RICE:  Sure.  Two things.  A second or two

10   could really mean the difference between someone being

11   able to take an action -- run, flee, hide -- and not,

12   because not all people involved in the incident are

13   going to be targeted at the same time.  Second, that

14   public policy is imperfect.  The court recognizes that,

15   you know, in *Jacobson*, as long ago as that, we kind of

16   realize that legislatures have to be free to legislate

17   for public safety, that when constitutional rights

18   aren't in place, so like if we're not infringing on the

19   Second Amendment right we only need to come up with the

20   rational basis.  We only need to show that there's some

21   conceivable connection so that we can experiment and

22   bring, bear out that federalistic experiment that the

23   Founders envisioned.  And I think that that's very

24   important.  There are a limited tools, and rightly so.

25   That's the structure of our government.  The government

1    in the United States is limited.  So what the

2    government can do to protect public safety within those

3    tools, they need the full span, and whether or not it's

4    actually successful is exactly the analysis that *Bruen*

5    told us we could no longer look at.  That nexus between

6    means and ends is no longer relevant to the Second

7    Amendment.

8         THE COURT:  Let's jump into the takings, and can

9    you, using Ocean State Tactical in particular, who

10   Mr. Kelly represents, has an inventory of, if the

11   injunction doesn't go forward is useless supplies that

12   the government through its regulation has determined

13   from a profitable expect to a zero sum aspect for them.

14   How is that not a taking?

15        MS. RICE:  Sure.  So there's kind of two points

16   there.  The first is that the public safety exception

17   does apply.

18        THE COURT:  I realize that maybe I shouldn't

19   have said exception because it's not really an

20   exception; it's a definition of taking.  But get at

21   the -- putting that aside for a second, why isn't that

22   a Fifth Amendment taking?

23        MS. RICE:  Sure.  So we're, again, not talking

24   about a seizure, which is very important in the

25   analysis.  There's a different standard that applies.

1    Here -- and it's a full economic taking, taking of all

2    the economic value when you're talking about personal

3    property as regulatory, it's not a seizure of property.

4         And here, there's residual economic value that

5    is still available.  Even if there's no market, there

6    is the ability retained in the law for Ocean State

7    Tactical to sell this excess inventory out of state.

8    Ocean State Tactical can take that capital asset and

9    modify it themselves.  So they have the ability to sell

10   out of state already because of they're a

11   federally-licensed firearm dealer.  And again, we're

12   here on an injunction, and Ocean State Tactical has not

13   put in any evidence that this is an existential threat

14   to their business.  The evidence that they put in about

15   revenue just was not enough to get them over that

16   threshold, and so an injunction is not warranted under

17   the standard because it's fully remediable by monetary

18   damages at the end of the case.

19        THE COURT:  Or irreparable harm.

20        MS. RICE:  And you wouldn't be alone if you

21   found that this kind of a law left residual value.

22   That's exactly what the Third Circuit found in the

23   *Association of New Jersey Rifle and Pistol Clubs v. The*

24   *Attorney General of New Jersey*.  And there was another

25   district court in California, *Weise*, that found that a

1    similar ban was not a taking, not on the public safety

2    rationale, which is what *Bonta* found, but on this other

3    issue.  And in fact that's also -- I think that that

4    was the grounds for *Fesjian*, which is the machine gun

5    takings case as well.

6         THE COURT:  Am I bound by the legislature's

7    finding of public safety in promulgating this

8    regulation when one analyzes the takings aspect of

9    this?  In other words do I accept the fact that the

10   policymaking arm of government, the legislature,

11   determined that it was a public safety reason for its

12   passage and ergo not a taking?  Or is mine an

13   independent analysis that I look outside of that for

14   determination?

15        MS. RICE:  I do think that it would be --

16        THE COURT:  There's language somewhere, I forget

17   where it's from, I don't know if it was from -- it was

18   from some of the takings cases that you all cited where

19   it seemed to imply great deference if not almost

20   adherence to the policymaking branches for that

21   determination.

22        MS. RICE:  Yes, I think that's right that great

23   deference is owed.  That is the standard.  Let's see.

24   Yes, so I mean that is the standard all the way back to

25   1887 in *Mugler v. Kansas* that --

1    THE COURT:  Excellent.

2    MS. RICE:  -- that are declared by valid

3    legislation to be injurious to the health, morals or

4    safety of the community cannot in any just sense be

5    deemed a taking.

