**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| OCEAN STATE TACTICAL, LLC d/b/a BIG BEAR HUNTING AND FISHING SUPPLY; JONATHAN HIRONS; JAMES ROBERT GRUNDY; JEFFREY GOYETTE; and MARY BRIMER,<br><br>*Plaintiffs*,<br><br>v.<br><br>STATE OF RHODE ISLAND; PETER F. NERONHA, in his Official Capacity as the Attorney General for the State of Rhode Island; and DARNELL S WEAVER, in his Official Capacity as the Superintendent of the Rhode Island State Police,<br><br>*Defendants*. | No. 1:22-cv-00246-JJM-PAS |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


TABLE OF CONTENTS .................... i

TABLE OF AUTHORITIES .................... ii

INTRODUCTION .................... 1

BACKGROUND .................... 2

A. Legal and Factual Background .................... 2

B. Procedural Background .................... 4

ARGUMENT .................... 7

I. HB6614 Violates The Second Amendment. .................... 7

A. The Second Amendment Presumptively Protects the Ammunition Feeding Devices that HB6614 Bans .................... 7

B. There is No Historical Tradition Supporting HB6614's Ban on Common Arms .................... 8

II. HB6614 Violates The Takings Clause. .................... 14

III. HB6614 Violates The Due Process Clause .................... 16

CONCLUSION .................... 18

# TABLE OF AUTHORITIES

**Cases**

*Andrus v. Allard*,
444 U.S. 51 (1979) ... 15

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
183 F.4th 211 (3d Cir. 2026) ... *passim*

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ... 6

*Capen v. Campbell*,
134 F.4th 660 (1st Cir. 2025) ... 13

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ... 14

*Chi., Burlington & Quincy R.R. Co. v. City of Chicago*,
166 U.S. 226 (1897) ... 14

*Chi., Burlington & Quincy Ry. Co. v. Illinois ex rel. Grimwood*,
200 U.S. 561 (1906) ... 15

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ... *passim*

*E. Enters. v. Apfel*,
524 U.S. 498 (1998) ... 16

*Garland v. Cargill*,
602 U.S. 406 (2024) ... 12

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024) ... 8, 10, 12

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ... 10

*Horne v. Dep't of Agric.*,
576 U.S. 351 (2015) ... 14, 15

*Kelo v. City of New London*,
545 U.S. 469 (2005) ... 15, 16

*Kolender v. Lawson*,
461 U.S. 352 (1983) ... 17

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) ........ 16

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ........ 14, 15

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ........ 15

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ........ 2, 7, 8, 10

*Ocean State Tactical, LLC v. Rhode Island*,
646 F.Supp.3d 368 (D.R.I. 2022) ........ *passim*

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024) ........ *passim*

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978) ........ 15

*Peoples Rights Org., Inc. v. City of Columbus*,
152 F.3d 522 (1998) ........ 16, 17

*Recchia v. Campbell*,
183 F.4th 1 (1st Cir. 2026) ........ 14

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) ........ 14

*United States v. Hemani*,
608 U.S. 772 (2026) ........ 8, 13

*United States v. Rahimi*,
602 U.S. 680 (2024) ........ 8, 12

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ........ 13, 15

*Usery v. Turner Elkhorn Mining Co.*,
428 U.S. 1 (1976) ........ 16

*Wolford v. Lopez*,
146 S.Ct. 2032 (2026) ........ *passim*

**Constitutional Provisions**

U.S. Const. amend. V ........ 14

**Statutes**

R.I. Gen. Laws §11-47.1-2(2) .......... 2

R.I. Gen. Laws §11-47.1-3(a) .......... 2

R.I. Gen. Laws §11-47.1-3(b)(1) .......... 4, 14, 15, 16

R.I. Gen. Laws §11-47.1-3(b)(2)-(b)(3) .......... 4

**Other Authorities**

Brief in Opp., *Ocean State Tactical, LLC v. Rhode Island*, No. 24-131 (U.S. Nov. 5, 2024) .......... 13

Crime Prevention Rsch. Ctr., *Ten Cases Over The Last Few Years Where People Have Had To Fire Ten Or More Shots In Self Defense* (Oct. 22, 2020) .......... 10

William English, *2026 National Firearms Survey: Results from the Second Wave, Including Current Ownership of AR-15 Style Rifles, Other "Assault Weapons," and Magazines that Hold More than 10 Rounds* (Georgetown Univ., Working Paper: Aug. 2026), perma.cc/L535-DTQF .......... *passim*

G. Halek, *Houston Concealed Carriers Unload on Armed Muggers—Why We Travel in Packs*, Concealed Nation (Dec. 21, 2015), perma.cc/X33S-89KZ .......... 10

Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3d ed. 2021) .......... 3

David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com (Nov. 20, 2022), perma.cc/T99Z-GAL5 .......... 12

David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) .......... 3, 11

Glenn Puit, *DA: Fatal Shooting In Parking Lot Was "Clear Case of Self-Defense,"* Las Vegas Review-Journal (May 4, 2020), perma.cc/S787-8KWA .......... 10