6    THE COURT:  That was exactly the quote I was

7    thinking of because it says as determined by the

8    legislature.

9    MS. RICE:  By the legislature.  So I think that

10   that is definitely where you're starting from.  And

11   think about it.  This happens kind of with fair

12   frequency of probably -- and *Duncan* spoken about this.

13   Every time a new drug is manufactured, like we get a

14   designer on the scene and it's added to the schedule,

15   there's a period of, there's a lag period between the

16   time the drug is invented, like synthetic marijuana,

17   and the time that it is added to the Controlled

18   Substances Act Schedule; and in between that time

19   people lawfully possess that substance, that chemical,

20   and automatically when that is added it's contraband.

21   People are not entitled to a taking for the loss of

22   their property in those banned chemicals.  So this

23   happens quite often.  It's not really an unusual event

24   that the legislature would deem something to be

25   injurious to the public.

1          THE COURT:  Is there any evidence that you know

2     of that the legislature considered compensating folks

3     like Ocean State Tactical and perhaps citizens for the

4     value of the illegal magazines?

5          MS. RICE:  The only legislative history that I

6     know of -- and we did examine this in coming up with

7     our arguments here -- is the hearing at which the Chief

8     of Police for the Providence Police Department

9     testified, so that is linked in our briefing.

10          THE COURT:  I read it.  Colonel Clements'

11    testimony.

12          MS. RICE:  Yes.  And other people testified at

13    that time in the committee.  But there is no other

14    (indecipherable) legislative history.  The Rhode Island

15    General Assembly does not keep written records of that.

16          THE COURT:  Probably a good thing.

17          MS. RICE:  At least a good thing for those whose

18    job it is to keep voluminous records.

19          THE COURT:  Ms. Rice, why don't you wrap up.

20          MS. RICE:  Thank you, your Honor.

21          So as you can see from this argument, these are

22    very important and pressing issues of public importance

23    balancing the Second Amendment rights that people have

24    to defend themselves with firearms, with reasonable

25    public safety measures that protect us all from those

1    lone actors and criminals that would seek to abuse

2    those rights.  And we submit we think there's a lot of

3    evidence here that this kind of restriction on an

4    accessory is a way to make that balance appropriately,

5    and we would urge you therefore to deny the preliminary

6    injunction at this time.

7          THE COURT:  Thanks.  Well, I'm not going to do

8    either at this time.  I'm going to get you a decision

9    as soon as I can; hopefully before the statute requires

10   the alleged taking part to go into effect.  We'll act

11   as quickly as we can.

12         Mr. Kelly, do you want your -- I don't see any

13   reason to keep this (gesturing).

14         MR. KELLY:  If I could have one minute to reply

15   to some of the questions you asked me.

16         THE COURT:  No.  As I said, everything was

17   briefed very well, and I promised my staff I would

18   limit it.

19         MR. KELLY:  Would it be possible to file just a

20   short 10-page supplement to address some of the issues

21   you raised?

22         THE COURT:  You are always welcome to request

23   further brief, sure.

24         MR. KELLY:  Would you like me to do that by

25   motion, your Honor, or...

1          THE COURT:  I would like you to; unless the

2     State wants to allow short supplemental.

3          MS. RICE:  We would not agree to that.

4          THE COURT:  Why don't you do it by motion,

5     Mr. Kelly.  Do a motion with it attached.

6          MR. KELLY:  Thank you.

7          THE COURT:  Thanks.  Again, I couldn't be

8     prouder to be a member of this Bar with the advocacy

9     that's taking place by both sides.  It was outstanding.

10    I tell everyone that sometimes that makes my job

11    easier, but more often than not like this it makes my

12    job a heck of a lot harder, so thank you to all

13    counsel.

14         MR. KELLY:  Thank you, your Honor.

15         MS. RICE:  Thank you, your Honor.

16         (Adjourned)

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3

4

5

6          I, Denise P. Veitch, RPR, do hereby certify

7     that the foregoing pages are a true and accurate

8     transcription of my stenographic notes in the

9     above-entitled case.

10

11

12

13                    /s/ Denise P. Veitch_
                      Denise P. Veitch, RPR
14                    Federal Official Court Reporter

15

16

17                    January 6, 2023
                      Date
18

19

20

21

22

23

24

25