*Gun Digest 2018* (Jerry Lee & Chris Berens eds., 72d ed. 2017) .......... 3

*Gun Shop Owner Shoots, Kills Man During Attempted Robbery*, WIS TV (Aug. 9, 2012), perma.cc/P6ZT-KHT7 .......... 10

Gus G. Sentementes & Julie Bykowicz, *Documents Detail Cross Keys Shooting*, Balt. Sun (Mar. 21, 2006), perma.cc/PC7R-289A .......... 10

Jacob Sullum, *The Threat Posed by Gun Magazine Limits*, Reason (Jan. 16, 2013), perma.cc/KQS2-HYS3 .......... 10

*Jewelry Store Burglarized, Scene of Deadly 1994 Robbery Attempt*, nbc12.com (2012), perma.cc/B3NN-CDSL ................ 10

Magazine, *The American Heritage Dictionary of The English Language*, perma.cc/CL4D-XJJD ................ 8

Nat'l Shooting Sports Found. ("NSSF"), *Detachable Magazine Report, 1990-2021* (2024), perma.cc/4VXU-DJWA ................ 2, 9

NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), perma.cc/A6BR-PQYV ................ 3

Resp. Br., *OST v. Rhode Island*, No. 23-1072 (1st Cir. filed June 21, 2023) ................ 15

Taking, *Black's Law Dictionary* (12th ed. 2024) ................ 14

## INTRODUCTION

Rhode Island has made it a felony, punishable by up to five years in prison, for otherwise-law-abiding members of the public to possess ammunition feeding devices capable of holding more than ten rounds, even though tens of millions of Americans possess hundreds of millions of these arms for lawful purposes, including self-defense. Making matters worse, the ban applies retrospectively: Under House Bill 6614 ("HB6614"), Rhode Islanders who lawfully acquired the now-outlawed magazines must surrender them, permanently alter them, or transfer them out of state, without any compensation from the state. HB6614 thus not only prohibits keeping arms in violation of the Second Amendment, but forces citizens to dispossess themselves of lawfully acquired property, in violation of the Takings Clause. It also threatens criminal punishment under terms that fail to provide fair notice regarding what compliance requires, in violation of the Due Process Clause.

Plaintiffs acknowledge that this Court and the First Circuit rejected Plaintiffs' claims at the preliminary-injunction stage and that the Supreme Court denied Plaintiffs' petition for writ of certiorari (with three Justices voting to grant). Plaintiffs respectfully maintain that those decisions were mistaken. Plaintiffs also respectfully submit that, regardless of whether those decisions correctly applied Supreme Court caselaw as it then existed, subsequent decisions from the Supreme Court confirm that HB6614 violates the Second Amendment. That said, Plaintiffs recognize that the First Circuit has treated its preliminary-injunction-appeal decision in this case as controlling the disposition of final-judgment appeals in related cases, notwithstanding either the difference in procedural posture or the Supreme Court's intervening authority. But Plaintiffs respectfully submit that the First Circuit was wrong to do so, and thus move this Court to grant Plaintiffs' motion for summary judgment and hold HB6614 unconstitutional.

## BACKGROUND

### A. Legal and Factual Background

On June 20, 2022, just days before the Supreme Court reiterated that "the Second Amendment protects the possession and use of weapons that are 'in common use,'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)), Rhode Island made it unlawful to "manufacture, sell, offer to sell, transfer, purchase, possess, or have under [one's] control a large capacity feeding device," R.I. Gen. Laws §11-47.1-3(a), a term the statute defines as any "magazine, box, drum, tube, belt, feed strip, or other ammunition feeding device" that is "capable of holding, or can readily be extended to hold, more than ten (10) rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm," except for "attached tubular device[s] … capable of holding only .22 caliber rimfire ammunition," *id.* §11-47.1-2(2). The statute's prohibition is criminal, and the penalties for violating it are steep, including "imprisonment of not more than five (5) years." *Id.* §11-47.1-3(a).

HB6614's broad (mis)classification of what makes a feeding device "large capacity" captures magazines that tens of millions of Americans, many Rhode Islanders included, have long lawfully kept and borne for lawful purposes such as self-defense. Indeed, hundreds of millions of feeding devices that fit HB6614's definition of "large capacity" have been sold in the United States in the past few decades alone, *see* Nat'l Shooting Sports Found. ("NSSF"), *Detachable Magazine Report, 1990-2021* (2024), perma.cc/4VXU-DJWA (SUMF¶24, Ex.7), and they have been purchased and put to use by tens of millions of American gun owners, *see* William English, *2026 National Firearms Survey: Results from the Second Wave, Including Current Ownership of AR-15 Style Rifles, Other "Assault Weapons," and Magazines that Hold More than 10 Rounds*, at 32-34 (Georgetown Univ., Working Paper: Aug. 2026), perma.cc/L535-DTQF (SUMF¶25, Ex.8).

Moreover, the most common reasons cited for owning these arms are self-defense at home and about (88% of owners), recreational target shooting (64.6%), hunting (47.2%), prevention of animal attacks (32.4%), and competitive shooting sports (24.8%). *Id.* at 31-32 (SUMF¶27, Ex.8).

None of that should come as a surprise. The magazines Rhode Island now bans have long been lawful in most of the country (including, until 2022, Rhode Island), and they remain lawful in most states today. Tracking consumer preference, many modern handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629—come standard with such magazines. *See Gun Digest 2018* at 386-88, 408 (Jerry Lee & Chris Berens eds., 72d ed. 2017) (SUMF¶22, Ex.4) (listing multiple pistols that come standard with more than 15-round magazines). So do many modern rifles, including all the best-settling semiautomatic models. *See* NSSF, *Modern Sporting Rifle Comprehensive Consumer Report* 31 (July 14, 2022), perma.cc/A6BR-PQYV (SUMF¶23, Ex.5); Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 1993 (3d ed. 2021) (SUMF¶23, Ex.2).

And for good reason. Having enough ammunition at the ready—without having to expend time reloading manually—can be critical to citizens' ability to thwart would-be assailants or (preferably) to deter attacks before they begin. After all, "[w]hen a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm." David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015). And reloading in the heat of a home invasion or assault leaves the potential victim "especially vulnerable." *Id.* Americans have long selected ten-plus-round magazines to guard against that vulnerability.

Nor are their concerns theoretical. Studies estimate that Americans use firearms in more than 1.6 million "defensive incidents" annually. *See, e.g.*, English, *supra*, at 36, 64-65 (SUMF¶27, Ex.8). Most of these incidents involve handguns—and, as explained, the most popular handguns

come standard with magazines that hold more than ten rounds. Given the number of defensive uses and the popularity of such magazines, it is therefore apparent that firearms equipped with such magazines are used in thousands of defensive stands annually. Confirming as much, hundreds of respondents in a recent survey reported facing scenarios "in which it would have been useful for defensive purposes to have a firearm with a magazine capacity in excess of 10 rounds." *Id.* at 36, 73-76 (SUMF¶29, Ex.8).

Nevertheless, Rhode Island not only banned these ubiquitous magazines via HB6614, but took the extraordinary step of confiscating them from law-abiding citizens who lawfully acquired them long before the ban took effect. Citizens of Rhode Island who "lawfully possesse[d] a large capacity feeding device" before HB6614 was enacted and still possessed one when it took effect had to do one of three things—none of which included keeping their property intact—within 180 days of the Act's passage: (1) permanently alter their feeding devices to hold no more than ten rounds; (2) surrender them to the police; or (3) transfer or sell them to a third party outside the state who may lawfully own them. R.I. Gen. Laws §11-47.1-3(b)(1). The 180-day mark expired in December 2022, so any Rhode Islander who currently possesses in Rhode Island a magazine capable of holding more than ten rounds, save for the few narrow classes of exempted individuals (federally licensed firearms dealers, certain law-enforcement officers, and active-duty members of the U.S. Armed Forces or National Guard, *see id.* §11-47.1-3(b)(2)-(b)(3)), is now a criminal in the state's eyes.

### B. Procedural Background

Fearing criminal punishment should they continue to possess their lawfully acquired arms, Plaintiffs filed this lawsuit just days after HB6614 was enacted. This Court denied Plaintiffs' request for injunctive relief, holding that keeping ammunition feeding devices is not conduct presumptively protected by the Second Amendment. *See Ocean State Tactical, LLC v. Rhode*

*Island*, 646 F.Supp.3d 368, 385-90 (D.R.I. 2022). The Court posited that ammunition feeding devices are not "Arms" because people do not use the devices themselves "to cast at or strike another," and credited the views of "a professor of linguistics" who opined that such devices are better understood to be "accoutrements" that have no independent self-defense utility. *Id.* at 387-90. After those determinations, "the Court's Second Amendment analysis simply end[ed]." *Id.* at 390.

The Court also ruled against Plaintiffs on their remaining claims. The Court acknowledged that "the only way to comply with the statute for some plaintiffs … is to forfeit" their property without compensation, but found "no 'taking'" nonetheless. *Id.* at 390-98. According to the Court, a law that mandates forfeiture or destruction of lawfully obtained property is best deemed a mere "use restriction[]," which the Court considered exempt from Takings Clause scrutiny so long as it is an exercise of the "police power." *Id.* at 391-92. And after finding that HB6614's magazine ban "is a valid exercise of police power" and not impermissibly vague, the Court found all the remaining preliminary-injunction factors to favor the state. *Id.* at 374, 392-93, 399-401.

The First Circuit affirmed. At the threshold, the First Circuit assumed without deciding that magazines capable of holding more than ten rounds are "'arms' within the scope of the Second Amendment." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024). Turning to historical tradition, the Court posited that HB6614 "imposes no meaningful burden on the ability of [its] residents to defend themselves," since people rarely fire at would-be attackers all the ammunition in the magazines that they commonly keep and bear. *Id.* at 45. The Court then deemed HB6614 to be analogous in "how" it burdens Second Amendment rights to bans on *un*common arms that are "*un*protected by the Second Amendment" (like sawed-off shotguns and machineguns), concealed-carry bans, and outlier restrictions recognized either contemporaneously

or more recently to be inconsistent with our Nation's historical traditions. *Id.* at 45-47 & n.9 (emphasis added).

As for the "why" component of the analysis, the First Circuit focused on Bowie knives, sawed-off shotguns, and machineguns, and inferred from laws restricting them that the Second Amendment does not protect arms that the government deems too "dangerous." *Id.* at 47-50. The Court then posited that ammunition feeding devices that hold more than ten rounds are analogous to machineguns because they are "frequently used" in a semiautomatic AR-15 rifle, which it declared to be "almost the same gun as the M16 machinegun." *Id.* at 49 (quoting *Bevis v. City of Naperville*, 85 F.4th 1175, 1195 (7th Cir. 2023)). And the Court closed by declaring Rhode Island's magazine ban analogous to founding-era laws that "limited the quantity of gunpowder that a person could possess, and/or limited the amount that could be stored in a single container." *Id.* at 49.

The First Circuit's analysis of Plaintiffs' Takings Clause and Due Process Clause claims were equally unfavorable. Because Rhode Island gives citizens a menu of options for getting rid of their property—forced sale, government forfeiture, or compulsory modification—the Court held that HB6614 does not effect a physical taking. In its view, physical takings occur only when "the government necessarily occup[ies], tak[es] title to, or physically possess[es] the relevant item." *Id.* at 53. That Rhode Island gives (or at least gave) citizens "the option to sell, transfer, or modify their magazines" thus sufficed to defeat Plaintiffs' Takings claim. *Id*. The Court further held that HB6614 does not effect "a regulatory taking," on the theory "that property owners must 'necessarily expect[]'" the government to force them to "dispos[e] of" or destroy their property "from time to time." *Id.* (first alteration in original). As for Plaintiffs' due process claim, the Court stated simply that HB6614 has no impermissibly retroactive impact, and that it is not vague since citizens could conduct "Google search[es]" to resolve any confusion. *Id.* at 53-54.

Plaintiffs filed a petition for writ of certiorari. The Supreme Court denied the petition over the noted dissent of Justices Thomas, Alito, and Gorsuch.

**ARGUMENT**

**I. HB6614 Violates The Second Amendment.**

**A. The Second Amendment Presumptively Protects the Ammunition Feeding Devices that HB6614 Bans.**

As the Supreme Court recently reiterated, the first question "in a Second Amendment case" is "whether the law before [the Court] clashes with the 'plain text' of the Amendment's language." *Wolford v. Lopez*, 146 S.Ct. 2032, 2043 (2026). If it does, it implicates the Second Amendment, and the state bears the burden to prove it is "consistent with [our] Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Answering this first question does not require "a lengthy discussion of historical materials and precedents" to determine the full scope of the right the Second Amendment protects. *Wolford*, 146 S.Ct. at 2049. It requires only a straightforward inquiry into "how contemporaries understood the text." *Id.* at 2054 (Barrett, J., concurring).

There is no dispute that HB6614 restricts (really, destroys) the ability of the people to keep and bear firearms equipped with feeding devices that hold more than ten rounds of ammunition. Nor is there any question that firearms are "Arms." "Even the narrowest Founding-era definition of 'Arms' addressed by the *Heller* Court 'stated that all firearms constituted 'arms.''" *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.* (*ANJRPC*), 183 F.4th 211, 239 (3d Cir. 2026) (en banc) (quoting *Heller*, 570 U.S. at 581-82). And while this Court previously concluded that ammunition feeding devices likely are not "Arms," and instead are mere "accoutrements," 646 F.Supp.3d at 387-88, intervening Supreme Court precedent confirms that that is the wrong question. To be clear, Plaintiffs firmly believe that a feeding device *is* a "thing that a man … takes into his hands" and "use[s] … to cast at or strike another," *Heller*, 554 U.S. at 581, and thus is itself an "Arm" as

the Supreme Court has defined that term. After all, a bullet will not fire unless a magazine has fed it into the chamber. *See ANJRPC*, 183 F.4th at 247; *Hanson v. District of Columbia*, 120 F.4th 223, 232 (D.C. Cir. 2024) (per curiam); *see also* Magazine, *The American Heritage Dictionary of The English Language*, perma.cc/CL4D-XJJD (last visited Sept. 16, 2026) (SUMF¶21, Ex.3) ("A compartment in some types of firearms, often a small detachable box, in which cartridges are held to be fed into the firing chamber."). But what matters at "*Bruen*'s first step," *Wolford*, 146 S.Ct. at 2049, is whether the conduct in which the challengers wish to engage is covered by the plain text. And Plaintiffs do not wish to own magazines just so they can put them in drawers; Plaintiffs (like millions of other law-abiding citizens) wish to equip semiautomatic firearms with them so they may be ready "in case of confrontation." *See Bruen*, 597 U.S. at 33. The real question, then, is whether keeping and bearing a functional semiautomatic firearm is conduct that the Second Amendment's plain text covers. The question answers itself.

### B. There is No Historical Tradition Supporting HB6614's Ban on Common Arms.

Because HB6614 "regulates arms-bearing conduct," the state "bears the burden to 'justify its regulation.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *Bruen*, 597 U.S. at 24). That, in turn, requires Rhode Island to show that HB6614 is "consistent with th[is] Nation's historical tradition of firearm regulation." *United States v. Hemani*, 608 U.S. 772, 780 (2026) (quoting *Bruen*, 597 U.S. at 24). Defendants cannot carry that burden.

"Drawing from th[e] historical tradition" of laws that "prohibited the carrying of 'dangerous and unusual weapons,'" the Supreme Court held in *Heller* that the Second Amendment protects "weapons that are … 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). That was no stray dicta. While much of *Heller* focused on whether the Second Amendment protects an individual right or just a collective right, the ultimate question before the Court was whether the

District of Columbia's prohibition on possessing handguns was constitutional. The Court therefore "*ha*[*d*] to consider … *what* types of weapons" the Second Amendment protects. 554 U.S. at 624 (first emphasis added). And it concluded that "the sorts of weapons protected [a]re those 'in common use at the time'" "for lawful purposes like self-defense." *Id.* at 624, 627.

To be sure, *Heller* did not need to decide precisely what marks the dividing line between arms that are "in common use" for lawful purposes and arms that are "not typically possessed by law-abiding citizens for lawful purposes," *id.* at 624-25, because D.C. had banned "an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose" "of self-defense," *id.* at 628-29. But the Court most certainly did have to identify the constitutional rule that governs arms bans. And the rule it identified is that the government may not ban arms that are "'in common use at the time' for lawful purposes like self-defense." *Id.* at 624.

Application of that rule is straightforward here, as the magazines HB6614 bans are by no stretch of the imagination "highly unusual in society at large," *id.* at 627. On the contrary, "millions of magazines are owned, often come factory standard with semi-automatic weapons, [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense." *ANJRPC*, 183 F.4th at 249. Indeed, "50.5% of gun owners, approximately 44.5 million adults, *currently* own magazines that hold more than 10 rounds." English, *supra*, at 30 (SUMF¶26, Ex.8); *see also, e.g.*, NSSF, *Detachable Magazine Report*, *supra* (SUMF¶26, Ex.7) (reporting that 56% of consumer detachable pistol magazines and 50% of consumer detachable rifle magazines have a capacity of over 10 rounds); NSSF, *Consumer Report*, *supra*, at 31 (SUMF¶26, Ex.5) (reporting that 69% of detachable rifle magazines have a capacity of 20 or 30 rounds). Simply put: "There may well be some capacity above which magazines are not in common use," but "that

capacity surely is not ten." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011); *accord Hanson*, 120 F.4th at 233-34 (10-plus-round magazines are in "wide circulation").

What is more, the most common reasons cited for owning the magazines HB6614 proscribes are self-defense (88% of owners), target shooting (64.6%), hunting (47.2%), prevention of animal attacks (32.4%), and competitive shooting sports (24.8%). *See* English, *supra*, at 31 (SUMF¶27, Ex.8). And *contra* 646 F.Supp.3d at 389; 95 F.4th at 45, there are numerous real-life (and publicly reported) instances in which civilians unfortunately needed more than 10 rounds to repel assailants. *See, e.g.*, Crime Prevention Rsch. Ctr., *Ten Cases Over The Last Few Years Where People Have Had To Fire Ten Or More Shots In Self Defense* (Oct. 22, 2020) (SUMF¶30, Ex.9) (providing inexhaustive list where "dozens" to "hundreds" of shots were fired in self-defense).[1]

That should be the end of the matter, as, again, our Nation's historical tradition is one of protecting the right of law-abiding citizens to keep and bear arms that are "in common use today" for lawful purposes. *Bruen*, 597 U.S. at 47; *ANJRPC*, 183 F.4th at 242-43. Indeed, semiautomatic

---

[1] *See also, e.g.*, G. Halek, *Houston Concealed Carriers Unload on Armed Muggers—Why We Travel in Packs*, Concealed Nation (Dec. 21, 2015), perma.cc/X33S-89KZ (SUMF¶30, Ex.10) (victim of attempted robbery emptied a 12-round magazine when shooting two assailants); Gus G. Sentementes & Julie Bykowicz, *Documents Detail Cross Keys Shooting*, Balt. Sun (Mar. 21, 2006), perma.cc/PC7R-289A (SUMF¶30, Ex.11) ("gas station owner" defended himself and his business with "9 mm Glock semiautomatic pistol" by firing "at his [three] assailants 16 times"); *Gun Shop Owner Shoots, Kills Man During Attempted Robbery*, WIS TV (Aug. 9, 2012), perma.cc/P6ZT-KHT7 (SUMF¶30, Ex.12) (dealer defended himself and his property with AR-15 by "empt[ying] a 30 round magazine before retreating … to get more ammunition"); *Jewelry Store Burglarized, Scene of Deadly 1994 Robbery Attempt*, nbc12.com (2012), perma.cc/B3NN-CDSL (SUMF¶30, Ex.13) (describing "hail of bullets from employees and owners of [a] store" used in defense of self and property); Glenn Puit, *DA: Fatal Shooting In Parking Lot Was "Clear Case of Self-Defense*," Las Vegas Review-Journal (May 4, 2020), perma.cc/S787-8KWA (SUMF¶30, Ex.14) (describing altercation where victim "fired 11 times" in self-defense); Jacob Sullum, *The Threat Posed by Gun Magazine Limits*, Reason (Jan. 16, 2013), perma.cc/KQS2-HYS3 (SUMF¶30, Ex.15) (noting "there are various scenarios, including riots, home invasions, and public attacks by multiple aggressors, in which so-called large-capacity magazines can make a crucial difference," and highlighting the "shopkeepers in Koreatown" during the LA riots who had "'large-capacity' magazines to defend themselves and their property against rampaging mobs").

firearms capable of firing more than ten rounds without the need to reload have been around for over a century, yet no state (or Congress) restricted the manufacture, sale, or possession of magazines or other ammunition feeding devices—without which semiautomatic firearms cannot perform that function—*until the 1990s*. Kopel, *supra*, at 864-66. Our Nation's tradition is thus one of respecting law-abiding citizens' right to keep and bear these self-defense arms.

The First Circuit held otherwise in the preliminary-injunction appeal. That was mistaken—as subsequent Supreme Court decisions confirm. The First Circuit took the view that this Nation's historical tradition is one of deferring to state legislatures on whether certain arms are just too dangerous in the wrong hands to allow law-abiding citizens to keep them. According to the Court of Appeals, the common-use inquiry that the Supreme Court derived from historical tradition does not supply the correct tradition, because it boils down to a mere "popularity test." 95 F.4th at 50. The Court then went on to justify HB6614 by reference to modern bans on sawed-off shotguns and machineguns, nineteenth-century laws restricting the concealed carry of Bowie knives, and founding-era gunpowder storage laws. 95 F.4th at 45-49 & n.16.

*Wolford* and *Hemani* make clear that the First Circuit undertook its historical analysis "at too high a level of generality," *Wolford*, 146 S.Ct. at 2056 (Barrett, J., concurring) (rejecting state's efforts to do exactly that), and that the analogies the First Circuit drew do not suffice to justify HB6614's ban on common arms. Instead of examining how and why historical laws operated, the First Circuit extrapolated from a hodge-podge of demonstrably distinguishable laws exceedingly high-level abstractions, like the notion that states have traditionally "reacted" to "'surge[s] of homicides'" "by 'passing laws severely restricting access to certain dangerous weapons.'" 95 F.4th at 48. But as subsequent decisions have made clear, "[t]he gap between the State's … analogues and [the state's] rule is just too wide." *Wolford*, 146 S.Ct. at 2052.

Under *Wolford* and *Hemani*, the historical laws on which the First Circuit relied—which imposed restrictions on *how* people may carry arms, or restrictions on *un*common arms—are not analogous to laws that not only "broadly restrict arms" lawfully used "by the public generally," but take the extreme step of banning their possession outright. *Rahimi*, 602 U.S. at 698; *see also ANJRPC*, 183 F.4th at 244-45 (rejecting notion that Bowie knife regulations are analogous to so-called large-capacity magazine ban). Sawed-off shotguns and machineguns have never been commonly used by law-abiding citizens for lawful purposes; quite the contrary, the people instead commonly saw fit to ban machineguns almost as soon as they appeared roughly a century ago, and it has long been a crime to wield a sawed-off shotgun. *See Garland v. Cargill*, 602 U.S. 406, 430-32 (2024) (Sotomayor, J., dissenting). No comparable tradition developed for semiautomatic firearms capable of firing more than ten rounds without reloading—even though they have been around even longer. The eighteenth-century Bowie-knife regulations to which the First Circuit pointed are similarly inapt: Almost all of them either prohibited only concealed carry (or carry with intent to do harm) or simply provided heightened punishments for using one in the commission of a crime. *See* David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com (Nov. 20, 2022), perma.cc/T99Z-GAL5. As for gunpowder-storage laws, those "were purely fire prevention measures that affected firearm capacity only incidentally, if at all," and thus "are not 'relevantly similar'" to magazine bans." *Hanson*, 120 F.4th at 235; *ANJRPC*, 183 F.4th at 243.

That smorgasbord of distinguishable restrictions cannot suffice to supply a valid historical justification for HB6614 after *Wolford*, which instructs that courts "must" engage in a meaningful why-and-how analysis. 146 S.Ct. at 2053; *see also id.* at 2056 (Barrett, J., concurring) (rejecting state's efforts to conduct historical analysis "at too high a level of generality"). Nor does it comport with *Hemani*, which rejects resort to general public-safety interests that do not map on to the actual

how or why of either the historical or the challenged laws. *See* 146 S.Ct. at 1691-92. Indeed, laws the First Circuit invoked restricting the storage of gunpowder, use of trap guns, and concealed carry of Bowie knives, clubs, and slungshots self-evidently "operated in different ways" than Rhode Island's all-out ban on a host of rifles, shotguns, pistols, and magazines. *See id.* at 1687; *see also ANJRPC*, 183 F.4th at 244-46 (so holding). And the machinegun laws the First Circuit invoked just prove that the real historical tradition in this Nation is one of restricting access only to "dangerous and unusual" arms, not those commonly kept and carried for lawful purposes. *See Heller*, 554 U.S. at 627. Because Rhode Island's "contemporary law" does not in any way "mirror[] a well-established historical analogue in purpose and operation," *Hemani*, 608 U.S. at 780, it cannot pass muster.

Plaintiffs thus respectfully submit that the First Circuit's earlier decision in this case is inconsistent with Supreme Court precedent, and that this Court need not and should not follow it. That decision came at the preliminary-injunction stage, and "conclusions of law made at the "preliminary injunction" stage "are not binding" at "final judgment." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Indeed, Rhode Island explicitly told the Supreme Court in opposing Plaintiffs' certiorari petition that the First Circuit's decision on appeal in this case was not the final word on this issue for that very reason. *See* Brief in Opp. at 17-19, *Ocean State Tactical, LLC v. Rhode Island*, No. 24-131 (U.S. Nov. 5, 2024). All that said, Plaintiffs recognize that the First Circuit has recently indicated that its preliminary views are indeed its final word, and therefore binding on this Court. *See Capen v. Campbell*, 134 F.4th 660, 676-77 (1st Cir. 2025) (holding that the First Circuit's preliminary-injunction-appeal opinion in this case "controls the outcome of [the plaintiffs'] [magazine]-related challenge … [u]nder the law-of-the-circuit doctrine"); *Recchia v.*

*Campbell*, 183 F.4th 1, 5-6 (1st Cir. 2026) (holding that neither *Hemani* nor *Wolford* undermines *Capen* or *OST*).

**II. HB6614 Violates The Takings Clause.**

HB6614 also violates the Takings Clause, U.S. Const. amend. V. *See Chi., Burlington & Quincy R.R. Co. v. City of Chicago*, 166 U.S. 226 (1897) (applying Clause to the states). A physical taking occurs whenever the government "dispossess[es] the owner" of her lawfully acquired property. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 n.19 (2002); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). That is true of personal property no less than real property; the Constitution's "categorical duty to pay just compensation" applies "when [the state] takes your car, just as when it takes your home," *Horne v. Dep't of Agric.*, 576 U.S. 351, 358 (2015), and it applies equally even when the state-authorized "inva[sion]" is only partial, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). HB6614 runs afoul of those settled principles, as it forces citizens to dispossess themselves of their lawfully acquired property without any compensation from the state.

HB6614 requires owners to: permanently alter their feeding devices to hold no more than ten rounds; surrender them to the police; transfer or sell them to a third party in another state who may lawfully possess them. R.I. Gen. Laws §11-47.1-3(b)(1). There is no question that the second and third options require physical dispossession: The owner must hand the property over to someone else. That is literally the definition of a taking. *See* Taking, *Black's Law Dictionary* (12th ed. 2024) ("taking" includes "transfer of possession").

The remaining "option"—to permanently alter their magazines to accept fewer than ten rounds—does not change the equation. That is obviously true with respect to the subset of magazines "that cannot be modified." 646 F.Supp.3d at 391. Dispossession is the only option for that property. But even as to magazines that *can* be "[p]ermanently modifie[d]," R.I. Gen. Laws

§11-47.1-3(b)(1)(i), the shrink-or-surrender "option" does not eliminate the taking. It made no difference in *Horne* that the raisin growers could have avoided the taking by "plant[ing] different crops" or selling "their raisin-variety grapes as table grapes or for use in juice or wine." 576 U.S. at 365. Likewise, in *Loretto*, it made no difference that the property owner could have avoided the taking by converting her building into something other than an apartment complex. 458 U.S. at 439 n.17. And in *Kelo v. City of New London*, it made no difference that the law there allowed Kelo to sell her property to a "private nonprofit entity." 545 U.S. 469, 473-75 (2005). This case is no different. Indeed, even Defendants referred to HB6614 as a "complete possessory ban" in their briefing when this case was before the First Circuit. Resp.Br.52, *OST v. Rhode Island*, No. 23-1072 (1st Cir. filed June 21, 2023).

To be sure, the First Circuit rejected Plaintiffs' Takings Clause claim as unlikely to succeed on the merits. 95 F.4th at 52-53. But, again, "conclusions of law made" at the "preliminary injunction" stage "are not binding" at "final judgment." *Camenisch*, 451 U.S. at 395. And Plaintiffs respectfully submit that the reasoning underlying that decision is faulty. The First Circuit wrongly reasoned that a complete deprivation of possession is just a "use" restriction and thus a regulatory taking, *see Andrus v. Allard*, 444 U.S. 51, 66 (1979); *accord Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 136 (1978), and wrongly reasoned that a law enacted pursuant to a state's police powers is immune from Takings Clause scrutiny, *see Loretto*, 458 U.S. at 425-26; *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1020-27 (1992); *Chi., Burlington & Quincy Ry. Co. v. Illinois ex rel. Grimwood*, 200 U.S. 561, 593 (1906). That said, the First Circuit gave no indication that its reasoning could be altered by any additional fact-finding or legal analysis. *See* 95 F.4th at 52-53. So, while Plaintiffs respectfully submit that this Court should rule in their favor, Plaintiffs cannot point to any changes in fact or law since the First Circuit issued its prior decision.

### III. HB6614 Violates The Due Process Clause.

HB6614 violates due process for largely the same reasons that it effects a taking without just compensation. Retroactively prohibiting the possession of lawfully acquired (and constitutionally protected) property from law-abiding citizens who have used that property without public harm for decades does not substantially advance any "legitimate governmental objective." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 542 (2005). Accordingly, the state's effort to "change the legal consequences of transactions long closed," *E. Enters. v. Apfel*, 524 U.S. 498, 548 (1998) (Kennedy, J., concurring in the judgment and dissenting in part), cannot "meet the test of due process," *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976), which requires "heightened scrutiny," *Kelo*, 545 U.S. at 493 (Kennedy, J., concurring).

Separately, HB6614 violates due process because it is impermissibly vague. HB6614 exempts from liability the possession of an ammunition feeding device that *was* capable of holding more than ten rounds if, after the 180-day grace period (which has long since passed), the device has been "[p]ermanently modifie[d] … such that it cannot hold more than ten (10) rounds of ammunition.'" R.I. Gen. Laws §11-47.1-3(b)(1)(i). But it does not define what it means by *either* "[p]ermanent[] modifi[cation]" *or* "ammunition," leaving individuals wishing to comply without sufficient direction, and leaving law enforcement with a vast degree of discretion.

For example, it is anyone's guess whether a feeding device that had already been modified so that it cannot accept more than ten rounds of standard ammunition remains contraband because 11 smaller rounds still fit. It is likewise anyone's guess whether "permanent modification" means that a magazine has to have been rendered unable to be restored to full capacity by a master gunsmith using the facilities of a fully equipped machine shop, or whether it will suffice that "the person in possession" cannot restore it to its initial capacity. *See Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 537 (1998) (holding "unconstitutionally vague" a municipal ordinance

that banned "assault weapons" and defined that term in part to mean "any firearm which may be restored to an operable assault weapon as defined in [other provisions]," because "the phrase 'may be restored' fails to provide sufficient guidance to a person of average intelligence as to what is prohibited"). And while the First Circuit highlighted at the preliminary injunction stage—via its own "Google search"—that some gun owners have "'permanently' modif[ied]" their magazines and posted "instructional videos," 95 F.4th at 54 & n.21, there is no indication in HB6614 (or from Defendants elsewhere) that such modifications are in fact "permanent" under HB6614. *See also id.* ("Google is hardly a legal test"). Put simply, HB6614 "is a trap for the unwary." *Peoples Rights Org.*, 152 F.3d at 536. It gives law enforcement vast discretion to prosecute ordinary citizens who have no reason to know they have done anything wrong, and for that reason alone it cannot stand. *See Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (most "important aspect of vagueness doctrine" is "the requirement that a legislature establish minimal guidelines to govern law enforcement").

As with Plaintiffs' Takings Clause claims, no new facts or precedent has intervened since this Court and the First Circuit rejected Plaintiffs' due process arguments, *see* 646 F.Supp.3d at 398-99; 95 F.4th at 53-54. Plaintiffs accordingly appreciate that the prior decisions may well dictate the outcome here. But Plaintiffs respectfully submit that those prior decisions are mistaken.

## CONCLUSION

For the foregoing reasons, and to the extent the Court does not deem itself bound to rule otherwise, the Court should grant Plaintiffs' motion for summary judgment on all claims.

Respectfully submitted,

s/ Michael A. Kelly
Michael A. Kelly, Esq. (#2116)
KSPR Law, P.C.
128 Dorrance Street, Suite 300
Providence, RI 02903
Tel: (401) 490-7334
Fax: (401) 490-7874
mkelly@ksprlaw.com

Matthew D. Rowen (admitted *pro hac vice*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

*Counsel for Plaintiffs*

September 21, 2026

**CERTIFICATION**

I, the undersigned, hereby certify that I filed the within document via the ECF filing system and that a copy is available for viewing and downloading. I have also caused a copy to be sent via the ECF System to counsel of record on this 21st day of September 2026.

s/ Michael A. Kelly
Michael A. Kelly, Esq. (#2116)